**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
04/04/2019

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| VANGUARD NATURAL RESOURCES, INC., *et al.*,[1] | ) Case No. 19-31786 (DRJ) |
|  | ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) **Re: Docket No. 26** |

**INTERIM ORDER
(I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING PURSUANT
TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE USE OF CASH COLLATERAL
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE,
(III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
FIRST LIEN SECURED PARTIES AND THE PREPETITION SECOND LIEN
SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363, AND 364 OF THE
BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS,
(V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion, dated April 1, 2019 (the "**DIP Motion**"), of the DIP Borrower

(as defined below), and the other debtors and debtors-in-possession (collectively,

the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), seeking entry of an

interim order (this "**Interim Order**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2),

364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 507, and 552 of chapter 11 of title 11 of the

United States Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014

of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1,

4001-1(b), 4002-1(i), and 9013-1 of the Local Rules of the United States Bankruptcy Court for

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Vanguard Natural Resources, Inc. (1494); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Escambia Asset Co. LLC (3869); Escambia Operating Co.

the Southern District of Texas and the Texas Complex Chapter 11 Case Procedures (together, the "**Local Rules**"), that, among other things:

(i)        authorizes Vanguard Natural Gas, LLC, a Kentucky limited liability company ("**VNG**") designated as the "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) (the "**DIP Borrower**") to obtain, and Vanguard Natural Resources, Inc., a Delaware corporation ("**Parent**") and the other guarantors under the DIP Loan Documents (as defined below) (collectively, the "**DIP Guarantors**") to unconditionally guaranty, jointly and severally, the DIP Borrower's obligations in respect of, senior secured priming and superpriority postpetition financing, which if approved on a final basis would consist of a revolving credit facility for up to $65,000,000 (the "**DIP Revolver Facility**"), including a letter of credit sub-facility for up to $5,000,000, which, for the avoidance of doubt, shall reduce availability under the DIP Revolver Facility on a dollar-for-dollar basis (the "**DIP LC Sub-Facility**"), and together with the DIP Revolver Facility, and the Roll Up (as defined below), collectively, the "**DIP Facility**", and the loans extended under the DIP Facility, including the Roll Up DIP Loans (as defined below) (the "**DIP Loans**"), pursuant to the terms of (x) this Interim Order, (y) that certain Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "**DIP Credit Agreement**"),[2] by and among the DIP Borrower, Citibank, N.A., as administrative agent and collateral agent (in such capacity, and as administrative agent and collateral agent under the Roll Up, collectively, the "**DIP Agent**"), and other financial institutions as such may become from time to time party to the DIP Credit Agreement as "Lenders" under, and as defined in, the

---

LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); and VNR Holdings, LLC (6371).  The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

DIP Credit Agreement (the "**DIP Revolving Lenders**," and together with the Roll Up DIP Lenders (as defined below), collectively, the "**DIP Lenders**," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "**DIP Secured Parties**"), in substantially the form attached to the DIP Motion, and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (B) provide letters of credit for the account of any of the Debtors, (C) subject to entry of a Final Order (as defined below), convert to DIP Obligations under the DIP Loan Documents, as provided in such Final Order, $65,000,000 of the outstanding principal amount of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement (as defined below)) held by the DIP Revolving Lenders ratably in accordance with their respective shares of the DIP Revolver Facility (including the DIP LC Sub-Facility) (the "**Roll Up**", and the holders of such rolled up Prepetition First Lien Obligations, the "**Roll Up DIP Lenders**", and the administrative agent and collateral agent for the Roll Up DIP Lenders, the "**Roll Up DIP Agent**", and together with the Roll Up DIP Lenders, collectively, the "**Roll Up DIP Secured Parties**"), and such converted Prepetition First Lien Obligations, the "**Roll Up DIP Loans**"), (D) pay certain transaction fees and other costs and expenses of administration of the Cases, and (E) pay fees and expenses (including reasonable attorneys' fees and expenses) and interest and other payments owed to the DIP Secured Parties under the DIP Loan Documents and this Interim Order;

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such

---

[2]    Unless otherwise specified herein, all capitalized terms used herein without definition shall have the

other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

(iii)      subject to the Carve Out, grants (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens (as defined in the DIP Credit Agreement) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) and the Adequate Protection Liens (as defined below), and shall be junior solely to any valid, enforceable, and non-avoidable Liens (including Excepted Liens (under and as defined in the DIP Credit Agreement)) that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens and the Prepetition Second Liens (each as defined below) to the extent provided under and after giving effect to any intercreditor or subordination agreement (all such Liens, collectively, the "**Prepetition Prior Liens**") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of this Interim Order, any Debtor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below);

(iv)      authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including Cash Collateral in which the

---

respective meanings given to such terms in the DIP Credit Agreement.  A copy of the DIP Credit Agreement is attached hereto as <u>Schedule 1</u>.

[3]      As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

DIP Secured Parties and/or the Prepetition First Lien Secured Parties (as defined below) have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)    vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vi)    authorizes the DIP Borrower at any time prior to the earlier of May 5, 2019, and the entry of the Final Order to borrow in a single draw under the DIP Facility in an aggregate outstanding principal amount that, when taken together with the aggregate face amount of letters of credit outstanding under the DIP LC Sub-Facility, will not exceed $20,000,000 (*provided* that such draw limitations shall not apply subsequent to entry of the Final Order), and authorizes the DIP Guarantors to unconditionally guaranty such obligations jointly and severally; *provided* that any amounts repaid under the DIP Revolver Facility may be reborrowed, subject to the terms of the DIP Loan Documents and this Interim Order;

(vii)    subject to the Carve Out, solely to the extent of any diminution in value of their collateral, grants (x) the Prepetition First Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition First Lien Adequate Protection (as defined below), which consists of, among other things, First Lien Adequate Protection Liens (as defined below), First Lien Adequate Protection Superpriority Claims (as defined below), and, subject to entry of the Final Order, the Roll Up, and (y) the Holders of Notes (each as defined in the Prepetition Second Lien Notes Indenture (as defined below)) (the "**Prepetition Second Lien Noteholders**"), the Prepetition Second Lien Trustee (as defined below), and any other parties to whom obligations may be owed under the Prepetition Second

Lien Note Documents (as defined below) (collectively, the "**Prepetition Second Lien Secured Parties**"), as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Second Lien Adequate Protection (as defined below);

(viii)   schedules a final hearing on the DIP Motion (the "**Final Hearing**"), at which, for the avoidance of doubt, the rights of all parties in interest are fully preserved to present arguments concerning the Final Order, to be held on April 30, 2019 at 10:00 a.m. (prevailing Central Time)  to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors[4] or this Court) acceptable to the DIP Secured Parties and the Prepetition First Lien Agent (as defined below) (the "**Final Order**");

(ix)   waives, solely upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(x)   provides that the DIP Secured Parties and the Prepetition First Lien Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply; and

(xi)   provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Roopesh Shah In Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the*

*Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* (the "<u>Shah Declaration</u>"), the *Declaration of Allison Firestone In Support of the Debtors'* <u>*Emergency*</u> *Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* (the "<u>Firestone Declaration</u>"), and the evidence submitted or proffered at the hearing on this Interim Order (the "**<u>Interim Hearing</u>**"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), 4001(d), and 9014, and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an Interim Hearing having been held and concluded on April 1, 2019; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the

---

[4]    Nothing herein permits a creditor to file any objection prohibited by the Intercreditor Agreement (as defined below).

DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.      **Petition Date**.   On March 31, 2019 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (this "**Court**").   The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No statutory committee of unsecured creditors (to the extent such committee is appointed, the "**Committee**"), trustee, or examiner has been appointed in the Cases.

B.      **Jurisdiction and Venue**.   This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.   Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Rules.

C.      **Notice**.   The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.   Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (a) the Office of the U.S. Trustee for the Southern District of Texas (the "**United States Trustee**"); (b) the holders of the

---

[5]      Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Agent and counsel thereto; (d) the Prepetition First Lien Agent and counsel thereto; (e) the Prepetition First Lien Lenders; (f) the Prepetition Second Lien Notes Trustee and counsel thereto; (g) the Prepetition Second Lien Noteholders; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c), and (d) and the Local Rules, and no other notice need be provided for entry of this Interim Order.

> D. **Debtors' Stipulations Regarding the DIP Facility**.  The Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (the "**Debtors' DIP Stipulations**") as follows:

>> (i) <u>Release of Claims</u>.  Upon entry of this Interim Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the DIP Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "**DIP Secured Party Releasees**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether

arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor-creditor relationship between any of the DIP Secured Parties, on the one hand, and any of the Debtors, on the other hand; *provided* that, nothing herein shall relieve the DIP Secured Party Releasees from fulfilling their obligations or commitments under the DIP Facility.

       E.       **Debtors' Stipulations Regarding the Prepetition First Lien Facility**. Subject only to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (Paragraphs E hereof shall be referred to herein collectively as the "**Debtors' First Lien Stipulations**") as follows:

       (i)       Prepetition First Lien Credit Facility.  Pursuant to that certain Fourth Amended and Restated Credit Agreement, dated as of August 1, 2017 (as amended, restated, or otherwise modified from time to time, the "**Prepetition First Lien Credit Agreement**," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition First Lien Loan Documents**"), among (a) Vanguard Natural Gas, LLC, a Kentucky limited liability company ("**VNG**"), as Borrower (as defined therein), (b) Parent, (c) the Lenders (as defined therein) from time to time party thereto (collectively, the "**Prepetition First Lien Lenders**"), and (d) Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Agent**" and, together with the Prepetition First Lien Lenders and any other party to which Prepetition First Lien Obligations are owed, the "**Prepetition First Lien Secured Parties**"), the Prepetition First Lien Secured Parties agreed to extend loans and other

financial accommodations to, and issue letters of credit for the account of, the Borrower (as defined in the Prepetition First Lien Credit Agreement) pursuant to the Prepetition First Lien Loan Documents.  All obligations of the Debtors arising under the Prepetition First Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition First Lien Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "**Prepetition First Lien Obligations**."

(ii)     Prepetition First Liens and Prepetition First Lien Collateral. Pursuant to the Security Instruments (as defined in the Prepetition First Lien Credit Agreement) (as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition First Lien Collateral Documents**"), by and among VNG, Parent, and their subsidiaries party thereto (collectively, the "**Grantors**") and the Prepetition First Lien Agent, each Grantor granted to the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing Lien (the "**Prepetition First Liens**") on substantially all of such Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition First Lien Credit Agreement granted or pledged by such Grantors pursuant to any Prepetition First Lien Collateral Document or any other Prepetition First Lien Loan Document shall collectively be referred to herein as the "**Prepetition First Lien Collateral**."  As of the Petition Date, (a) the Prepetition First Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject

to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below), and (C) the Prepetition Prior Liens, and (b) (I) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, (III) no portion of the Prepetition First Lien Obligations or any payments made to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of each Guarantor (as defined in the Prepetition First Lien Credit Agreement) under that certain Guaranty Agreement, the Security Instruments, and the other Prepetition First Lien Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition First Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii)     <u>Amounts Owed under Prepetition First Lien Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued, and other financial

accommodations made by the Prepetition First Lien Secured Parties, an aggregate principal amount of not less than $123,437,500 on account of the Term Loans (as defined in the Prepetition First Lien Credit Agreement) and not less than $677,717,700.12 on account of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement), *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents.

(iv)    Release of Claims.  Subject to Paragraph 6 below and entry of the Final Order, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition First Lien Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "**Prepetition First Lien Secured Party Releasees**") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition First Lien Obligations, the Prepetition First Liens, or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or

13

pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Obligations or any payments or other transfers made on account of the Prepetition First Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition First Lien Secured Party Releasees.

F.      Cash Collateral.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties and, to the extent the Prepetition Second Lien Trustee and the other Prepetition Second Lien Secured Parties have an allowed secured claim with respect to such cash, the Prepetition Second Lien Trustee and the other Prepetition Second Lien Secured Parties.

G.      Intercreditor Agreement.   That certain Amended and Restated Intercreditor Agreement, dated as of August 1, 2017, between Prepetition First Lien Agent and Delaware Trust Company, as collateral trustee, and acknowledged and agreed to by Parent, VNG, and the other Grantors (as defined therein) (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "**Intercreditor Agreement**"), sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Secured Parties and their respective Prepetition First Lien Obligations and Prepetition First Liens, on the one hand, and the Prepetition Second Lien Secured Parties and their respective Prepetition Second Lien Obligations (as defined below) and Second Liens (as defined

14

in the Intercreditor Agreement) (such second liens, the "**Prepetition Second Liens**"), on the other hand.  Pursuant to section 510 of the Bankruptcy Code, such Intercreditor Agreement and any other intercreditor agreement or subordination agreement between and/or among any of (i) the Prepetition First Lien Agent, (ii) Delaware Trust Company, as trustee and collateral trustee (the "**Prepetition Second Lien Trustee**") under that certain Amended and Restated Indenture, dated as of August 1, 2017, among Parent, as issuer, the Guarantors (as defined therein), and Prepetition Second Lien Trustee (as amended, restated, or otherwise modified from time to time, the "**Prepetition Second Lien Notes Indenture**" and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Second Lien Note Documents**"),[6] (iii) any Prepetition First Lien Secured Party, (iv) any Prepetition Second Lien Secured Party, (v) any Debtor or (vi) any affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture, or related document, (A) shall remain in full force and effect, (B) shall continue to govern the relative priorities, rights, and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (C) shall not be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, and for avoidance of doubt, any acts or omissions by any Prepetition Second Lien Secured Party in

---

[6]    All obligations of the Debtors arising under the Prepetition Second Lien Notes Indenture (including the "Obligations" as defined therein, whether or not arising under the Prepetition Second Lien Note Documents) or the other Prepetition Second Lien Note Documents shall collectively be referred to herein as the "**Prepetition Second Lien Obligations**."

connection with any chapter 11 plan of reorganization or liquidation in these Cases (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code), and any distributions on account of, or other treatment of, any Prepetition Second Lien Obligations pursuant to any such plan, shall remain subject to the Intercreditor Agreement (including its turnover provisions) or any other applicable intercreditor or subordination provisions; *provided*, *however* that the foregoing shall not prejudice the rights of any party to the Intercreditor Agreement to assert that taking any action or not taking any action is permitted by or prohibited by, as the case may be, the Intercreditor Agreement, and all parties' rights with respect to such assertions are reserved.

H.   **Findings Regarding the DIP Facility**.

(i)   <u>Need for Postpetition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to otherwise preserve the value of the Debtors' estates.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful reorganization and/or to otherwise preserve the enterprise value of the Debtors' estates.  Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

(ii)   <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The

16

Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facility (including, subject to entry of the Final Order, the Roll Up DIP Loans) on the terms set forth herein and in the DIP Loan Documents, (c) granting to the Prepetition First Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition First Lien Adequate Protection and, subject to entry of the Final Order, the conversion of certain Prepetition First Lien Obligations into the Roll Up, and (d) granting to the Prepetition Second Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein, including the Prepetition Second Lien Adequate Protection (all of the foregoing described in clauses (a), (b), (c), and (d) above, collectively, the "**DIP Protections**").

I.     **Interim Financing**.  During the Interim Period (as defined below), the DIP Secured Parties and, as applicable, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (together, the "**Prepetition Secured Parties**") are willing to provide financing to the Debtors and/or consent, or be deemed to consent, to the use of Cash Collateral by the Debtors, subject to (i) the entry of this Interim Order and (ii) the terms and conditions of the DIP Loan Documents.

J.    **Adequate Protection for Prepetition Secured Parties**.  The Prepetition Secured Parties have agreed, or are deemed to have agreed, to permit the Debtors' continued use of the Prepetition First Lien Collateral and the Second Lien Collateral (as defined in the Intercreditor Agreement) (the "**Prepetition Second Lien Collateral**"), including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Primed Liens pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition Secured Parties are entitled to the adequate protection as set forth herein, including, with respect to the Prepetition First Lien Secured Parties, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition First Lien Secured Parties.  The Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties consent to, are deemed to consent to, or if not either of the foregoing, the Court hereby approves the relief set forth herein over the absence of such consent or lack thereof, pursuant to the Prepetition First Lien Loan Documents, and, in any event, the prepetition Liens and security interests of such parties are adequately protected pursuant to the terms of this Interim Order.  Notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties' consent to the DIP Facility and to the priming of the Prepetition First Liens and the Prepetition Second Liens by the DIP Liens is expressly limited to the present DIP Facility

18

and the DIP Liens securing same and shall not be applicable to any other debtor-in-possession credit facility, even if it contains substantially the same economic terms as this DIP Facility.

K.        **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to (i) the Carve Out, in the case of the DIP Secured Parties, and (ii) the Carve Out and the DIP Liens, in the case of the Prepetition First Lien Secured Parties, each of the DIP Secured Parties and the Prepetition First Lien Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

L.        **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)        The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)        The terms and conditions of the DIP Facility (including, subject to the entry of the Final Order, the Roll Up) as set forth in the DIP Loan Documents and this Interim Order, and the fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, are fair, reasonable, and the best available under the circumstances, and the Debtors' agreement to the terms and conditions of the DIP Loan Documents and to the payment of such fees reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

(iii)        The DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arm's-length in, as applicable, negotiating, consenting to, and/or agreeing to, the DIP

Facility (including, subject to the entry of the Final Order, the Roll Up), the Debtors' use of the

DIP Collateral and the Prepetition First Lien Collateral (including Cash Collateral), the DIP Loan

Documents, and the DIP Protections (including the Prepetition First Lien Adequate Protection).

The DIP Obligations (including all advances that are made at any time to the Debtors under the

DIP Loan Documents and including, subject to entry of the Final Order, the Roll Up DIP Loans)

and the Debtors' use of the DIP Collateral and the Prepetition First Lien Collateral (including

Cash Collateral) shall be deemed to have been extended and/or consented to by the DIP Secured

Parties and the Prepetition First Lien Secured Parties for valid business purposes and uses and in

good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and

good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and

this Interim Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, the

Prepetition First Lien Adequate Protection, and the other DIP Protections shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this

Interim Order or any other order or any provision hereof or thereof is vacated, reversed,

amended, or modified on appeal or otherwise.

M.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors

have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2)

and 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the

Debtors' estates, their businesses and properties, and their ability to successfully reorganize or

otherwise preserve the enterprise value of the Debtors' estates will be immediately and

irreparably harmed.  Consummation of the DIP Facility and authorization of the use of Cash

Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the

best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of

the foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Agent, and the requisite Prepetition First Lien Secured Parties (on behalf of all of the Prepetition First Lien Secured Parties), and the DIP Agent (on behalf of all of the DIP Secured Parties), and the deemed consent of the Prepetition Second Lien Secured Parties pursuant to the terms of the Intercreditor Agreement, in each case, to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted**.  The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.   Any objections, reservations of rights, and/or other statements with respect to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.     **DIP Loan Documents and DIP Protections**.

(a)     <u>Approval of DIP Loan Documents</u>.   The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (as defined below) (including, subject to the entry of the Final Order, to convert to DIP Obligations under the DIP Loan Documents each DIP Revolving Lender's ratable share of $65,000,000 of the outstanding principal amount of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) (with each DIP Revolving Lender's ratable share based on the ratio of such DIP

Revolving Lender's share of the DIP Revolver Facility, including the DIP LC Sub-Facility)), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized and directed to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including all closing fees, administrative fees, commitment fees, and reasonable and documented attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect; *provided* that the payment of the fees and expenses of the Lender Professionals (as defined below) shall be subject to the provisions of Paragraph 20(b). Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid, and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms. Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)     DIP Obligations. For purposes of this Interim Order, the term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including all

"Obligations" as defined in the DIP Credit Agreement), and subject to the entry of the Final Order, the Roll Up DIP Obligations) and shall include the principal of, interest on, and fees, costs, expenses, premiums, and other charges owing in respect of, such amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise. Notwithstanding anything to the contrary herein, the relative rights and priorities of the DIP Secured Parties in respect of the DIP Collateral shall be as provided in this Interim Order (and, with respect to the Roll Up DIP Secured Parties, upon entry of the Final Order, in such Final Order) and the other DIP Loan Documents.

(c)     Authorization to Incur DIP Obligations and Use Cash Collateral. To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration Date (as defined below), in each case unless extended by written agreement of the DIP Agent and the Prepetition First Lien Agent (the period from the entry of this Interim Order through and including such earliest date, the "**Interim Period**"), the DIP Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow and obtain letters of credit under the DIP Facility; *provided* that (I) the aggregate outstanding amount for all such borrowings and letters of credit shall not exceed $20,000,000 under the DIP Facility; (II) any such borrowing shall be made in a single draw (*provided* that such draw limitations shall not apply subsequent to entry of the Final Order; *provided*, *further*, that any amounts repaid under the DIP Revolver Facility may be reborrowed, subject to the terms of the DIP Loan Documents and this Interim Order), and (III)

any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget (as defined below) and the Budget Covenants, subject to any applicable Permitted Variance, as defined and contained in Paragraph 2(f) below. Following the entry of the Final Order, the DIP Borrower's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Loan Documents. All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents. The Prepetition First Lien Secured Parties are directed to turn over promptly to the DIP Agent for application to the DIP Obligations (other than the Roll Up DIP Obligations) until Paid in Full (as defined below), and then to the Roll Up DIP Obligations until Paid in Full, all Cash Collateral received or held by them that had not been applied to the Prepetition First Lien Obligations prior to the Petition Date; *provided* that, subject to the Carve Out, the Prepetition First Lien Secured Parties are granted adequate protection in the form of the Prepetition First Lien Adequate Protection.

(d)     Roll Up.  Subject to the entry of the Final Order, each DIP Revolving Lender's ratable share of $65,000,000 of the outstanding principal amount of the Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) (with each DIP Revolving Lender's ratable share based on the ratio of such DIP Revolving Lender's share of the DIP Revolver Facility, including the DIP LC Sub-Facility) shall immediately, automatically, and irrevocably be deemed to have been converted into Roll Up DIP Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents. The conversion of the Roll Up DIP Obligations shall

24

be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the Roll Up DIP Lenders to fund amounts under the DIP Revolver Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition First Lien Obligations.  The Prepetition First Lien Lenders would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens and the DIP Agent and the DIP Revolving Lenders would not be willing to provide the DIP Revolver Facility or extend credit to the Debtors thereunder without the inclusion of the Roll Up within the DIP Facility.  The Final Order shall provide that the full amount of the Roll Up DIP Obligations will be required to be repaid in cash on the Maturity Date (as defined in the DIP Credit Agreement), except that the Roll Up DIP Agent and the holders of Roll Up DIP Obligations representing at least two-thirds in amount and more than one-half in number of all Roll Up DIP Obligations may elect to allow the Roll Up DIP Obligations to be treated in any other manner acceptable to them.  As used herein, the term "**Roll Up DIP Obligations**" shall mean the Roll Up DIP Loans and all interest accrued and accruing thereon and all other amounts owing by the respective Debtors in respect thereof.

(e)     Budget.  Attached hereto as Schedule 2 is a rolling 13-week cash flow budget (the "**Initial Approved Budget**") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the DIP Agent (including counsel and financial advisors therefor), the Prepetition First Lien Agent (including counsel and financial advisors therefor), and any other fees and expenses relating to the DIP Facility), (iii) the sum of weekly

unused availability under the DIP Facility plus unrestricted cash on hand (collectively, "**Aggregate Liquidity**"), and (iv) the weekly outstanding principal balance of the loans made and letters of credit issued under the DIP Facility (including the principal amount of the Roll Up from and after the entry of a Final Order). Commencing on April 3, 2019 (the "**Initial Reporting Date**") and continuing on the date of each four-week anniversary of such date occurring thereafter (*i.e.*, every four weeks) (each, a "**Subsequent Reporting Date**" and, each such Subsequent Reporting Date together with the Initial Reporting Date, a "**Reporting Date**"), the Debtors shall prepare and deliver simultaneously to the DIP Agent and the Prepetition First Lien Agent an updated "rolling" 13-week budget (a "**Proposed Supplemental Budget**"), which shall be in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders (as defined in the DIP Credit Agreement) and the Prepetition First Lien Agent, and which, once approved in writing by each of the DIP Agent, the Majority Lenders (as defined in the DIP Credit Agreement), and the Prepetition First Lien Agent in their respective sole discretion, shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget (as defined below), as applicable, then in effect (each such updated budget that has been approved in writing by each of the DIP Agent, the Majority Lenders (as defined in the DIP Credit Agreement), and the Prepetition First Lien Agent, a "**Supplemental Approved Budget**") without further notice, motion, or application to, order of, or hearing before, this Court; *provided* that the DIP Agent (on its own behalf and as directed by the Majority Lenders (as defined in the DIP Credit Agreement)) and the Prepetition First Lien Agent shall each have five (5) Business Days (as defined in the DIP Credit Agreement) to approve each Proposed Supplemental Budget (any such party that fails to timely provide the Debtors written notice of any objection to such Proposed Supplemental Budget shall be deemed to have approved such Proposed Supplemental

Budget); *provided further* that unless and until each of the DIP Agent (on its own behalf and as directed by the Majority Lenders (as defined in the DIP Credit Agreement)) and the Prepetition First Lien Agent have approved in writing (or be deemed to have approved as provided above) such Proposed Supplemental Budget or any other proposed modification to the Initial Approved Budget or any Supplemental Approved Budget, as applicable, then in effect, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Interim Order, and the DIP Secured Parties and the Prepetition First Lien Secured Parties shall, as applicable, have no obligation to fund under any such Proposed Supplemental Budget or otherwise fund any amounts not otherwise provided for in the Initial Approved Budget or Supplemental Approved Budget, as applicable, or permit the use of Cash Collateral with respect thereto, as applicable.  The Initial Approved Budget, as modified by all Supplemental Approved Budgets, shall constitute the "**Approved Budget**."   Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs, and expenses of the DIP Agent's advisors and the Prepetition First Lien Agent's advisors, respectively, shall be due, payable, and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(f)      Budget Covenants.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (and, in the case of the costs and expenses of the DIP Agent and the Prepetition First Lien Agent, in accordance with

27

the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the Permitted Variances set forth in this Paragraph 2(f), which shall be tested on (i) the first Wednesday (or, if such Wednesday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Wednesday or the immediately preceding Business Day, as applicable, a "**Testing Date**") and (ii) the third Wednesday (or, if such Wednesday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Wednesday or the immediately preceding Business Day, an "**Alternative Testing Date**" and, together with each Testing Date, a "**Variance Testing Date**") (in each case, testing as of the most recent Variance Testing Date for the immediately preceding four-week period then ended (each such period, a "**Testing Period**," and each such report, a "**Variance Report**")).   On or before 5:00 p.m. (prevailing Eastern Time) on each Variance Testing Date, the Debtors shall prepare and deliver simultaneously to the DIP Agent and the Prepetition First Lien Agent, a Variance Report, which shall be certified by a Financial Officer (as defined in the DIP Credit Agreement) of the Debtors, in form and substance reasonably satisfactory to the DIP Agent, the Majority Lenders, and the Prepetition First Lien Agent (as defined in the DIP Credit Agreement), setting forth on a line-item basis (i) the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance (separating out the amount of the Roll Up during the Interim Period) of the Debtors for the applicable Testing Period and the Aggregate Liquidity and outstanding letter of credit exposure as of the end of the applicable Testing Period, (ii) the variance in dollar amounts and percentage (whether positive or negative) of the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance for the applicable Testing Period, and the actual Aggregate Liquidity and outstanding letter of credit exposure as of the end of the applicable Testing Period, from those

28

budgeted amounts for, or as applicable, as of the end of, the corresponding period reflected in the Approved Budget, and (iii) all postpetition expenses of the Debtors that are accrued and unpaid as of the end of the applicable Testing Period.  As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Debtors shall not allow the aggregate disbursements made by the Debtors during such Testing Period (excluding disbursements in respect of professional fees incurred in the Cases by the Debtors during such Testing Period) to be greater than 115% of the aggregate disbursements for the Debtors set forth in the Approved Budget for such Testing Period (a "**Permitted Variance**").  Additional variances, if any, from any Approved Budget, and any proposed changes to any Approved Budget, shall be subject to the written consent of the DIP Agent, the Majority Lenders (as defined in the DIP Credit Agreement), and the Prepetition First Lien Agent (such consent not to be unreasonably conditioned, delayed, or withheld).  In addition to and without limiting the foregoing, no later than 5:00 p.m. (prevailing Eastern Time) on each Wednesday, commencing with the first such Wednesday to occur after the Interim Facility Effective Date (as defined in the DIP Credit Agreement), the Debtors shall deliver a report to the DIP Agent  and the Prepetition First Lien Agent showing actual receipts and disbursements through the prior week in the format of the Approved Budget and, promptly upon request of the DIP Agent or the Prepetition First Lien Agent, an explanation of any variance to the applicable Approved Budget.  The foregoing budget-related covenants are collectively referred to herein as the "**Budget Covenants**."

(g)     <u>Interest, Fees, Costs, Indemnities, and Expenses</u>.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.

The Debtors shall pay within two Business Days (as defined in the DIP Credit Agreement) all fees, costs, indemnities, expenses (including reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent), and other charges payable under the terms of the DIP Loan Documents.  All such fees, costs, indemnities, expenses, and disbursements, whether incurred, paid or required to be paid prepetition or postpetition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized, and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses, and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 20(b) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect and shall be payable without need to obtain further Court approval.

(h)     Use of DIP Facility and Proceeds of DIP Collateral.  The DIP Borrower shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order, the DIP Loan Documents, and the Budget (subject to any applicable Permitted Variance).  Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP Loans, or otherwise) on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except (i) with respect to the Prepetition First Lien Obligations, as set forth in this Interim Order and a Final Order; (ii) as provided in the orders entered by the Court in the Cases (other than this Interim Order) pursuant to motions and applications filed by the Debtors within ten (10) days after the Petition Date (the "**First Day Orders**"), which First Day Orders shall be in form and substance reasonably acceptable to the DIP Agent with respect to any provisions that

30

affect the rights or duties of the DIP Secured Parties or the Prepetition First Lien Secured Parties; *provided* that the Cash Management Order (as defined below) shall be in form and substance acceptable to the DIP Agent in its sole discretion; (iii) as expressly provided in other motions, orders, and requests for relief, each in form and substance reasonably acceptable to the DIP Secured Parties and the Prepetition First Lien Agent prior to such motion, order, or request for such relief being filed; or (iv) as otherwise expressly provided in the DIP Credit Agreement, without giving effect to any amendment or waiver thereof to which the Prepetition First Lien Agent has not consented in writing.

(i)     <u>Conditions Precedent</u>.  The DIP Secured Parties and Prepetition First Lien Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral or Prepetition First Lien Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit and/or use of DIP Collateral, Prepetition First Lien Collateral, or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived in writing by the DIP Secured Parties and the Prepetition First Lien Agent in accordance with the DIP Loan Documents or Prepetition First Lien Credit Agreement, as applicable, and this Interim Order.

(j)     <u>DIP Liens</u>.  Subject to the Carve Out, as security for the DIP Obligations, effective as of the Petition Date, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtors to the DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens granted to the DIP Agent for the benefit of all the DIP Secured

Parties pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**"), on all property of the Debtors, now existing or hereinafter acquired, including all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable (including those owed to the Debtors generated by intercompany transactions), other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of domestic and foreign subsidiaries and in other entities, tax and other refunds, insurance proceeds, claims (including commercial tort claims), causes of action (including, upon entry of the Final Order, the proceeds of Avoidance Actions), and products, offspring, profits, and proceeds relating thereto, rights under section 549 of the Bankruptcy Code (whether received by judgment, settlement, or otherwise), all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located; *provided* that the Avoidance Actions themselves shall not be DIP Collateral; *provided*, *further*, that the DIP Liens on the proceeds of Avoidance Actions shall be subject to the entry of the Final Order; *provided*, *further*, that the DIP Collateral shall not include any lease or other real property right of any

32

Debtor solely to the extent such lease or other real property right is not an Oil and Gas Property (as defined in the DIP Credit Agreement) and/or is not an oil and gas interest and the granting of any Liens thereto or thereon would constitute: (a) an abandonment, invalidation, or unenforceability of any material right of ownership or title of any Debtor therein, or (b) a material breach or termination pursuant to the terms of, or a material default under, any such lease or document governing any other real property right pursuant to any provision thereof, unless in the case of each of the foregoing clauses (a) and (b), the applicable provision is rendered ineffective by applicable nonbankruptcy law or the Bankruptcy Code (all of the foregoing collateral collectively, the "**DIP Collateral**"):

> (A)    pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on and security interest in all DIP Collateral that is not otherwise subject to a valid, perfected, and enforceable security interest or Lien in existence as of the Petition Date or a valid Lien perfected (but not granted) after the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under the Bankruptcy Code), including, subject to the entry of the Final Order, the proceeds of Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions", which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

> (B)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable Lien on and security interest in all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve Out; and

> (C)    subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority, senior priming Lien on and security interest in all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the Adequate Protection Liens and senior and priming to (A) the Prepetition First Liens and (B) any Liens that are junior to the Prepetition First Liens or the First Lien Adequate Protection Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the

"**Primed Liens**") and shall be junior only to the Prepetition Prior Liens and the Carve Out.

(k)     DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens, and to the extent provided in this Interim Order and the DIP Loan Documents, shall also be subject to the Carve Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity (including the Primed Liens and the Adequate Protection Liens), whether created voluntarily or involuntarily (including by order of a court).

(l)     Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto (including any trustee or other estate representative in any Successor Case (as defined below), and their creditors and other parties-in-interest, in accordance with their terms.  Subject to the provisions of Paragraph 2(d) hereof with respect to the Roll Up DIP Obligations, no obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other

34

challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)    Superpriority Administrative Claim Status.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, (i) all of the DIP Obligations and (ii) the Swap Obligations (as defined in the DIP Credit Agreement) owing to any DIP Lender or its Affiliate (as defined in the DIP Credit Agreement) under any Swap Agreement (as defined in the DIP Credit Agreement) shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve Out in accordance with this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the First Lien Adequate Protection Superpriority Claims (as defined below) and the Second Lien Adequate Protection Superpriority Claims (as defined below)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject

35

to the entry of the Final Order, the proceeds of Avoidance Actions.  Other than as expressly provided in the DIP Credit Agreement and/or this Interim Order with respect to the Carve Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or this Interim Order.  The DIP Superpriority Claims granted, subject to entry of the Final Order, to the Roll Up DIP Secured Parties shall be immediately junior in priority and subject to the DIP Superpriority Claims of the other DIP Secured Parties.

(n)     Priority of DIP Liens and DIP Superpriority Claims.  The DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases, and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order.

36

3.      **Adequate Protection for Prepetition First Lien Secured Parties**.     In consideration for the use of the Prepetition First Lien Collateral (including Cash Collateral) and the priming of the Prepetition First Liens, the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, shall receive the following adequate protection (collectively, the "**Prepetition First Lien Adequate Protection**"):

(a)      First Lien Adequate Protection Liens.   Subject to the Carve Out, to the extent there is a diminution in value of the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("**Diminution in Prepetition First Lien Collateral Value**"), the Prepetition First Lien Agent, for the benefit of all the Prepetition First Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**First Lien Adequate Protection Liens**"), which First Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition First Liens, and the Carve Out; *provided*, *however*, that the definition of "diminution in value" as used in this paragraph 3(a) shall be subject to, and not exceed that which is protected pursuant to, applicable law and the Bankruptcy Code, including, but not limited to, section 361 of the Bankruptcy Code.

(b)     First Lien Adequate Protection Superpriority Claims.     Subject and subordinate to the Carve Out, to the extent of Diminution in Prepetition First Lien Collateral Value, the Prepetition First Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**First Lien Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Carve Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); *provided* that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations) have been Paid in Full.  Subject to the relative priorities set forth above, the First Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "**Paid in Full**," "**Repaid in Full**," "**Repay in Full**," "**Pay in Full**," and "**Payment in Full**" shall mean, with respect to any referenced DIP Obligations and/or Prepetition First Lien Obligations, (i) the indefeasible payment in full in cash of such obligations,

(ii) the termination or cash collateralization, in accordance with the DIP Loan Documents or Prepetition First Lien Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all credit commitments under the DIP Loan Documents and/or Prepetition First Lien Loan Documents, as applicable; *provided* that the First Lien Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Payment in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.

(c)     Priority of First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims.  The First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (iii) shall be valid, binding, perfected, and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order.

(d)    <u>Professional Fees of Prepetition First Lien Agent</u>.  As further adequate protection, and without limiting any rights of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition First Lien Secured Parties (or with respect to the Prepetition First Lien Secured Parties that have neither consented nor objected) to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition First Lien Agent for any and all fees, costs, expenses, and charges (including the reasonable and documented fees, costs, and expenses of one primary counsel, one local counsel, and the financial advisor for the Prepetition First Lien Agent) to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, including any unpaid fees, costs, and expenses accrued prior to or after the Petition Date within five (5) Business Days after the presentment of any such invoices to the Debtors.

(e)    <u>Professional Fees of Prepetition First Lien Secured Parties Other Than Prepetition First Lien Agent</u>.  Additionally, the Debtors shall pay, within five (5) Business Days after receipt of an Ad Hoc First Lien Invoice (as defined herein), the reasonable and documented fees, costs, and expenses of (i) Brown Rudnick, as counsel to that certain group of Prepetition First Lien Lenders not otherwise represented by the advisors representing the Prepetition First Lien Agent (the "**Ad Hoc First Lien Group**") and (ii) one local counsel, if any, to the Ad Hoc First Lien Group ((i) and (ii) collectively, the "**Ad Hoc First Lien Fee Parties**"), in each case solely to the extent incurred during the period between April 1, 2019 and through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration Date and in an aggregate amount not to exceed $250,000 (such aggregate amount of the Ad Hoc First

Lien Fee Parties, the "**Additional First Lien Fees**"); *provided* that (x) the Ad Hoc First Lien Fee Parties shall, as a condition to receiving payment, (1) provide reasonably detailed invoices (redacted to protect privileged, confidential, or proprietary information) to the Debtors with copies to be shared contemporaneously with the Committee and the United States Trustee (the "**First Lien Invoices**"), and (2) file a verified statement in accordance with Bankruptcy Rule 2019; (y) the Ad Hoc First Lien Fee Parties shall not be required to comply with the U.S. Trustee fee guidelines or file any fee applications with the Court; and (z) nothing in this Interim Order prejudices the rights of the Ad Hoc First Lien Group, the Ad Hoc First Lien Fee Parties, the Debtors, the Prepetition First Lien Agent, or any other party with respect to the Final Order.

(f)     The Debtors shall deliver to the Prepetition First Lien Agent all information, reports, documents, and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(g)     Notwithstanding the Payment in Full of the DIP Obligations and the termination of the DIP Loan Documents, the covenants set forth in the DIP Loan Documents and any order of this Court relating thereto shall continue in full force and effect for the benefit of the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties, and may be enforced by the Prepetition First Lien Agent.  Unless otherwise expressly set forth herein or in the DIP Loan Documents, any consent or approval rights or similar rights granted or referenced in this Interim Order or in the DIP Loan Documents in favor of any or all of the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agent, and the other Prepetition First Lien Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(h)     <u>Consent to Priming and Adequate Protection</u>.  The Prepetition First Lien Agent, on behalf of the Prepetition First Lien Secured Parties that have consented or have been

deemed to consent, consents to the Prepetition First Lien Adequate Protection and the priming provided for herein; *provided* that certain of the Prepetition First Lien Secured Parties have not consented but the Court hereby approves the relief requested set forth herein over the absence of such consent; *provided*, *further* that such consent of the Prepetition First Lien Agent to the priming of the Prepetition First Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order (and, after the Interim Period, upon entry of the Final Order), and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; *provided*, *further*, that such consent shall be of no force and effect in the event (i) this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition First Lien Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved or (ii) after the Interim Period, the Final Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition First Lien Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(i)      <u>Right to Seek Additional Adequate Protection</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition First Lien Secured Parties.  However, the Prepetition First Lien Agent, on behalf of the Prepetition First Lien Secured Parties, or, separately, the Ad Hoc First Lien Group may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in

interest to the grant of any additional or alternative adequate protection (except as provided in the Intercreditor Agreement); *provided* that any such additional or alternative adequate protection shall at all times be subordinate and junior to the Carve Out and claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents; *provided*, *further*, that nothing in this paragraph shall authorize the Prepetition First Lien Agent or Prepetition First Lien Secured Parties to deny the Debtors access to Cash Collateral or DIP Loans in accordance with the Approved Budget, subject to any Permitted Variance, pursuant to the terms of this Interim Order during the pendency of such request for additional or alternative adequate protection.  The consent of the Prepetition First Lien Secured Parties to the priming of the Prepetition First Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition First Lien Secured Parties that their respective interests in the Prepetition First Lien Collateral are adequately protected pursuant to this Interim Order or otherwise.

4. **Adequate Protection for Prepetition Second Lien Secured Parties.**  In consideration for the use of the Prepetition Second Lien Collateral (including Cash Collateral) and the priming of the Prepetition Second Liens, the Prepetition Second Lien Trustee, for the benefit of the Prepetition Second Lien Secured Parties, shall receive, subject to the Carve Out, the following adequate protection (collectively, the "**Prepetition Second Lien Adequate Protection**" and, together with the Prepetition First Lien Adequate Protection, the "**Prepetition Adequate Protection**"):

(a) Second Lien Adequate Protection Liens.  Subject and subordinate to the Carve Out, to the extent there is a diminution in value of the interests of the Prepetition Second

Lien Secured Parties in the Prepetition Second Lien Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Second Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the granting of the Prepetition First Lien Adequate Protection, the subordination of the Prepetition Second Liens thereto and to the Carve Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, the Prepetition Second Lien Trustee, for the benefit of all the Prepetition Second Lien Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**Second Lien Adequate Protection Liens**" and, together with the First Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), which Second Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition First Liens, the First Lien Adequate Protection Liens, and the Carve Out; *provided*, *however*, that the definition of "diminution in value" as used in this paragraph 4(a) shall be subject to, and not exceed that which is protected pursuant to, applicable law and the Bankruptcy Code, including, but not limited to, section 361 of the Bankruptcy Code.

(b)     <u>Priority of Second Lien Adequate Protection Liens</u>.  The Second Lien Adequate Protection Liens (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of

44

the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (iii) shall be valid, binding, perfected, and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases, and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order.

(j)     Second Lien Adequate Protection Superpriority Claims.   Subject and subordinate to the Carve Out, to the extent of Diminution in Prepetition Second Lien Collateral Value, the Prepetition Second Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "**Second Lien Adequate Protection Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 8), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Carve Out to the extent provided herein and in the DIP Loan Documents and the Prepetition First Lien Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); *provided* that the Prepetition Second Lien Secured Parties

45

shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations), Prepetition First Lien Obligations, and the First Lien Adequate Protection Superpriority Claims have been Paid in Full. Subject to the relative priorities set forth above, the Second Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis. The Second Lien Adequate Protection Superpriority Claims granted to the Prepetition Second Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Payment in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.

(c)      Consent to Priming and Adequate Protection.   The Prepetition Second Lien Trustee, on behalf of the Prepetition Second Lien Secured Parties, consents, or pursuant to the Intercreditor Agreement, is deemed to consent, to the Prepetition Second Lien Adequate Protection and the priming provided for herein; *provided* that such consent of the Prepetition Second Lien Trustee to the priming of the Prepetition Second Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order.

(d)      Professional Fees of Prepetition Second Lien Secured Parties. Additionally, the Debtors shall pay, within five (5) Business Days after receipt of an Ad Hoc Second Lien Invoice (as defined herein), the reasonable and documented fees, costs, and expenses of (i) Davis Polk & Wardwell LLP, as counsel to that certain group of Prepetition Second Lien Secured Parties (the "**Ad Hoc Second Lien Group**"); (ii) Miller Buckfire & Co., as

financial advisor to the Ad Hoc Second Lien Group; and (iii) Porter Hedges LLP, as local counsel of the Ad Hoc Second Lien Group ((i)-(iii), collectively, the "**Ad Hoc Second Lien Fee Parties**"), in each case solely to the extent incurred during the period between April 1, 2019 and through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration Date (such aggregate amount of the Ad Hoc Second Lien Fee Parties, the "**Additional Second Lien Fees**"); *provided* that (w) the Ad Hoc Second Lien Fee Parties shall, as a condition to receiving payment, (1) provide reasonably detailed invoices (redacted to protect privileged, confidential, or proprietary information) to the Debtors, sufficient to reasonably demonstrate that such Ad Hoc Second Lien Fees were incurred in connection with these Cases and not related to potential or actual litigation against or actions otherwise inconsistent with good faith negotiations with the Debtors and the Prepetition First Lien Agent regarding the terms of an Approved Plan of Reorganization with copies to be shared contemporaneously with the Committee and the United States Trustee (the "**Second Lien Invoices**"), and (2) file a verified statement in accordance with Bankruptcy Rule 2019; (x) the Ad Hoc Second Lien Fee Parties shall not be required to comply with the U.S. Trustee fee guidelines or file any fee applications with the Court; (y) the Ad Hoc Second Lien Fee Parties shall not be entitled to payment on account of any fees, costs, and expenses arising from or related to any act, whether taken or contemplated, that is inconsistent with the Intercreditor Agreement; and (z) nothing in this Interim Order prejudices the rights of the Ad Hoc Second Lien Group, the Ad Hoc Second Lien Fee Parties, the Debtors, the Prepetition First Lien Agent, or any other party with respect to the Final Order.

  5. **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens

and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the Prepetition First Lien Agent shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts, and commodities accounts within the meaning of such Uniform Commercial Code and other law), or (c) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition First Lien Agent (in the latter case, solely with respect to the First Lien Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Agent and/or the Prepetition First Lien Agent, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection, and priority of the DIP Liens and the First Lien Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent and the Prepetition First Lien Agent may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer

48

designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition First Lien Secured Parties in accordance with this Interim Order.  To the extent that the Prepetition First Lien Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan

49

Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition First Lien Secured Parties. The Prepetition First Lien Agent shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

6.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' DIP Stipulations shall be binding upon the Debtors, their estates, and each other party in interest, including the Committee, in all circumstances upon entry of this Interim Order. The Debtors' First Lien Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order. The Debtors' First Lien Stipulations shall be binding upon each party in interest (other than the Debtors), including the Committee and any chapter 11 trustee (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing[7] *first*, commences, by the earlier of (x) forty (40) calendar days after the Petition Date, (y) with respect to any Committee, thirty (30) calendar days after the formation of any Committee, but in no event later than sixty (60) calendar days after the Petition Date, and (z) the date of confirmation of a chapter 11 plan (such time period established by the earlier of clauses (x), (y), and (z), as the same may be extended in accordance with this Paragraph 6, shall be referred to as the "**Challenge Period**,"[8] and the date that is the next calendar day after the termination of the Challenge Period in the

---

[7]    For clarity, in the Final Order, the Court may limit the proof that would be required by the Committee to obtain standing.

event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**"), (A) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' First Lien Stipulations, or (B) a contested matter or adversary proceeding against any or all of the Prepetition First Lien Secured Parties in connection with or related to the Prepetition First Lien Obligations, or the actions or inactions of any of the Prepetition First Lien Secured Parties arising out of or related to the Prepetition First Lien Obligations, the Prepetition First Lien Loan Documents, including any claim against any or all of the Prepetition First Lien Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition First Lien Obligations (including those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (clauses (A) and (B) collectively, the "**Challenges**" and, each individually, a "**Challenge**"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**").  If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and

---

[8]   The Debtors and the parties who are protected by the Challenges must reasonably and promptly provide

for all purposes in these Cases and any Successor Cases (and after the dismissal of these Cases or any Successor Cases), (i) all payments made to or for the benefit of the Prepetition First Lien Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code (which claims and Liens shall have been deemed satisfied to the extent the Prepetition First Lien Obligations are converted into Roll Up DIP Obligations as provided herein), and (iv) the Debtors' First Lien Stipulations, including the release provisions therein, shall be binding on all parties in interest in these Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' First Lien Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' First Lien Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  The Challenge Period may be extended only with the written consent of the Prepetition First Lien Agent in its sole discretion or pursuant to a Court order for good cause shown.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on or authority to any party in interest, including any Committee, to pursue or bring any cause of action, including any Challenge, on

requested documents in discovery, including any pre-challenge investigation.

behalf of the Debtors or their Debtors' estates.  The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 6 or to require or permit an extension of the Challenge Period Termination Date.  For the avoidance of doubt, as to the Debtors, upon entry of this Interim Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' First Lien Stipulations shall be binding in all respects on the Debtors irrespective of the filing of any Challenge.

7.  **Carve Out**.

(a)  Carve Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed

Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); *provided* that within one business day of the occurrence of the Trigger Notice Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and

concluding on the Trigger Notice Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Trigger Notice Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person; *provided* that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to Paragraph 7(c) below.  Solely as it relates to the DIP Agent and the DIP Lenders, any deemed draw and borrowing pursuant to Paragraph 7(c)(i)(x) for amounts under Paragraph 7(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Trigger Notice Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Trigger Notice Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Trigger Notice Date (such amount, the "**DIP Professional Fee Carve Out Cap**").   For the avoidance of doubt, the DIP Agent shall be entitled to maintain at all times a reserve (the "**Carve Out Reserve**") in an amount (the "**Carve Out Reserve Amount**") equal to the sum of (i) the greater of (x) the

55

aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under Paragraph 7(a)(i) and 7(a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "**Budgeted Cushion Amount**").  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to the DIP Agent a report setting forth the Carve Out Reserve Amount as of such time, and, in setting the Carve Out Reserve, the DIP Agent shall be entitled to rely upon such reports in accordance with section 11.04 of the DIP Credit Agreement.  Prior to the delivery of the first report setting forth the Carve Out Reserve Amount, the DIP Agent shall calculate the Carve Out Reserve Amount by reference to the Approved Budget for subsection (i) of the Carve Out Reserve Amount.

(c)    Carve Out Trigger Notice Reserves.

(i)    On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "**Trigger Notice Date**"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Credit Facility (on a pro rata basis based on the then outstanding Commitments (as defined in the DIP Credit Agreement)), in an amount equal to the sum of (1) the amounts set forth in Paragraphs 7(a)(i) and 7(a)(ii) above, and (2) the lesser of (a) then unpaid amounts of the Allowed Professional Fees and (b) the DIP Professional Fee Carve

Out Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in Paragraphs 7(a)(i)–(iii) above.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.

(ii)    On the Trigger Notice Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for DIP Loans under the DIP Credit Facility (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Trigger Notice Reserves**") prior to any and all other claims.

(iii)   On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default (each as defined in the DIP Credit Agreement), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Credit Facility, any termination of the DIP Loan Commitment following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP

Credit Agreement), each DIP Lender (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Credit Facility; *provided* that in no event shall any DIP Secured Party be required to extend DIP Loans pursuant to a deemed draw and borrowing pursuant to Paragraphs 7(c)(i)(x) and 7(c)(ii)(x) in an aggregate amount exceeding the Carve Out Reserve Amount.

(iv)     All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the First Lien Lenders and Second Lien Noteholders in accordance with their rights and priorities as of the Petition Date, including as set forth in the Intercreditor Agreement.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the First Lien Lenders and Second Lien Noteholders in accordance with their rights and priorities as of the Petition Date, including as set forth in the Intercreditor Agreement.

(v)     Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Trigger Notice Reserves is not funded in full in the amounts set forth in this Paragraph 7, then, any excess funds in one of the Carve Out Trigger Notice Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Trigger Notice Reserve, up to the applicable amount set forth in this Paragraph 7(c), prior to making any payments to the DIP Agent or the First Lien Lenders and Second Lien Noteholders, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the First Lien Agent, and the Second Lien Trustee shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Trigger Notice Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Trigger Notice Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Trigger Notice Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Trigger Notice Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Trigger Notice Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Credit Facility, the First Lien Credit Agreement, or the Second Lien Indenture, the Carve Out shall be senior to all liens and claims securing the DIP Credit Facility, the

Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and the Second Lien Adequate Protection Superpriority Claims and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Prepetition First Lien Obligations, or the Prepetition Second Lien Obligations.

(d)   _Payment of Allowed Professional Fees Prior to Trigger Notice Date._   Any payment or reimbursement made prior to the occurrence of the Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.   Prior to the occurrence of the Trigger Notice Date, the Debtors shall be permitted to pay allowed fees and expenses of the Debtor Professionals and the Committee Professionals subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim compensation procedures order entered by this Court.

(e)   _No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees._   None of the DIP Secured Parties, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.   Nothing in this Interim Order or otherwise shall be construed to obligate any DIP Secured Party, any Prepetition First Lien Secured Party, or any Prepetition Second Lien Secured Party in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.   Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Cases or any Successor Cases, or of any person or entity, or shall affect the right of any DIP Secured Party or

any Prepetition First Lien Secured Party to object to the allowance and payment of any such fees and expenses.

(f)     Payment of Carve Out On or After the Trigger Notice Date.  Any payment or reimbursement made on or after the occurrence of the Trigger Notice Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

8.     **Waiver of 506(c) Claims**.  Subject to the entry of the Final Order, as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition First Lien Secured Parties to the payment of the Carve Out to the extent provided herein) and (ii) the Debtors' use of Cash Collateral pursuant to this Interim Order and a Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition First Lien Secured Parties, the Prepetition First Lien Collateral, the DIP Collateral, and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent, (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition First Lien Secured Parties or their Prepetition

First Liens on or other interests in any or all of the DIP Collateral, the Prepetition First Lien Collateral, and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition First Lien Collateral, and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties.

9.      **After-Acquired Property**.   Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable, and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

10.      **Protection of DIP Secured Parties' and Prepetition First Lien Secured Parties' Rights**.

(a)      Unless the requisite DIP Secured Parties under the DIP Loan Documents and the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents shall have provided their prior written consent or all DIP Obligations and Prepetition First Lien Obligations have been Paid in Full, there shall not be entered in any of these Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of

indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition First Lien Collateral and/or that is entitled to administrative priority status, other than the Carve Out, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the Prepetition Prior Liens, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and/or the other DIP Protections; (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the Prepetition First Lien Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order, (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (iv) any modification of any of the DIP Secured Parties' or the Prepetition First Lien Secured Parties' rights under this Interim Order, the DIP Loan Documents, or the Prepetition First Lien Loan Documents with respect to any DIP Obligations.

(b)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition First Lien Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Secured Parties or the Prepetition First Lien Secured Parties) to provide under the DIP Loan Documents, the Prepetition Loan Documents (in the absence of the pendency of these Cases), or the

provisions of this Interim Order, (iii) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition First Lien Agent reasonable access to any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents and/or the Prepetition First Lien Loan Documents, (iv) permit the DIP Agent and the Prepetition First Lien Agent and their respective consultants, advisors, and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets, and (v) upon reasonable advance notice, permit the DIP Agent and the Prepetition First Lien Agent to conduct, at their discretion and at the Debtors' cost and expense, reasonable field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition First Lien Collateral.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition First Lien Agent, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.  For avoidance of doubt, the Prepetition First Lien Agent shall have the same access and cooperation rights as the DIP Agent for purposes of this Paragraph 10(b).

11.     **Proceeds of Subsequent Financing**.   Without limiting the provisions and protections of the Carve Out and Paragraph 10 above, if at any time prior to the Payment in Full of all the DIP Obligations and the Prepetition First Lien Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full and then to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations until Paid in Full.

12.     **Cash Collection**.   From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition First Lien Collateral or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition First Lien Collateral (the "**Prepetition Collateral Accounts**") were deposited under the Prepetition First Lien Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "**Cash Collection Accounts**"), which accounts shall be subject to the sole dominion and control of the DIP Agent and, solely to the extent such funds are deposited into the Prepetition Collateral Accounts, the Prepetition First Lien Agent (and the funds in such accounts may be used by the Debtors to the extent provided in this Interim Order and the DIP Loan Documents).   Upon the

65

direction of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition

First Lien Agent, at any time after the occurrence of a Termination Event and subject to the

provisions of Paragraph 7 and Paragraph 15, all proceeds in the Cash Collection Accounts shall

be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full, and

then to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations

until Payment in Full, and the DIP Agent and the Prepetition First Lien Agent shall be entitled to

take all action that is necessary or appropriate to effectuate the foregoing.  Unless otherwise

agreed to in writing (email shall suffice) by the DIP Agent and the Prepetition First Lien Agent,

the Debtors shall maintain no accounts except those identified in any order (the "**Cash

Management Order**") approving the relief requested in the *Debtors' Emergency Motion for

Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their

Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform

Intercompany Transactions, and (II) Granting Related Relief* (the "**Cash Management

Motion**").  The Debtors and the financial institutions where the Debtors' Cash Collection

Accounts are maintained (including those accounts identified in any Cash Management Order)

are authorized and directed to remit, without offset or deduction, funds in such Cash Collection

Accounts upon receipt of any direction to that effect from the DIP Agent or, following Payment

in Full of the DIP Obligations, the Prepetition First Lien Agent.  The Debtors are authorized to

incur obligations and liabilities for treasury, depositary, or cash management services, including

overnight overdraft services, controlled disbursement, automated clearinghouse transactions,

return items, overdrafts, and interstate depository network services provided on a postpetition

basis by any financial institution at which any Cash Collection Account is maintained; *provided*,

*however*, that (i) any Lien securing any such obligations shall be junior to the DIP Lien on the

funds in the Cash Collection Accounts at such financial institution, and (ii) except to the extent otherwise required by this Court, nothing herein shall require any DIP Secured Party or Prepetition First Lien Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

(a)     <u>Cash Management</u>.  Notwithstanding anything to the contrary in the Cash Management Motion or the Cash Management Order, (i) the Debtors may only agree to and implement changes to the Cash Management System (as defined in the Cash Management Motion) and procedures related thereto with the written consent (email shall suffice) of the DIP Agent; *provided* that the Debtors shall be permitted to amend any signature card to denominate a Bank Account (as defined in the Cash Management Motion) to be a debtor-in-possession account at an approved depository; (ii) any authorization to continue the Virtual Card Program (as defined in the Cash Management Motion) and Credit Card Program (as defined in the Cash Management Motion) subject to the terms and conditions thereof, including the payment of any service fees incurred in connection therewith, and to pay any prepetition amounts related thereto, shall be subject to the terms of the DIP Credit Agreement and this Interim Order (including all Approved Budgets, subject to a Permitted Variance, as applicable), (iii) any authorization to grant and deliver cash collateral to the card issuer to secure all obligations arising from the Credit Card Program and to enter into appropriate collateral documentation in connection therewith shall be subject to the consent of the DIP Agent, (iv) any postpetition payment from a Debtor to another Debtor under any postpetition Intercompany Transaction (as defined in the Cash Management Motion) accorded administrative expense priority status under the Cash Management Order shall be (A) subject to the terms of the DIP Credit Agreement and this Interim Order (including all Approved Budgets, subject to a Permitted Variance, as applicable)

and (B) subject and junior to the Carve Out and the claims, including the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claims, granted in connection with the DIP Facility under this Interim Order, and (v) those certain deposit agreements existing between the Debtors and the Cash Management Banks (as defined in the Cash Management Motion) shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks and, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including, the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Cash Management Bank (including, for the avoidance of doubt, any rights of a Cash Management Bank to use funds from the Bank Accounts (as defined in the Cash Management Motion) to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors, with the consent of the DIP Agent, and such Cash Management Bank agree otherwise, and any other legal rights and remedies afforded to the Cash Management Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

13.     **Disposition of DIP Collateral; Credit Bid**.

(a)     Unless the DIP Obligations and the Prepetition First Lien Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition First Lien Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition First Lien Collateral (or enter into any binding agreement to do so) (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) without the prior written consent of the DIP Agent and, solely

68

with respect to the Prepetition First Lien Collateral, the Prepetition First Lien Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition First Lien Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Prepetition First Lien Loan Documents, as applicable, and this Interim Order.   Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any DIP Collateral (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) shall be remitted to the DIP Agent for application to the DIP Obligations and then to the Prepetition First Lien Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents or the Prepetition First Lien Loan Documents, as the case may be.   In addition, the Debtors are authorized and directed to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition First Lien Agent is a party without the need to enter into new blocked account agreements.

(b)    Subject to Paragraph 6 of this Interim Order and the Intercreditor Agreement, (i) the Prepetition First Lien Agent (or one or more of its designees, affiliates, or assignees) shall have the unqualified right to credit bid up to the full amount of any Prepetition First Lien Obligations in any sale of the Prepetition First Lien Collateral (or any DIP Collateral subject to any First Lien Adequate Protection Liens) under or pursuant to (A) section 363 of the Bankruptcy Code, (B) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment in Full of all of the DIP Obligations on the effective date of such plan, or (C) section 725 of the

Bankruptcy Code and (ii) the Prepetition Second Lien Agent (or one or more of its designees, affiliates, or assignees) shall have the unqualified right to credit bid up to the full amount of any Prepetition Second Lien Obligations in any sale of the Prepetition Second Lien Collateral (or any DIP Collateral subject to any Second Lien Adequate Protection Liens) under or pursuant to (A) section 363 of the Bankruptcy Code, (B) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated thereunder does not result in Payment in Full of all of the DIP Obligations on the effective date of such plan, or (iii) section 725 of the Bankruptcy Code; *provided*, *however*, that any credit bid by the Prepetition Second Lien Agent (on behalf of the Prepetition Second Lien Secured Parties) shall include a sufficient cash purchase price to Pay in Full the DIP Obligations and the Prepetition First Lien Obligations on the closing date of any such sale.  The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Prepetition First Lien Collateral (or any DIP Collateral subject to any First Lien Adequate Protection Liens) that does not include an unqualified right to credit bid up to the full amount of the Prepetition First Lien Obligations would mean that the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties will not receive the indubitable equivalent of their claims and interests.  The DIP Agent (or one or more of its designees, affiliates, or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  If the DIP Agent or the Prepetition First Lien Agent or their respective designees, affiliates, or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral or Prepetition First Lien Collateral, then for purposes of such auction or sale process or any

applicable order of this Court, the DIP Agent and/or Prepetition First Lien Agent shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

14.   **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition First Lien Agent (each, a "**Termination Event**"):

(a)   The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "**DIP Default Termination Event**"), including, for avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Secured Parties and the Prepetition First Lien Agent, on or before the date that is thirty-five (35) days following the Petition Date.

(b)   Any other breach, default, or other violation by any of the Debtors of the terms and provisions of this Interim Order.

(c)   The Debtors' failure to timely and strictly comply with any of the obligations and deadlines set forth in <u>Schedule 3</u> attached hereto.

15.   **Rights and Remedies Upon Termination Event**.

(a)   Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, subject to the Carve Out, to the extent necessary to permit the DIP Secured Parties to (i) exercise immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the DIP Loan Documents, and/or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral and with respect to the

Debtors' use of Cash Collateral in accordance with an Approved Budget during the five (5) Business Days after the Termination Declaration Date, each as provided in Paragraph 15(b) below), including the right to (A) declare all DIP Obligations to be immediately due and payable, (B) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (C) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and/or (ii) declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration under any of clauses 15(a)(i)(A), (B) or (C) or 15(a)(ii) shall be made to the respective lead counsel to the Debtors, the Committee, and the United States Trustee, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "**Termination Declaration Date**")).

(b)     In addition to the rights and remedies described above, five (5) Business Days following the Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral.  Solely during the five (5) Business Day period after a Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court for the sole purpose of contesting whether a Termination Event has

occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the Committee, or any other party in interest in an effort to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in this Interim Order or the DIP Loan Documents. During such five (5) Business Day period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the DIP Facility except in accordance with the Approved Budget.

        (c)      In the event that the DIP Obligations have been Paid in Full, any automatic stay otherwise applicable to the Prepetition First Lien Secured Parties is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the Prepetition First Lien Secured Parties to (i) exercise immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents, and/or applicable non-bankruptcy law (other than those rights and remedies against the Prepetition First Lien Collateral and the Debtors' use of Cash Collateral in accordance with an Approved Budget during the five (5) Business Days after the First Lien Termination Declaration Date, each as provided in Paragraph 15(d) below), including the right to (A) declare all Prepetition First Lien Obligations to be immediately due and payable, (B) declare the termination, reduction, or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, and/or (C) terminate the Prepetition First Lien Credit Agreement and any other Prepetition First Lien Loan Documents as to any future liability or obligation of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties, but without affecting any of the Prepetition First Lien Obligations or the Prepetition First Liens securing the Prepetition First Lien Obligations; and/or (ii) declare a termination, reduction, or restriction on the ability of the Debtors to use any

Cash Collateral (any such declaration under any of clauses 15(c)(i)(A), (B) or (C) or (ii) shall be made to the respective lead counsel to the Debtors, the Committee, and the United States Trustee, and shall be referred to herein as a "**First Lien Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "**First Lien Termination Declaration Date**").

> (d)   In addition to the rights and remedies described in Paragraph 15(c) above, in the event that the DIP Obligations have been Paid in Full, five (5) Business Days following the First Lien Termination Declaration Date, unless prior to such time this Court determines that a Termination Event has not occurred and/or is not continuing, the Prepetition First Lien Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on, its Prepetition First Liens on all or any portion of the Prepetition First Lien Collateral, including by collecting accounts receivable and applying the proceeds thereof to the Prepetition First Lien Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the Prepetition First Lien Collateral.   Solely during the five (5) Business Day period after a First Lien Termination Declaration Date, the Debtors and any Committee shall be entitled to an emergency hearing before this Court for the sole purpose of contesting whether a Termination Event has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtors, the Committee, or any other party in interest in an effort to restrict or preclude any Prepetition First Lien Secured Party from exercising any rights or remedies set forth in this Interim Order or the Prepetition First Lien Loan Documents.   During such five (5) Business Day period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the Prepetition First Lien Credit Agreement except in accordance with the Approved Budget.

(e)     Upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 15(b) hereof, the Prepetition First Lien Agent shall have relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order, or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition First Priority Liens and the First Lien Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition First Lien Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition First Lien Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition First Lien Collateral) or otherwise exercise remedies against the DIP Collateral or Prepetition First Lien Collateral permitted by this Interim Order, the Prepetition First Lien Loan Documents, and/or applicable non-bankruptcy law; *provided*, *however*, that any such foreclosure or other enforcement by the Prepetition First Lien Agent of any Prepetition First Priority Liens or any First Lien Adequate Protection Liens or any other such exercise of remedies by the Prepetition First Lien Agent against the DIP Collateral or Prepetition First Lien Collateral shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Agent, and any proceeds received by the Prepetition First Lien Agent in connection with such foreclosure, enforcement, or other exercise of remedies shall be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

(f)     Subject to the provisions of Paragraph 6 hereof, and subject to the Carve Out, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition First Lien Secured Parties shall be turned over *first* to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the

DIP Loan Documents and this Interim Order until Payment in Full of all of the DIP Obligations and *then* to the Prepetition First Lien Agent for application to the Prepetition First Lien Obligations under, and in accordance with the provisions of, the Prepetition First Lien Loan Documents and this Interim Order until Payment in full of the Prepetition First Lien Obligations.

(g)    Subject to entry of the Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) Business Days' written notice to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a Lien of any third party and that are used by Debtors in their businesses, in the case of either subsection (i) or (ii) of this Paragraph 15(g) without interference from lienholders, lessors, or licensors thereunder, subject to such lienholders', lessors', or licensors' rights under applicable law; *provided*, *however*, that the DIP Agent, on behalf of the DIP Secured Parties, shall pay only rent and make lease payments and pay additional rent, lease obligations, fees, royalties, or other monetary obligations of the

Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis if and to the extent that such expenses were included in an Approved Budget. Nothing herein shall require the Debtors, the DIP Agent, or the other DIP Secured Parties to assume any lease, license, or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(g).

(h)     Subject to the entry of the Final Order and Payment in Full of the DIP Obligations, notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Prepetition First Lien Agent or the other Prepetition First Lien Secured Parties contained in this Interim Order or the Prepetition First Lien Loan Documents, or otherwise available at law or in equity, the Prepetition First Lien Agent shall succeed to, and be entitled to, all of the rights, remedies, benefits, and protections accorded to the DIP Agent pursuant to Paragraph 15(g), as if all references therein to the "DIP Agent" and the "DIP Parties" are references to the "Prepetition First Lien Agent" and the "Prepetition First Lien Secured Parties."

(i)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the First Lien Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition First Lien Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Secured Parties and the Prepetition First Lien Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents, and/or this Interim Order, (iii) to permit each of the DIP Agent, the

other DIP Secured Parties, the Prepetition First Lien Agent, and the other Prepetition First Lien Secured Parties to perform any act authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

16.     **Restriction on Use of Proceeds**.   Notwithstanding anything herein to the contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition First Lien Collateral, Prepetition Second Lien Collateral, or any portion of the Carve Out may be used by (a) any Debtor, Committee, or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtor Professionals, the Committee Professionals, or the members of any Committee ("**Committee Members**")) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the DIP Collateral or the Prepetition First Lien Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtor Professionals, the Committee Professionals, or the Committee Members) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any modification to this Interim Order not approved by the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, to the extent such modification would affect the rights of any of the Prepetition First Lien Secured Parties, the

Prepetition First Lien Agent (after obtaining the approval of the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement); (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties, their respective affiliates, assigns, or successors and the respective officers, directors, employees, agents, attorneys, representatives, and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the Prepetition First Lien Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, or the First Lien Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the First Lien Adequate Protection Liens, or the other Prepetition First Lien Adequate Protection; (D) any "lender liability" cause of action; (E) except to contest in good faith the occurrence or continuance of any Termination Event as permitted in Paragraph 15, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties', and, after the Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Parties', assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral, or the Prepetition First Lien Collateral in accordance with the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, or

this Interim Order); and/or (F) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, or any payments made thereunder or in respect thereof; *provided*, *however*, up to $50,000 in the aggregate of the Carve Out, any DIP Collateral, any Prepetition First Lien Collateral, any Prepetition Second Lien Collateral, any Cash Collateral, and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims and/or Liens of the Prepetition First Lien Agent and the other Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents (but not the claims and/or Liens of the DIP Agent and the other DIP Secured Parties) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition First Lien Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and the Prepetition First Lien Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition First Lien Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition First Lien Agent, as applicable.

17.     **Proofs of Claim**.  The Prepetition First Lien Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' First Lien Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Secured Parties in respect of all Prepetition First Lien Obligations.  In addition, the Prepetition First Lien Secured Parties and the DIP Secured Parties will not be required to file any request for allowance and/or payment of any administrative expenses, and

this Order shall be deemed to constitute a timely filed request for allowance and/or payment of any Prepetition First Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable.   Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, and the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, in its discretion) in each of the Cases or Successor Cases (i) in the case of Prepetition First Lien Agent, a proof of claim and/or aggregate proofs of claim in respect of any Prepetition First Lien Obligations, and (ii) in the case of each of the Prepetition First Lien Agent and the DIP Agent, a request or aggregate requests for allowance and/or payment of any portion of the Prepetition First Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable.

       18.      **Preservation of Rights Granted Under the Interim Order**.

       (a)      <u>No Non-Consensual Modification or Extension of Interim Order</u>.   The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent and the Prepetition First Lien Agent, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition First Lien Secured Parties.   In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of

cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority, or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or the Prepetition First Lien Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)    <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the

DIP Secured Parties and the Prepetition Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations and all Prepetition First Lien Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively.

(c)     <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties

and the Prepetition Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections, and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order.  Subject to the provisions of Paragraph 2(d) of this Interim Order with respect to the treatment of the Roll Up DIP Obligations, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agent, and the other Prepetition First Lien Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition First Lien Agent from time to time to evidence or effectuate the foregoing.

20.    **Surety Bonds**.  Notwithstanding anything to the contrary in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue their Surety Bond Program and (II) Granting Related Relief* (the "**Surety Bond Motion**") and any order approving the relief sought therein, in the ordinary course of business, the Debtors may only (a) renew, amend, modify, supplement, and extend their existing Surety Bond Program, (b) obtain new Surety Bonds (as defined in the Surety Bond Motion), (c) post

84

new or additional collateral, or issue letters of credit, (d) execute other agreements in connection with the Surety Bond Program (as defined in the Surety Bond Motion), and (e) continue to perform under the Surety Indemnity Agreements (as defined in the Surety Bond Motion), in each case of (a)-(e), with the consent of the DIP Agent.

21.    **Postpetition Hedging Arrangement**.    For the avoidance of doubt, (a) any postpetition hedging arrangements must be (i) with the Lenders or their Affiliates (each as defined in the DIP Credit Agreement) and (ii) consented to by the DIP Agent (provided that no such consent shall be granted if objected to by the Majority Lenders (as defined in the DIP Credit Agreement) within three (3) Business Days of notification by the DIP Agent of any Debtor's desire to enter into a Postpetition Hedging Arrangement (as defined in the Hedging Motion (as defined in the DIP Credit Agreement)) and (b) any such complying postpetition hedging arrangement will be granted DIP Superpriority Claims.

22.    **Preservation of Prepetition Priorities and Interests**.    Nothing in this Interim Order is intended to change or otherwise modify the prepetition priorities among secured creditors of the Debtors, including any sureties', operators', or nonoperators' recoupment rights to the extent their rights are valid, enforceable, nonavoidable, and perfected, and nothing in this Interim Order shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved; *provided*, *however*, that the Debtors, the Committee, the DIP Secured Parties, and all other parties in interest reserve all rights to object to any of the foregoing claims or liens.

23.    **Other Rights and Obligations**.

(a)    Expenses.    As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable

and documented expenses incurred by the DIP Agent (including the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-party appraisers, consultants, advisors, and auditors engaged by or for the benefit of the DIP Agent and/or its counsel) in connection with the Cases, including the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b)      Notice of Professional Fees.   Professionals for the DIP Agent and the Prepetition First Lien Agent (including professionals engaged by counsel to the DIP Agent or Prepetition First Lien Agent, as applicable) (collectively, the "**Lender Professionals**") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; *provided*, *however*, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee, or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve

such objection within ten (10) days of receipt of such invoices, then the Debtors, United States

Trustee, or the Committee, as the case may be, shall file with this Court and serve on such

Lender Professionals an objection (the "**Fee Objection**") limited to the issue of the

reasonableness of such fees and expenses, and any failure by any such party to file a Fee

Objection within such ten (10) day period shall constitute a waiver of any right of such party to

object to the applicable invoice.   Notwithstanding any provision herein to the contrary, any

objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set

forth in a professional fee invoice in respect of Lender Professionals shall be limited to the

reasonableness of the particular items or categories of the fees, costs, and expenses that are the

subject of such objection.   The Debtors shall timely pay in accordance with the terms and

conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any

invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on

any invoice to which no Fee Objection has been timely filed.   All such unpaid fees, costs,

expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis

of an objection filed by the Debtor, the United States Trustee, or the Committee (or any

subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute

DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order.

Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor

to the DIP Agent or the other DIP Secured Parties in connection with or with respect to the DIP

Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in

full and non-refundable and shall not otherwise be subject to any Challenge.

       (c)    Information Rights. The Debtors shall substantially contemporaneously

provide the advisors to the Committee, the United States Trustee, the advisors to the First Lien

Ad Hoc Group, and the advisors to the Second Lien Ad Hoc Group with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Loan Documents and the DIP Orders; *provided that* to the extent such information constitutes material non-public information, such information will be shared either (i) with the advisors to the Committee, the advisors to the First Lien Ad Hoc Group, and the advisors to the Second Lien Ad Hoc Group on a professionals' eyes only basis or (ii) with the advisors to the Committee, the advisors to the First Lien Ad Hoc Group, and the advisors to the Second Lien Ad Hoc Group for distribution to the members of the Committee, the First Lien Ad Hoc Group, and the Second Lien Ad Hoc Group pursuant to a confidentiality agreement in form and substance reasonably satisfactory to the Debtors; *provided further* that, for the avoidance of doubt, the United States Trustee, the members of the Committee, the First Lien Ad Hoc Group, and the Second Lien Ad Hoc Group shall not be entitled to any consent right granted to the DIP Agent and/or any of the DIP Lenders with respect to such written financial reporting and other periodic reporting.

(d)     Binding Effect.  Subject only to Paragraph 6 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective estates, successors, and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such

Case or Successor Case; *provided*, *however*, that the DIP Secured Parties and the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(e)     No Waiver.  The failure of the Prepetition First Lien Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition First Lien Secured Party or any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).  Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition First Lien Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case or on terms other than those set forth in this Interim Order, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination

of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition First Lien Secured Parties, respectively, under the DIP Loan Documents or the Prepetition First Lien Loan Documents, the Bankruptcy Code, or otherwise.  Except to the extent otherwise expressly provided in this Interim Order or by law, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition First Lien Loan Documents, applicable law, or equity.

(f)     No Third Party Rights.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(g)      No Marshaling.  Neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

(h)      Amendments.   The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility by more than $5,000,000, (iii) shortens the Maturity Date (as defined in the DIP Credit Agreement), or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.  Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition First Lien Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition First Lien Agent on behalf of the Prepetition First Lien Secured Parties (after obtaining the approval of the requisite Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement).

(i)     <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.  In the event of any inconsistency between the terms or conditions of this Interim Order and the terms or conditions of any other order entered by this Court in the nature of a First Day Order, the provisions of this Interim Order shall govern and control.

(j)     <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(k)     <u>Reservation of Rights</u>.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition First Lien Obligations, and the Prepetition First Lien Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(l)     <u>No Requirement to Accept Title to Collateral</u>.  The DIP Secured Parties and the Prepetition First Lien Secured Parties shall not be obligated to accept title to any portion of the DIP Collateral or the Prepetition First Lien Collateral in payment of any of the DIP Obligations or Prepetition First Lien Obligations, as applicable, in lieu of payment in cash or cash equivalents, nor shall the DIP Secured Parties and the Prepetition First Lien Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable.

(m)     <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

24.     **<u>Final Hearing</u>**

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for April 30, 2019, at 10:00 a.m. (prevailing Central time) at the United States Bankruptcy Court for the Southern District of Texas.  The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)     <u>Final Hearing Notice</u>.  As soon as reasonably practicable following entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid

(such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**") and (ii) a copy of this Interim Order on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the United States Bankruptcy Court for the Southern District of Texas no later than April 23, 2019, at 4:00 p.m. (prevailing Central Time) which objections shall be served so that the same are received on or before such date by: (a) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn:  Christopher Marcus, P.C., Brian E. Schartz, P.C., and Aparna Yenamandra; cmarcus@kirkland.com,  bschartz@kirkland.com,  and  aparna.yenamandra@kirkland.com);  (b) counsel to the DIP Agent and the Prepetition First Lien Agent, (i) Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022-4834 (Attn: Mitchell A. Seider, Esq. and Annemarie V. Reilly, Esq.; Mitchell.Seider@lw.com and Annemarie.Reilly@lw.com) and (ii) Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002 (Attn: Timothy A. "Tad" Davidson II, Esq.; TadDavidson@huntonak.com); (c) counsel to any Committee appointed in these cases; (d) the Prepetition Second Lien Trustee, 251 Little Falls Drive, Wilmington, DE 19808; (e) counsel to the Ad Hoc Second Lien Group, Davis Polk & Wardwell LLP, 450 Lexington Avenue New York, NY 10017, (Attn: Brian M. Resnick and Benjamin M. Schak; brian.resnick@davispolk.com and benjamin.schak@davispolk.com); (f) the Office of the United States Trustee for the Southern District of Texas; and (g) any other party that has filed a request for notices with this Court, and such objections shall be filed with the Clerk of the United States

Bankruptcy Court for the Southern District of Texas, in each case to allow actual receipt of the foregoing no later than April 23, 2019, at 4:00 p.m. (prevailing Central time).

25.    **Retention of Jurisdiction**.   This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**Signed:  April 03, 2019**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## **<u>Schedule 1</u>**

DIP Credit Agreement

**EXECUTION VERSION**

---

**DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

Dated as of
April 3, 2019

among

**VANGUARD NATURAL GAS, LLC,**
as Borrower,

**CITIBANK, N.A.,**
as Administrative Agent and Issuing Bank,

and

The Other Lenders Party Hereto

**CITIGROUP GLOBAL MARKETS INC.**
as Lead Arranger and Bookrunner

---

# TABLE OF CONTENTS

Page

Article I       Definitions And Accounting Matters
.................................................................................................................1
  Section 1.01.   Certain Defined Terms..........................................................................1
  Section 1.02.   Types of Loans and Borrowings .........................................................25
  Section 1.03.   Accounting Terms and Determinations; GAAP ...................................26
  Section 1.04.   Changes in GAAP................................................................................26
  Section 1.05.   [Reserved] ...........................................................................................26
  Section 1.06.   Determination of Time of Day.............................................................26
  Section 1.07.   Amounts of Letters of Credit ..............................................................26

Article II      The Credits
.................................................................................................................26
  Section 2.01.   Commitments.......................................................................................26
  Section 2.02.   Loans and Borrowings ........................................................................27
  Section 2.03.   Requests for Borrowings ....................................................................27
  Section 2.04.   Interest Elections.................................................................................28
  Section 2.05.   Funding of Borrowings .......................................................................29
  Section 2.06.   Termination and Reduction of Aggregate Commitments....................30
  Section 2.07.   [Reserved] ...........................................................................................30
  Section 2.08.   Letters of Credit ..................................................................................30
  Section 2.09.   [Reserved] ...........................................................................................35
  Section 2.10.   [Reserved] ...........................................................................................35
  Section 2.11.   Cash Collateral....................................................................................35
  Section 2.12.   Defaulting Lenders ..............................................................................35
  Section 2.13.   Collateral; Guarantees.........................................................................37

Article III     Payments of Principal and Interest; Prepayments; Fees
.................................................................................................................38
  Section 3.01.   Repayment of Loans ...........................................................................38
  Section 3.02.   Interest ................................................................................................38
  Section 3.03.   Alternate Rate of Interest ....................................................................39
  Section 3.04.   Prepayments ........................................................................................39
  Section 3.05.   Fees .....................................................................................................42

US-DOCS\106250840.21

Article IV      Payments; Pro Rata Treatment; Sharing of Set-offs ..............................................43

    Section 4.01.      Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............................43

    Section 4.02.      Presumption of Payment by the Borrower................................................................44

    Section 4.03.      Certain Deductions by the Administrative Agent ....................................................44

    Section 4.04.      [Reserved.] ...............................................................................................................44

Article V      Increased Costs; Break Funding Payments; Taxes; Illegality ....................................44

    Section 5.01.      Increased Costs .........................................................................................................44

    Section 5.02.      Break Funding Payments .........................................................................................46

    Section 5.03.      Taxes .........................................................................................................................46

    Section 5.04.      Designation of a Different Lending Office................................................................49

    Section 5.05.      Illegality ....................................................................................................................49

Article VI      Conditions Precedent ................................................................................................50

    Section 6.01.      Interim Facility Effective Date .................................................................................50

    Section 6.02.      Final Facility Effective Date ....................................................................................52

    Section 6.03.      Conditions Precedent to Each Credit Event..............................................................52

Article VII      Representations and Warranties ...............................................................................54

    Section 7.01.      Organization; Powers................................................................................................54

    Section 7.02.      Authority; Enforceability .........................................................................................54

    Section 7.03.      Approvals; No Conflicts ...........................................................................................54

    Section 7.04.      Financial Condition; No Material Adverse Change ..................................................55

    Section 7.05.      Litigation...................................................................................................................55

    Section 7.06.      Environmental Matters .............................................................................................55

    Section 7.07.      Compliance with the Laws and Agreements; No Defaults.................................56

    Section 7.08.      Investment Company Act .........................................................................................56

    Section 7.09.      Taxes .........................................................................................................................56

    Section 7.10.      ERISA........................................................................................................................57

    Section 7.11.      Disclosure; No Material Misstatements ...................................................................58

    Section 7.12.      Insurance ...................................................................................................................58

    Section 7.13.      Restriction on Liens ..................................................................................................59

    Section 7.14.      Subsidiaries ...............................................................................................................59

Section 7.15.     Location of Business and Offices .......................................................................59

Section 7.16.     Properties; Titles, Etc....................................................................................59

Section 7.17.     Maintenance of Properties ..............................................................................60

Section 7.18.     Gas Imbalances, Prepayments .........................................................................60

Section 7.19.     Marketing of Production..................................................................................60

Section 7.20.     Swap Agreements ..........................................................................................61

Section 7.21.     [Reserved].....................................................................................................61

Section 7.22.     [Reserved].....................................................................................................61

Section 7.23.     Anti-Corruption Laws and Sanctions ...............................................................61

Section 7.24.     [Reserved].....................................................................................................61

Section 7.25.     Article 8 of Uniform Commercial Code ............................................................61

Section 7.26.     EEA Financial Institution ...............................................................................61

Section 7.27.     Accounts .......................................................................................................61

Section 7.28.     Secured Obligations; Priority...........................................................................61

Section 7.29.     Chapter 11 Orders .........................................................................................62

Article VIII     Affirmative Covenants

                 ..................................................................................................................62

Section 8.01.     Financial Statements; Other Information...........................................................62

Section 8.02.     Notices of Material Events ..............................................................................65

Section 8.03.     Existence; Conduct of Business........................................................................66

Section 8.04.     Payment of Obligations ..................................................................................66

Section 8.05.     Performance of Obligations under Loan Documents ..........................................66

Section 8.06.     Operation and Maintenance of Properties ........................................................67

Section 8.07.     Insurance ......................................................................................................68

Section 8.08.     Books and Records; Inspection Rights ..............................................................68

Section 8.09.     Compliance with Laws ...................................................................................68

Section 8.10.     Environmental Matters ...................................................................................68

Section 8.11.     Further Assurances ........................................................................................69

Section 8.12.     Reserve Reports .............................................................................................70

Section 8.13.     Title Information ............................................................................................71

Section 8.14.     Additional Collateral; Additional Guarantors....................................................71

Section 8.15.     ERISA Compliance ........................................................................................72

Section 8.16.     [Reserved]......................................................................................................72

Section 8.17.   Use of Proceeds ............................................................................... 72

Section 8.18.   Budget Update; Cash Reporting ................................................. 73

Section 8.19.   Cash Management ........................................................................... 74

Article IX   Negative Covenants

.............................................................................................................. 74

Section 9.01.   Minimum Liquidity ......................................................................... 74

Section 9.02.   Debt ................................................................................................... 74

Section 9.03.   Liens .................................................................................................. 75

Section 9.04.   Dividends, Distributions and Redemptions .............................. 76

Section 9.05.   Investments, Loans and Advances ............................................. 76

Section 9.06.   Nature of Business; International Operations ........................... 77

Section 9.07.   [Reserved] ........................................................................................ 77

Section 9.08.   Proceeds of Loans .......................................................................... 77

Section 9.09.   ERISA Compliance .......................................................................... 77

Section 9.10.   Sale or Discount of Receivables ................................................. 78

Section 9.11.   Mergers, Etc ..................................................................................... 78

Section 9.12.   Sale of Properties ........................................................................... 78

Section 9.13.   Environmental Matters ................................................................. 79

Section 9.14.   Transactions with Affiliates ......................................................... 79

Section 9.15.   Subsidiaries ..................................................................................... 79

Section 9.16.   Negative Pledge Agreements; Dividend Restrictions ............. 79

Section 9.17.   Gas Imbalances, Take-or-Pay or Other Prepayments ............. 80

Section 9.18.   Swap Agreements ........................................................................... 80

Section 9.19.   Marketing Activities ...................................................................... 80

Section 9.20.   Liquidation of Swap Agreements ................................................ 80

Section 9.21.   Budget Variances ............................................................................ 80

Section 9.22.   Accounting Changes ...................................................................... 81

Section 9.23.   Passive Holding Company; Etc .................................................... 81

Article X   Events of Default; Remedies

.............................................................................................................. 81

Section 10.01.  Events of Default ............................................................................. 81

Section 10.02.  Remedies ........................................................................................... 84

iv

Article XI        The Agents
............................................................................................................................85

          Section 11.01.   Appointment; Powers ...................................................................85

          Section 11.02.   Rights as a Lender.......................................................................86

          Section 11.03.   Exculpatory Provisions ...............................................................86

          Section 11.04.   Reliance by Administrative Agent................................................87

          Section 11.05.   Delegation of Duties ...................................................................87

          Section 11.06.   Resignation of Administrative Agent and/or Issuing Bank .................87

          Section 11.07.   Non-Reliance on Administrative Agent and Other Lenders..............88

          Section 11.08.   No Other Duties, etc ...................................................................88

          Section 11.09.   Administrative Agent May File Proofs of Claim................................89

          Section 11.10.   Collateral and Guaranty Matters...................................................89

          Section 11.11.   Secured Treasury Management Agreements ...................................90

Article XII       Miscellaneous
............................................................................................................................90

          Section 12.01.   Notices .......................................................................................90

          Section 12.02.   Waivers; Amendments.................................................................93

          Section 12.03.   Expenses, Indemnity; Damage Waiver..........................................94

          Section 12.04.   Successors and Assigns Generally................................................97

          Section 12.05.   Survival; Revival; Reinstatement ................................................100

          Section 12.06.   Counterparts; Integration; Effectiveness; Electronic Signatures ........101

          Section 12.07.   Severability ...............................................................................101

          Section 12.08.   Right of Setoff ...........................................................................101

          Section 12.09.   GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                           PROCESS; WAIVER OF JURY TRIAL ...................................102

          Section 12.10.   Headings ..................................................................................103

          Section 12.11.   Confidentiality ...........................................................................103

          Section 12.12.   Interest Rate Limitation ..............................................................104

          Section 12.13.   EXCULPATION PROVISIONS ...................................................104

          Section 12.14.   Collateral Matters; Treasury Management Agreements....................105

          Section 12.15.   No Third Party Beneficiaries .......................................................105

          Section 12.16.   USA Patriot Act Notice ...............................................................105

          Section 12.17.   [Reserved]................................................................................105

v

Section 12.18.   Replacement of Lenders ...................................................................105

Section 12.19.   Time of the Essence .......................................................................106

Section 12.20.   No Advisory or Fiduciary Responsibility ..........................................106

Section 12.21.   [Reserved] ...................................................................................107

Section 12.22.   [Reserved] ...................................................................................107

Section 12.23.   Acknowledgement and Consent to Bail-In of EEA Financial Institutions .........107

vi

ANNEXES, EXHIBITS AND SCHEDULES

Annex I          Roll-Up Loans Applicable Percentages
Annex II         New Money Loans Applicable Percentages and Commitments


Exhibit A        Form of Note

Exhibit B        Form of Borrowing Request

Exhibit C        Form of Interest Election Request

Exhibit D        Form of Compliance Certificate

Exhibit E        Form of Interim Order

Exhibit F        Form of Assignment and Assumption

Exhibit G-1      Form of U.S. Tax Compliance Certificate (Foreign Lenders claiming the portfolio interest exemption)

Exhibit G-2      Form of U.S. Tax Compliance Certificate (Foreign Participants that are not beneficial owners)

Exhibit G-3      Form of U.S. Tax Compliance Certificate (Foreign Participants that are not beneficial owners)

Exhibit G-4      Form of U.S. Tax Compliance Certificate (Foreign Lenders that are partnerships)

Exhibit H        Initial Budget

Exhibit I        Form of Reserve Report Certificate


Schedule 7.12    Insurance

Schedule 7.14    Subsidiaries

Schedule 7.18    Gas Imbalances

Schedule 7.19    Marketing Contracts

Schedule 7.20    Current Swap Agreements

Schedule 7.27    Accounts

Schedule 9.02    Existing Debt

Schedule 9.03    Existing Liens

Schedule 9.05    Investments

US-DOCS\106250840.21

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of April 3, 2019, is among **VANGUARD NATURAL GAS, LLC**, as debtor and debtor-in-possession, a limited liability company duly formed and existing under the laws of the Commonwealth of Kentucky (the "Borrower"), each of the Lenders from time to time party hereto and **CITIBANK, N.A.** (in its individual capacity, "Citibank"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent") and as Issuing Bank under and as defined herein.

R E C I T A L S

A.      WHEREAS, on March 31, 2019 (the "Petition Date"), the Loan Parties and certain of their respective Subsidiaries (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court;

B.      WHEREAS, the Borrower requests that the Lenders provide the Borrower with a debtor-in-possession, superpriority, senior secured credit facility in an aggregate principal amount of up to $130,000,000 (the "DIP Facility") which shall consist of (x) $65 million (the "New Money Facility") which the Borrower shall be permitted to draw subject to the terms and conditions set forth in herein and (y) subject to entry of the Final Order only, $65 million to roll up the Obligations (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "Roll-Up Facility"), in each case to be afforded the liens and priority set forth in the DIP Order and as set forth in the other Loan Documents and to be used during the Chapter 11 Cases for the purposes set forth in Section 8.17, and which DIP Facility shall be available for borrowings and other extensions of credit as of the Interim Facility Effective Date, subject in all respects to the terms set out herein and in the other Loan Documents; and

C.      WHEREAS, by execution and delivery of this Agreement and the other Loan Documents, the Guarantors, as applicable, agree to guarantee the Obligations and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Administrative Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, substantially all of such Loan Party's respective assets, in each case, on and subject to the terms and priorities set forth in the DIP Orders and the other Loan Documents.

In consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adequate Protection Liens" has the meaning assigned such term in the DIP Orders.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

1

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied from time to time by the Administrative Agent.

"<u>Affected Loans</u>" has the meaning assigned such term in <u>Section 5.05</u>.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified.

"<u>Agent Parties</u>" has the meaning assigned such term in <u>Section 12.01(d)(ii)</u>.

"<u>Agents</u>" means, collectively, the Administrative Agent and other agents subsequently named; and "<u>Agent</u>" shall mean either the Administrative Agent or such other agent, as the context requires.

"<u>Aggregate Commitments</u>" at any time, means the sum of the aggregate amount of the Commitments of all of the Lenders at such time, as the same may be reduced or terminated pursuant to <u>Section 2.06</u>.

"<u>Agreement</u>" means this Debtor-in-Possession Credit Agreement, as the same may from time to time be amended, modified, amended and restated, supplemented or restated.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day plus 0.50%, (b) to the extent ascertainable, the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis and, for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate determined on such day at 11:00 a.m. (London time)) plus 1.00% and (c) the Prime Rate. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, as the case may be.

"<u>Alternate Testing Date</u>" shall have the meaning assigned to such term in <u>Section 8.18(b)</u>.

"<u>Anti-Corruption Laws</u>" means all state or federal laws, rules, and regulations applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including the FCPA.

"<u>Applicable Margin</u>" means, for any day, (a) with respect to any ABR Loan, 4.50% per annum and (b) with respect to any Eurodollar Loan, 5.50% per annum.

"<u>Applicable Percentage</u>" means, with respect to any Lender at any time, the percentage of the Aggregate Commitments represented by such Lender's Commitment at such time; <u>provided</u> that, at any time a Defaulting Lender shall exist, "<u>Applicable Percentage</u>" shall mean the percentage of the Aggregate Commitments (disregarding any Defaulting Lenders' Commitment at such time, but subject to <u>Section 2.12(a)(i)(A)</u>) represented by such Lender's Commitment. If the Aggregate Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Aggregate Commitments most recently in effect, giving effect to any assignments.

"<u>Approved Counterparty</u>" means with respect to any Swap Agreement, (i) a Person that is a Lender or an Affiliate of a Lender, or was a Lender or an Affiliate of a Lender, at the time such Swap Agreement was entered into or (ii) an assignee of any such Person described in clause (i) above so long as such assignee is a Lender or an Affiliate of a Lender.

2

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means Miller and Lents and any other independent petroleum engineers acceptable to the Administrative Agent.

"Approved Plan of Reorganization" shall have the meaning assigned to such term in the DIP Order.

"Arranger" means Citigroup Global Markets Inc., in its capacity as lead arranger and bookrunner hereunder.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from the Interim Facility Effective Date, to, but excluding, the Termination Date.

"Available Funds" means, as of any date of determination, the amount by which the Effective Commitments on such date exceed the Total Credit Exposure of all Lenders on such date.

"Avoidance Action" shall have the meaning assigned to such term in the DIP Order.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" shall have the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

3

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a borrowing in accordance with Section 2.03.

"Budget" shall have the meaning assigned to such term in Section 8.18(a).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City, New York or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Capital Expenditures" means, in respect of any Person, for any period, the aggregate (determined without duplication) of all exploration and development expenditures and costs that are capital in nature and any other expenditures that are capitalized on the balance sheet of such Person in accordance with GAAP.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Collateralize" means, in respect of any obligation, the provision, and pledge (as a security interest with the priority set forth in the DIP Order) of, cash collateral in Dollars, at a location and pursuant to documentation in form and substance satisfactory to the Administrative Agent and the Issuing Bank (and "Cash Collateralization" has a corresponding meaning).

"Cash Equivalent" means: (a) securities issued or fully guaranteed or insured by the United States Government or any agency thereof and backed by the full faith and credit of the United States and having maturities of not more than twelve (12) months from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits, or bankers' acceptances having in each case a tenor of not more than twelve (12) months from the date of acquisition issued by, and demand deposits with, any U.S. commercial bank or any branch or agency of a non-U.S. commercial bank licensed to conduct business in the U.S. having combined capital and surplus of not less than $500,000,000, whose long term securities are rated at least A (or then equivalent grade) by S&P and A2 (or then equivalent grade) by Moody's at the time of acquisition; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's at the time of acquisition, and in either case having a tenor of not more than twelve (12) months; and (d) Investments, classified in accordance with GAAP as current assets of the Loan Parties or any of their Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Cash Management Order" means one or more orders of the Bankruptcy Court, including any interim and/or final orders, entered in the Chapter 11 Cases, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which, among other matters, authorizes the Debtors to maintain their existing cash management system.

4

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Parent, the Borrower or any of the other Subsidiaries.

"CERCLA" has the meaning set forth in the definition of "Environmental Laws".

"Change in Control" means (a) except as permitted by this Agreement, the Parent ceases to own 100% of the Equity Interests of the Borrower or the Borrower or any Guarantor ceases to own 100% of the Equity Interests of any of their respective subsidiaries, (b) at any time when the Parent has any class of securities that is listed on a national securities exchange or national securities association, the occupation of a majority of the seats (other than vacant seats) on the board of directors of Parent by Persons who were neither (i) nominated, appointed or approved for consideration by shareholders for election by the board of directors of the Parent nor (ii) appointed by managers so nominated, appointed or approved, or (c) a Change of Control (as defined in any documentation governing any Material Debt excluding the Prepetition Credit Agreement the Prepetition Second Lien Indenture) shall have occurred.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated thereunder by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities or otherwise, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law" introduced or adopted after the date hereof, regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" means the cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court from and after the Petition Date.

"Chapter 11 Milestones" shall have the meaning assigned to such term in the DIP Order.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means all property of any kind which is subject to a Lien in favor of Administrative Agent to secure the Obligations or which under the terms of any Loan Document is purported to be subject to such Lien, which includes, for the avoidance of doubt, all existing (whether pre- or post-petition) and after-acquired, tangible and intangible, personal and real property and assets of each of the Loan Parties and any proceeds thereof (including, subject to entry of the Final Order, proceeds of any Avoidance Action); provided that the Avoidance Actions themselves shall not be Collateral; provided, further that the Collateral shall not include any lease or other real property right of any Loan Party solely to the extent such lease or other real property right is not an Oil and Gas Property and the granting of any liens thereto or thereon would constitute (a) an abandonment, invalidation, or unenforceability of any material right of ownership or title of any Loan Party, or (b) a material breach or termination pursuant to the terms of, or a material default under, any such lease or document governing any other real property right pursuant to any provision thereof, unless in the case of each of the forgoing clauses (a) and (b), the applicable provision is rendered ineffective by applicable nonbankruptcy law or the Bankruptcy Code.

5

"<u>Commitment</u>" means, with respect to each Lender, the commitment of such Lender to make New Money Loans and to acquire participations in Letters of Credit hereunder in an aggregate principal amount at any one time outstanding not to exceed the amounts set forth opposite such Lender's name as its "<u>Commitment</u>" on <u>Annex II</u> (as such <u>Annex II</u> may be amended or modified from time to time in connection with any reduction or modification to any Commitment or to the Aggregate Commitments pursuant to this Agreement), which amount represents the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) reduced or terminated from time to time pursuant to <u>Section 2.06</u> and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to <u>Section 12.04(b)</u> or otherwise, and (c) terminated in accordance with <u>Section 10.02</u> or otherwise in accordance with the terms of this Agreement.

"<u>Commitment Fee Rate</u>" means 1.00% per annum.

"<u>Committee</u>" means any statutory committee of unsecured creditors appointed in the Chapter 11 Cases.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute, and any regulations promulgated thereunder.

"<u>Communications</u>" has the meaning assigned such term in <u>Section 12.01(d)</u>.

"<u>Confirmation Order</u>" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming the Approved Plan of Reorganization.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such Person) will be deemed to "control" such other Person.  "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Debt</u>" means, for any Person (as used in this definition, a "<u>Subject Person</u>"), without duplication, (a) all obligations of such Subject Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Subject Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Subject Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) and other obligations of any other Person secured by (or for which the holder of such Debt or other delegation has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Subject Person, whether or not such Debt is assumed by such Subject Person; (g) all Debt (as defined in the other clauses of this definition) and other obligations of any other Person of others guaranteed by such Subject Person or in which such Subject Person otherwise assures a creditor against loss of such Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Subject Person to maintain or cause to be maintained the financial position or covenants of any other Person or to purchase the Debt or Property of any other Person; (i) obligations to deliver commodities, goods or services,

6

including, without limitation, Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Subject Person; (k) any Debt of a partnership for which such Subject Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Subject Person or for the creation of which such Subject Person directly or indirectly received payment.  The Debt of any Subject Person shall include all obligations of such Subject Person of the character described above to the extent such Subject Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Subject Person under GAAP.

"Debtor" has the meaning assigned to such term in the Recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means at any time, subject to Section 2.12(b), (i) any Lender that has failed for two or more Business Days to comply with its obligations under this Agreement to make a Loan, make a payment to the Issuing Bank in respect of an LC Disbursement or make any other payment due hereunder (each, a "funding obligation"), unless such Lender has notified the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding has not been satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing), (ii) any Lender that has notified the Administrative Agent, the Borrower or the Issuing Bank in writing, or has stated publicly, that it does not intend to comply with its funding obligations hereunder, unless such writing or statement states that such position is based on such Lender's determination that one or more conditions precedent to funding cannot be satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing or public statement), (iii) any Lender that has, for three or more Business Days after written request of the Administrative Agent or the Borrower, failed to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender will cease to be a Defaulting Lender pursuant to this clause (iii) upon the Administrative Agent's and the Borrower's receipt of such written confirmation), or (iv) any Lender with respect to which a Lender Insolvency Event, other than by way of an Undisclosed Administration, has occurred and is continuing with respect to such Lender or its Parent Company (provided, in each case, that neither the reallocation of funding obligations provided for in Section 2.12(a)(i) as a result of a Lender's being a Defaulting Lender nor the performance by Non-Defaulting Lenders of such reallocated funding obligations will by themselves cause the relevant Defaulting Lender to become a Non-Defaulting Lender). Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any of clauses (i) through (v) above will be conclusive and binding absent manifest error, and such Lender will be deemed to be a Defaulting Lender (subject to Section 2.12(b)) upon notification of such determination by the Administrative Agent to the Borrower, the Issuing Bank and the Lenders.

"DIP Facility" shall have the meaning assigned to such term in the recitals hereto.

"DIP Fee Letter" means that certain letter agreement dated as of March 31, 2019 from Citibank and acknowledged and agreed to by the Borrower.

<div align="center">7</div>

"DIP Order" means the Interim Order and the Final Order, as applicable.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, farmout, conveyance, transfer, casualty, condemnation or other disposition thereof, but excluding any issuance by a Person of its own Equity Interests (but not excluding, for the avoidance of doubt, any sale, lease, sale and leaseback, assignment, farmout, conveyance, transfer, casualty, condemnation or other disposition by a Person of the Equity Interests of another Person).  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in the case of each of the foregoing, on or prior to the date that is one hundred eighty (180) days after the earlier of (a)  the Maturity Date and (b) the date on which there are no Loans, LC Exposure or other obligations hereunder outstanding and all of the Aggregate Commitments and the LC Commitment are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Commitment" means (a) during the Interim Facility Period, the Interim Facility Cap and (b) during the Final Facility Period, the Aggregate Commitments.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 12.04(b)(v) and (vi) (subject to such consents, if any, as may be required under Section 12.04(b)(iii)); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Parent, the Borrower or any Subsidiary or any of their respective Affiliates.

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health or safety (with respect to exposure to Hazardous Materials), the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous

8

Materials, in effect in any and all jurisdictions in which the Borrower or any Subsidiary is conducting, or at any time has conducted, business, or where any Property of the Borrower or any Subsidiary is located, including, the Oil Pollution Act of 1990, as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, waiver, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Parent, the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) a "Reportable Event" described in Section 4043 of ERISA and the regulations issued thereunder, (b) the withdrawal of the Parent, the Borrower, a Subsidiary or any ERISA Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, (e) receipt of a notice of withdrawal liability pursuant to Section 4202 of ERISA or (f) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned such term in Section 10.01.

"Excepted Liens" means:

(a)      Liens for Taxes, assessments or other governmental charges or levies (i) which are not delinquent; (ii) the nonpayment of which is permitted or required by the Bankruptcy Code; or (iii) which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP;

9

(b)      Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP;

(c)      statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties, including any valid and enforceable rights of recoupment related thereto;

(d)      contractual Liens which are customary in the oil and gas business and arise in the ordinary course of business of the Borrower under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and any valid and enforceable rights of recoupment related thereto; provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any other Subsidiary or materially impair the value of such Property subject thereto;

(e)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of the other Subsidiaries to provide collateral to the depository institution;

(f)      easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, in each case incurred in the ordinary course of business, which do not secure any Debt or other monetary obligations and which do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any other Subsidiary or materially impair the value of such Property subject thereto;

(g)      minor defects and irregularities in title to any Property which are incurred in the ordinary course of business and which do not secure any Debt or other monetary obligations and which do not materially impair use of such Property for the purposes for which such Property is held by the Borrower or any other Subsidiary, as applicable, or materially impair the value of such Property subject thereto and which do not alter the working interest or net working interest of any Oil and Gas Properties affected thereby or would cause any portion of the net revenue of any Oil and Gas Properties affected thereby to be placed in suspense;

(h)      Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases,

10

statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business and to the extent the Debt in respect thereof is permitted by Section 9.02(d) or (g);

(i)        judgment and attachment Liens with respect to obligations arising subsequent to the Petition Date not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; and

(j)        Liens arising from Uniform Commercial Code financing statement filings made solely as a precautionary measure regarding operating leases entered into by the Borrower and/or any of its subsidiaries in the ordinary course of business covering only the Property under lease;

provided, that (i) all such Liens described in clauses (a) through (j) shall remain Excepted Liens only for so long as no action to enforce such Lien has been commenced (unless subject to the automatic stay of Section 362 of the Bankruptcy Code) and no intention to subordinate the Liens granted in favor of the Administrative Agent and/or the other Secured Parties is to be hereby implied or expressed by, or as a result of, the permitted existence of any Excepted Liens and (ii) the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money other than the Obligations.

"Excess Cash" means, as of any date of determination, all cash and Cash Equivalents of the Loan Parties (i) prior to the entry of the Final Order, in excess of $15,000,000 in the aggregate at any time and (ii) from and after the entry of the Final Order, in excess of $25,000,000 in the aggregate at any time.

"Excluded Swap Obligation" means, with respect to the Borrower or any Guarantor, (a) as it relates to all or a portion of any guarantee of the Borrower or such Guarantor, any Swap Obligation if, and to the extent that, such Swap Obligation (or any guarantee in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of the Borrower's or such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of the Borrower or such Guarantor becomes effective with respect to such Swap Obligation or (b) as it relates to all or a portion of the grant by the Borrower or such Guarantor of a security interest, any Swap Obligation if, and to the extent that, such Swap Obligation (or such security interest in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of the Borrower's or such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of the Borrower or such Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in

11

each case to the extent that, pursuant to <u>Section 5.03</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 5.03(g)</u> and (d) any U.S. federal withholding Taxes imposed under FATCA.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreements and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; <u>provided</u> that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>Final Facility Effective Date</u>" has the meaning assigned to such term in <u>Section 6.02</u>.

"<u>Final Order</u>" shall have the meaning assigned to such term in the Interim Order.

"<u>Final Period</u>" means the period commencing on the Final Facility Effective Date and ending on the Termination Date.

"<u>Financial Officer</u>" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Parent.

"<u>Financial Statements</u>" means the financial statement or statements of the Parent and the Subsidiaries referred to in <u>Section 7.04(a)</u>.

"<u>Flood Insurance Regulations</u>" has the meaning specified in <u>Section 7.12(b)</u>.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is not a Domestic Subsidiary.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in <u>Section 1.04</u>.

"<u>Governmental Authority</u>" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, commission, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) over the Parent, the Borrower, any Subsidiary, any of their Properties, any Agent, the Issuing Bank or any Lender.

12

"<u>Governmental Requirement</u>" means any law (including binding principles of common law), statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereafter in effect, including, without limitation, energy regulations of any Governmental Authority.

"<u>Guarantors</u>" means (a) the Parent, (b) each Subsidiary that is a party to the Guaranty, and (c) each other Person that guarantees the Obligations pursuant to, and in accordance with, <u>Section 8.14(e)</u>.

"<u>Guaranty</u>" means the Guaranty Agreement executed and delivered by the Guarantors on the date hereof (or pursuant to any joinder thereto as provided therein) and each other guaranty that supports or purports to support the Obligations, including any joinder thereto.

"<u>Hazardous Material</u>" means any substance regulated, or as to which liability might arise, under any applicable Environmental Law, including: (a) any chemical, compound, material, product, byproduct, substance or waste regulated or defined as, or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law due to its hazardous, toxic, dangerous or deleterious characteristics; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes.

"<u>Hedging Motion</u>" means a motion, in form and substance satisfactory to the Administrative Agent, authorizing the Loan Parties to continue Prepetition Swap Agreements and enter into postpetition Swap Agreements, among other relief, which may be heard at the "second day" hearing in the Chapter 11 Cases.

"<u>Hedging Order</u>" means the order, in form and substance satisfactory to the Administrative Agent, granting the Hedging Motion.

"<u>Highest Lawful Rate</u>" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"<u>Hydrocarbon Interests</u>" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases (excluding coal and timber), or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.  Unless otherwise indicated herein, each reference to the term "<u>Hydrocarbon Interests</u>" shall mean Hydrocarbon Interests of the Borrower and the other Subsidiaries.

"<u>Hydrocarbons</u>" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom. Unless otherwise indicated herein, each reference to the term "<u>Hydrocarbons</u>" shall mean Hydrocarbons of the Borrower and the other Subsidiaries.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

US-DOCS\106250840.21

"Information" has the meaning assigned such term in Section 12.11.

"Interest Election Request" means a request by the Borrower substantially in the form of Exhibit C to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each calendar month and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Eurodollar Borrowing of which such Eurodollar Loan is a part.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which shall extend beyond the Termination Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Facility Cap" means, as of any date of determination, $20,000,000; provided that, if as of any such date of determination the Aggregate Commitments are less than $20,000,000, the "Interim Facility Cap" in effect on such date shall equal the amount of the Aggregate Commitments in effect on such date.

"Interim Facility Effective Date" has the meaning specified therefor in Section 6.01.

"Interim Order" means the interim order of the Bankruptcy Court approving the DIP Facility on an interim basis and entered by the Bankruptcy Court in the form of Exhibit E, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Majority Lenders and the Borrower.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Termination Date.

"Investment" means, for any Person:  (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale) or any capital contribution to any other Persons; (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, any Debt or other obligation or liability of any

14

other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"IRS" means the United States Internal Revenue Service.

"Issuing Bank" means Citibank, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Collection Account" means each deposit account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Secured Parties, in form and substance satisfactory to the Administrative Agent and the Issuing Bank.

"LC Commitment" means, at any time, $5,000,000.

"LC Disbursement" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lender Insolvency Event" means that (i) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator, or a similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation, or any other state or federal regulatory authority acting in such a capacity, has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or (iii) such Lender or its Parent Company has become the subject of a Bail-In Action, provided that a Lender Insolvency Event shall not occur solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or its Parent Company by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; provided further that a Lender Insolvency Event shall not occur solely by virtue of the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or its Parent Company under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation).

"Lenders" means, collectively, the New-Money Lenders and the Roll-up Lenders.

"Letter of Credit" means any standby letter of credit issued pursuant to this Agreement by the Issuing Bank to the Borrower for the account of any of the Borrower and any other Subsidiary that is a Guarantor.

"Letter of Credit Agreements" means the Letters of Credit, all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower,

15

or entered into by the Borrower (whether for itself or any other Subsidiary that is a Guarantor as the account party), with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/100 of 1%) at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period. Notwithstanding anything else in this definition, the LIBO Rate shall be deemed to be not less than zero for all purposes of this Agreement.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a deed of trust, mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and the other Subsidiaries, as applicable, shall be deemed to be the owner of any Property which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" or "Liquidation" means, with respect to any Swap Agreement, (a) the sale, assignment, novation, unwind or termination (whether upon the maturity thereof or otherwise) of all or any part of such Swap Agreement (including, without limitation, any transaction thereunder) or (b) the creation of an offsetting position against all or any part of such Swap Agreement.

"Liquidity" means, as of any date of determination, without duplication, the sum of (a) unrestricted cash and Cash Equivalents of the Loan Parties as of such date, which are subject to a perfected lien and security interest in favor of the Administrative Agent pursuant to the Loan Documents with the priority set forth in the Interim Order and, once entered, the Final Order, less any amount on deposit in any LC Collection Account, plus (b) the Available Funds as of such date.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Agreements, the Security Instruments, the DIP Fee Letter, the DIP Order and all other agreements, instruments, consents and certificates heretofore or hereafter executed and delivered by the Parent, the Borrower, any other Loan Party or any of their respective Affiliates in connection with this Agreement (other than Treasury Management Agreements).

"Loan Parties" means, collectively, the Borrower, the Parent and each other Guarantor.

16

"Loans" means, individually, any New Money Loan or Roll-Up Loan made by any Lender pursuant to this Agreement, and collectively, the New Money Loans and Roll-Up Loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any time, Lenders having Loans, LC Exposure and unused Commitments representing more than 50% of the sum of all Loans outstanding, LC Exposure and unused Commitments at such time (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(d)); provided that Loans, LC Exposure and unused Commitment of any Defaulting Lender at such time shall be disregarded for purposes of making a determination of Majority Lenders.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or condition (financial or otherwise) of the Parent, the Borrower and the other Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, (b) the ability of the Parent, the Borrower or any other Subsidiary to perform any of its obligations under any Loan Document (including, without limitation, payment and performance of the Obligations), (c) the validity or enforceability of any Loan Document or the Obligations or (d) the rights and remedies of, or benefits available to, the Administrative Agent, any other Agent, the Issuing Bank or any Lender under any Loan Document.

"Material Gas Imbalance" means, with respect to all gas balancing agreements to which the Borrower or any other Subsidiary is a party or by which any mineral interest owned by the Borrower or any other Subsidiary is bound, a net gas imbalance to the Borrower or any other Subsidiary, individually or taken as a whole in excess of $5,000,000.  Gas imbalances will be determined based on written agreements, if any, specifying the method of calculation thereof, or, alternatively, if no such agreements are in existence, gas imbalances will be calculated by multiplying (x) the volume of gas imbalance as of the date of calculation (expressed in thousand cubic feet) by (y) the heating value in btu's per thousand cubic feet, times the Henry Hub average daily spot price for the month immediately preceding the date of calculation.

"Material Indebtedness" means Debt (other than the Loans and Letters of Credit) of any one or more of the Parent, the Borrower and the other Subsidiaries in an aggregate principal amount exceeding $2,000,000.

"Maturity Date" means the nine-month anniversary of the Interim Facility Effective Date.

"Midstream Assets" means any Property (including, without limitation, contracts, rights of way, easements, surface leases, surface use agreements, permits, pipelines, flow lines, meters, facilities, tank batteries and electrical generation sources) comprising the business of (a) processing, gathering, storing, transporting, treating and/or marketing of Hydrocarbons or (b) processing, gathering, storing, transporting, treating and/or disposal of fresh or produced water.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means, as of any date of determination, each Property of the Loan Parties that is subject to a lien and security interest in favor of the Administrative Agent (or its designee) pursuant to any Mortgage and/or any other Loan Document.

"Mortgages" means the mortgages, deeds of trust, deeds of hypothecation, debentures, pledges, leasehold mortgages, assignments of leases and rents, assignments of proceeds of production, security

17

documents and similar agreements securing the Prepetition Credit Agreement Obligations (including all amendments, modifications and supplements thereto) delivered pursuant to the Prepetition Credit Agreement granting a lien and security interest in Oil and Gas Properties and other Properties of the Loan Parties in favor of the Prepetition Credit Agreement Agent.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in Section 3(37) or 4001(a)(3) of ERISA.

"Net Cash Proceeds" means with respect to (x) any Disposition or Casualty Event, (y) the Liquidation, close-out or other similar action in respect of any transaction arising under any Swap Agreement, or (z) any incurrence of Debt, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of direct expenses (including Taxes) incurred by the Loan Parties in the ordinary course of business in connection with such Disposition, Casualty Event, incurrence of Debt or Liquidation, which shall, in each case, be reasonably acceptable to the Majority Lenders.

"New Money Facility" shall have the meaning assigned to such term in the Recitals hereto.

"New Money Lenders" means the Persons listed on Annex II and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a New Money Loan or a Commitment and, as the context requires, includes any Issuing Bank and, in each case, includes their respective permitted successors and assigns.

"New Money Loan" shall have the meaning assigned to such term in Section 2.01(b).

"Non-Defaulting Lender" means, at any time, a Lender that is not a Defaulting Lender or a Potential Defaulting Lender.

"Notes" means any promissory notes of the Borrower described in Section 2.02(d) and which are substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Obligations" means any and all amounts owing or to be owing by the Parent, the Borrower, any other Subsidiary or other Loan Party (including without limitation, all debts, liabilities, obligations, covenants and duties of each such Person, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising) and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate of any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding:  (a) to the Administrative Agent, the Issuing Bank, any Lender or any other Secured Party under, or in connection with, any Loan Document; (b) any Treasury Management Bank under any Secured Treasury Management Agreement; and (c) all renewals, extensions and/or rearrangements of any of the above; provided that, notwithstanding anything to the contrary herein or in any Loan Document, "Obligations" shall not include, with respect to any Loan Party, any Excluded Swap Obligations of such Loan Party.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling

18

agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, flow lines, water disposal systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing. Unless otherwise indicated herein, each reference in this Agreement to the term "Oil and Gas Properties" shall mean Oil and Gas Properties of the Borrower and the other Subsidiaries.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non US jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 12.18).

"Parent" means Vanguard Natural Resources, Inc., a Delaware corporation.

"Parent Company" means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

19

"Participant" has the meaning set forth in Section 12.04(d).

"Participant Register" has the meaning set forth in Section 12.04(d).

"PATRIOT Act" has the meaning assigned to such term in Section 12.16.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"PDP" means those Proved Reserves which are expected to be recovered from completion intervals which are open and producing at the time of the estimate.

"Permitted Variance" has the meaning assigned to such term in Section 9.21.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals to this Agreement.

"Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Parent, the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Parent, the Borrower or a Subsidiary or an ERISA Affiliate.

"Platform" has the meaning assigned such term in Section 12.01(d).

"Potential Defaulting Lender" means, at any time, (i) any Lender with respect to which an event of the kind referred to in the definition of "Lender Insolvency Event" has occurred and is continuing in respect of any subsidiary or financial institution affiliate of such Lender, or (ii) any Lender that has notified, or whose Parent Company or a subsidiary or financial institution affiliate thereof has notified, the Administrative Agent, the Borrower or the Issuing Bank in writing, or has stated publicly, that it does not intend to comply with its funding obligations generally under other loan agreements or credit agreements or other similar/other financing agreements, unless such writing or statement states that such position is based on such Lender's determination that one or more conditions precedent to funding cannot be satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing or public statement).  Any determination by the Administrative Agent that a Lender is a Potential Defaulting Lender under any of clauses (i) and (ii) above will be conclusive and binding absent manifest error, and such Lender will be deemed a Potential Defaulting Lender (subject to Section 2.12(b)) upon notification of such determination by the Administrative Agent to the Borrower, the Issuing Bank and the Lenders.

"Prepetition" means the time period prior to the Petition Date.

"Prepetition Intercreditor Agreement" means that certain Amended and Restated Intercreditor Agreement, dated as of August 1, 2017, among the Borrower, the Parent, the other Subsidiaries named therein, certain other Affiliates of the Parent, the Prepetition Credit Agreement Agent and the Prepetition Second Lien Trustee, as in effect on the Petition Date.

"Prepetition Credit Agreement Agent" means Citibank, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement.

20

"Prepetition Credit Agreement" means that certain Fourth Amended and Restated Credit Agreement, dated as of August 1, 2017, among the Borrower, the Parent, the lenders from time to time party thereto (the "Prepetition Lenders") and the Prepetition Agent, as amended by that certain Limited Waiver and First Amendment to Fourth Amended and Restated Credit Agreement dated as of January 9, 2018, that certain Second Amendment to Credit Agreement dated as of July 5, 2018 and that certain Third Amendment to Fourth Amended and Restated Credit Agreement dated as of December 6, 2018 and that certain Ratification and Fourth Amendment to Fourth Amended and Restated Credit Agreement dated as of March 31, 2019 (the "Prepetition Credit Agreement Ratification").

"Prepetition Credit Agreement Obligations" means the "Obligations" as defined in the Prepetition Credit Agreement.

"Prepetition Lenders" has the meaning assigned to such term in the definition of "Prepetition Credit Agreement".

"Prepetition Loan Documents" means the "Loan Documents" as defined in the Prepetition Credit Agreement.

"Prepetition Revolving Loans" means the "Revolving Loans" as defined in the Prepetition Credit Agreement.

"Prepetition Second Lien Debt Documents" means, collectively, the Prepetition Second Lien Indenture, the Prepetition Second Lien Notes, all guaranties in respect of the Prepetition Second Lien Notes, and all other agreements, documents or instruments executed and delivered by the Borrower or any Guarantor in connection with, or pursuant to, the issuance of the Prepetition Second Lien Notes, in each case, as in effect on the Petition Date.

"Prepetition Second Lien Indenture" means the Amended and Restated Indenture, dated as of August 1, 2017, among, *inter alia*, the Prepetition Second Lien Trustee, the Parent , and certain Subsidiaries (including the Borrower), as guarantors, as in effect on the Petition Date together with all amendments, modifications, replacements, extensions and rearrangements thereof permitted by the Prepetition Intercreditor Agreement and this Agreement.

"Prepetition Second Lien Noteholders" means the holders of the Prepetition Second Lien Notes.

"Prepetition Second Lien Notes" means the Parent's 9.00% Senior Secured Second Lien Notes due 2024, issued pursuant to the Prepetition Second Lien Indenture, in an amount not to exceed $80,722,487 and subordinated pursuant to the Prepetition Intercreditor Agreement.

"Prepetition Second Lien Obligations" means the "Obligations" (as defined in the Prepetition Second Lien Indenture).

"Prepetition Second Lien Trustee" means Delaware Trust Company, or such other entity serving in the capacity as the "collateral trustee" under the Prepetition Second Lien Indenture to the extent permitted under the Prepetition Second Lien Indenture and the Prepetition Intercreditor Agreement.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Citibank as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the

21

Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Professional Fees" means fees and expenses of Retained Professionals and any Committee (each as defined in and in accordance with the DIP Order).

"Projected Production" means, for any specified period, the projected volume of production of Hydrocarbons from Proved Reserves of the Oil and Gas Properties (as reflected on the most recently delivered Projected Production Report) reasonably anticipated by Borrower and acceptable to Administrative Agent, during such period.

"Projected Production Report" means each report, in form and substance satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th, the Projected Production for (i) the first 24 month period following the date of such Projected Production Report, (ii) the succeeding 24-month period (from the 25th month through the 48th month) following the date of such Projected Production Report, and (iii) the succeeding 12-month period (from the 48th month through the 60th month) following the date of such Projected Production Report.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proved Oil and Gas Properties" means Hydrocarbon Interests to which Proved Reserves are attributed.

"Proved Reserves" means those recoverable Hydrocarbons that have been estimated with reasonable certainty, as demonstrated by geological and engineering data, to be economically recoverable from the Oil and Gas Properties by existing producing methods under existing economic conditions.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 8.02.

"PUD" means economically recoverable Proved Reserves estimated to exist in proved reservoirs which will be recovered from wells to be drilled in the future.  Reserves in undrilled areas are included in proved reserved estimates if they are considered proved by geologic analysis of the current well information.

"PV-9" means the present worth of future net income, discounted to present value at the simple interest rate of nine percent (9%) per year.

"Recipient" means (a) the Administrative Agent, (b) any Lender and (c) the Issuing Bank, as applicable.

"RCRA" has the meaning set forth in the definition of "Environmental Laws".

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt.  "Redeem" has the correlative meaning thereto.

"<u>Register</u>" has the meaning assigned such term in <u>Section 12.04(c)</u>.

"<u>Regulation D</u>" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"<u>Release</u>" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, injecting, escaping, leaching, migrating, dumping, or disposing into the environment.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives (including attorneys, accountants and experts) of such Person and of such Person's Affiliates.

"<u>Remedial Work</u>" has the meaning assigned such term in <u>Section 8.10(a)</u>.

"<u>Reporting Date</u>" has the meaning assigned to such term in <u>Section 8.21(a)</u>.

"<u>Required Roll-Up Lenders</u>" means, at any time, Roll-Up Lenders having Roll-Up Loans representing more than $66^{2/3}$% of the sum of all Roll-Up Loans outstanding

"<u>Reserve Report</u>" means each report, in form and substance satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th, the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the other Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and Capital Expenditures with respect thereto as of such date, based upon the economic and pricing assumptions consistent with the Administrative Agent's lending requirements at the time.

"<u>Responsible Officer</u>" means, as to any Person, the chief executive officer, the president, any Financial Officer of such Person or any vice president of such Person.  Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"<u>Restricted Payment</u>" means (a) any dividend or other distribution or return of capital (whether in cash, securities or other Property) with respect to any Equity Interests in the Parent, Borrower or any of the other Subsidiaries, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, Redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Parent, Borrower or any of the Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in, or issued by, the Parent, the Borrower or any of the Subsidiaries and (b) any payment of management fees, advisory fees or similar fees by the Parent, the Borrower or any of the other Subsidiaries to any holders of their respective Equity Interests, or any Affiliates thereof.

"<u>Revolving Credit Exposure</u>" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's New Money Loans and its LC Exposure at such time and, as the context may require, the aggregate Revolving Credit Exposure of all Lenders.

"<u>Roll-Up Loan Amount</u>" means, with respect a Roll-Up Lender, a percentage of the Roll-Up Loans allocated to such Roll-Up Lender as set forth opposite such Roll-Up Lender's name on <u>Annex I</u> (as updated by the Administrative Agent on the Final Facility Effective Date in accordance with <u>Section 2.01(a)</u>).

"<u>Roll-Up Facility</u>" shall have the meaning assigned to such term in the Recitals hereto.

<div align="center">23</div>

"Roll-Up Lenders" means the Persons listed on Annex I (as updated by the Administrative Agent from time to time on or prior to the Final Facility Effective Date in accordance Section 2.01(a)) and any Person that becomes a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) with respect to a Roll-Up Loan and includes their respective permitted successors and assigns.

"Roll-Up Loan" shall have the meaning assigned to such term in Section 2.01(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, region, territory or government.

"Sanctioned Person" means, at any time, any person with whom dealings are restricted or prohibited under Sanctions, including, without limitation (a) any Person listed in any Sanctions-related list of designated or identified Persons maintained by the United States (including, without limitation, by OFAC, the U.S. Department of the Treasury, the U.S. Department of State or the US Department of Commerce), the United Nations Security Council, the European Union or any European Union member state, the United Kingdom (including, without limitation, Her Majesty's Treasury), Switzerland, Australia or any other relevant authority, (b) any Person located, operating, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (c) any Person directly or indirectly owned or controlled by, or acting for the benefit or in behalf of, any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (a) the U.S. government (including, without limitation, OFAC, the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce) (b) the United Nations Security Council; (c) the European Union or any of its member states; (d) the United Kingdom (including, without limitation, Her Majesty's Treasury); (e) Switzerland; (f) Australia or (g) any other relevant authority.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Parties" means the Lenders, the Issuing Bank, the Treasury Management Banks and any other Person holding Obligations secured by the Liens granted under any Loan Document, including pursuant to the DIP Orders.

"Secured Treasury Management Agreement" means any Treasury Management Agreement entered into between, or among, any Loan Party and any Treasury Management Bank.

"Security Instruments" means, collectively, each security agreement, the Mortgages, the DIP Orders, the Guaranty and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Parent, the Borrower or any other Person (other than Secured Treasury Management Agreements) in connection with, or as security for, any Obligations, the Notes, this Agreement, and reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve

percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject, with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding Equity Interests having ordinary voting power to elect a majority of the board of directors, board of managers or equivalent governing body of such corporation, partnership, limited liability company or other entity (irrespective of whether or not at such time Equity Interests of any other class or classes of such corporation, partnership, limited liability company or other entity shall or may have voting power by reason of the happening of any contingency) is at the time owned by (directly or indirectly) or the management thereof is otherwise controlled by (directly or indirectly) such Person.  Unless otherwise indicated herein, each reference to the term 'Subsidiary' shall mean a Subsidiary of the Parent.

"Superpriority Claim" means a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against a Loan Party in any of the Chapter 11 Cases having priority over any or all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the a Loan Party or its estate, including claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Agreement" means (a) any agreement with respect to any swap, put, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, and to the extent not otherwise included in this definition, any and all agreements, contracts or transactions that constitute a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, managers, officers, employees or consultants of any of the Loan Parties and their respective Subsidiaries shall be a Swap Agreement and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, (x) agreements or obligations to physically sell any commodity at any index-based price shall not be considered Swap Agreements and (y) any right of a Person to 'put' an asset to another Person that arises in connection with an acquisition, disposition or similar agreement shall not be considered a Swap Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Lease" means, as to any Person, any lease (including a lease that may be terminated by the lessee at any time) of any Property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the Property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) 5 days after the Petition Date, if the Interim DIP Order has not been entered prior to the expiration of such period, (c) 35 days (or a later date consented to by the Administrative Agent and the Majority Lenders) after the entry of the Interim Order, if the Bankruptcy Court has not entered the Final Order on or prior to such date, (d) the effective date of an Approved Plan of Reorganization, (e) the consummation of a sale of all or substantially all of the equity and/or assets of the Debtors and budgeted and necessary expenses of the estates (unless done pursuant to an confirmed chapter 11 plan), (f) the date of the payment in full, in cash, of all Obligations (and the termination of all Commitments and the LC Commitment in accordance with the terms hereof) and (g) the date of the termination of the Commitments and the LC Commitment and/or the acceleration of all of the Obligations under this Agreement and the other Loan Documents following the occurrence and during the continuance of an Event of Default in accordance with Section 10.02.

"Testing Date" shall have the meaning assigned to such term in Section 8.18(b).

"Testing Period" shall have the meaning assigned to such term in Section 8.18(b).

"Total Credit Exposure" means, as to any Lender at any time, the sum of such Lender's unused Commitment, the principal amount at such time of its outstanding Loans and such Lender's LC Exposure at such time.

"Transactions" means, with respect to (a) the Parent and the Borrower, the execution, delivery and performance by each of this Agreement, and each other Loan Document to which it is a party, the borrowing of New Money Loans, the use of the proceeds thereof and the issuance (or deemed issuance) of Letters of Credit hereunder, the borrowing or deemed borrowing of Roll-Up Loans and the grant of liens and other security interests by the Parent and the Borrower against its respective Mortgaged Properties and its other Properties, in each case, pursuant to the Loan Documents and (b) each Guarantor (other than the Parent), the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, such Guarantor's guarantee of the Obligations and all other obligations arising under the Guaranty and such Guarantor's grant of the security interests and provision of collateral under the Loan Documents, including the grant of security interests and liens by such Guarantor on its Mortgaged Properties and its other Properties pursuant to the Loan Documents.

"<u>Treasury Management Agreement</u>" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"<u>Treasury Management Bank</u>" means any Person that, at the time it enters into a Treasury Management Agreement with the Borrower or any other Subsidiary or any Guarantor, is a Lender or an Affiliate of a Lender, or was a Lender or an Affiliate of a Lender, at the time such Treasury Management Agreement was entered into; <u>provided</u> that, so long as any Lender is a Defaulting Lender, such Lender will not be a Treasury Management Bank with respect to any Treasury Management Agreement entered into while such Lender was a Defaulting Lender.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"<u>Undisclosed Administration</u>" means in relation to a Lender the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"<u>U.S. Person</u>" means any Person that is a "<u>United States person</u>" as defined in Section 7701(a)(30) of the Code.

"<u>U.S. Tax Compliance Certificate</u>" shall have the meaning assigned to such term in <u>Section 5.03(g)(ii)(B)(3)</u>.

"<u>Variance Report</u>" shall have the meaning assigned to such term in <u>Section 8.18(b)</u>.

"<u>Variance Testing Date</u>" shall have the meaning assigned to such term in <u>Section 8.18(b)</u>.

"<u>Wholly-Owned Subsidiary</u>" means any Subsidiary of which all of the outstanding Equity Interests, on a fully-diluted basis, are owned by the Parent, the Borrower or one or more of the Wholly-Owned Subsidiaries.

"<u>Withholding Agent</u>" means any Loan Party and the Administrative Agent.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.    <u>Types of Loans and Borrowings</u>.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (<i>e.g.</i>, a "<u>Eurodollar Loan</u>" or a "<u>Eurodollar Borrowing</u>").

(a)    <u>Terms Generally; Rules of Construction</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein

shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including", (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement, (g) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (h) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, cash, securities, accounts and contract rights.   No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

(b)      Headings.   Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03.      Accounting Terms and Determinations; GAAP.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared for the Parent, the Borrower and the Subsidiaries, on a consolidated basis, in accordance with GAAP, applied on a basis consistent with the Financial Statements except for changes in which the Parent's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

Section 1.04.      Changes in GAAP.   If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Majority Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Majority Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP provided, further that for purposes of interpreting accounting terms and for purposes of determinations made with respect to accounting matters hereunder and under any other Loan Document (i) obligations of the Borrower or any of its Subsidiaries under operating leases shall not be deemed to constitute obligations under Capital Leases or Debt and (ii) a lease that would not be considered a capital lease pursuant to GAAP prior to the effectiveness of ASC 842 (whether or not such lease was in effect on such date) shall not be deemed to constitute a Capital Lease and the obligations under such lease shall not

28

be deemed to constitute Debt, for purposes of this Agreement regardless of any change in GAAP following December 31, 2017 that would otherwise require such lease to be characterized or re-characterized (on a prospective or retroactive basis or otherwise) as a Capital Lease or otherwise reflected on the balance sheet.

Section 1.05.   **[Reserved].**

Section 1.06.   <u>Determination of Time of Day</u>.  Unless designated otherwise, all references herein to times of day shall be references to Central time (daylight or standard, as applicable).

Section 1.07.   <u>Amounts of Letters of Credit</u>.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; <u>provided</u>, <u>however</u>, that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreements related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

ARTICLE II

THE CREDITS

Section 2.01.   <u>Commitments</u>.

(a)      On the Final Facility Effective Date, each Roll-Up Lender shall become entitled to roll up an aggregate principal amount of Prepetition Revolving Credit Loans held by such Roll-Up Lender equal to such Roll-Up Lender's Roll-Up Loan Amount as set forth opposite such Roll-Up Lender's name on <u>Annex I</u> into roll-up loans hereunder (the "<u>Roll-Up Loans</u>"). Subject to the terms and conditions set forth herein, on the Final Facility Effective Date, and without any further action by any party to this Agreement, each Roll-Up Lender's Roll-Up Loans shall, from and after such date, be designated as such and administered hereunder. Such designation is not intended to and shall not constitute a payment on account of the applicable Prepetition Revolving Credit Loans, which shall continue to be outstanding under the Prepetition Credit Agreement and administered under this Agreement as Roll-Up Loans. As a consequence of such designation, and solely to enable the Roll-Up Loans to be administered hereunder, effective with such designation and except as otherwise provided in the Prepetition Credit Agreement, each Roll-Up Loan that is the subject of such designation shall from and after such designation constitute a Roll-Up Loan hereunder; <u>provided</u> that, for the avoidance of doubt, the Roll-Up Loans shall continue to be guaranteed by the Guarantors under the Guaranty Agreement (as defined in the Prepetition Credit Agreement) and secured by and entitled to the benefits of all Liens and security interests created and arising under the Security Instruments (as defined in the Prepetition Credit Agreement), which Liens and security interests shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority, as if such Loans had not been so designated. Each such designation shall be applied on a pro rata basis to each class of Prepetition Revolving Credit Loans held by such Roll-Up Lender under the Prepetition Credit Agreement to the extent rolled up under this Agreement as set forth on <u>Annex I</u>. For the avoidance of doubt, each Roll-Up Lender acknowledges and agrees that by accepting the benefits of this Agreement, on the Final Facility Effective Date each Prepetition Lender rolling up loans under this Agreement shall become a party to this Agreement as a Roll-Up Lender hereunder by executing and delivering this Agreement. Amounts rolled up under this <u>Section 2.01(a)</u> and repaid or prepaid may not be reborrowed. The Administrative Agent shall update <u>Annex I</u> on the Final Facility Effective Date to reflect each Roll-Up Lender's Roll-Up Loan Amount (which Roll-Up Loan Amount listed on <u>Annex I</u> shall be conclusive absent manifest error) and deliver such updated <u>Annex I</u> to

the Borrower and the Roll-Up Lenders, whereupon such updated <u>Annex I</u> shall constitute <u>Annex I</u> for all purposes hereunder.

(b)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees to make New Money Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (b) during the Interim Period, such Lender's Revolving Credit Exposure exceeding its Applicable Percentage of the Interim Facility Cap or (c) the total Revolving Credit Exposure of all Lenders exceeding the Effective Commitment.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the New Money Loans.

Section 2.02.     <u>Loans and Borrowings</u>.

(a)     <u>Borrowings; Several Obligations</u>.  Each New Money Loan shall be made as part of a Borrowing consisting of New Money Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any New Money Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; <u>provided</u> that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required hereunder.

(b)     <u>Types of Loans</u>.  Subject to <u>Section 3.03</u>, each Borrowing of New Money  Loans shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such New Money Loan; <u>provided</u> that any exercise of such option shall not affect the obligation of the Borrower to repay such New Money Loan in accordance with the terms of this Agreement.

(c)     <u>Minimum Amounts; Limitation on Number of Borrowings</u>.  Prior to the Final Facility Effective Date, the Borrower shall make a single Borrowing of New Money Loans in an amount not to exceed the Interim Facility Cap and (i) in the case of a Eurodollar Borrowing, in an aggregate amount that is an integral multiple of $500,000 and not less than $2,500,000 and (ii) in the case of an ABR Borrowing, in an integral multiple of $100,000 and not less than $1,000,000. On and after the Final Facility Effective Date, at the commencement of each Interest Period for any Eurodollar Borrowing of New Money Loans, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $2,500,000.  At the time that each ABR Borrowing of New Money Loans is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000; <u>provided</u> that an ABR Borrowing of New Money Loans may be in an aggregate amount that is equal to the entire unused balance of the Aggregate Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by <u>Section 2.08(e)</u>.  Borrowings of more than one Type may be outstanding at the same time, <u>provided</u> that there shall not at any time be more than a total of five (5) Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)     <u>Loans, Obligations and Notes</u>. The Obligations and credit extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the credit extensions made by such Lender to the Borrower and the interest and payments thereon.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the

30

absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse the date, Type (if applicable), and amount and maturity of its Loans and payments made with respect thereto.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the Obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

      Section 2.03.   <u>Requests for Borrowings</u>.  To request a Borrowing of New Money Loans the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., Houston, Texas time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., Houston, Texas time, on the date of the proposed Borrowing; <u>provided</u> that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in <u>Section 2.08(e)</u>.  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile (or other electronic communication subject to <u>Section 12.01(b)</u>) to the Administrative Agent of a written Borrowing Request in substantially the form of <u>Exhibit B</u> and signed by the Borrower; <u>provided</u> that the failure by the Borrower to provide such written confirmation shall not in any way revoke or affect such Borrowing Request.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with <u>Section 2.02</u>:

      (i)      the aggregate amount of the requested Borrowing;

      (ii)      the date of such Borrowing, which shall be a Business Day;

      (iii)      whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

      (iv)      in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period of one month;

      (v)      the amount of the (A) then-effective Aggregate Commitments, (B) the amount of Available Funds and the then-effective Effective Commitment, (C) the current total Revolving Credit Exposure (without regard to the requested Borrowing) and (D) the pro forma total Revolving Credit Exposure (giving effect to the requested Borrowing); and

      (vi)      the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.05</u>.

      If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  Each Borrowing Request shall constitute a representation by the Borrower that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposure to exceed the then-effective Effective Commitments.

      Other than in respect of the Borrowing Request delivered to the Administrative Agent by the Borrower on the Effective Date, promptly following receipt of a Borrowing Request in accordance with this <u>Section 2.03</u>, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04.      Interest Elections.

(a)      Conversion and Continuance.  Each Borrowing initially shall be of the Type (i) in the case of Roll-Up Loans, identical to those of the Prepetition Revolving Loans rolled up by such Roll-Up Loans and (ii) in the case of New Money Loans, as specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period of one month.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing, all as provided in this Section 2.04.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower, provided that the failure by the Borrower to provide such written confirmation shall not in any way revoke or affect such Interest Election Request.

(c)      Information in Interest Election Requests.  Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and (iv) shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which, in all cases, whether or not so indicated in such Interest Election Request, shall be a period of one month.

If any such Interest Election Request does not specify a Type, then the Borrower shall be deemed to have selected a Type of ABR Borrowing.

(d)      Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)      Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and

32

is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05.   Funding of Borrowings.

(a)   Funding by Lenders.  Each Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., Houston, Texas time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such New Money Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)   Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to ABR Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(c)   Several Obligations of Lenders.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments pursuant to Section 12.03(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 12.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 12.03(c).

(d)   ERISA.  Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the

33

Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)     the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable so as to exempt from the prohibitions of Section 406 of ERISA and Section 4975 of the Code such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (1) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (2) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (3) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(v)     In addition, unless either (1) sub-clause (A) in the immediately preceding clause (i) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and the Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that  none of the Administrative Agent or the Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender involved in the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto).

Section 2.06.     Termination and Reduction of Aggregate Commitments.

(a)     Scheduled Termination of Commitments.  Unless previously terminated, the Commitments and the LC Commitment shall terminate on the Termination Date.

(b)    Optional Termination and Reduction of Aggregate Commitments.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Commitments; provided that (A) each reduction of the Aggregate Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $2,500,000 and (B) the Borrower shall not terminate or reduce the Aggregate Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposure would exceed the total Effective Commitments.

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Commitments under Section 2.06(b)(i) at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable.  Any termination or reduction of the Aggregate Commitments shall be permanent and may not be reinstated.  Each reduction of the Aggregate Commitments shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07.    **[Reserved].**

Section 2.08.    Letters of Credit.

(a)    General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated standby Letters of Credit, in an aggregate amount not to exceed the LC Commitment, for its own account or for the account of any of the other Subsidiaries that are Guarantors, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period; provided that the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if, after giving effect to such issuance, amendment, renewal the aggregate Revolving Credit Exposure would exceed the Effective Commitment.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.  Notwithstanding anything herein to the contrary, no Issuing Bank shall have any obligation hereunder to issue, and shall not issue, any Letter of Credit (i) the proceeds of which would be made available to any Person (A) to fund any activity or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding, is the subject of any Sanctions or (B) in any manner that would result in a violation of any Sanctions by any party to this Agreement, (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any Governmental Requirement relating to the Issuing Bank or any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Issuing Bank in good faith deems material to it or (iii) if the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally under similar circumstances for similarly situated borrowers; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated

35

by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed not to be in effect on the Effective Date for purposes of clause (ii) above, regardless of the date enacted, adopted, issued or implemented.

(b)      Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or facsimile (or transmit by other electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension (or such shorter period of time as may be acceptable to the Administrative Agent and the applicable Issuing Bank in its sole discretion)) a notice:

(i)      requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)      specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)      specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)      specifying the amount of such Letter of Credit;

(v)      specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)      specifying (A) the amount of the Effective Commitments at such time, (B) the current total Revolving Credit Exposure (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and (C) the pro forma total Revolving Credit Exposure (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (A) the LC Exposure shall not exceed the LC Commitment and (Bi) the total Revolving Credit Exposure shall not exceed the then-effective Effective Commitments. No letter of credit issued by an Issuing Bank (if the Issuing Bank is not the Administrative Agent) shall be deemed to be a "Letter of Credit" issued under this Agreement unless the Issuing Bank has requested and received written confirmation from the Administrative Agent that the representations by Borrower contained in the foregoing clauses (A) and (B) are true and correct.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.

The Issuing Bank shall not be under any obligation to issue any Letter of Credit if there is a default of any Lender's obligations to fund under Section 2.08(d) or any Lender is at such time a Defaulting Lender hereunder, unless the Issuing Bank has entered into satisfactory arrangements with the Borrower or such Lender to eliminate the Issuing Bank's risk with respect to such Defaulting Lender.

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business no later than ten (10) days prior to the last day of the Availability Period.

36

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each New Money Lender, and each New Money Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such New Money Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.   In consideration and in furtherance of the foregoing, each New Money Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each New Money Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the aggregate Revolving Credit Exposure exceeding the Effective Commitments or reduction or termination of the Aggregate Commitments or otherwise, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)      Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that if such LC Disbursement is less than or equal to $1,000,000, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each New Money Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the New Money Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the New Money Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that New Money Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such New Money Lenders and the Issuing Bank as their interests may appear.  Any payment made by a New Money Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)      Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of

US-DOCS\106250840.21

Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the New Money Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by facsimile) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the New Money Lenders with respect to any such LC Disbursement.

(h)     Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.08(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made but excluding the date that the Borrower reimburses the Issuing Bank for such LC Disbursement, at the rate per annum then applicable to ABR Loans.  Interest accrued pursuant to this Section 2.08(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any New Money Lender pursuant to Section 2.08(e) to reimburse the Issuing Bank shall be for the account of such New Money Lender to the extent of such payment.

(i)     Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the New Money Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the retiring Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and

obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. From and after the effective date of any such replacement, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit or to extend, renew or increase any existing Letter of Credit, including, without limitation, any Letter of Credit with an auto-extend feature (for the avoidance of doubt, the retiring Issuing Bank is authorized to notify any and each beneficiary of each Letter of Credit (in accordance with the terms of such Letter of Credit) that any such Letter of Credit will not be renewed, extended or increased, automatically or otherwise). Upon the acceptance of a successor's appointment as Issuing Bank hereunder, (A) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, except with respect to Letters of Credit issued by such retiring Issuing Bank prior to its resignation, (B) the retiring Issuing Bank and shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (C) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(j)     Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority New Money Lenders demanding the deposit of cash collateral pursuant to this Section 2.08(j), (ii) the LC Exposure exceeds the LC Commitment or (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to any LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then the Borrower shall deposit, in an LC Collection Account, in the name of the Administrative Agent and for the benefit of the New Money Lenders, an amount in cash equal to (A) in the case of an Event of Default, the LC Exposure, (B) in the case of the LC Exposure exceeding the LC Commitment, an amount equal to such excess and (C) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any other Subsidiary described in Section 10.01(h). The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the New Money Lenders, an exclusive first priority and continuing perfected security interest in and Lien on the LC Collection Account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the LC Collection Account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor. The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of the other Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the New Money Lenders or any other Person for any reason whatsoever. Such deposit shall be held as collateral securing the payment and performance of the Obligations. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collection Account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative

39

Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in the LC Collection Account.  Moneys in the LC Collection Account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to any LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

Section 2.09.   **[Reserved].**

Section 2.10.   **[Reserved].**

Section 2.11.   Cash Collateral.  If any New Money Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, if any Letter of Credit is at the time outstanding, the Issuing Bank may (except, in the case of a Defaulting Lender, to the extent the Commitment of such Defaulting Lender has been fully reallocated pursuant to Section 2.12(a)(i)), by notice to the Borrower and such Defaulting Lender or Potential Defaulting Lender through the Administrative Agent, require the Borrower to Cash Collateralize the obligations of the Borrower to the Issuing Bank in respect of such Letter of Credit in amount at least equal to 102% of the aggregate amount of the unreallocated obligations (contingent or otherwise) of such Defaulting Lender or such Potential Defaulting Lender to be applied pro rata in respect thereof, or to make other arrangements satisfactory to the Administrative Agent and to the Issuing Bank in their sole discretion to protect them against the risk of non-payment by such Defaulting Lender or Potential Defaulting Lender.

Section 2.12.   Defaulting Lenders.

(a)   Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)   Reallocation of Defaulting Lender Commitment, Etc.  If a Lender becomes, and during the period it remains, a Defaulting Lender, the following provisions shall apply with respect to any outstanding LC Exposure of such Defaulting Lender:

(A)   the LC Exposure of such Defaulting Lender will, subject to the limitation in the first and second proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders pro rata in accordance with their respective Commitments; provided that (I) after giving effect to such reallocation, each Non-Defaulting Lender's Revolving Credit Exposure may not in any event exceed the Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation, (II) there exists no Default at such time of reallocation and (III) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Bank or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender;

40

(B)　　**[reserved]**; and

(C)　　any amount paid by the Borrower or otherwise received by the Administrative Agent for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but will instead be retained by the Administrative Agent in a segregated non-interest bearing account until (subject to Section 2.12(b)) the termination of the Aggregate Commitments and payment in full of all Obligations and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority: *first* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement, *second* to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank (pro rata as to the respective amounts owing to each of them) under this Agreement, *third* to the payment of post-default interest and then current interest due and payable to the Lenders hereunder other than Defaulting Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them, *fourth* to the payment of fees then due and payable to the Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them, *fifth* to pay principal and unreimbursed LC Disbursements then due and payable to the Non-Defaulting Lenders hereunder ratably in accordance with the amounts thereof then due and payable to them, *sixth* to the ratable payment of other amounts then due and payable to the Non-Defaulting Lenders, and *seventh* after the termination of the Aggregate Commitments and payment in full of all obligations of the Borrower hereunder, to pay amounts owing under this Agreement to such Defaulting Lender or as the Bankruptcy Court or any other court of competent jurisdiction may otherwise direct.

(ii)　　Right to Give Drawdown Notices. In furtherance of the foregoing, if any Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank is hereby authorized by the Borrower (which authorization is irrevocable and coupled with an interest) to give, in its discretion, through the Administrative Agent, Notices of Borrowing pursuant to Section 2.03 in such amounts and in such times as may be required to (A) reimburse an outstanding LC Disbursement, and/or (B) Cash Collateralize the obligations of the Borrower in respect of outstanding Letters of Credit in an amount at least equal to the aggregate amount of the obligations (contingent or otherwise) of such Defaulting Lender or Potential Defaulting Lender in respect of such Letter of Credit.

(iii)　　Certain Fees. Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will not be entitled to any fees accruing during such period pursuant to Section 3.05(a) and Section 3.05(b)(i) (without prejudice to the rights of the Non-Defaulting Lenders in respect of such fees), provided that (A) to the extent that all or a portion of the LC Exposure of such Defaulting Lender is reallocated to the Non-Defaulting Lenders pursuant to Section 2.12(a)(i)(A), such fees that would have accrued for the benefit of such Defaulting Lender will instead accrue for the benefit of and be payable to such Non-Defaulting Lenders, pro rata in accordance with their respective Commitments, and (B) to the extent that all or any portion of such LC Exposure cannot be so reallocated, such fees will instead accrue for the benefit of and be payable to the Issuing Bank, as applicable (and the pro rata payment provisions of this Agreement (including without limitation, Article IV) will automatically be deemed adjusted to reflect the provisions of this Section).

(b)　　Defaulting Lender Cure. If the Borrower, the Administrative Agent and the Issuing Bank agree in writing in their discretion that a Lender is no longer a Defaulting Lender or a Potential Defaulting

Lender, as the case may be, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any amounts then held in the LC Collection Account pursuant to Section 2.11), such Lender will, to the extent applicable, purchase at par such portion of outstanding Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Credit Exposure and LC Exposure of the Lenders to be on a pro rata basis in accordance with their respective Commitments, whereupon such Lender will cease to be a Defaulting Lender or Potential Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Exposure and LC Exposure of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender or a Potential Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender or Potential Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender or Potential Defaulting Lender.

Section 2.13.    Collateral; Guarantees.

(a)    Priority and Liens.  The parties hereto acknowledge and agree that, upon entry of the DIP Orders and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the superpriority claims and liens as set forth in, the DIP Orders.

(b)    Payment of Obligations.  On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(c)    No Discharge; Survival of Claims.  The Borrower and each Guarantor agrees that (a) any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Obligations, other than after the payment in full in cash to the Secured Parties of all Obligations (and the cash collateralization of all outstanding Letters of Credit in amount and subject to documentation satisfactory to the Issuing Bank) and termination of the Commitments on or before the effective date of a plan of reorganization and (b) to the extent the Obligations are not satisfied in full, (i) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent, the Lenders, and the Secured Treasury Management Banks pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

(d)    Perfection and Protection of Security Interests and Liens.  The Loan Parties will from time to time deliver to the Administrative Agent all financing statements, amendments, assignments and continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by each Loan Party, as applicable, in form and substance satisfactory to the Administrative Agent, in each case, which the Administrative Agent requests for the purpose of perfecting, confirming, or protecting its lien and security interest in Collateral for the purpose of securing the Obligations.

(e)    Offset.  To secure the payment and performance of the Obligations, each Loan Party hereby grants the Administrative Agent and each Lender a security interest, lien, and right of offset, each of which shall be in addition to all other interests, liens, and rights of the Administrative Agent at common law, under the this Agreement and the other Loan Documents, or otherwise, and each of which shall be upon and against (a) any and all monies, securities or other property (and the proceeds therefrom) of the Loan Parties now or hereafter held or received by or in transit to the Administrative Agent or any Lender from or for the

42

account of any Loan Party, whether for safekeeping, custody, pledge, transmission, collection or otherwise, (b) any and all deposits (general or special, time or demand, provisional or final) of any Loan Party with the Administrative Agent or any Lender, and (c) any other credits and claims of any Loan Party at any time existing against the Administrative Agent or any Lender, including claims under certificates of deposit. During the existence of any Event of Default, the Administrative Agent or any Lender is hereby authorized to foreclose upon, offset, appropriate, and apply, at any time and from time to time, without notice to any Loan Party, any and all items hereinabove referred to against the Obligations then due and payable.

(f)     **[Reserved].**

(g)     The direct or indirect value of the consideration received and to be received by such Guarantor in connection herewith is reasonably worth at least as much as the liability and obligations of each Guarantor hereunder and under the other Loan Documents, and the incurrence of such liability and obligations in return for such consideration may reasonably be expected to benefit each Guarantor, directly or indirectly.

ARTICLE III

PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01.     Repayment of Loans.  The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02.     Interest.

(a)     ABR Loans.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)     Eurodollar Loans.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     Post-Default Rate.  Notwithstanding the foregoing,

(i)     if any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding shall automatically bear interest, after as well as before judgment, at a rate per annum equal to three percent (3%) plus the rate applicable to ABR Loans as provided in Section 3.02(a) (including the Applicable Margin), but in no event to exceed the Highest Lawful Rate, and shall be payable on demand made by the Administrative Agent, and

(ii)     if there exists any Event of Default, then all Loans outstanding shall automatically bear interest, after as well as before judgment, at a rate per annum equal to three percent (3%) plus the rate applicable to ABR Loans as provided in Section 3.02(a) (including the Applicable Margin), but in no event to exceed the Highest Lawful Rate and shall be payable on demand made by the Administrative Agent.

(d)     Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; provided that (i) interest accrued

43

pursuant to <u>Section 3.02(c)</u> shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)　　<u>Interest Rate Computations</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03.　　<u>Alternate Rate of Interest</u>.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)　　the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate for such Interest Period; or

(b)　　the Administrative Agent is advised by the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective (and shall be deemed to be a request for an ABR Borrowing), and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 3.04.　　<u>Prepayments</u>.

(a)　　<u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with <u>Section 3.04(b)</u>. Notwithstanding the foregoing, no voluntary prepayment of Roll-Up Loans may be made until all New Money Loans and all other Obligations in respect thereof have been paid in full in cash and all Commitments have been terminated.

(b)　　<u>Notice and Terms of Optional Prepayment</u>.  The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., Houston, Texas time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m. Houston, Texas time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any

44

Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)    Mandatory Prepayments.

(i)    If, at any time after giving effect to any termination or reduction of the Aggregate Commitments pursuant to Section 2.06(b) or for any other reason, the total Revolving Credit Exposure exceeds the Effective Commitment at such time, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of any LC Exposure, immediately pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)    **[Reserved].**

(iii)    Subject to the payment priorities set forth in the DIP Orders, if any Loan Party receives any Net Cash Proceeds from the consummation, whether in a single transaction or a series of transactions, of any Disposition, including in connection with any Casualty Event, of any Loan Party's Property (other than Net Cash Proceeds from the sale of Hydrocarbons in the ordinary course of business as permitted by Section 9.12), the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds (less any prepayments from such Net Cash Proceeds made pursuant to clause (i) of this Section 3.04(c)); provided that no such prepayment or repayment shall be required unless and until the aggregate amount of Net Cash Proceeds received by the Loan Parties after the Petition Date in connection with all such Dispositions and Casualty Events exceeds $5,000,000, and thereupon, only in respect of amounts in excess of such $5,000,000 exception.

(iv)    Subject to the payment priorities set forth in the DIP Orders, notwithstanding anything to the contrary in clause (iii) of this Section 3.04(c), if any Loan Party receives or realizes any Net Cash Proceeds from the monetization, Liquidation, close-out or other similar equivalent action taken by any Loan Party in respect of any transaction arising under any Swap Agreement to which any Loan Party is a party, the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds, less any prepayments from such Net Cash Proceeds made pursuant to clause (i) of this Section 3.04(c).

(v)    Subject to the payment priorities set forth in the DIP Orders, immediately upon the incurrence of any Debt (other than Debt permitted pursuant to Section 9.02) by any Loan Party or any of their respective Subsidiaries or the receipt of any amount in respect of the Equity Interests of any Loan Party or their respective Subsidiaries, the Borrower shall repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) on the date of such incurrence or receipt equal to 100% of (i) in the case of the proceeds of any Debt, 100% of the Net Cash Proceeds thereof or (ii) in the case of amounts received in respect of any such Equity Interests, 100% of such amounts.

(vi)    If, at any time, the Loan Parties and/or any of their respective Subsidiaries have any Excess Cash, then the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable

45

Percentage) in an amount equal to the lesser of (A) such Excess Cash and (B) the aggregate principal amount of the outstanding Borrowings as of such date. To effectuate the payment required hereunder, the Loan Parties hereby authorize each Lender, in its (or its applicable Affiliate's) capacity as a depository bank, to, upon written notice from the Administrative Agent, initiate debit entries to any and all accounts held by any Loan Party or any Subsidiary thereof with such bank and to debit the amount set forth in such written notice (which, for the avoidance of doubt, shall be an amount not to exceed the lesser of (i) the outstanding principal amount of the outstanding Borrowings and (ii) the amount of such Excess Cash) from such accounts. The foregoing authorizations to initiate debit entries shall remain in full force and effect, and such debits shall continue from time to time, until the Administrative Agent terminates such respective arrangement. The Borrower, for itself and the other Loan Parties and their respective Subsidiaries, acknowledges that (x) such debit entries may cause an overdraft of such accounts which may result in such bank's refusal to honor items drawn on such accounts until adequate deposits are made to such account, (y) such bank is under no duty or obligation to initiate any debit entry for any purpose and (z) if a debit is not made, the payment required by this Section 3.04(c)(vi) may be late or past due for all purposes hereunder (including, without limitation, Sections 3.02(c)(i) and 10.01(a)).

(vii)   Each prepayment or repayment of Borrowings pursuant to clauses (i) and (iii) through (vi) of this Section 3.04(c) shall be applied as follows: *first*, ratably to any ABR Borrowings of New Money Loans then outstanding, and, *second*, to any Eurodollar Borrowings of New Money Loans then outstanding, and if more than one Eurodollar Borrowing of New Money Loans is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto, *third*, ratably to any ABR Borrowings Roll-Up Loans then outstanding and *fourth*, to any Eurodollar Borrowings of Roll-Up Loans then outstanding, and if more than one Eurodollar Borrowing of Roll-Up Loans is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto and otherwise, (A) *first*, on a pro rata basis in accordance with each such Lender's Applicable Percentage, to pay accrued and unpaid interest on, and accrued and unpaid expenses in respect of, the Obligations, to the extent due and payable in accordance with the Loan Documents; and (B) *second*, on a pro rata basis in accordance with each such Lender's Applicable Percentage, to repay any principal amounts or other Obligations which have been advanced and are outstanding under the DIP Facility (including to Cash Collateralize LC Exposure); and (C) *third*, as required by the DIP Orders. Each prepayment or repayment of Borrowings pursuant to clause (v) of this Section 3.04(c) shall also permanently reduce the Aggregate Commitments by the amount of such prepayment.

(viii)   Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in such prepaid Borrowings. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest in accordance with Section 3.02.

(d)   No Premium or Penalty. Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

(e)   No Effect on Treasury Management Agreements. Prepayments permitted or required under this Section 3.04 shall not affect the Borrower's obligation to continue making payments under any Secured Treasury Management Agreement, each of which shall remain in full force and effect notwithstanding such prepayment, subject to the terms of such Secured Treasury Management Agreement.

US-DOCS\106250840.21

Section 3.05.    Fees.

(a)    Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage a commitment fee, which shall accrue at the Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the Interim Facility Effective Date to but excluding the Termination Date.  Accrued commitment fees shall be payable monthly in arrears on the last day of each calendar month, and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage a participation fee with respect to its participations in Letters of Credit, which shall accrue at a per annum rate equal to the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the daily face amount of such Lender's Applicable Percentage in respect of Letters of Credit on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Interim Facility Effective Date to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.35% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Interim Facility Effective Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, provided that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees under this Section 3.05(b) shall be payable monthly in arrears on the last day of each calendar month, commencing on the first such date to occur after the Interim Facility Effective Date; provided that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.   All fees in this Section 3.05(b) shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate in which case such fee shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed upon between the Borrower and the Administrative Agent).

ARTICLE IV

PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Payments by the Borrower.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts

47

payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans, participations in LC Disbursements or other obligations hereunder, resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon, participations in LC disbursements or other such obligations, greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall

(i)      notify the Administrative Agent of such fact, and

(ii)      purchase (for cash at face value) participations in the Loans, participations in LC Disbursements and/or such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans, participations in LC Disbursements and/or other amounts owing them; provided that

(A)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and

(B)      the provisions of this Section 4.01(c) shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).

48

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

Section 4.02.    Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03.    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(a), Section 2.08(d), Section 2.08(e) or Section 4.02, or otherwise hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 4.04.    **[Reserved].**

ARTICLE V

INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

Section 5.01.    Increased Costs.

(a)    Increased Costs, Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except  any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Bank;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any

49

such Loan, or to increase the cost to such Lender, the Issuing Bank or such other Recipient of participating in, issuing, renewing, extending or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue, renew, extend or maintain any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, the Issuing Bank or such other Recipient hereunder (whether of principal, interest or any other amount), then the Borrower will pay to such Lender, the Issuing Bank or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the Issuing Bank or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any lending office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in under Section 5.01(a) or (b) and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs incurred or reductions suffered more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270 day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Protection Absolute.  The protection of this Section shall be available to each Lender and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

Section 5.02.     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 12.18, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss,

50

cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 5.03.    Taxes.

(a)    Issuing Bank.  For purposes of this Section 5.03, the term "Lender" includes the Issuing Bank.

(b)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Borrower and the Other Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each

51

case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 5.03, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)      Status of Lenders.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-

52

E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (2)      executed copies of IRS Form W-8ECI;

        (3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

        (4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

        (C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

        (D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

<div align="center">53</div>

(E)     the Administrative Agent and the Issuing Bank shall deliver to the Borrower on or prior to the Interim Facility Effective Date (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Forms W-8 and to the extent legally entitled to do so, W-9, as applicable, certifying that each such Person is entitled to exemption from or reduction of withholding Tax with respect to any payments by the Borrower to such Person under this Agreement.

Each of the Lenders, the Administrative Agent, and the Issuing Bank agree that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, such Person shall update such form or certification or promptly notify the Borrower (and, in the case of the Lenders, the Administrative Agent) in writing of such Person's legal inability to do so.

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.03 (including by the payment of additional amounts pursuant to this Section 5.03), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person , but the indemnifying party will be entitled to receive reasonable evidence of the actual payment(s) giving rise to the indemnification obligations.

Section 5.04.   Designation of a Different Lending Office.  If any Lender requests compensation under Section 5.01, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or 5.03, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 5.05.   Illegality.  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its applicable lending office to honor its obligation to make or maintain Eurodollar Loans either generally or having a particular Interest Period hereunder, then (a) such Lender shall promptly notify the Borrower and the Administrative Agent thereof and such Lender's obligation to make such Eurodollar Loans shall be suspended (the "Affected Loans") until such time as such Lender may again make and maintain such Eurodollar Loans and (b) all Affected Loans which would otherwise be made by such Lender shall be made instead as ABR Loans (and, if such Lender so requests by notice to the Borrower and the Administrative Agent, all Affected Loans of such Lender then outstanding shall be automatically converted into ABR Loans on the date specified by such Lender in such notice) and,

54

to the extent that Affected Loans are so made as (or converted into) ABR Loans, all payments of principal which would otherwise be applied to such Lender's Affected Loans shall be applied instead to its ABR Loans.

<div align="center">ARTICLE VI</div>

<div align="center">CONDITIONS PRECEDENT</div>

Section 6.01.    <u>Interim Facility Effective Date</u>.  The obligations of the Lenders to enter into and execute this Agreement, and make Loans and other extensions of credit hereunder during the Interim Facility Period, shall commence on the first Business Day (the "<u>Interim Facility Effective Date</u>") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

(a)     the Petition Date shall have occurred;

(b)     the Administrative Agent shall have received (i) duly executed and delivered counterparts (in such numbers as may be requested by the Administrative Agent) of this Agreement and the other Loan Documents to be executed and delivered on or prior to such date, from each party hereto or thereto, as applicable, signed on behalf of such party and (ii) the duly executed Notes payable to each Lender that requests a Note in the principal amount equal to such Lender's Commitment;

(c)     the Administrative Agent shall have received a certificate of the Secretary, Assistant Secretary or a Responsible Officer with similar responsibilities of each Loan Party, or in the event that such Loan Party is a limited partnership, of such Person's general partner, certifying as of the Interim Facility Effective Date:

(i)     resolutions of its board of directors or members, authorizing the transactions contemplated hereby;

(ii)     the names and genuine signatures of the Responsible Officers and Financial Officers of such Person, authorized to execute, deliver and perform, as applicable, this Agreement, any Notes, the Guaranty, the other Security Instruments, and all other Loan Documents to be delivered by such Person;

(iii)     the Organizational Documents of such Person as in effect as of the Interim Facility Effective Date;

(iv)     the good standing certificate for such Person, from its state of incorporation, formation or organization, as applicable, dated as of a recent date; and

(v)     as may be reasonably requested by the Administrative Agent, certificate(s) of authority for such Person from states wherein such Person is required to be qualified to conduct business, evidencing such Person's qualification to do business in such state, dated as of a recent date; <u>provided that</u>, if requested by the Borrower prior to the Interim Facility Effective Date, the certificates described in this <u>clause (v)</u> may be provided within a reasonable period of time after the Interim Facility Effective Date, such period of time to be agreed by the Borrower and the Administrative Agent;

(d)     the Bankruptcy Court shall have entered the Interim Order within five (5) Business Days following the Petition Date, which Interim Order (i) shall have been entered on the docket of the Bankruptcy

<div align="center">55</div>

Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders;

(e)        all first-day motions filed by the Loan Parties and/or their Subsidiaries, as applicable (including any motions related to any critical vendor or supplier motions) and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Administrative Agent;

(f)        all motions related to the DIP Facility and cash management, and related orders entered by the Bankruptcy Court (including the DIP Order and the Cash Management Order) shall be in form and substance satisfactory to the Administrative Agent;

(g)        all governmental and third-party consents and approvals, in each case, necessary in connection with the DIP Facility shall have been obtained and remain in effect;

(h)        the making of the Loans and the issuance of the Letters of Credit, if any, shall not violate any Governmental Requirement and shall not have been enjoined, whether temporarily, preliminarily, or permanently;

(i)        all reasonable and documented pre- and post-petition fees, charges and expenses (including, without limitation, the fees, charges and expenses of Latham & Watkins LLP, RPA Advisors, LLC, and one local counsel in each applicable jurisdiction), and all other amounts due and payable on or prior to the Interim Facility Effective Date, required to be paid to the Administrative Agent and Lenders on or before the Interim Facility Effective Date shall have been paid;

(j)        the Administrative Agent shall have received a 13-week cash flow forecast, containing line items of sufficient detail to reflect the Loan Parties' projected receipts and disbursements for the 13-week period commencing on the Petition Date, in form and substance acceptable to the Administrative Agent and the Majority Lenders and attached hereto as Exhibit H (the "Initial Budget"), together with a certificate of a Financial Officer of the Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower and each other Loan Party to be reasonable at the time made and from the best information then available to the Borrower and each other Loan Party;

(k)        there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Chapter 11 Cases) in any court or before any Governmental Authority or facts or circumstances that, in the reasonable opinion of the Administrative Agent and the Majority Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect;

(l)        the Administrative Agent and Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act, and, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in respect of the Borrower;

(m)        the holders of the Prepetition Credit Agreement Obligations shall have received adequate protection in respect of the Liens securing such Prepetition Credit Agreement Obligations pursuant to, and on the terms set forth in, the Interim Order;

(n)       all Obligations shall be secured by a perfected lien and security interest on all assets of the Loan Parties pursuant to, and such Lien and security interest shall have the priorities set forth in, the Interim Order, subject only to the Liens permitted by Section 9.03 and all filing and recording fees and taxes with respect to such Liens and security interests that are due and payable as of the Interim Facility Effective Date shall have been duly paid;

(o)       The Administrative Agent shall have received an opinion of Kirkland & Ellis LLP, counsel to the Loan Parties, in form and substance reasonably acceptable to the Administrative Agent and its counsel; and

(p)       The Prepetition Credit Agreement Ratification shall be in full force and effect.

For purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying its objection thereto.

Section 6.02.    Final Facility Effective Date.  The obligation of each Lender to make its Loans hereunder and the obligation of the Issuing Bank to issue Letters of Credit hereunder during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

(a)       the Bankruptcy Court shall have entered the Final Order within thirty-five (35) days (or such later date consented to by the Administrative Agent and the Majority Lenders) following the entry of the Interim Order, which Final Order (i) shall have been entered on the docket of the Bankruptcy Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders; and

(b)       the Administrative Agent shall have received all Budget updates required in accordance with Section 8.18.

For purposes of determining compliance with the conditions specified in this Section 6.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Final Facility Effective Date specifying its objection thereto.

Section 6.03.    Conditions Precedent to Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the Roll-Up Loans and the initial funding, if any, of New Money Loans on the Interim Facility Effective Date), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)       At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(b)       Except as disclosed to the Lenders in writing, at the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

57

(c)    The representations and warranties of the Borrower and the other Loan Parties set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct as of such specified earlier date; provided that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates).

(d)    The making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, would not conflict with, or cause any Lender or the Issuing Bank to violate or exceed, any applicable Governmental Requirement, and no Change in Law shall have occurred, and no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, amendment, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(e)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit in accordance with Section 2.08(b), as applicable.

(f)    At the time of and immediately after giving effect to each such Borrowing or the issuance, amendment, renewal or extension of each such Letter of Credit, or both, as applicable, the aggregate Revolving Credit Exposures for all Lenders shall not exceed the then-effective Effective Commitments.

(g)    The making of the Loans shall not contravene any laws applicable to any Agent or any Lender.

(h)    All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect.

(i)    The Administrative Agent shall have received all Budget updates and Variance Reports required in accordance with Section 8.18.

(j)    The Administrative Agent shall have received (i) a schedule of all "first day" motions and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases, (ii) at least three (3) Business Days prior to the filing thereof, copies of each of the "first day" motions and proposed orders that affect the rights or duties of the Secured Parties, the Prepetition Credit Agreement Agent, or the Prepetition Lenders, other than the Cash Management Order, which orders shall be in form and substance reasonably satisfactory to the Administrative Agent, (iii) at least three (3) Business Days prior to the filing thereof, a copy of the cash management motion and proposed order to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases which orders shall be in form and substance reasonably satisfactory to the Administrative Agent.

(k)    DIP Orders.

(i)    The Interim Order or Final Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Administrative Agent and the Majority Lenders.

58

(ii)     The Administrative Agent shall have received a true and complete copy of the applicable DIP Order.

(iii)    The Loan Parties shall be in compliance with the applicable DIP Order.

(iv)    With respect to the Final Order, such Final Order shall, without limitation, approve the Roll-Up Facility.

(l)     (i) At the time of such Borrowing before giving effect thereto, the Borrower and the Loan Parties shall not have any Excess Cash and (ii) such Borrowing shall not trigger a mandatory prepayment under Section 3.04(c)(vi).

(m)     All "second day" orders filed on or after the Petition Date shall be, in form and substance, reasonably satisfactory to the Administrative Agent.

(n)     With respect to any Borrowing to occur more than thirty (30) days (or such later date consented to by the Administrative Agent and the Majority Lenders) after the Initial Facility Effective Date, and any Roll-Up Loans, the Bankruptcy Court shall have entered the Final Order, which Final Order (i) shall have been entered on the docket of the Bankruptcy Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders.

(o)     No trustee or examiner shall have been appointed with respect to the Loan Parties or their Property.

(p)     All reasonably and documented fees, charges and expenses (including, without limitation, the fees, charges and expenses of Latham & Watkins LLP, RPA Advisors, LLC, and one local counsel in each applicable jurisdiction), and all other amounts due and payable on or prior to the date of such Borrowing, required to be paid to the Administrative Agent and Lenders on or before the Date of such Borrowing shall have been paid (or will be paid with the proceeds of the Loan authorized under the Interim Order or the Final Order, as applicable).

In addition to the other conditions precedent herein set forth, if any Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank will not be required to issue any Letter of Credit, or to amend, extend increase or renew any outstanding Letter of Credit (or increase the face amount thereof, alter the drawing terms thereunder or extend the expiry date thereof), unless the Issuing Bank is satisfied that any exposure that would result therefrom is eliminated or fully covered by the commitments of the Non-Defaulting Lenders or by Cash Collateralization or a combination thereof satisfactory to the Issuing Bank in its sole discretion.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.03.

ARTICLE VII

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent, the Issuing Bank and the Lenders that:

Section 7.01.   Organization; Powers.   Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each of the Parent, the Borrower and the other Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except, to the extent any such failure occurs after the Petition Date, where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02.   Authority; Enforceability.   Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, the Transactions are within the Borrower's and each Guarantor's limited liability company, partnership, and corporate powers (as applicable) and have been duly authorized by all necessary limited liability company and, if required, member action (including, without limitation, any action required to be taken by any class of managers, directors or  partners (as applicable) of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and, upon the entry of the Interim Order or the Final Order, as applicable, constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of the DIP Order and subject to any restrictions arising on account of the Parent's, the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code and further subject to other applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03.   Approvals; No Conflicts.   The Transactions (a) subject to the entry of the DIP Order, do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including members or any class of managers, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect, other than (i) the recording and filing of the Security Instruments as required by this Agreement, (ii) those third party approvals or consents which, if not made or obtained, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, and (iii) consents by, required notices to, or other actions by state and federal governmental entities in connection with the assignment of state and federal oil and gas leases or other interests therein that are customarily obtained subsequent to such assignments (b) will not violate any applicable law or Organizational Documents of the Parent, the Borrower or any other Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Parent, the Borrower or any other Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Subsidiary and (d) will not result in the creation or imposition of any Lien on any Property of the Parent, the Borrower or any other

60

Subsidiary (other than the liens and security interests in favor of the Administrative Agent (or any designee) created by the Loan Documents).

Section 7.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrower has heretofore furnished to the Lenders (i) the Parent's audited consolidated balance sheet and statements of income, members' equity and cash flows as of and for the fiscal year ended December 31, 2017 reported on by BDO USA, LLP, independent public accountant and (ii) the Parent's unaudited balance sheet and statements of income, members' equity and cash flows as of and for the fiscal quarter ended September 30, 2018.  Such financial statements present fairly, in all material respects, the consolidated financial condition and results of operations and cash flows of the Parent and the Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.  Such balance sheets and the notes thereto disclose all Debt and other liabilities, direct or contingent, of the Parent and the Subsidiaries as of the dates thereof.

(b)    Since the Petition Date, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Parent and the Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    Neither the Parent, the Borrower nor any other Subsidiary has, on the date hereof, any Debt (other than immaterial Debt to the extent permitted by Section 9.02), Disqualified Capital Stock or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the financial statements most recently delivered pursuant to Section 8.01(a) or (b).

Section 7.05.    Litigation.    Other than the Chapter 11 Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower or Parent, threatened against or affecting the Parent, the Borrower or any other Subsidiary which (a) affect or pertain to the Transactions or this Agreement or any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

Section 7.06.    Environmental Matters.    Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    Neither the Parent, the Borrower, or any other Subsidiary, nor any Property of the Parent, the Borrower or any other Subsidiary nor the operations conducted thereon is in violation of any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)    No Property of the Parent, the Borrower or any other Subsidiary, nor the operations currently conducted thereon, or, to the knowledge of the Borrower, formerly conducted thereon by any prior owner or operator of such Property or operation, is in violation of any Environmental Laws, or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)    All Environmental Permits, if any, required to be obtained or filed in connection with the operation or use of any and all Property of the Parent, the Borrower and each other Subsidiary, or otherwise in connection with the operation of their businesses, including, without limitation, for the past or present treatment, storage, disposal or Release of Hazardous Materials, have been duly obtained or filed, are in full

61

force and effect, and the Parent, the Borrower and each other Subsidiary are in compliance with the terms and conditions of all such Environmental Permits.

(d)     All Hazardous Materials, if any, generated at any and all Properties of the Parent, the Borrower or any other Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the knowledge of the Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)     The Parent, the Borrower and the other Subsidiaries have taken all steps required by Environmental Laws to determine and have determined  that no Hazardous Materials have been disposed of or otherwise Released, and there has been no threatened Release of any Hazardous Materials on, to or from any Property of the Parent, the Borrower or any other Subsidiary, except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

(f)     None of the Parent, the Borrower nor any other Subsidiary has any known liability or is conducting any Remedial Work in connection with any Release or threatened Release of any Hazardous Materials.

Section 7.07.     Compliance with the Laws and Agreements; No Defaults.

(a)     Each of the Parent, the Borrower and each other Subsidiary is in compliance in all material respects with all Governmental Requirements applicable to it and/or its Property and all agreements and other instruments binding upon it and/or its Property, and, subject to any restrictions arising on account of Parent's, the Borrower's or any other Subsidiaries' status as a "debtor" under the Bankruptcy Code, possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of the Parent's, the Borrower's or any other Subsidiaries' Property and/or the conduct of the Parent's, the Borrower's or any other Subsidiaries' business.

(b)     Except to the extent subject to the automatic stay under the Chapter 11 Cases, none of the Parent, the Borrower or any other Subsidiary is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Parent, the Borrower or any other Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Indebtedness is outstanding or by which the Parent, the Borrower or any other Subsidiary or any of their Properties is bound.

(c)     No Default or Event of Default has occurred and is continuing.

Section 7.08.     Investment Company Act.  None of the Parent, the Borrower nor any other Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09.     Taxes. Each of the Parent, the Borrower and the other Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which the Parent, the Borrower or such Subsidiary, as applicable, has set

US-DOCS\106250840.21

aside on its books adequate reserves in accordance with GAAP, (ii) to the extent otherwise excused or prohibited by the Bankruptcy Code, or (iii) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 7.10.    ERISA.

(a)    The Parent, the Borrower, the other Subsidiaries and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

(b)    Each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.

(c)    No act, omission or transaction has occurred which could result in imposition on the Parent, the Borrower, any other Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under Section 409 of ERISA.

(d)    No Plan (other than a defined contribution plan) or any trust created under any such Plan has been terminated since September 2, 1974.  No liability to the PBGC (other than for the payment of current premiums which are not past due) by the Parent, the Borrower, any other Subsidiary or any ERISA Affiliate has been or is expected by the Parent, the Borrower, any other Subsidiary or any ERISA Affiliate to be incurred with respect to any Plan.  No ERISA Event with respect to any Plan has occurred.

(e)    Full payment when due has been made of all amounts which the Parent, the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof, and no accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the Code), whether or not waived, exists with respect to any Plan.

(f)    The actuarial present value of the benefit liabilities under each Plan which is subject to Title IV of ERISA does not, as of the end of the Parent's most recently ended fiscal year, exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities.  The term "actuarial present value of the benefit liabilities" shall have the meaning specified in Section 4041 of ERISA.

(g)    None of the Parent, the Borrower, the other Subsidiaries or any ERISA Affiliate sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in Section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Parent, the Borrower, any other Subsidiary or any ERISA Affiliate in its sole discretion at any time without any material liability.

(h)    None of the Parent, the Borrower, the other Subsidiaries or any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any Multiemployer Plan.

(i)    None of the Parent, the Borrower, the other Subsidiaries or any ERISA Affiliate is required to provide security under Section 401(a)(29) of the Code due to a Plan amendment that results in an increase in current liability for the Plan.

Section 7.11.    Disclosure; No Material Misstatements.    The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to

which it, the Parent, or any of the other Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the other reports, financial statements, certificates or other information furnished by or on behalf of the Parent, the Borrower or any other Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no fact peculiar to the Parent, the Borrower or any other Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Parent, the Borrower or any other Subsidiary prior to, or on, the date hereof in connection with the transactions contemplated hereby. There are no statements or conclusions in any Reserve Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Parent, the Borrower and the other Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12.    Insurance.

(a)    Schedule 7.12 sets forth a true, complete and correct description of all insurance maintained by the Parent, the Borrower or by the Parent or the Borrower for the other Subsidiaries or by each Subsidiary for itself, as the case may be, as of the date hereof. The Parent and the Borrower have, and have caused all of their respective Subsidiaries to have, (i) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (ii) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are commercially reasonable and usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Parent, the Borrower and the other Subsidiaries. The Administrative Agent has been named as an additional insured in respect of such liability insurance policies, and the Administrative Agent has been named as lender's loss payee with respect to Property loss insurance.

(b)    Except to the extent that flood insurance in form and substance satisfactory to the Administrative Agent has been obtained with respect thereto, no Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Insurance Regulations) is located on any real property in a special flood hazard area as designated by any Governmental Authority. As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 U.S.C. 4001 et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

Section 7.13.    Restriction on Liens. Subject to any restrictions arising on account of the Parent's, the Borrower's or any other Subsidiaries' status as a "debtor" under the Bankruptcy Code, neither the Borrower nor any of the other Subsidiaries is a party to any agreement or arrangement (other than (A) Capital Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such

Capital Lease and (B) the Prepetition Second Lien Indenture), or, other than as a result of the Chapter 11 Cases, subject to any order, judgment, writ or decree, which either restricts or purports to restrict any of the Parent's, the Borrower's or any of the other Subsidiaries' ability to grant Liens to the Administrative Agent and the Lenders on, or in respect of any of their respective Properties to secure the Obligations.

Section 7.14.    <u>Subsidiaries</u>.  Neither the Parent nor the Borrower have any Subsidiaries other than those set forth on <u>Schedule 7.14</u> (as such Schedule may be supplemented by the Borrower to the Administrative Agent in writing from time to time).  No Loan Party has any Foreign Subsidiaries.  Each Subsidiary on <u>Schedule 7.14</u> (as such Schedule may be supplemented by the Borrower to the Administrative Agent in writing from time to time) is a Wholly-Owned Subsidiary.

Section 7.15.    <u>Location of Business and Offices</u>.  The Parent's jurisdiction of organization is Delaware; the name of the Parent, as listed in the public records of its jurisdiction of organization, is Vanguard Natural Resources, Inc.; and the organizational identification number, if any, of the Parent in its jurisdiction of organization is 4686581 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to <u>Section 8.01(o)</u> in accordance with <u>Section 12.01</u>).  Borrower's jurisdiction of organization is Kentucky; the name of the Borrower as listed in the public records of its jurisdiction of organization is Vanguard Natural Gas, LLC; and the organizational identification number of the Borrower in its jurisdiction of organization is 0601349 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to <u>Section 8.01(m)</u> in accordance with <u>Section 12.01</u>).  The Parent's principal place of business is located at the San Felipe Street address in Houston, Texas specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(o) and Section 12.01(c)), and its chief executive offices is located at the San Felipe Street address in Houston, Texas specified in Section 12.01 (or as set forth in a notice delivered pursuant to <u>Section 8.01(o)</u> and <u>Section 12.01(c)</u>).  The Borrower's principal place of business is located at the San Felipe Street address in Houston, Texas specified in <u>Section 12.01</u>, and the Borrower's chief executive offices is located at the San Felipe street address in Houston, Texas specified in <u>Section 12.01</u>.  Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on <u>Schedule 7.14</u> (as such Schedule may be supplemented by the Borrower to the Administrative Agent in writing from time to time).

Section 7.16.    <u>Properties; Titles, Etc.</u>

(a)    Each of the Borrower and the other Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, and each Loan Party has good title to all its personal Properties, in each case, free and clear of all Liens (other than Liens permitted by <u>Section 9.03</u>).  The Loan Party or Subsidiary who is specified as the owner in such Reserve Report owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such other Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such other Subsidiary's net revenue interest in such Property. The ownership by the Borrower or any other Subsidiary of the Hydrocarbons and the undivided interests therein specified on the exhibits to the Mortgages are the same interests reflected in the most recently delivered Reserve Report.

(b)    Other than as a result of the Chapter 11 Cases, all leases and agreements necessary for the conduct of the business of the Borrower and the other Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the

65

passage of time or both would give rise to a material default under any such lease or leases (determined individually for each such lease and in the aggregate for all such leases).

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and the other Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the other Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     All of the Properties of the Borrower and the other Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

(e)     The Borrower and each other Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such other Subsidiaries does not infringe upon the rights of any other Person.  The Borrower and the other Subsidiaries either own or have valid licenses or other rights to use all material databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons.

(f)     Each Loan Party has good and defensible title to its Midstream Assets free and clear of all Liens except Liens permitted by <u>Section 9.03</u>.

Section 7.17.    <u>Maintenance of Properties</u>.  Subject to the prior rights and limitations of Borrower as an owner of non-operated working interests, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and the other Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and the other Subsidiaries.  (i) No Oil and Gas Property of the Borrower or any other Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any other Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements (except with respect to horizontal wells permitted by Governmental Authority), and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such other Subsidiary.  Subject to any necessary order or authorization of the Bankruptcy Court, all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures, equipment and all other Midstream Assets owned in whole or in part by the Borrower or any of the other Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of the other Subsidiaries, in a manner consistent with the Borrower's or the other Subsidiaries' past practices.

Section 7.18.    <u>Gas Imbalances, Prepayments</u>.  Except as set forth on <u>Schedule 7.18</u> or on the most recent certificate delivered pursuant to <u>Section 8.12(c)</u>, on a net basis there are no Material Gas Imbalances, take or pay or other prepayments which would require the Borrower or any of the other Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

66

Section 7.19.   Marketing of Production.   Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or another Subsidiary is receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of production from the Borrower's or the other Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20.   Swap Agreements.   Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(f), sets forth, a true and complete list of all Swap Agreements of the Borrower and each other Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.21.   **[Reserved].**

Section 7.22.   **[Reserved].**

Section 7.23.   Anti-Corruption Laws and Sanctions.   The Parent and the Borrower have implemented and maintain in effect policies and/or procedures designed to ensure compliance by the Parent, the Borrower and the other Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions, and the Parent, the Borrower and the other Subsidiaries and their respective officers and employees and, to the knowledge of the Parent and the Borrower, their respective directors, officers, employees and agents are in compliance with applicable Anti-Corruption Laws and applicable Sanctions in all material respects.   None of (a) the Parent, the Borrower nor the other Subsidiaries nor any of their respective directors, officers or employees, nor (b) to the knowledge of the Parent or the Borrower, any agent of the Parent, the Borrower or any other Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or Letter of Credit, use of proceeds thereof or any other transaction contemplated by this Agreement will violate any applicable Anti-Corruption Law or applicable Sanctions.

Section 7.24.   **[Reserved].**

Section 7.25.   Article 8 of Uniform Commercial Code.   No Equity Interest of Borrower or any other Subsidiary is evidenced by a certificate or other instrument.   None of the Organizational Documents of Borrower or any Subsidiary provides that any Equity Interest in Borrower or any other Subsidiary is a security governed by Article 8 of the Uniform Commercial Code.

Section 7.26.   EEA Financial Institution.   Neither the Parent, the Borrower, nor any other Subsidiary is an EEA Financial Institution.

Section 7.27.   Accounts.   Schedule 7.27 attached hereto sets forth as of the Interim Facility Effective Date a complete and accurate list of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a reasonably detailed description thereof (including, without limitation, the bank

or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

Section 7.28.   Secured Obligations; Priority.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Facility and (y) the hearings for the approval of the DIP Order was given in each case.  The Borrower has given, on a timely basis as specified in the DIP Order, all notices required to be given on or prior to the date of this representation to all parties specified in the DIP Order.

(b)     The provisions of this Agreement and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "DIP Liens"), having the priority set forth in the Loan Documents, including the DIP Order, and enforceable against the Loan Parties.

(c)     Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents constituting Superpriority Claims shall be allowed by the Bankruptcy Court, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

Section 7.29.   Chapter 11 Orders.  The DIP Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Administrative Agent and the Majority Lenders.

ARTICLE VIII

AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, each Loan Party covenants and agrees with the Lenders that:

Section 8.01.   Financial Statements; Other Information.   The Borrower will furnish to the Administrative Agent and each Lender:

(a)     Annual Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Parent, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by an independent public accountant of recognized national standing (without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)     Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Parent, its consolidated balance sheet and related statements of operations,

68

stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)     Certificate of Financial Officer – Compliance.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer in substantially the form of Exhibit D hereto or such other form acceptable to the Administrative Agent in its reasonable discretion (i) certifying as to whether a Default has occurred and is continuing as of the date of such certificate, and if a Default has occurred and is continuing, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 at such times as required therein and in connection therewith, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 8.13(b) and Section 9.01 and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 (or, if later, the most recently delivered audited financial statements pursuant to Section 8.01(a)) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)     Certificate of Accounting Firm – Defaults.  Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines).

(e)     Certificate of Financial Officer – Consolidating Information.  If, at any time, all of the Subsidiaries of the Parent are not consolidated Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all consolidated Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Parent.

(f)     Certificate of Financial Officer – Swap Agreements.  Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b), a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of such fiscal quarter or fiscal year, as applicable, a true and complete list of all Swap Agreements of the Borrower and each of its Subsidiaries, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(g)     Certificate of Insurer – Insurance Coverage.  Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(h)     Other Accounting Reports.  Promptly upon receipt thereof, a copy of each other report or letter submitted to the Parent, the Borrower or any of the other Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Parent, the Borrower or any such other Subsidiary, and a copy of any response by the Parent, the Borrower or any such

Subsidiary, or the board of directors (or comparable governing body) of the Parent, the Borrower or any such other Subsidiary, to such letter or report.

(i)  <u>SEC and Other Filings; Reports to Shareholders</u>.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Parent with the SEC, or with any national securities exchange, or distributed by Parent to its shareholders generally, as the case may be.

(j)  <u>Notices Under Material Instruments</u>.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this <u>Section 8.01</u>.

(k)  <u>Notice of Sales of Oil and Gas Properties; Midstream Assets</u>.  In the event the Borrower or any other Subsidiary intends to Dispose of any Oil and Gas Properties, Midstream Assets or any Equity Interests in any other Subsidiary in accordance with, and as permitted by, <u>Section 9.12</u>, prior written notice of such Disposition, the price thereof and the anticipated date of closing and any other details thereof requested by the Administrative Agent or any Lender.

(l)  <u>Notice of Casualty Events</u>.  Prompt written notice, and in any event within one (1) Business Day, of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event.

(m)  <u>Information Regarding Borrower and Guarantors</u>.  Thirty (30) days prior written notice of any change (i) in the Borrower or any Guarantor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower or any Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Borrower or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower or any Guarantor's federal taxpayer identification number, if any.

(n)  <u>Production Reports, Lease Operating Statements and Projected Production Reports</u>. Concurrently with the delivery of any Reserve Report to the Administrative Agent pursuant to <u>Section 8.12</u>, (i) a report setting forth, for each calendar month during the prior twelve (12) month period, on a field by field summary basis and an aggregate summary basis (A) the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and (B) the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, and (ii) a Projected Production Report.

(o)  <u>Gas Balancing Reports</u>.  Within 45 days after the end of each fiscal quarter of the Parent, a report setting forth, for the quarter during the then current fiscal year to date, the existence of any Material Gas Imbalances listed on a property-by-property basis.

(p)  <u>Notices of Certain Changes</u>.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the Organizational Documents of the Parent, the Borrower or any other Subsidiary.

(q)   Notification of Hedging Violation.  Promptly notify Administrative Agent if the volumes of Hydrocarbons hedged under Swap Agreements ever exceed the actual daily production of the Hydrocarbons from the Mortgaged Property.

(r)   PATRIOT Act.  Promptly after the request by the Administrative Agent, the Issuing Bank or any Lender, all documentation and other information that the Administrative Agent, the Issuing Bank or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and the Beneficial Ownership Regulation.

(s)   Other Requested Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Parent, the Borrower or any other Subsidiary or any of their Affiliates (including, without limitation, (x) a list of first purchasers which accounted for at least 75% of the total revenues of the Parent, the Borrower and the other Subsidiaries during the twelve month period ended as of the immediately preceding December 31 or June 30th, as applicable, and (y) any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may request.

Documents required to be delivered under Section 8.01(a), (b) or (j) to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to be delivered on the date (i) on which the Parent posts such documents, or provides a link thereto on the Parent's website on the Internet or (ii) on which such documents are posted the Parent's or the Borrower's behalf on an internet or intranet website, if any, to which each Lender, the Issuing Bank and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided, however, that (x) the Borrower shall deliver paper copies of such documents to the Administrative Agent, the Issuing Bank or any Lender upon its request until a written request to cease delivering paper copies is given by the Administrative Agent, the Issuing Bank or such Lender and (y) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e. soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 8.02.   Notices of Material Events. The Borrower will furnish to the Administrative Agent and each Lender prompt written notice (and in any event, within three (3) Business Days) of the following:

(a)   the occurrence of any Default or Event of Default;

(b)   (i) other than the Chapter 11 Cases, the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Parent, the Borrower or any of the other Subsidiaries or any of their respective Affiliates, not previously disclosed in writing to the Administrative Agent and the Lenders and (ii) any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Administrative Agent and the Lenders) that could reasonably be expected to result in liability, obligation or judgment in excess of $2,000,000 (whether or not subject to the automatic stay in the Chapter 11 Cases);

71

(c)      the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Parent, the Borrower and the Subsidiaries in an aggregate amount exceeding $500,000;

(d)      promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Parent or the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which Parent or the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)      at least three (3) Business Days prior to filing (or such shorter period as the Administrative Agent may agree), the Borrower shall use commercially reasonable efforts to provide the Administrative Agent copies of all pleadings and motions (other than "first day" motions and proposed orders) to be filed by or on behalf of the Borrower or any of the other Loan Parties with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Borrower or any of the other Loan Parties to any official committee appointed in the Chapter 11 Cases, which such pleadings shall include the Administrative Agent as a notice party;

(f)      on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order, in the manner specified therefor therein.

(g)      any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger may, at their option, make available to the Lenders and the Issuing Bank the Communications by posting the Communications on the Platform and (b) certain of the Lenders (each, a "Public Lender") may personnel who do not wish to receive material non-public information with respect to the Parent, the Borrower, any of the other Subsidiaries or any of their respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the other Agents, the Arranger, the Issuing Bank and the Lenders to treat such Communications as not containing any material non-public information with respect to the Borrower, any of the Loan Parties or Parent, or any of their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Communications constitute Information, they shall be treated as set forth in Section 12.11); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent, the other Agents and each of the Arranger shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Section 8.03.      Existence; Conduct of Business.  The Parent and the Borrower will, and will cause each of their respective Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises

72

material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which any of its Oil and Gas Properties are located or the ownership of any Properties requires such qualification.

Section 8.04.    Payment of Obligations.  The Parent and the Borrower will, and will cause each of their respective Subsidiaries to, pay its obligations, including Tax liabilities of the Parent, the Borrower and all of the Subsidiaries before the same shall become delinquent or in default, except (x) to the extent such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (y) where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Parent, the Borrower or such other Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 8.05.    Performance of Obligations under Loan Documents.  The Borrower will pay the Obligations in accordance with the Loan Documents and the Borrower will, and will cause the Parent and each other Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06.    Operation and Maintenance of Properties.  Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower, at its own expense, will, and will cause each other Subsidiary to:

(a)      operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, in those circumstances where a reasonably prudent operator under similar circumstances and in accordance with customary industry practice would be prudent not to do so, and the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b)      operate and maintain in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the gathering, transportation or processing of Hydrocarbons and other minerals therefrom, except, in each case, in those circumstances where a reasonably prudent operator under similar circumstances and in accordance with customary industry practice would be prudent not to do so, and the failure to comply could not reasonably be expected to have a Material Adverse Effect, all pipelines, compressor stations, wells, gas or crude oil processing facilities, field gathering systems, tanks, tank batteries, pumps, pumping units, fixtures, valves, fittings, machinery, parts, engines, boilers, meters, apparatus, appliances, tools, implements, casing, tubing, rods, cables, wires, towers, surface and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of the other Subsidiaries that are useful or necessary to conduct normal operations relating to gathering, transportation, processing or removal of Hydrocarbons and other minerals, water or $CO_2$ therefrom.

(c)      keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair,

73

working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties, including, without limitation, all equipment, machinery and facilities.

(d)        promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties or gas or crude oil processing facilities and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(e)        promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties.

(f)        operate its Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties, gas or crude oil processing facilities and other material Properties to be operated in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, in each case, other than any such failure to operate or comply could not reasonably be expected to result in claims against, or obligations and/or liabilities of, any of the Loan Parties in an amount in excess of $2,000,000 in the aggregate.

To the extent the Borrower is not the operator of any Property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07.    Insurance.  The Borrower will, and will cause the Parent and each other Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance reasonably satisfactory to the Administrative Agent (it being hereby confirmed that the insurance of the Parent and its Subsidiaries effective as of the Effective Date, as described in Schedule 7.12(a), satisfies the foregoing requirement as of the Effective Date) and (a) in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations and (b) in accordance in all material respects with all Governmental Requirements.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral for the Obligations shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent in its capacity as such as "additional insured" and/or "lender's loss payee," as applicable, and provide that the insurer will use commercially reasonable efforts to give at least thirty (30) days' prior notice of any cancellation to the Administrative Agent.

Section 8.08.    Books and Records; Inspection Rights.  The Borrower will, and will cause the Parent and each other Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause the Parent and each other Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 8.09.    Compliance with Laws.  Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower will, and will cause the Parent and each other Subsidiary to (a) comply with all laws, rules, regulations and orders of any Governmental Authority applicable to any of the Parent

and/or its Subsidiaries or any such Person's Property, and (b) maintain in effect and enforce policies and/or procedures designed to ensure compliance by the Borrower, the Parent, the other Subsidiaries and each of their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

Section 8.10.    <u>Environmental Matters</u>.

(a)    Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower shall at its sole expense:  (i) comply, and shall cause its Properties and operations and each Subsidiary and each other Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not Release, and shall cause each other Subsidiary not to Release, any Hazardous Material on, under, about or from any of the Borrower's or the other Subsidiaries' Properties, or any other Property to the extent caused by the Borrower's or any of the Subsidiaries' operations, except in compliance with applicable Environmental Laws, the Release of which could be reasonably expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each other Subsidiary to timely obtain or file, all Environmental Permits, if any, required to be obtained or filed in connection with the operation or use of the Borrower's or the other Subsidiaries' Properties or the conduct of the Borrower's or the other Subsidiaries' businesses, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "<u>Remedial Work</u>") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future Release or threatened Release of Hazardous Material on, under, about or from any of the Borrower's or the other Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; and (v) establish and implement, and shall cause each other Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and the other Subsidiaries' obligations under this <u>Section 8.10(a)</u> are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)    The Borrower will promptly, but in no event later than five (5) days of the occurrence of thereof, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any Person against the Borrower or the other Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower could reasonably anticipate that such action will result in liability (whether individually or in the aggregate) in excess of $1,000,000, not fully covered by insurance, subject to normal deductibles.

(c)    The Borrower will, and will cause each other Subsidiary to, provide environmental assessments, audits and tests in accordance with the most current version of the American Society of Testing Materials standards upon reasonable request by the Administrative Agent and the Lenders in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11.    <u>Further Assurances</u>.

(a)    The Parent and the Borrower shall, and shall cause each other Subsidiary to, at their respective sole expense, and each other Loan Party will, and will cause their respective Subsidiaries to, at their respective sole expense, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with,

cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower, the Parent and any other Subsidiary, as the case may be, in the Loan Documents, including Notes (and to deliver a Note to any Lender at its request), or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions or other mistakes in this Agreement and the other Loan Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement and the other Loan Documents or the priority thereof and of any Liens or other security interests granted thereunder, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.  Borrower and each other Loan Party does hereby grant Administrative Agent a special power of attorney (which power is coupled with an interest) to act in the name, place and stead of such Loan Party for the purpose of taking any and all actions requested by the Administrative Agent to be taken by Borrower and the other Loan Parties pursuant to this Section 8.11(a). The special power of attorney herein granted may be exercised any time with the authorization of the Bankruptcy Court. Each Loan Party recognizes that such power of attorney is in favor of Administrative Agent and is coupled with an interest under this Agreement and, thus, irrevocable as long as this Agreement is in force and effect. All Persons dealing with Administrative Agent, or any officer thereof, or any substitute, shall be fully protected in treating the powers and authorities conferred by this Section as continuing in full force and effect until advised by Administrative Agent of the occurrence of the expiration or termination of all of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been made), the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent and the Issuing Bank shall have been made), the expiration or termination of all Secured Treasury Management Agreements (other than Secured Treasury Management Agreements as to which other arrangements satisfactory to the applicable Treasury Management Bank, in its sole discretion, shall have been made).

(b)     Each Loan Party hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property or other Property covered by the Lien of the Loan Documents without the signature of the applicable Loan Party where permitted by law.  A carbon, photographic or other reproduction of the applicable Loan Documents or any financing statement covering the Mortgaged Property, such other Property or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 8.12.     Reserve Reports.

(a)     On or before March 1 and September 1 of each year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and the other Subsidiaries as of the immediately preceding December 31st and June 30th,

(i)     the Reserve Report as of December 31 of each year shall be prepared by Approved Petroleum Engineers and shall use economic parameters (including but not limited to, hydrocarbon prices, escalation rates, discount rate assumptions, and other economic assumptions) acceptable to Administrative Agent, and

(ii)     the Reserve Report as of June 30 of each year shall be prepared by or under the supervision of the chief engineer of the Borrower and shall use economic parameters (including but not limited to hydrocarbon prices, escalation rates, discount rate assumptions, and other economic assumptions) acceptable to Administrative Agent.  In addition to the certification required by Section 8.12(c), the chief engineer of the Borrower shall certify that (x) such Reserve Report is true and accurate and is based on information that was prepared in good faith based upon assumptions believed to be reasonable at the time, (y) there are no statements or conclusions in

76

such Reserve Report which are based upon or include materially misleading information or fail to take into account material information known to the Borrower regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties of the Borrower and the other Subsidiaries and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Borrower and the other Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate) and (z) such Reserve Report has been prepared in accordance with the procedures used in the immediately preceding December 31 Reserve Report.

(b)      **[Reserved].**

(c)      With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer, substantially in the form of <u>Exhibit I</u> attached hereto, certifying that:  (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects, and is based on information that was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time, (ii) the Borrower or the other Subsidiaries own good and defensible title to the Oil and Gas Properties and other Properties evaluated in such Reserve Report and such Oil and Gas Properties are free of all Liens except for Liens permitted by <u>Section 9.03</u>, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no Material Gas Imbalances, take or pay or other prepayments in excess of the volume specified in <u>Section 7.18</u> with respect to the Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any other Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of the Oil and Gas Properties have been Disposed of since the Petition Date except as set forth on an exhibit to the certificate, which shall list all of the Oil and Gas Properties so Disposed, in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on <u>Schedule 7.18</u> had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties (the certificate described herein, the "Reserve Report Certificate").

Section 8.13.      <u>Title Information</u>.

(a)      On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by <u>Section 8.12</u> and at such other times as the Administrative Agent shall request, the Borrower will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(b)      If the Borrower has provided title information for additional Oil and Gas Properties under <u>Section 8.13(a)</u>, the Borrower shall, within sixty (60) days after notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Oil and Gas Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by <u>Section 9.03(b)</u> raised by such information or (ii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(c)    **[Reserved].**

(d)    In respect of any Midstream Assets not covered by the title information delivered in clauses (a) and (b) above, the Borrower shall, and shall cause each of the other Subsidiaries to, deliver to the Administrative Agent such information as the Administrative Agent shall deem reasonably necessary to verify the Loan Parties' ownership of the easements, rights of way, fee-owned real estate and other real estate interests necessary to use, operate and maintain the Midstream Assets.

Section 8.14.    <u>Additional Collateral; Additional Guarantors</u>.

(a)    **[Reserved].**

(b)    The Borrower shall promptly cause each Domestic Subsidiary to guarantee the Obligations pursuant to the Guaranty.  In connection with any such guarantee, the Borrower shall, or shall cause such Subsidiary to promptly, (A) execute and deliver a supplement or joinder to the Guaranty, this Agreement and any other Loan Document reasonably requested by the Administrative Agent, (B) pledge all of the Equity Interests of such new Subsidiary pursuant to a Security Instrument or other Loan Document (including, without limitation, delivery of original stock certificates, if any, evidencing the Equity Interests of such Subsidiary, together with appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)    **[Reserved].**

(d)    **[Reserved].**

(e)    Notwithstanding the restrictions in <u>Section 9.06</u>, each Subsidiary of a Loan Party now existing or created, acquired or coming into existence after the date hereof, including each of the Guarantors, shall promptly execute and deliver to the Administrative Agent the Guaranty (or joinder thereto) and any Security Instrument or other Loan Document (or joinder thereto) as may be required by the Administrative Agent.  Such Subsidiary shall, and the Borrower shall cause such Subsidiary to, deliver to the Administrative Agent, simultaneously with its delivery of such Guaranty and any such Security Instrument or other Loan Document (or joinder), (x) written evidence satisfactory to the Administrative Agent that such Subsidiary has taken all organizational action necessary to duly approve and authorize its execution, delivery and performance of such Guaranty, any such Security Instrument and any other documents which it is required to execute, and (y) such additional closing documents, certificates and opinions of counsel as the Administrative Agent shall require.

Section 8.15.    <u>ERISA Compliance</u>.  The Borrower will promptly furnish and will cause the Parent and the other Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (a) promptly after the filing thereof with the United States Secretary of Labor, the Internal Revenue Service or the PBGC, copies of each annual and other report with respect to each Plan or any trust created thereunder, (b) immediately upon becoming aware of the occurrence of any ERISA Event or of any non-exempt "prohibited transaction," as described in Section 406 of ERISA or in Section 4975 of the Code, in connection with any Plan or any trust created thereunder, a written notice signed by the President or the principal Financial Officer of the Parent, the Borrower or such other Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Parent, such other Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (c) immediately upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan.  With respect to each Plan (other than a Multiemployer

78

Plan), the Borrower will, and will cause the Parent and each other Subsidiary and ERISA Affiliate to, (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of Section 412 of the Code (determined without regard to subsections (d), (e), (f) and (k) thereof) and of Section 302 of ERISA (determined without regard to Sections 303, 304 and 306 of ERISA), and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to Sections 4006 and 4007 of ERISA.

Section 8.16.    **[Reserved].**

Section 8.17.    <u>Use of Proceeds</u>.

(a)    The proceeds of the Borrowings shall be used by the Borrower to (i) pay certain costs and expenses of administering the Chapter 11 Cases, (ii) fund the working capital needs, capital improvements and other general corporate purposes of the Borrower and its Subsidiaries and (iii) make the payments provided for in the DIP Orders.

(b)    The proceeds of the Loans shall be applied by the Borrower for uses solely to the extent that any such application of proceeds shall be in compliance with the then-effective Budget pursuant to the terms set forth in <u>Section 9.21</u>, including the Permitted Variances.

(c)    No portion of the proceeds of any Loan shall be used in any manner that causes such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof.

(a)    No portion of the proceeds of any Loan, nor any other cash collateral of the Loan Parties, shall be used to (i) to permit any Loan Party or any other party in interest or its representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of any of the Lenders or the Prepetition Lenders or (ii) the enforceability of the obligations of any Loan Party under either hereunder or under the Prepetition Credit Agreement, or (ii) to investigate, commence, or prosecute any claim, motion, proceeding or cause of action against any of the Administrative Agent, the Lenders, the Prepetition Credit Agreement Agent or the Prepetition Lenders, each in such capacity, and their respective agents, attorneys, advisors or representatives, including any lender liability claims or subordination claims.

Section 8.18.    <u>Budget Update; Cash Reporting</u>.

(a)    On or before 5:00 pm, New York City time, on April 3, 2019, and on the date of each four-week anniversary of such date occurring thereafter (each, a "<u>Reporting Date</u>"), the Borrower will provide to the Administrative Agent a new updated thirteen (13)-week budget covering the 13-week period commencing on the applicable Reporting Date, which update shall contain line items substantially similar to the Initial Budget and all other information reasonably requested by the Administrative Agent and/or the Majority Lenders, in each case, in form and substance satisfactory to the Administrative Agent and the Majority Lenders (the Initial Budget and each such updated 13-week budget, as applicable, the "<u>Budget</u>"). Within five (5) Business Days after receipt by the Administrative Agent and the Majority Lenders of each new updated Budget, the Administrative Agent (on its own behalf and as directed by the Majority Lenders) shall deliver notice to the Borrower indicating whether such updated Budget is in form and substance satisfactory to the Administrative Agent and the Majority Lenders; <u>provided</u> that (i) if the Administrative Agent does not deliver such notice to the Borrower within such five-Business Day period, such updated Budget shall then become the "Budget" for all purposes herein on the day immediately following such five-Business Day period and (ii) if Administrative Agent delivers notice to the Borrower within such five-

Business Day period indicating that such update is not in form and substance satisfactory to the Administrative Agent and the Majority Lenders, the most recent preceding Budget shall continue as the then-effective Budget until the day immediately following the delivery of an updated Budget in form and substance satisfactory to the Administrative Agent and the Majority Lenders.

(b)     On or before 5:00 pm, New York City time, on (i) the first Wednesday (or, if such Wednesday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Wednesday, a "Testing Date") and (ii) the third Wednesday (or, if such Wednesday is not a Business Day, the immediately preceding Business Day) following each Reporting Date (each such Wednesday, an "Alternate Testing Date" and, together with each Testing Date, a "Variance Testing Date"), commencing with the first such Variance Testing Date to occur after the Interim Facility Effective Date, the Borrower will provide to the Administrative Agent a variance report tested as of the most recent Variance Testing Date for the immediately preceding four-week period then ended (each such period, a "Testing Period" and each such report, a "Variance Report"), in form and substance reasonably satisfactory to the Administrative Agent and the Majority Lenders, detailing the following:

(i)     the aggregate disbursements of the Loan Parties and aggregate receipts during the applicable Testing Period; and

(ii)     any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Loan Parties against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Loan Parties during such Testing Period).

(c)     No later than 5:00 p.m., New York City time on each Wednesday, commencing with the first such Wednesday to occur after the Interim Facility Effective Date, the Borrower shall provide to the Administrative Agent and the Lenders a report showing actual receipts and disbursements through the prior week in the format of the Budget, and, promptly upon request of the Administrative Agent, an explanation of any variance to the Budget.

Section 8.19.     Cash Management.     The Loan Parties and their respective Subsidiaries shall maintain their cash management system as it existed prior to the Petition Date for the benefit of the entire DIP Facility, with such changes as may be required by an order of the Bankruptcy Court and/or as may be made with the consent of the Administrative Agent and the Majority Lenders.

ARTICLE IX

NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, each Loan Party covenants and agrees with the Lenders that:

Section 9.01.     Minimum Liquidity.     The Borrower and its Subsidiaries shall not permit Liquidity to be less than (i) $10,000,000 at any time during the period commencing on the Interim Facility Effective Date and ending on, but excluding, the date that is thirty (30) days after the Interim Facility Effective Date, (ii) $15,000,000 at any time during the period commencing on the date that is thirty (30) days after the Interim Facility Effective Date and ending on, but excluding, the Final Facility Effective Date and (iii) $25,000,000 at any time from and after the Final Facility Effective Date.

80

Section 9.02.    Debt.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, incur, create, assume or suffer to exist any Debt, except:

(a)       the Obligations;

(b)       (i) Debt of the Borrower and its Subsidiaries in respect of trade payables arising as a result of the deferred purchase price of Property or services from time to time incurred in the ordinary course of business of the Borrower and its Subsidiaries and (ii) Debt of the Parent in respect of trade payables arising as a result of the deferred purchase price of services from time to time incurred in the ordinary course of business of the Parent; provided that, in respect of each of the foregoing clause (i) and (ii), such trade payables are not overdue by more than sixty (60) days or such trade payables are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c)       Debt of the Borrower and its Subsidiaries under Capital Leases entered into prior to the Petition Date and set forth on Schedule 9.02(c) hereto;

(d)       Debt of the Borrower and its Subsidiaries associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations for the account of the Borrower and its Subsidiaries to the extent required by any Governmental Requirements and otherwise in connection with the operation of the Oil and Gas Properties; provided that the aggregate amount of such Debt shall not exceed $1,000,000;

(e)       unsecured intercompany Debt between the Borrower and any Guarantor (other than the Parent) or between Guarantors (other than the Parent) to the extent permitted by Section 9.05(g); provided that such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than the Borrower or one of its Wholly-Owned Subsidiaries, and, provided, further, that any such Debt owed by either the Borrower or a Guarantor shall be subordinated to the Obligations on terms satisfactory to the Administrative Agent;

(f)       Debt of the Borrower and its Subsidiaries in the form of endorsements of negotiable instruments for collection in the ordinary course of business;

(g)       Debt of the Borrower and its Subsidiaries in respect of performance, bid, surety or similar bonds or surety obligations in existence on the Petition Date and set forth on Schedule 9.02(g) (including any recoupment obligations or other Debt arising in connection with the foregoing, whether before or after the Petition Date) for the account of the Borrower and its Subsidiaries, in each case, to the extent required by any Governmental Requirements applicable to the Borrower and its Subsidiaries and otherwise in connection with the operation of the Oil and Gas Properties of the Borrower and its Subsidiaries, together with all replacements, extensions and renewals thereof made in the ordinary course of business;

(h)       **[Reserved]**;

(i)       **[Reserved]**; and

(j)       (i) the Prepetition Second Lien Obligations and (ii) the Prepetition Credit Agreement Obligations;

Section 9.03.    Liens.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

US-DOCS\106250840.21

(a) Liens securing the payment of any Obligations;

(b) (i) Excepted Liens on any Property of the Borrower and its Subsidiaries, (ii) Excepted Liens on any Property (other than the Parent's right, title and interest in, and to, any and all Equity Interests issued by any of the direct or indirect Subsidiaries of the Parent) of the Parent and (iii) inchoate Tax Liens on the Parent's right, title and interest in, and to, any and all Equity Interests issued by any of the direct or indirect Subsidiaries of the Parent;

(c) Liens on any Property of the Borrower and its Subsidiaries securing Debt arising in respect of Capital Leases so long as such Debt is permitted under Section 9.02(c); provided that such Liens attach only to the assets acquired with the proceeds of such Debt and do not cover any Hydrocarbon Interests or Equity Interests in Persons owning direct or indirect interests in Hydrocarbon Interests);

(d) Liens on any Property of the Borrower and its Subsidiaries existing on the Petition Date and set forth on Schedule 9.03; provided that (i) no such Lien shall at any time be extended to cover any additional Property not subject thereto on the Petition Date and (ii) the principal amount of the Debt secured by such Liens shall not be extended, renewed, refunded or refinanced;

(e) Liens securing the Prepetition Credit Agreement Obligations under the Prepetition Loan Documents; provided that such Liens are subject to the terms and conditions of the DIP Order;

(f) Liens securing the Prepetition Second Lien Obligations under the Prepetition Second Lien Debt Documents; provided that such Liens are subject to the terms and conditions of the DIP Order; and

(g) Adequate Protection Liens.

Section 9.04. Dividends, Distributions and Redemptions.

(a) Dividends and Distributions. The Borrower and the Parent will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders, members or partners (or other equivalent holders of their respective Equity Interests) or make any distribution of its Property to its Equity Interest holders, except the Borrower may declare and pay cash distributions to Parent to permit Parent to pay federal and state Taxes due with respect to the income of the Borrower arising after the Petition Date and to pay federal and state Taxes arising prior to the Petition Date to the extent the payment of such Taxes arising prior to the Petition Date is approved by the Bankruptcy Court.

(b) Prepayments, Redemptions of Prepetition Credit Agreement Obligations, Prepetition Second Lien Obligations; Certain Amendments. The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to make any Redemption or any other prepayments of principal, interest or payment of fees on, or in connection with, the Prepetition Loan Documents or the Prepetition Second Lien Debt Documents (collectively "Restricted Payments"), in each case, other than payments permitted to be made as required by the DIP Orders. Neither the Parent, the Borrower nor any other Loan Party shall, nor shall the Parent, the Borrower or any other Loan Party permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to, the terms or provisions contained in any of (i) the Prepetition Second Lien Debt Documents, (ii) the Prepetition Loan Documents or (iii) the documentation relating to any other Debt.

Section 9.05. Investments, Loans and Advances. The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)     Investments in existence on the Petition Date and set forth in <u>Schedule 9.05</u>;

(b)     Investments of the Borrower and its Subsidiaries in the form of accounts receivable arising in the ordinary course of business;

(c)     Investments of the Borrower and its Subsidiaries in the form of direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)     Investments of the Borrower and its Subsidiaries in the form of commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's;

(e)     Investments held in the form of Cash Equivalents;

(f)     Investments of the Borrower and its Subsidiaries in the form of deposits in money market funds investing exclusively in Investments described in <u>Section 9.05(c)</u>, <u>Section 9.05(d)</u> or <u>Section 9.05(e)</u>;

(g)     Investments (i) made by the Borrower in or to the Guarantors (other than Parent), and (ii) made by any Subsidiary in or to the Borrower or any Guarantor (other than Parent);

(h)     **[Reserved];**

(i)     Investments made by the Borrower or any of its Subsidiaries in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America, <u>provided</u> that (A) the Borrower shall be in compliance, on a pro forma basis after giving effect to any such Investment, with <u>Section 9.01</u>, and (B) no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(j)     **[Reserved];**

(k)     other Investments of the Borrower and its Subsidiaries not to exceed $1,000,000 in the aggregate at any time.

Section 9.06.   <u>Nature of Business; International Operations</u>.  The Parent and the Borrower will not, and will not permit their respective Subsidiaries to, allow any material change to be made in the character of its business as currently conducted by it and business activities reasonably incidental thereto as an independent oil and gas exploration and production company with operations in the continental United States.  From and after the date hereof, the Parent and the Borrower and their respective Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States. The Parent and the Borrower shall at all times remain organized under the laws of the United States of America or any State thereof.

Section 9.07.   <u>Proceeds of Loans</u>. (a) Neither the Parent, the Borrower nor any Person acting on behalf of the Parent or the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board, to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder or to violate any applicable Anti-Corruption Law or applicable Sanctions, in each case as now in effect or as the same may hereafter be in effect.  If requested by the Administrative Agent, the Parent and the Borrower will furnish to the

Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

(c)      The Borrower will not request any Borrowing, and the Parent and the Borrower shall not use, and shall cause that their respective Subsidiaries and its or their respective directors, officers, employees and agents not to use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.08.   ERISA Compliance.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, at any time:

(a)      engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, the Parent or a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code.

(b)      terminate, or permit any ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability of the Borrower, the Parent or a Subsidiary or any ERISA Affiliate to the PBGC.

(c)      fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, the Parent or a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto.

(d)      permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, whether or not waived, with respect to any Plan.

(e)      permit, or allow any ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan maintained by the Borrower, the Parent or a Subsidiary or any ERISA Affiliate which is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities. The term "actuarial present value of the benefit liabilities" shall have the meaning specified in Section 4041 of ERISA.

(f)      contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan.

(g)      acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to the Borrower, the Parent or a Subsidiary or with respect to any ERISA Affiliate of the Borrower, the Parent or a Subsidiary if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (1) any Multiemployer Plan, or (2) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the

84

current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities.

(h)        incur, or permit any ERISA Affiliate to incur, a liability to or on account of a Plan under Sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA.

(i)        contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any employee welfare benefit plan, as defined in Section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability.

(j)        amend, or permit any ERISA Affiliate to amend, a Plan resulting in an increase in current liability such that the Borrower, the Parent or a Subsidiary or any ERISA Affiliate is required to provide security to such Plan under Section 401(a)(29) of the Code.

Section 9.09.    Sale or Discount of Receivables.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.10.    Mergers, Divisions, Etc.  Neither the Parent, the Borrower nor any of their respective Subsidiaries will merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with the Parent, the Borrower or any of their respective Subsidiaries, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property (whether now owned or hereafter acquired) to any other Person, or liquidate or dissolve or divide.

Section 9.11.    Sale of Properties.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, Dispose of, Liquidate, sell, assign, farm-out, convey or otherwise transfer any Property, including without limitation, Equity Interests of the Parent, the Borrower or any of their respective Subsidiaries, except for:

(a)        the sale of Hydrocarbons of the Borrower and its Subsidiaries in the ordinary course of business;

(b)        farmouts of undeveloped acreage of the Borrower and its Subsidiaries and assignments in connection with such farmouts and reassignments of Oil and Gas Property to a farmout upon expiration or termination of a farmout, in each case, in the ordinary course of business on customary industry terms; provided that no such farmout or assignment shall be permitted under this Section 9.11(b) (x) if the respective Loan Party counterparty or counterparties is or are required to make an upfront commitment of cash payments or (y) to the extent any such farmout or assignment pertains to Oil and Gas Properties with an aggregate fair market value (as determined by reference to the most-recently delivered Reserve Report delivered to the Administrative Agent), for all such farmouts and assignments, in excess of $5,000,000;

(c)        the sale or transfer of equipment of the Borrower and its Subsidiaries that is no longer necessary for the business of the Borrower or such Subsidiary or is replaced by equipment of at least comparable value and use; and

(d)        Dispositions of any Property of the Borrower and its Subsidiaries not otherwise permitted by this Section 9.11, provided that (i) no Default or Event of Default shall have occurred and be continuing or result therefrom and (ii) the aggregate fair market value of such Dispositions shall not exceed $5,000,000 in the aggregate.

85

Section 9.12.    Environmental Matters.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, cause or permit any of its Property which such Persons operate to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations, Release or threatened Release, exposure or Remedial Work could reasonably be expected to have a Material Adverse Effect.  The Borrower will, and will cause its Subsidiaries to, use reasonable efforts to cause the operator of Properties which the Borrower or any other Subsidiary does not operate to comply with the terms and provisions of this Section 9.12.

Section 9.13.    Transactions with Affiliates.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors and Wholly-Owned Subsidiaries of the Borrower) other than transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time) or approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Administrative Agent and the Majority Lenders.

Section 9.14.    Subsidiaries.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, create or acquire any additional Subsidiary.  The Parent and the Borrower shall not, and shall not permit any of their respective Subsidiaries to, Dispose of any Equity Interests in any such Subsidiary.  None of the Borrower, the Parent nor any other Subsidiary shall create, form or otherwise hold or acquire any Foreign Subsidiaries.

Section 9.15.    Negative Pledge Agreements; Dividend Restrictions.  No Loan Party nor any of such Loan Party's Subsidiaries shall enter into or permit to exist any contractual obligation (other than this Agreement, any other Loan Document, the Prepetition Loan Documents or the Prepetition Second Lien Debt Documents) that limits the ability (a) of any Subsidiary to make Restricted Payments to or otherwise transfer property to Parent, the Borrower or any Guarantor, (b) of Parent to guarantee the Obligations, or any Subsidiary to guarantee the Obligations, or (c) of Parent, the Borrower, or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations, except restrictions imposed pursuant to an agreement entered into in connection with a Disposition permitted under Section 9.11.

Section 9.16.    Gas Imbalances, Take-or-Pay or Other Prepayments.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, (a) incur, become or remain liable for, any Material Gas Imbalance, or (b) allow take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor.

Section 9.17.    Swap Agreements.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreements with any Person other than Swap Agreements of the Borrower and any Subsidiary in respect of commodities entered into not for speculative purposes (x) with an Approved Counterparty and (y) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not (and in connection with any future acquisition of Oil and Gas Properties, after giving effect to such future acquisition on a pro forma basis) exceed 85% of the Projected Production from Proved Reserves constituting PDP only for the five-year period beginning on the date of the most recently delivered Projected Production Report for each of crude oil and natural gas, calculated separately. Prior to entering into any Swap Agreements, the Borrower shall submit a hedging

plan (a "Hedging Plan") to the Administrative Agent for approval. If such Hedging Plan is acceptable to the Administrative Agent, it shall provide the Hedging Plan to the Lenders for their review. If the Majority Lenders fail to object to the Hedging Plan within three Business Days after such Hedging Plan has been provided to the Lenders, such Hedging Plan shall be deemed to be approved and, subject to the limitations provided herein, the Borrower or its Subsidiaries may enter into Swap Agreements in accordance with such Hedging Plan.

Section 9.18.    Marketing Activities.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than marketing activities and such contracts of the Borrower and its Subsidiaries (i) as are in effect on the Petition Date and (ii) as entered into from time to time in the ordinary course of business of the Borrower and its Subsidiaries.

Section 9.19.    Liquidation of Swap Agreements.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, Liquidate any Swap Agreement (including, without limitation, any transaction thereunder); provided that the foregoing shall not prohibit the Liquidation of Swap Agreements (including, without limitation, any transactions thereunder) to the extent the Net Cash Proceeds of any such Liquidation are, subject to the DIP Orders, applied to the Borrowings as required by Section 3.04(c)(iv).

Section 9.20.    Budget Variances.  As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Parent and the Borrower shall not allow the aggregate disbursements (excluding disbursements in respect of Professional Fees by the Loan Parties during such Testing Period) made by the Loan Parties and their respective Subsidiaries during such Testing Period to be greater than 115% of the aggregate disbursements for the Loan Parties and their respective Subsidiaries set forth in the Budget for such Testing Period (after giving effect to the accrued and unused portion of the most recent rolling 4-week carryover) (the variances described in the foregoing, the "Permitted Variances").

Section 9.21.    Accounting Changes.  No Loan Party shall, or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (ii) change the fiscal year of any Loan Party or of any of its Subsidiaries.

Section 9.22.    Passive Holding Company; Etc.  The Parent will not conduct, transact or otherwise engage in any operating or other business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Capital Stock) of the Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of the Parent and the Borrower and (iv) the performance of its obligations under and in connection with the Loan Documents, the Chapter 11 Cases, the Prepetition Second Lien Debt Documents and any documents relating to other Debt permitted under Section 9.02.

Section 9.23.    Superpriority Claims.  Neither the Parent nor the Borrower will create or permit to exist any Superpriority Claim other than Superpriority Claims permitted by the DIP Order and the orders approving the "first day" motions in respect of the Chapter 11 Cases.

Section 9.24.    Bankruptcy Orders.  The Parent and the Borrower will not, and will not permit any Subsidiary to (a) obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Administrative Agent's or any Lender's remedies hereunder or under any other Loan Document, except as specifically provided in the DIP Order (b) seek to change or otherwise modify any DIP Order or other order in the Bankruptcy Court with respect to the DIP Facility or (c) without the consent of the Majority Lenders, propose, file, consent, solicit votes with respect to or support any chapter 11 plan or debtor in possession

financing unless (i) such plan or financing would, on the date of effectiveness, pay in full in cash all Obligations or (ii) such plan is an Approved Plan of Reorganization.

<div align="center">ARTICLE X</div>

<div align="center">EVENTS OF DEFAULT; REMEDIES</div>

Section 10.01.   Events of Default.  One or more of the following events shall constitute an "Event of Default":

(a)      the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable (other than LC Disbursements which are repaid through an ABR Borrowing as permitted by Section 2.08(e) hereof), whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)      any representation or warranty made or deemed made by or on behalf of the Parent, the Borrower or any other Subsidiary in, or in connection with, any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect when made or deemed made;

(d)      the Parent, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 2.12(a)(i)(B), Section 8.01(a), Section 8.01(b), Section 8.01(j), Section 8.01(k), Section 8.01(m), Section 8.01(p), Section 8.02, Section 8.03, Section 8.13, Section 8.14, Section 8.15, Section 8.17, Section 8.18 or in Article IX.

(e)      the Parent, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of five (5) Business Days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (B) a Responsible Officer of the Parent, the Borrower or such Subsidiary otherwise becoming aware of such failure.

(f)      the Parent, the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness incurred on or after the Petition Date.

(g)      any event or condition occurs that results in any Material Indebtedness incurred on or after the Petition Date becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Parent, the Borrower or any Subsidiary to make an offer in respect thereof;

<div align="center">88</div>

(h)     any Change in Control shall occur;

(i)     the Parent, the Borrower or any other Subsidiary shall attempt to invalidate or otherwise impair the Loans or other Obligations hereunder or under any other Loan Document;

(j)     the entry of the Interim Order has not occurred on or prior to the date that is five (5) days after the Petition Date, or the entry of the Final Order has not occurred prior to or on the date that is thirty-five (35) days (or a later date consented to by the Administrative Agent and the Majority Lenders) after the Petition Date;

(k)     with respect to the Parent, the Borrower or any Subsidiary:  (i) one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (to the extent not covered by independent third party insurance provided by insurers of the highest claims paying rating or financial strength as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Parent, the Borrower, any Subsidiary or any combination thereof, and, in each case of clauses (i) and (ii), the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent, the Borrower or any Subsidiary to enforce any such judgment, and unless, with respect to any of the foregoing, the same shall be effectively stayed pursuant to the Bankruptcy Code.

(l)     the Loan Documents after delivery thereof shall for any reason cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Loan Party party thereto or shall be repudiated or contested by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby or the Parent, the Borrower or any other Subsidiary or any of their Affiliates shall so state in writing or any Loan Party shall contest the validity or perfection of the Liens and security interests securing the Obligations.

(m)     an ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Parent, the Borrower and the other Subsidiaries in an aggregate amount exceeding $1,000,000 in any year.

(n)     the occurrence of any early Termination Date (as defined in such Swap Agreement)  under any Swap Agreement entered into after the Petition Date resulting from (i) any event of default under such Swap Agreement to which the Borrower or any Subsidiary is the Defaulting Party (as defined in such Swap Agreement), or (ii) any Termination Event (as so defined) under such Swap Agreement as to which the Borrower or any other Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Borrower or such other Subsidiary as a result thereof exceeds $1,000,000 in the aggregate;

(o)     any Loan Party seeks to obtain Bankruptcy Court approval of any sale or other disposition of all or a material portion of the Collateral securing the Loans pursuant to section 363 of the Bankruptcy Code if such sale or disposition does not contemplate satisfying the Obligations in full, in Cash, and other than as permitted by the DIP Orders or the Approved Plan of Reorganization (or pursuant to a transaction that is permitted hereunder), or any Loan Party proposes, supports, or fails to contest in good faith the entry of such an order;

<div align="center">89</div>

(p)      the entry of an order or filing authorizing, approving granting or seeking additional postpetition financing not otherwise permitted hereunder, or any Liens on the Collateral not otherwise permitted hereunder, other than the pursuant to the Carve-Out;

(q)      the payment by any Loan Party of any Prepetition claim other than as permitted by the Budget (subject to any Permitted Variances);

(r)      the allowance of any claim under section 506(c) of the Bankruptcy Code, or otherwise, surcharging any Collateral or the termination or modification of the exclusivity periods set forth in section 1121 of the Bankruptcy Code;

(s)      the Final Order fails to provide that each of the Administrative Agent, the Lenders, the Prepetition Credit Agreement Agent and the Prepetition Lenders are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, and, following the entry of the Final Order, the "equities of the case" shall not apply;

(t)      the filing of a motion by any of the Loan Parties seeking dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(u)      the dismissal or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(v)      the appointment of a Chapter 11 trustee or examiner with enlarged powers in any of the Chapter 11 Cases without the prior written consent of the Lenders in their sole discretion;

(w)      the Bankruptcy Court's entry of an order granting any, or any other grant of any, lien or claim that is senior to or *pari passu* with the Administrative Agent's liens and claims under the DIP Facility;

(x)       the payment or granting of adequate protection with respect to any Indebtedness in an amount in excess of $2,000,000 (other than as described herein or the applicable DIP Order) without the prior written consent of the Prepetition Credit Agreement Agent;

(y)      (i) any Liens granted with respect to the DIP Facility or the Obligations shall cease to be valid, perfected and enforceable in all respects with the priority set forth in the DIP Order (other than upon a release by reason of a transaction that is expressly permitted under the Loan Documents), (ii) the Obligations shall cease to be valid and enforceable or shall cease to have the superpriority claims status set forth in the DIP Orders (other than upon a release by reason of a transaction that is expressly permitted under the Loan Documents), or (iii) the disallowance, expungement, extinguishment or impairment of any portion of the Obligations;

(z)      (i) the filing of a motion by any of the Loan Parties seeking, or the entry of, one or more orders of the Bankruptcy Court (A) reversing, amending, supplementing, vacating, or otherwise modifying the Interim Order or Final Order, as applicable, without the prior written consent of the Administrative Agent and the Lenders, or (B) avoiding or requiring repayment of any of the payments made to the Administrative Agent or the Lenders in accordance with the terms hereof or the DIP Orders shall otherwise cease to be in full force and effect;

(aa)      the entry of one or more orders of the Bankruptcy Court modifying the automatic stay with respect to assets having a value in excess of $1,000,000 in the aggregate without the prior written consent of the Majority Lenders;

90

(bb)    failure to satisfy any of the Chapter 11 Milestones in accordance with the terms relating to such Chapter 11 Milestone;

(cc)    there shall be a breach by any Debtor of any provisions of the Interim Order (prior to entry of the Final Order) or the Final Order, or the Interim Order (prior to entry of the Final Order) or Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Administrative Agent and Majority Lenders;

(dd)    the filing of a plan of reorganization or liquidation by the Loan Parties other than an Approved Plan of Reorganization; or

(ee)    the entry of an order precluding the Prepetition Credit Agreement Agent the Administrative Agent from "credit bidding".

Section 10.02.   Remedies.

(a)    Upon the occurrence and continuance of any Event of Default, subject in all respects to the Carve Out (i) the Administrative Agent may, and upon the written request of the Majority Lenders, shall (A) deliver a notice to the Company of the Event of Default, (B) declare the termination, reduction, or restriction of the Commitments, and thereupon the Commitments shall be terminated, reduced, or restricted immediately unless and until the Majority Lenders and the Administrative Agent shall reinstate the same in writing, (C) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations), shall become due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party, (D) declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral (other than as set forth in clause (iii) below) (E) terminate the DIP Facility and (F) charge the Default Rate (each of clauses (A) through (F) above, a "Termination Declaration" and the earliest date to occur of any such Termination Declaration, the "Termination Declaration Date"), in each case of clauses (A) through (F) above, without first obtaining relief from the automatic stay under section 362 of the Bankruptcy Code; (ii) five (5) Business Days' after the Termination Declaration Date, the Loan Parties and/or any Committee shall be permitted to seek an emergency hearing before the Bankruptcy Court (which they shall seek on an expedited basis) solely to determine whether an Event of Default has occurred, provided, however, that (1) if the Debtors or any Committee seeks an expedited emergency hearing within five (5) Business Days, until such time the Court has entered an order ruling on whether an Event of Default has occurred, the Administrative Agent shall not be permitted to exercise its rights and remedies with respect to such Termination Declaration; (2) if the Loan Parties and any Committee do not seek an expedited emergency hearing within five (5) Business Days after the Termination Declaration Date, the Administrative Agent shall be entitled to exercise all rights and remedies provided for in the Loan Documents with respect to such Termination Declaration, including the right to foreclose on, or otherwise exercise its rights with respect to all or any portion of the Collateral, including by applying the proceeds thereof to the Obligations; and (iii) the Loan Parties shall not be permitted to use any proceeds of the Loans, or any other cash collateral, except in accordance with the Budget.

(b)    In the case of the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

91

(c)     All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:

*First*, to payment or reimbursement of that portion of the Obligations constituting fees, expenses, indemnities and other amounts (including all fees, costs and disbursements of counsel to the Administrative Agent, and amounts payable under Article V) payable to the Administrative Agent in its capacity as such;

*Second*, pro rata to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Issuing Bank and to the Lenders;

*Third*, pro rata to payment of (i) accrued and unpaid interest on the New Money Loans and LC Disbursements, (ii) accrued and unpaid interest on the Roll-Up Loans, (iii) fees on each Letter of Credit and (iii) other accrued and unpaid interest included in the Obligations;

*Fourth*, pro rata to (i) payment of principal outstanding on the New Money Loans, (ii) payment of principal outstanding on the  Roll-Up Loans, (ii) payment of Obligations then owing under any Secured Treasury Management Agreement, and (iii) to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure;

*Fifth*, pro rata to any other unpaid Obligations; and

*Sixth*, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be held as required by the Bankruptcy Court and/or any other Governmental Requirement.

Subject to Sections 2.08 and 2.11, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fifth above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, Obligations arising under and Secured Treasury Management Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank.  Each Treasury Management Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article XI hereof for itself and its Affiliates as if a "Lender" party hereto.

ARTICLE XI

THE AGENTS

Section 11.01.   Appointment; Powers.

(a)     Each of the Lenders and the Issuing Bank hereby irrevocably appoints Citibank, N.A. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are

US-DOCS\106250840.21

reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Bank, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacity as a potential Treasury Management Bank) and the Issuing Bank hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and the Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 11.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Instruments or any other Loan Document, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article XI and Article XII (including Section 12.03(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 11.02.  Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Parent, the Borrower or any other Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 11.03.  Exculpatory Provisions.

(a)     The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent will not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

93

(iii)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request or direction of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.02 and 12.02)), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower, a Lender or the Issuing Bank.

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Instruments, (v) the value or sufficiency of any of the Collateral, (vi) the financial or other condition of the Parent, the Borrower or any other Loan Party or any of their respective Subsidiaries, or (vii) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 11.04.  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 11.05.  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent.  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that

94

the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

Section 11.06.   <u>Resignation of Administrative Agent and/or Issuing Bank</u>.

(a)      The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower.  Upon receipt of any such notice of resignation, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the Issuing Bank directly, until such time as the Majority Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 12.03</u> shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)      Any resignation by Citibank, N.A. as Administrative Agent pursuant to this Section shall also constitute its resignation as Issuing Bank.  After the resignation of the Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit or to extend, renew or increase any existing Letter of Credit, including, without limitation, any Letter of Credit with an auto-extend feature (for the avoidance of doubt, the retiring Issuing Bank is authorized to notify any and each beneficiary of each Letter of Credit (in accordance with the terms of such Letter of Credit) that any such Letter of Credit will not be renewed, extended or increased, automatically or otherwise).  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (ii) the retiring Issuing Bank and shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(c)      In addition to the foregoing, if a Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank may, upon prior written notice to the Borrower and the Administrative Agent, resign as Issuing Bank, effective at the close of business New

York time on a date specified in such notice (which date may not be less than 30 days after the date of such notice); provided that such resignation by the Issuing Bank will have no effect on the validity or enforceability of any Letter of Credit then outstanding or on the obligations of the Borrower or any Lender under this Agreement with respect to any such outstanding Letter of Credit or otherwise to the Issuing Bank.

Section 11.07.   Non-Reliance on Administrative Agent and Other Lenders.  Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 11.08.   No Other Duties, etc.  Anything herein to the contrary notwithstanding, none of the Arranger nor any other Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the Issuing Bank hereunder.  Neither the Arranger nor any other Agent shall have or be deemed to have any fiduciary relationship with any Lender.

Section 11.09.   Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party or any of their Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan or LC Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Bank and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Bank and the Administrative Agent under Sections 3.05 and 12.03) allowed in such judicial proceeding; and

(b)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Bank, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Section 11.10.   Collateral and Guaranty Matters.

(a)       Each of Lenders and the other Secured Parties (including each Lender in its capacity as a potential Treasury Management Bank), and the Issuing Bank, irrevocably authorize the Administrative Agent, at its option and in its discretion,

96

(i)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (w) upon termination of all of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been made) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent and the Issuing Bank shall have been made), (x) on the Termination Date, (y) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted under the Loan Documents, or (z) subject to Section 12.02, if approved, authorized or ratified in writing by the Majority Lenders;

(ii)      to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 9.03; and

(iii)      to release any Guarantor (other than the Parent) from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Article XI. In each case as specified in this Section 11.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Instruments and the other Loan Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 11.10.

(b)      The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(c)      The Secured Parties further irrevocably authorize the Administrative Agent, at their option and in their discretion, without the necessity of any notice to or further consent from the Secured Parties, at the the at the direction of the Majority Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) or to Dispose of (or to consent to any such Disposition of) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, or at any sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law.

Section 11.11.   Secured Treasury Management Agreements.  No Treasury Management Bank that obtains the benefits of Section 10.02(c), any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty, any Security Instrument or any other Loan Document shall have any right to notice of any action or to consent, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article XI to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect

to, Obligations arising under Secured Treasury Management Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank.

<p align="center">ARTICLE XII</p>

<p align="center">MISCELLANEOUS</p>

Section 12.01.   Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)      if to the Borrower or any other Loan Party, to it at

5847 San Felipe, Suite 3000
Houston, Texas  77057-3399
Attn:  Mr. Ryan Midgett
Facsimile No:  832-327-2260
Telephone:  832-327-2255
Electronic Mail Address:  rmidgett@vnrenergy.com
Website Address (for Section 8.02 purposes): www.vnrenergy.com

(ii)      if to the Administrative Agent, to it at

Citibank, N.A.
811 Main Street, Suite 4000
Houston, TX  77002
Attention:  Mr. Phil Ballard
Facsimile No:  281-271-8970
Telephone:  713-821-4789
Electronic Mail Address: phil.ballard@citi.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
811 Main Street, Suite 3700
Houston, TX, 77002
Attention:  Trevor Wommack
Facsimile No: 713-546-5401
Telephone:  713-546-7425
Electronic Mail Address: trevor.wommack@lw.com

<p align="center">98</p>

(iii)      if to the Issuing Bank, to it at

Citibank, N.A.
811 Main Street, Suite 4000
Houston, TX 77002
Attention: Ms. Hilda Munoz
Facsimile No: 713-481-0252
Telephone: 713-821-4738
Electronic Mail Address: hilda.g.munoz@citi.com

(iv)      if to any other Lender, to it at its address (or facsimile number), or electronic mail address set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)      Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to any Lender or the Issuing Bank pursuant to Article II, Article III, Article IV and Article V if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that for both clauses (i) and (ii) above, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)      Platform.

(i)      Each Loan Party agrees that the Administrative Agent and/or the Arranger may, but shall not be obligated to, make the Communications (as defined below) available to the Issuing Bank and the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

US-DOCS\106250840.21

(ii)     The Platform is provided "as is" and "as available."  The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.   No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.   In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any other Loan Party's or the Administrative Agent's transmission of communications through the Platform.   "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Parent, the Borrower nor any other Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent, any Lender or the Issuing Bank by means of electronic communications, including through the Platform.

(iii)     Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower, any of the other Loan Parties, or Parent, or their securities for purposes of United States Federal or state securities laws.

Section 12.02.   Waivers; Amendments.

(a)     No failure on the part of the Administrative Agent, any other Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any other Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, any other Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 10.02 for the benefit of all the Secured Parties; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Administrative Agent) hereunder and under

100

the other Loan Documents, (b) the Issuing Bank from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with <u>Section 12.08</u> (subject to the terms of <u>Section 4.01</u>), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any debtor relief law; and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as the Administrative Agent hereunder and under the other Loan Documents, then (i) the Majority Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 10.02</u> and (ii) in addition to the matters set forth in <u>clauses (b)</u>, <u>(c)</u> and <u>(d)</u> of the preceding proviso and subject to <u>Section 4.01</u>, any Lender may, with the consent of the Majority Lenders, enforce any rights and remedies available to it and as authorized by the Majority Lenders.

(b)    Other than an update to <u>Schedule 7.14</u> pursuant to <u>Section 8.14(d)</u> or an update to <u>Annex I</u> pursuant to <u>Section 2.01(a)</u>, neither this Agreement nor any provision hereof nor any other Loan Document nor any provision thereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; <u>provided</u> that no such agreement shall (i) increase the Aggregate Commitments or the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Obligations hereunder or under any other Loan Document, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Obligations hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date without the written consent of each Lender affected thereby, (iv) change <u>Section 2.02(a)</u>, <u>Section 2.04(a)</u>, <u>Section 2.06(b)(ii)</u>, <u>Section 2.12(a)(i)(C)</u>, <u>Section 3.04(b)</u>, <u>Section 3.04(c)</u>, <u>Section 4.01(b)</u>, <u>Section 4.01(c)</u> or <u>Section 10.02(c)</u> in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender affected thereby, (v) waive or amend <u>Section 8.14</u>, without the written consent of each Lender affected thereby, (vi) release all or substantially all of the Guarantors (except in accordance with the terms of the Guaranty), release all or substantially all of the Collateral (other than as provided in <u>Section 11.10</u>), without the written consent of each Lender affected thereby, or (vii) change any of the provisions of this <u>Section 12.02(b)</u> or the definition of "Majority Lenders" or "Maturity Date", or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender affected thereby; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing or any other provision to the contrary, (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other Agent, or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, such other Agent or the Issuing Bank, as the case may be, and (B) nothing in this <u>Section 12.02</u> shall cause any waiver, amendment, modification or consent to (1) any fee letter between the Borrower and any Lender, Agent or the Administrative Agent or the Issuing Bank to require the consent of the Majority Lenders, (2) any Letter of Credit Agreements between the Borrower or any Subsidiary of the Borrower and the Issuing Bank to require the consent of the Majority Lenders, (3) any Letter of Credit issued by the Issuing Bank pursuant to the terms of this Agreement to require the consent of the Majority Lenders except as specifically required by <u>Section 2.08</u>, or (4)  any Secured Treasury Management Agreement to require the consent of the Majority Lenders.

(c)    Notwithstanding the foregoing, (i) the Borrower and the Administrative Agent may amend this Agreement or any other Loan Document without the consent of the Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document, and (ii) the Administrative Agent and the Borrower (or other applicable Loan Party) may enter into any amendment, modification or waiver of this Agreement or any other Loan Document or

enter into any agreement or instrument to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral, Mortgaged Property or other Property to become Mortgaged Property to secure the Obligations for the benefit of the Lenders or as required by any Governmental Requirement to give effect to, protect or otherwise enhance the rights or benefits of any Lender under the Loan Documents without the consent of any Lender.

(d)     Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Majority Lenders or all of the Lenders, as required, have approved any such amendment or waiver (and the definition of "Majority Lenders" will automatically be deemed modified accordingly for the duration of such period); provided, that any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

(e)     Anything herein to the contrary notwithstanding the Required Roll-Up Lenders may (without the consent of any other Lenders or any Agent) agree on behalf of all Roll-Up Lenders that the full amount of the Roll-Up Loans will not be required to be repaid in cash on the Termination Date, but instead shall be treated in any manner approved by the Required Roll-Up Lenders. No amendment or waiver shall, unless signed by all Roll-Up Lenders, change the definition of the term Required Roll-Up Lenders or the percentage of Roll-Up Lenders which shall be required for Roll-Up Lenders to take any action hereunder, in each case without the consent of all Roll-Up Lenders.

Section 12.03.    Expenses, Indemnity; Damage Waiver.

(a)     The Borrower shall pay, on a monthly basis (and in any event promptly following written demand therefor), without the requirement of prior Bankruptcy Court approval and whether incurred before or after the Petition Date, (i) all out-of-pocket expenses incurred by the Administrative Agent and its Affiliates in connection with the syndication of the credit facilities provided for herein and the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by any Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement, any Security Instrument or any other Loan Document or any other document referred to herein or therein, (iii) all out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) all out-of-pocket expenses incurred by any Agent, the Issuing Bank or any Lender in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 12.03, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. The Borrower shall also pay the fees and expenses of the attorneys (for any reasonable and documented or invoiced out-of-pocket legal expenses of one firm of counsel for all Lenders, taken as a whole and, if necessary, of a single local counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all such Lenders, taken as a whole, and, solely in the case of a conflict of interest, one additional counsel in each applicable jurisdiction) and advisors for the

US-DOCS\106250840.21

Administrative Agent, any Lender or the Issuing Bank on the Interim Facility Effective Date and thereafter as provided under the Budget, whether or not incurred prior to, on or after the Petition Date.  Invoices supporting such fees and expenses shall be submitted to counsel for the Loan Parties, with copies to the U.S. Trustee and counsel for any Committee (invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine). No attorney or advisor to the Administrative Agent, any Lender or the Issuing Bank shall be required to file an application seeking compensation for services or reimbursement of expenses with the Bankruptcy Court. The U.S. Trustee, the Loan Parties, and any Committee shall have ten (10) Business Days in which to raise an objection to the fees and expenses of such attorneys and advisors. In the event any such payment would be required to be repaid to the Loan Parties as a result of application of Section 506(b) of the Bankruptcy Code or otherwise, any such amounts shall not be repaid and instead shall be applied as follows: first, to the Obligations until such Debt is indefeasibly paid in full, in cash; second, to the Prepetition Credit Agreement Obligations until such Debt is paid in full, in cash; and third, to the Borrower and its estate.

(b)      THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT (AND ANY SUB-AGENT THEREOF), EACH LENDER, EACH ARRANGER AND THE ISSUING BANK, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND DEFEND AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES, TAXES, PENALTIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE AND DOCUMENTED OR INVOICED OUT-OF-POCKET LEGAL EXPENSES OF ONE FIRM OF COUNSEL FOR ALL SUCH INDEMNITEES, TAKEN AS A WHOLE AND, IF NECESSARY, OF A SINGLE LOCAL COUNSEL IN EACH APPROPRIATE JURISDICTION (WHICH MAY INCLUDE A SINGLE SPECIAL COUNSEL ACTING IN MULTIPLE JURISDICTIONS) FOR ALL SUCH INDEMNITEES, TAKEN AS A WHOLE, AND, SOLELY IN THE CASE OF A CONFLICT OF INTEREST, ONE ADDITIONAL COUNSEL IN EACH APPLICABLE JURISDICTION TO THE AFFECTED INDEMNITEES), AND SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM ALL FEES AND TIME CHARGES AND DISBURSEMENTS FOR ATTORNEYS WHO MAY BE EMPLOYEES OF ANY INDEMNITEE, INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON OR BY THE BORROWER OR ANY OTHER LOAN PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, (II) THE FAILURE OF THE PARENT, THE BORROWER OR ANY OF THEIR RESPECTIVE SUBSIDIARIES TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (III) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE PARENT, THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (IV) ANY LOAN OR LETTER OF CREDIT OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT), (V) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF THE SUBSIDIARIES OR OTHER

103

LOAN PARTIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF THE SUBSIDIARIES OR OTHER LOAN PARTIES, (VI) OR THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (VII) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (VIII) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS SUBSIDIARIES BY THE BORROWER AND ITS SUBSIDIARIES, (IX) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS AND THE OTHER LOAN DOCUMENTS, (X) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON ANY OF THEIR PROPERTIES, (XI) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY OTHER SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY OTHER SUBSIDIARY, (XII) THE PAST OWNERSHIP BY THE BORROWER OR ANY OTHER SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE PARENT, THE BORROWER OR OF THEIR RESPECTIVE SUBSIDIARIES OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE PARENT, THE BORROWER OR ANY OF THEIR RESPECTIVE SUBSIDIARIES, (XIII) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE PARENT, THE BORROWER OR ANY OF THEIR RESPECTIVE SUBSIDIARIES, (XIV) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR, (XV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE BORROWER OR ANY OTHER SUBSIDIARY OR OTHER LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES, PENALTIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) RESULT FROM A CLAIM BROUGHT BY THE BORROWER OR ANY OTHER LOAN PARTY AGAINST AN INDEMNITEE FOR ANY MATERIAL BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF THE BORROWER OR SUCH LOAN PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.  This Section 12.03(b) shall not apply

with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Issuing Bank or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that with respect to such unpaid amounts owed to the Issuing Bank solely in its capacity as such, only the Lenders shall be required to pay such unpaid amounts, such payment to be made severally among them based on such Lenders' Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) provided, further, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Issuing Bank in connection with such capacity.  The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.05(c).

(d)     To the fullest extent permitted by applicable law, the Parent and the Borrower shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     All amounts due under this Section 12.03 shall be payable not later than three (3) Business Days after written demand therefor.

(f)     The provisions of this Section 12.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans and the Obligations, the expiration or termination of the Aggregate Commitments, the expiration of any Letter of Credit, the invalidity, unenforceability or termination of any or all Loan Documents or term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Lender or the Issuing Bank.

Section 12.04.   Successors and Assigns Generally.

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, (any attempted assignment or transfer by the Borrower without such consent shall be null and void) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section 12.04, (ii) by way of participation in accordance with

105

the provisions of underline(paragraph (d)) of this underline(Section 12.04), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of underline(paragraph (e)) of this underline(Section 12.04) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants to the extent provided in underline(paragraph (d)) of this underline(Section 12.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)      Minimum Amounts.

(A)      in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in underline(paragraph (b)(i)(B)) of this underline(Section 12.04) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in underline(paragraph (b)(i)(A)) of this underline(Section 12.04), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $2,500,000, unless the Administrative Agent otherwise consents.

(ii)      Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to such Lender's Roll-up Loans, New Money Loans or the Commitments assigned.

(iii)      Required Consents.  No consent shall be required for any assignment except to the extent required by underline(paragraph (b)(i)(B)) of this underline(Section 12.04) and, in addition:

(A)      **[Reserved];**

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments if such assignment is to a Person that is not a Lender with a Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)      the consent of the Issuing Bank shall be required for any assignment in respect of the Loan and Commitment of any Lender.

(iv)      Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing

106

and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     No Assignment to Certain Persons.  No such assignment shall be made to (A) any Loan Party or any Loan Party's Affiliates and Subsidiaries or (B) any Defaulting Lender or Potential Defaulting Lender or any of their respective Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural Person.

(vii)     Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment will be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Issuing Bank and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder becomes effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest will be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 12.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 5.01 and 5.03 and Section 12.03 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 12.04.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its office located in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"), and upon the determination by the Administrative Agent of (i) the satisfaction of all conditions precedent to the effectiveness of such

<div align="center">107</div>

Assignment and Assumption (including, without limitation, the receipt of all requisite consents, payment of fees and transfer of money) and (ii) the expiration of any trading freeze or trading holds due to any amendment, consent or waiver, or any other interruption in, or hold on, trading as determined by the Administrative Agent, the Administrative Agent will accept such Assignment and Assumption and record the appropriate information contained therein in the Register. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be maintained in a manner such that the obligations listed are considered to be in registered form within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code. The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Issuing Bank and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 2.08(d), Section 12.03(c) and otherwise with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver which requires the consent of each Lender affected thereby under Section 12.02 to the extent if affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 5.01, 5.02 and 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(g) (it being understood that the documentation required under Section 5.03(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 12.04; provided that such Participant (A) agrees to be subject to the provisions of Sections 5.04 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 5.01 or 5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant shall also be entitled to the benefits of Section 12.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 4.01 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and within the meaning of Sections 163(f), 871(h)(2) and

108

881(c)(2) of the Code.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 12.05.  Survival; Revival; Reinstatement.  (a) All covenants, agreements, representations and warranties made by the Parent, the Borrower and the other Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other Obligation or amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Aggregate Commitments have not expired or terminated.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or any other Obligation, the expiration or termination of the Letters of Credit and the Aggregate Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.  Each party's obligations under Section 5.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

(b)     To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated and the Parent, the Borrower and each other Loan Party shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06.  Counterparts; Integration; Effectiveness; Electronic Signatures.

(a)     This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral

<div align="center">109</div>

or written, relating to the subject matter hereof and thereof. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. **TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THE TERMS OF THIS AGREEMENT OR ANY LOAN DOCUMENT AND THE DIP ORDER, THE PROVISIONS OF THE DIP ORDER SHALL GOVERN.**

(c)     The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.07.   <u>Severability</u>.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08.   <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, the Issuing Bank or any such Affiliate, to or for the credit or the account of the Parent, the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Bank or their respective Affiliates, irrespective of whether or not such Lender, the Issuing Bank or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Parent, the Borrower or such other Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender or the Issuing Bank different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u> that in the event that any Defaulting Lender exercises any such right of setoff, (x) all amounts so set off will be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.12(a)(i)</u> and, pending such payment, will be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Bank and the Lenders and (y) the Defaulting Lender will provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender, the Issuing Bank and their respective Affiliates under this <u>Section 12.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have.  Each Lender and the Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

110

Section 12.09.  GOVERNING  LAW;  JURISDICTION;  CONSENT  TO  SERVICE  OF PROCESS; WAIVER OF JURY TRIAL.

(a)     Governing Law.  This Agreement and the other Loan Documents (other than the DIP Order) and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except for the DIP Order and, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York and applicable Federal law.

(b)     Submission to Jurisdiction.  The Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, the Issuing Bank, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court and if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York in the Borough of Manhattan, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent, any Lender or the Issuing Bank may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)     Waiver of Venue.  The Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 12.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(e)     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.10.  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11.  Confidentiality.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, (g) with the consent of the Borrower, (h) to any credit insurance provider relating to the Borrower and its obligations, this Agreement or payments hereunder, (i) on a confidential basis (i) to any rating agency in connection with the rating the Parent, the Borrower or the Subsidiaries or the Loans or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; or (j) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 12.11 or (2) becomes available to the Administrative Agent, the Issuing Bank or any Lender or any of their Affiliates on a nonconfidential basis from a source other than the Borrower.

For the purposes of this Section 12.11, "Information" means all information received from the Parent, the Borrower or any of the other Subsidiaries relating to the Parent, the Borrower or any of the other Subsidiaries and their respective businesses, including, but not limited to, any Swap Agreements, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Parent, the Borrower or any of the other Subsidiaries; provided that, in the case of information received from the Parent, the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Lenders and the Issuing Bank acknowledges that (a) the Information may include material non-public information concerning the Parent, the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 12.12.  Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the States of New York and Texas, or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:   (a) the aggregate of all

consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13.  EXCULPATION PROVISIONS.  EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

113

Section 12.14.   Collateral Matters; Treasury Management Agreements.  The benefit of the Security Instruments and the other Loan Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available to any Treasury Management Bank with respect to amounts payable by the Borrower, any Subsidiary, and any Guarantor under any Secured Treasury Management Agreement.  All Secured Treasury Management Agreements are independent agreements governed by the terms thereof and will remain in full force and effect, unaffected by any repayment, prepayment, acceleration, reduction, increase or change in the terms of the Loans created under this Agreement except as otherwise provided in such Secured Treasury Management Agreements, and any payoff statement from any Lender relating to this Agreement shall not apply to Secured Treasury Management Agreements, except as otherwise expressly provided in such payoff statement.

Section 12.15.   No Third Party Beneficiaries.  This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, the Parent, any Subsidiary, any obligor, contractor, subcontractor, supplier or materialman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.  There are no third party beneficiaries.

Section 12.16.   USA Patriot Act Notice.  Each Lender that is subject to the PATRIOT Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (the "PATRIOT Act") and the Customer Due Diligence Requirements for Financial Institutions issued by the U.S. Department of Treasury Financing Crimes Enforcement Network under the Bank Secrecy Act (such rule published May 11, 2016 and effective May 11, 2018, as amended from time to time), each of them is required to obtain, verify and record information that identifies you and a certification regarding beneficial ownership required by 31 C.F.R. 1010.230, which information includes the name and address of such person and other information that will allow the Arranger to identify such person in accordance with the PATRIOT Act and other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each Financial Institutions and each Lender.

Section 12.17.   **[Reserved].**

Section 12.18.   Replacement of Lenders.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 5.04, or if any Lender is a Defaulting Lender or a Potential Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 5.01 or Section 5.03) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(a)        the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 12.04;

(b)        such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other

114

amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 5.02) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)      in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)      such assignment does not conflict with applicable law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 12.19.   Time of the Essence.  Time is of the essence of the Loan Documents.

Section 12.20.   No Advisory or Fiduciary Responsibility.   The Borrower and each other Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that in connection with all aspects of (1) the transaction evidenced by this Agreement and the other Loan Documents, (2) the Transactions and (3) each other transaction contemplated hereby and by the other Loan Documents (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) that:

(a)      (i)      the arranging and other services regarding this Agreement and the other Loan Documents provided by the Agents and the Arranger, are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent, the other Agents and each of the Arranger, on the other hand,

(ii)      each of the Borrower and the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and

(iii)      the Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents;

(b)      (i)      each of the Administrative Agent, the other Agents, the Issuing Bank, the Lenders and the Arranger, is, and has been, acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Loan Party or any of their respective Affiliates, or any other Person;

(ii)      none of the Administrative Agent, the other Agents, the Issuing Bank, the Lenders nor the Arranger has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents;

(iii)      any of the Administrative Agent, the other Agents, the Issuing Bank, the Lenders and the Arranger, and any of their respective Affiliates, may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and none of the Administrative Agent, the other Agents nor  the Arranger has any obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates.

US-DOCS\106250840.21

To the fullest extent permitted by law, each of the Borrower and the other Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent, any of the other Agents, the Issuing Bank, the Lenders or the Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby and by the other Loan Documents.

Section 12.21.   **[Reserved].**

Section 12.22.   **[Reserved].**

Section 12.23.   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[This space is left intentionally blank.  Signature Pages follow.]

116

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**

**VANGUARD NATURAL GAS, LLC**


By:_____


**PARENT:**

**VANGUARD NATURAL RESOURCES, INC.**


By:_____


**OTHER GUARANTORS:**

**VNR HOLDINGS, LLC**

By: Vanguard Natural Gas, LLC
    its Sole Member


    By:_____




**VANGUARD OPERATING, LLC**


By: Vanguard Natural Gas, LLC
    its Sole Member


    By:_____


[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

**EAGLE ROCK ACQUISITION PARTNERSHIP, L.P.**

By:  EAGLE ROCK UPSTREAM DEVELOPMENT
COMPANY, INC.,
its general partner

By:_____

**EAGLE ROCK ACQUISITION PARTNERSHIP II, L.P.**

By:  EAGLE ROCK UPSTREAM DEVELOPMENT
COMPANY II, INC.,
its general partner

By:_____

**EAGLE ROCK ENERGY ACQUISITION CO., INC.**

By:_____

**EAGLE ROCK ENERGY ACQUISITION CO. II, INC.**

By:_____

**EAGLE ROCK UPSTREAM DEVELOPMENT COMPANY, INC.**

By:_____

**EAGLE ROCK UPSTREAM DEVELOPMENT COMPANY II, INC.**

By:_____


**ESCAMBIA ASSET CO. LLC**

By:_____


**ESCAMBIA OPERATING CO. LLC**

By:_____

US-DOCS\106250840.21

**ADMINISTRATIVE AGENT**:

**CITIBANK, N.A.,**
as Administrative Agent and Issuing Bank


By:_____
Name: _____
Title: _____



**LENDERS**:

**CITIBANK, N.A.,**
as a Lender


By:_____
Name: _____
Title: _____

*Annex II*

| | Name of Lender | Applicable Percentage | New Money DIP Loan Commitment |
|---|---|---|---|
| 1 | Citibank, N.A. | 100% | $65,000,000.00 |

## **<u>Schedule 2</u>**

Initial Approved Budget

**Vanguard Natural Resources, Inc**
Initial DIP Budget

| ($ in thousands) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending (Friday) | 4/5/19 | 4/12/19 | 4/19/19 | 4/26/19 | 5/3/19 | 5/10/19 | 5/17/19 | 5/24/19 | 5/31/19 | 6/7/19 | 6/14/19 | 6/21/19 | 6/28/19 | 13 Week Total |
| **Total Collections** | $ 1,927 | $ 2,072 | $ 9,223 | $ 33,286 | $ 5,536 | $ 1,761 | $ 1,761 | $ 14,567 | $ 14,602 | $ 5,358 | $ 1,874 | $ 15,307 | $ 16,021 | $ 123,294 |
| **Operating Disbursements & CapEx** | | | | | | | | | | | | | | |
| Royalties | (4,000) | (34) | (34) | (9,958) | (2,739) | (45) | (45) | (7,493) | (2,326) | (54) | (27) | (27) | (9,386) | (36,167) |
| AP & Compensation | (8,679) | (6,391) | (3,868) | (8,191) | (5,494) | (4,433) | (5,136) | (3,698) | (5,322) | (5,666) | (6,439) | (5,316) | (5,925) | (74,559) |
| Production and Ad Valorem Tax Payments | (232) | (155) | (155) | (5,931) | (352) | (156) | (156) | (6,924) | (156) | (206) | (137) | (137) | (893) | (15,589) |
| **Total Operating Disbursements & CapEx** | $ (12,911) | $ (6,580) | $ (4,057) | $ (24,079) | $ (8,584) | $ (4,634) | $ (5,337) | $ (18,115) | $ (7,804) | $ (5,926) | $ (6,603) | $ (5,480) | $ (16,203) | $ (126,315) |
| **Net Operating Cash Flow** | $ (10,984) | $ (4,508) | $ 5,167 | $ 9,206 | $ (3,048) | $ (2,874) | $ (3,577) | $ (3,548) | $ 6,798 | $ (569) | $ (4,730) | $ 9,827 | $ (182) | $ (3,021) |
| Professional Fees | - | - | - | - | - | (3,825) | - | (3,825) | - | (3,600) | - | (3,600) | - | (14,850) |
| **Debt Service and Compressor Financing** | | | | | | | | | | | | | | |
| Lease Compressor Financing Obligation | - | (472) | - | - | - | (472) | - | - | - | - | (472) | - | - | (1,415) |
| DIP | (2,275) | - | - | - | (176) | - | - | - | (642) | - | - | - | (656) | (3,749) |
| **Total Debt Service and Compressor Financing** | $ (2,275) | $ (472) | $ - | $ - | $ (176) | $ (472) | $ - | $ - | $ (642) | $ - | $ (472) | $ - | $ (656) | $ (5,163) |
| **Net Cash Flow** | $ (13,259) | $ (4,979) | $ 5,167 | $ 9,206 | $ (3,224) | $ (7,170) | $ (3,577) | $ (7,373) | $ 6,156 | $ (4,169) | $ (5,201) | $ 6,227 | $ (838) | $ (23,034) |
| **Book Cash Balance** | | | | | | | | | | | | | | |
| Beginning (Book) Cash Balance | $ 8,658 | $ 15,398 | $ 10,419 | $ 15,586 | $ 24,792 | $ 21,568 | $ 14,398 | $ 10,821 | $ 8,449 | $ 14,605 | $ 10,436 | $ 5,235 | $ 11,462 | $ 8,658 |
| Net Cash Flow | (13,259) | (4,979) | 5,167 | 9,206 | (3,224) | (7,170) | (3,577) | (7,373) | 6,156 | (4,169) | (5,201) | 6,227 | (838) | (23,034) |
| DIP Draw / (Repayment) | 20,000 | - | - | - | - | - | - | 5,000 | - | - | - | - | - | 25,000 |
| Other Draw / (Repayment) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | $ 15,398 | $ 10,419 | $ 15,586 | $ 24,792 | $ 21,568 | $ 14,398 | $ 10,821 | $ 8,449 | $ 14,605 | $ 10,436 | $ 5,235 | $ 11,462 | $ 10,624 | $ 10,624 |
| Unused DIP Availability | - | - | - | - | 45,000 | 45,000 | 45,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **Aggregate Liquidity** | $ 15,398 | $ 10,419 | $ 15,586 | $ 24,792 | $ 66,568 | $ 59,398 | $ 55,821 | $ 48,449 | $ 54,605 | $ 50,436 | $ 45,235 | $ 51,462 | $ 50,624 | |

Notes:
(1) Revenue calculated with strip pricing on March 28, 2019.

## **Schedule 3**

Chapter 11 Milestones

- The Court shall have entered the Interim DIP Order by the date that is no later than five (5) calendar days after the Petition Date.

- The Debtors shall file a chapter 11 plan with respect to the Debtors, which plan shall be in form and substance acceptable to the DIP Secured Parties (the "**Approved Plan of Reorganization**") and a disclosure statement for the Approved Plan of Reorganization shall be in form and substance acceptable to the DIP Secured Parties (the "**Disclosure Statement**"), in each case, by the date that is no later than thirty (30) calendar days after the Petition Date.

- The Court shall have entered the Final Order by the date that is no later than thirty-five (35) days after the Petition Date.

- The Disclosure Statement shall be approved by the Court by the date that is no later than eighty (80) days after the Petition Date.

- The Court shall have entered an order confirming the Approved Plan of Reorganization by the date that is no later than one hundred ten (110) days after the Petition Date.

- The Approved Plan shall become effective by the date that is no later than one hundred twenty (120) days after the Petition Date.