# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VANGUARD NATURAL RESISTANCE, INC., *et al.*,[1] | ) | Case No. 19-31786 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

---

**DISCLOSURE STATEMENT RELATING
TO THE JOINT PLAN OF REORGANIZATION OF
VANGUARD NATURAL RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

---

**BLANK ROME LLP**
James T. Grogan (TX Bar No. 24027354)
Philip M. Guffy (SDTX ID No. 3380372)
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone:     (713) 228-6601
Facsimile:      (713) 228-6605
Email:          jgrogan@blankrome.com
                pguffy@blankrome.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:      (713) 836-3601
Email:          brian.schartz@kirkland.com

-and-

Christopher Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          christopher.marcus@kirkland.com
                aparna.yenamandra@kirkland.com

Dated:  April 30, 2019

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, Inc. (1494); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); and VNR Holdings, LLC (6371).  The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF VANGUARD NATURAL RESOURCES, INC. AND ITS DEBTOR AFFILIATES. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, CERTAIN HOLDERS OF CLAIMS, AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE PLAN SUPPORT AGREEMENT, INCLUDING THE CONSENTING REVOLVER LENDERS AND THE CONSENTING TERM LOAN LENDERS. THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF

---

2   Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE PLAN SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 38, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145

OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL, NATURAL GAS, AND NATURAL GAS LIQUID PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;

- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION. .................................................................................................................1

II.     PRELIMINARY STATEMENT. ........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN. ....................................................................................................................................4

        A.    What is chapter 11? ...............................................................................................4
        B.    Why are the Debtors sending me this Disclosure Statement? ..........................5
        C.    Am I entitled to vote on the Plan? ........................................................................5
        D.    What will I receive from the Debtors if the Plan is consummated? ...................6
        E.    Are any regulatory approvals required to consummate the Plan? ...................9
        F.    What happens to my recovery if the Plan is not confirmed or does not go effective? ......9
        G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
              Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
              "Consummation?" ...................................................................................................9
        H.    Is there potential litigation related to the Plan? ................................................10
        I.    Will the final amount of Allowed Unsecured Claims affect the recovery of holders of
              Allowed Unsecured Claims under the Plan? ......................................................10
        J.    How will the preservation of the Causes of Action impact my recovery under the Plan? ......10
        K.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ......11
        L.    What is the deadline to vote on the Plan? ..........................................................15
        M.    How do I vote for or against the Plan? ................................................................15
        N.    Why is the Bankruptcy Court holding a Confirmation Hearing? ....................15
        O.    When is the Confirmation Hearing set to occur? ..............................................16
        P.    What is the purpose of the Confirmation Hearing? ...........................................16
        Q.    What is the effect of the Plan on the Debtors' ongoing businesses? .................16
        R.    Who do I contact if I have additional questions with respect to this Disclosure Statement
              or the Plan? ............................................................................................................16
        S.    Do the Debtors recommend voting in favor of the Plan? ..................................17
        T.    Who supports the Plan? .........................................................................................17

IV.     THE DEBTORS' DIP FACILITY AND PLAN. ...............................................................17

        A.    The DIP Facility. ....................................................................................................17
        B.    The Plan. .................................................................................................................18

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........20

        A.    Vanguard's Corporate History. ............................................................................20
        B.    Post-Vanguard I Organizational Structure. ........................................................21
        C.    The Debtors' Assets and Operations. ..................................................................22
        D.    Prepetition Capital Structure. ..............................................................................27

VI.     EVENTS LEADING TO THE CHAPTER 11 CASES. ...................................................29

        A.    Market Decline and Industry-Specific Challenges. ............................................29
        B.    Proactive Approach to Addressing Liquidity Constraints. ................................31

VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
        CASES. .................................................................................................................................35

        A.    Corporate Structure upon Emergence. ................................................................35
        B.    Expected Timetable of the Chapter 11 Cases. ....................................................36
        C.    First Day Relief. .....................................................................................................36

D.      Other Procedural and Administrative Motions. ........................................................36
E.      Schedules and Statements. ......................................................................................37
F.      Litigation Matters. ..................................................................................................37

VIII.   RISK FACTORS. .............................................................................................................38

A.      Bankruptcy Law Considerations. ............................................................................38
B.      Risks Related to Recoveries under the Plan. ...........................................................41
C.      Risks Related to the Debtors' and the Reorganized Debtors' Businesses. ..............44

IX.     SOLICITATION AND VOTING PROCEDURES. ..........................................................49

A.      Holders of Claims Entitled to Vote on the Plan. .....................................................49
B.      Voting Record Date. ...............................................................................................49
C.      Voting on the Plan. .................................................................................................50
D.      Ballots Not Counted. ..............................................................................................50

X.      CONFIRMATION OF THE PLAN. ..................................................................................51

A.      Requirements for Confirmation of the Plan. ...........................................................51
B.      Best Interests of Creditors/Liquidation Analysis. ...................................................51
C.      Feasibility. ..............................................................................................................52
D.      Acceptance by Impaired Classes. ...........................................................................52
E.      Confirmation Without Acceptance by All Impaired Classes. ..................................52
F.      Valuation of the Debtors. ........................................................................................53

XI.     CERTAIN SECURITIES LAW MATTERS. ....................................................................54

A.      Issuance of Securities under the Plan. .....................................................................54
B.      Subsequent Transfers of Securities Issued under the Plan. ......................................54

XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
        THE PLAN. .......................................................................................................................55

A.      Introduction. ...........................................................................................................55
B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the
        Reorganized Debtors. ..............................................................................................57
C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims. ..................60
D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims. ............66
E.      Information Reporting and Back-Up Withholding. ..................................................71

XIII.   RECOMMENDATION. ....................................................................................................73

**EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Plan Support Agreement[*]

EXHIBIT C    Corporate Organization Chart

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Liquidation Analysis[*]

EXHIBIT F    Financial Projections[*]

EXHIBIT G    Valuation Analysis[*]

---

[*]    The Debtors shall file Exhibits B, E, F, and G in advance of the deadline to object to the adequacy of this Disclosure Statement.

## I.      INTRODUCTION.

Vanguard Natural Resources, Inc. ("VNR") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors," or "Vanguard"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Vanguard Natural Resources, Inc. and Its Debtor Affiliates*, dated April 30, 2019 (the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE PLAN SUPPORT AGREEMENT, INCLUDING THE AD HOC TERM LOAN LENDER GROUP, THE HOLDERS OF OVER 66 ⅔ PERCENT OF THE REVOLVING CREDIT FACILITY CLAIMS AND THE SECURED SWAP CLAIMS, AND THE HOLDERS OF OVER 66 ⅔ PERCENT OF THE TERM LOAN CLAIMS, SUPPORT CONFIRMATION OF THE PLAN AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.   AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.      PRELIMINARY STATEMENT.

The Debtors are an oil and natural gas company with acquisition, production, and development activities in the Rocky Mountain, Mid-Continent, Gulf Coast, and West Texas regions of the United States.  The Debtors operate in the "upstream" oil and gas sector and conduct their exploration and production activities across eight states in nine geologic basins.  The Debtors' strategy focuses on properties with mature, long-lived production, relatively predictable decline curves, and lower-risk development opportunities.  Headquartered in Houston, Texas, the Debtors have approximately 295 employees.

The oil and gas industry began a steep decline in late 2014 in response to rapidly declining oil prices, resulting in a sustained, historic downturn.  As a result, such market forces pushed a number of oil and gas companies to file chapter 11.  This wave of bankruptcies included the predecessors to the Debtors, namely Vanguard Natural Resources, LLC ("VNR LLC") and its subsidiaries, which filed for relief under chapter 11 of the Bankruptcy Code in early 2017 (such cases, "Vanguard I"), and emerged from chapter 11 approximately six months later in August 2017.[2]  The feasibility of the chapter 11 plan confirmed in Vanguard I (the "Vanguard I Plan") was predicated on various assumptions that ultimately did not materialize.  These included, as discussed further herein, assumptions about commodity prices, the impact of commodity price hedging on the business, and the expected returns on a number of capital investments

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan**.  **In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

[2]    *In re Vanguard Nat. Res., LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Feb. 1, 2017); *see also Declaration of Richard A. Robert, Chief Financial Officer of Vanguard Natural Resources, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6].  Vanguard I confirmed a plan of reorganization, which has gone effective, but the cases have not yet closed.  *See Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 1109]; *Notice of Occurrence of Effective Date of Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 1219].

pursued by Vanguard upon emergence. Notwithstanding the consummation of the Vanguard I Plan, Vanguard exited chapter 11 over-levered and has endured significant liquidity challenges.

Over the past year, the Debtors took a number of steps to forestall the need for another chapter 11 filing, even while many of their peers have pursued in-court restructurings. Specifically, the Debtors consummated a series of transactions, including a number of non-core divestitures and asset sales, as well as executing various amendments to their credit facility in order to extend financial runway. Most of the net cash proceeds from these divestments were used to pay down outstanding debt and thus did not result in additional liquidity or improved metrics for the Debtors, however. Some sales actually resulted in reduced liquidity and degraded the leverage metrics in the short term because of the terms of the Debtors' credit facility and leverage levels.

Further, the Debtors made various capital investments in certain geologic regions that produced lower-than-expected returns in late 2017 and 2018. In certain instances, the Debtors' wells provided a much lower rate of return than expected at the time of the original investment. In other instances, delays in operations or regional basin differentials prevented the Debtors from receiving any return on their investments.

In response to these operational and financial headwinds, the Debtors instituted measures to ensure frugality and preserve capital, including measures to increase operational efficiency and the reduction of employment-related expenses through headcount reduction. However, it became clear to the Debtors that such measures alone would not be sufficient to meet future capital requirements and satisfy financial obligations. At that time, facing an increasingly tight liquidity outlook and a dearth of comprehensive asset sale options, Vanguard's board of directors (the "Board"), with the assistance of its advisors, began to consider other strategic alternatives to address the Debtors' liquidity and upcoming maturity issues through a more comprehensive restructuring.

In particular, with limited liquidity to fund a long-term operations and the inability to further decrease capital expenditures or divest non-core assets to extend Vanguard's liquidity runway, it became clear to the Board that it was necessary to pursue a transformative transaction, including potentially through a chapter 11 filing. As such, rather than simply hope for a market recovery, the Debtors began to pivot towards meaningful chapter 11 contingency preparations, including soliciting proposals for potential debtor in possession financing and negotiating a holistic financial reorganization to reduce leverage, provide a recovery to all stakeholders, and increase liquidity.

In early 2019, the Debtors, with the assistance of their advisors, commenced substantive comprehensive restructuring negotiations with certain creditor constituencies, including: (a) the administrative agent and the holders of at that time, approximately 38 percent of the approximately $677.7 million in revolving obligations outstanding under that certain credit agreement dated August 1, 2017, by and among Vanguard Natural Gas, LLC ("VNG") as borrower, Citibank, N.A. ("Citi") as administrative agent and issuing bank, and the lenders party thereto (the "Steering Committee," and such agreement as amended, supplemented, or modified from time to time in accordance with the terms therein, the "Credit Agreement"); and (b) the holders of approximately 75 percent of the Debtors' approximately $80.7 million aggregate principal amount outstanding of 9.0 percent senior secured second lien notes due 2024 (the "Noteholder Group," and such notes, the "Senior Notes").

Prior to the Petition Date, these discussions culminated in the Debtors securing new money financing up to $65 million under a new senior secured superpriority, priming debtor-in-possession credit facility (the "DIP Facility") and agreement on certain key milestones to keep these cases moving forward. Following the Petition Date, these discussions continued and the Debtors also engaged with the holders of approximately 20 percent of the $123.4 million in principal amount of term loan obligations outstanding

2

under the Credit Agreement (the "Ad Hoc Term Loan Lender Group,"[3] and, together with the Steering Committee and the other Consenting Lenders, the "Consenting Stakeholders"), and reached agreement as to the terms of a comprehensive and consensual restructuring of the Debtors, as set forth in that certain plan support agreement, dated as of April [●], 2019, a copy of which is attached hereto as **Exhibit B** (as amended from time to time and including all exhibits thereto, the "Plan Support Agreement").

The Plan Support Agreement contemplates a comprehensive restructuring that will result in a substantial deleveraging of the Debtors' balance sheet by approximately $532 million and provide a meaningful recovery to the Debtors' stakeholders. Upon consummation of this restructuring, the Debtors will be positioned to capitalize on their attractive asset base as the oil and gas industry looks to recover from the sustained downturn in commodities prices.

The key financial components and commitments of the restructuring are as follows:

- holders of Allowed DIP Facility Claims will receive their Pro Rata share of participation in a post-Effective Date first lien reserve-based revolving credit facility with an initial borrowing base of $65 million (which will be reduced on a dollar-for-dollar basis equal to 75 percent of the net cash proceeds of any assets of the Reorganized Debtors prior to the Effective Date) and a term loan lending facility in the aggregate amount of $65 million (the "Exit RBL/Term Loan A Facility");

- holders of Allowed Revolving Credit Facility Claims and Allowed Secured Swap Claims will receive their Pro Rata share of and interest in: (i) a new term loan lending facility in the aggregate amount of $350 million less the aggregate amount of the Exit Term Loan A Facility (the "Exit Term Loan B Facility," and together with the Exit RBL/Term Loan A Facility, the "Exit Facilities"); (ii) at least 86.1 percent of the new series of class A convertible preferred stock to be issued by Reorganized Vanguard on the Effective Date (the "New Preferred Equity Class A Stock"), subject to the elections of holders of Class 4 Allowed Term Loan Claims as set forth below; and (iii) 75 or 89 percent of the new common stock of Reorganized Vanguard (the "New Common Stock"), depending on whether Class 5 votes to accept or reject the Plan, and subject to dilution on account of the Management Incentive Plan (if any);

- holders of Allowed Term Loan Claims will receive a Pro Rata share and interest in 10 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any), as well as at the option of each holder of an Allowed Term Loan Claim, either: (i) such holder's Pro Rata share of the New Preferred Equity Class A Stock;[4] or (ii) such holder's Pro Rata share of the new series of class B convertible preferred stock to be issued by Reorganized Vanguard on the Effective Date (the "New Preferred Equity Class B Stock");

- holders of Allowed Senior Notes Claims will receive a Pro Rata share and interest in: (i) 15 percent of the New Common Stock, if the Class of Senior Notes Claims votes to accept the Plan, subject to dilution on account of the Management Incentive Plan (if any); or (ii) 1 percent of the New Common Stock, if the Class of Senior Notes Claims

---

[3]   Because the Ad Hoc Term Loan Lender Group coalesced immediately prior to the Petition Date, the Debtors were unable to include them in prepetition negotiations.

[4]   The maximum amount of New Preferred Equity Class A Stock available to all holders of Allowed Class 4 Claims who elect such option shall not exceed 13.9 percent of the New Preferred Equity Class A Stock to be distributed in the aggregate.

votes to reject the Plan, subject to dilution on account of the Management Incentive Plan (if any); and

- [holders of Allowed General Unsecured Claims shall receive (to the extent such General Unsecured Claims have not already been paid in full during the Chapter 11 Cases), in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, on the Effective Date such treatment as is acceptable to the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent and in accordance with the Bankruptcy Code, to be determined prior to the hearing to consider approval of the Disclosure Statement].

The DIP Facility and the Plan Support Agreement require that the Debtors proceed expeditiously through chapter 11.  The Consenting Stakeholders' support for the transactions contemplated by the Plan Support Agreement is contingent upon, among other things, the Debtors administering the Chapter 11 Cases in accordance with certain milestones set forth in the DIP Facility and the Plan Support Agreement, namely:

- filing a chapter 11 plan of reorganization and related disclosure statement within 30 days of the Petition Date;

- entry of a Final Order approving the DIP Facility within 35 days of entry of the interim order approving the DIP Facility;

- entry of the Disclosure Statement Order by the date that is no later than 80 days after the Petition Date;

- entry of the Confirmation Order by the date that is no later than 110 days after the Petition Date; and

- occurrence of the chapter 11 plan of reorganization's effective date within 120 days following the date of entry of the Confirmation Order.

The Plan Support Agreement is a significant achievement for the Debtors in the wake of a historically challenging operating environment.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, and represents the best available alternative at this time.  Given the Debtors' core strengths, including their experienced management team and the strategic location of their assets, the Debtors are confident that they can implement the restructuring contemplated by the Plan Support Agreement.  For these reasons, the Debtors strongly recommend that holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

4

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| *Unclassified Non-Voting Claims* | | | |
| N/A | DIP Facility Claims | Unimpaired | N/A |
| N/A | Administrative Claims | Unimpaired | N/A |
| N/A | Priority Tax Claims | Unimpaired | N/A |
| *Classified Claims and Interests of the Debtors* | | | |
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims and Secured Swap Claims | Impaired | Entitled to Vote |
| Class 4 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | [TBD] | [TBD] |
| Class 7 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to holders of Allowed Claims or Allowed Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
| --- | --- | --- | --- | --- |
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims | Projected Recovery Under the Plan |
| N/A | DIP Facility Claims | Each holder of an Allowed DIP Facility Claim shall receive its Pro Rata share of participation in the Exit RBL Facility/Term Loan A Facility and all commitments under the DIP Credit Agreement shall terminate.  Upon the indefeasible payment or satisfaction in full of the DIP Facility Claims in accordance with the terms of Article II.D of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. | [●] | [100]% |

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims | Projected Recovery Under the Plan |
| N/A | Administrative Claims | Each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:   (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court. | [●] | [100]% |
| N/A | Priority Tax Claims | Each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | [●] | [100]% |
| Class 1 | Other Secured Claims | Each holder of an Allowed Class 1 Claim shall receive, at the option of the applicable Debtor, with the consent of the Required Consenting Revolver Lenders and the DIP Agent:  (i) payment in full in Cash of its Allowed Class 1 Claim; (ii) the collateral securing its Allowed Class 1 Claim; (iii) Reinstatement of its Allowed Class 1 Claim; or (iv) such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [●] | [100]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Allowed Claims** | **Projected Recovery Under the Plan** |
| Class 2 | Other Priority Claims | Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim on the later of (i) the Effective Date, or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such Allowed Class 2 Claim. | [●] | [100]% |
| Class 3 | Revolving Credit Facility and Secured Swap Claims | Each holder of an Allowed Class 3 Claim shall receive a Pro Rata share of and interest in: (i) the Exit Term Loan B Facility; (ii) the Class 3 New Preferred Equity Class A Stock Pool; and (iii) the Class 3 Common Stock Pool. | [●] | [●]% |
| Class 4 | Term Loan Claims | Each holder of an Allowed Class 4 Claim shall receive a Pro Rata share and interest in: (i) at the option of each holder of an Allowed Class 4 Claim, either (x) the Class 4 Preferred A Option or (y) the Class 4 Preferred B Option; and (ii) 10 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any). | $[126,000,000.00] | [●]% |
| Class 5 | Senior Notes Claims | Each holder of an Allowed Class 5 Claim shall receive a Pro Rata share and interest in: (i) if Class 5 votes to accept the Plan, 15 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any); or (ii) if Class 5 votes to reject the Plan, 1 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any). | $[82,000,000.00] | [●]% |
| Class 6 | General Unsecured Claims | [To the extent such Claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed General Unsecured Claim, on the Effective Date each holder thereof will receive such treatment as is acceptable to the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent and in accordance with the Bankruptcy Code, to be determined prior to the hearing to consider approval of the Disclosure Statement.] | [●] | [●]% |
| Class 7 | Intercompany Claims | Each Class 7 Claim shall be, at the option of the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent, either reinstated, canceled and released without any distribution, or otherwise addressed at such parties' discretion. | [●] | [●]% |

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Allowed Claims | Projected Recovery Under the Plan |
| Class 8 | Intercompany Interests | Class 8 Interests shall be, at the option of the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent, either reinstated, canceled and released without any distribution, or otherwise addressed at such parties' discretion. | [●] | [100]%/[0]% |
| Class 9 | Existing Equity Interests | Each Class 9 Interest will be canceled, released, and extinguished, and will be of no further force or effect. Each holder of an Interest will not receive any distribution on account of such Interest. | $[0.00] | [0]% |
| Class 10 | Section 510(b) Claims | Class 10 Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such Claims. | $[0.00] | [0]% |

**E.      Are any regulatory approvals required to consummate the Plan?**

There are no known U.S. regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**F.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 51, and the Liquidation Analysis attached hereto as **Exhibit E**.

**G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 51, for a discussion of the conditions precedent to consummation of the Plan.

### H.      Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.11 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 48.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 39.

### I.      Will the final amount of Allowed Unsecured Claims affect the recovery of holders of Allowed Unsecured Claims under the Plan?

As of the date hereof, the Debtors have not determined the treatment of Allowed General Unsecured Claims.

### J.      How will the preservation of the Causes of Action impact my recovery under the Plan?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, which, for the avoidance of doubt, shall become property of the Reorganized Debtors, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**K.** **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the other parties to the Plan Support Agreement in obtaining their support for the Plan pursuant to the terms of the Plan Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

**1.** ***Releases by the Debtors.***

**Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on**

11

behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, or filing of the Plan Support Agreement, the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan by the Debtors, the Reorganized Debtors, and their Estates, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in Article VIII.C of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interest of the Debtors, the Reorganized Debtors, and their Estates and all holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions of the Plan, a bar to the Debtors, the Reorganized Debtors, and their Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

### 2. *Releases by Holders of Claims and Interests*.

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and

forever, released and discharged by each Debtor, Reorganized Debtor, the Debtors' Estates and each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, or filing of the Plan Support Agreement, the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation or any Claim or obligation arising under the Plan.  For the avoidance of doubt, nothing in the Plan shall be deemed to be, or construed as, a release, waiver, or discharge of any of the Indemnification Provisions.

3.   *Exculpation*.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing or termination of the Plan Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes, or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,

including the issuance of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted bad faith, gross negligence, actual fraud, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce the Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation or any claim or obligation arising under the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4. *Injunction*.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Causes of Action, or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (4) asserting any right of setoff, subrogation, recoupment, or other similar legal or equitable right of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests unless such holder has Filed a motion requesting the right to perform such legal or equitable right on or before the Effective Date, and notwithstanding an indication of a claim, Cause of Action, or interest or otherwise that such holder asserts, has, or intends to preserve any such right pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their Related Parties shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

### 5. *Release of Liens*.

Except as otherwise provided in the Exit Facility Documentation, the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors (with the consent of the Required Consenting Revolver Lenders and the DIP Agent) elect to reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such mortgage, deed of trust, Lien, pledge, or other security interest, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, or other security interests.

### L. What is the deadline to vote on the Plan?

The Voting Deadline is scheduled for [June 21], 2019, at 5:00 p.m. (prevailing Central Time).[6]

### M. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Prime Clerk LLC (the "Claims and Balloting Agent") **on or before the Voting Deadline,** *i.e.* **[June 21], 2019, at 5:00 p.m. prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures," which begins on page 49 for more information.

### N. Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

---

6    Although the Voting Deadline is set for [June 21, 2019], the Debtors and the Claims and Noticing Agent intend to make reasonable efforts to commence solicitation of all funded debt Claims and all General Unsecured Claims which appear on the Debtors' schedules and statements immediately upon the entry of the Order. To the extent the holders of General Unsecured Claims file proofs of such Claims after the Debtors have commenced solicitation, the Debtors shall provide ballots and solicitation materials on a rolling basis.

**O.      When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for [July 1], 2019, at [9]:00 a.m. (prevailing Central Time), or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than [June 21], 2019, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

**P.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Q.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be forced to go out of business.   Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect, (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan), and (3) the Debtors declare the Plan effective.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**R.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims and Balloting Agent, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Vanguard Natural Resources, Inc.
> Ballot Processing Center
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
>
> *By electronic mail at:*
> vnrballots@PrimeClerk.com

*By telephone (toll free) at:*
(844) 216-9850 (Domestic)
(347) 859-8076 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.primeclerk.com/VNR/ (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

**S.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**T.      Who supports the Plan?**

The Plan is supported by the Debtors and the Consenting Stakeholders, as set forth in the following chart:

| Consenting Stakeholders | Support (Expressed as an Approximate Percentage of the Total Principal Amount of Claims Outstanding) |
|---|---|
| Debtors | N/A |
| Holders of Revolving Credit Facility Claims | [>66⅔]% |
| Holders of Secured Swap Claims | [>66⅔]% |
| Holders of Term Loan Claims | [>66⅔]% |

**IV.      THE DEBTORS' DIP FACILITY AND PLAN**.

**A.      The DIP Facility**.

To fund the administration of the Chapter 11 Cases, Citi, as agent under the Credit Facility, and certain of the lenders in the Steering Committee agreed to provide the $130 million DIP Facility, subject to the terms and conditions specified in the DIP Loan Documents with respect to the DIP Facility.

More specifically, the DIP Facility provides the Debtors with $65 million in revolving new money financing with an interest rate of LIBOR plus 5.50 percent (subject to a LIBOR floor of 0.00 percent), $20 million of which became immediately available upon entry of the interim order approving entry into the DIP Facility.  The remaining $45 million of new money financing will become available upon entry of the final order approving entry into the DIP Facility.  Further, upon entry of the final order approving entry into the DIP Facility, $65 million of the DIP Facility will roll up the ratable share of the outstanding principal amount of the Revolving Credit Facility of each lender under the DIP Facility.  Additionally, the DIP Facility includes a sub-facility of up to $5,000,000 for the issuance of letters of credit, which in turn reduce availability under the DIP Facility on a dollar-for-dollar basis.

17

Citi is also acting as DIP Agent.  Pursuant to the DIP Credit Agreement, the Debtors have agreed to pay certain fees in connection with the extension of credit under the DIP Facility.

As of the commencement of the Chapter 11 Cases, the Debtors had approximately $8.6 million of unrestricted cash.  The DIP Facility provides liquidity that is essential to fund the administrative cost of the Chapter 11 Cases.  The DIP Facility allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors' businesses.  The DIP Lenders' commitments under the DIP Facility are contingent upon, among other things, the Debtors administering their chapter 11 cases in accordance with the milestones contemplated therein.

The Debtors believe that the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of the Chapter 11 Cases as the Debtors seek to implement the restructuring contemplated by the Plan.

**B.     The Plan**.

The Plan contemplates the following key terms, among others described herein and therein:

### 1.     Issuance and Distribution of New Preferred Stock and New Common Stock.

On the Effective Date, Reorganized Vanguard shall issue the New Preferred Stock and the New Common Stock pursuant to the Plan and the New Preferred Equity Documentation, as applicable. The issuance of the New Common Stock, including any options, or other equity awards, if any, reserved for the Management Incentive Plan (if any), by Reorganized Vanguard shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. Reorganized Vanguard shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Preferred Stock and the New Common Stock is denominated) of the New Preferred Stock and the New Common Stock required to be issued under the Plan and pursuant to its New Organizational Documents.  On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units or equity interests (as the case may be based on how the New Preferred Stock and the New Common Stock is denominated) of the New Preferred Stock and the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 2.     The Exit Facilities.

To fund the Reorganized Debtors' operations upon emergence from the Chapter 11 Cases, on the Effective Date the Reorganized Debtors will enter into the Exit Facilities, comprised of:  (i) the Exit RBL/Term Loan A Facility, consisting of a new first lien reserve-based revolving credit facility with an initial borrowing base of $65 million (which will be reduced on a dollar for dollar basis equal to 75 percent of the net cash proceeds of any assets of the Reorganized Debtors prior to the Effective Date), and term loan lending facility in the aggregate amount of up to $65 million; and (ii) the Exit Term Loan B Facility, consisting of a new term loan lending facility in the aggregate amount of $350 million less the aggregate amount of the Exit Term Loan A Facility, in each case on terms set forth in the Exit Facility Documentation.

The terms of the Exit Facilities shall be consistent with the Exit Facility Term Sheet and Exit Facility Documentation, as applicable.

Entry of the Confirmation Order shall be deemed approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documentation, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Exit Facilities.

The Debtors believe the Exit Facilities will allow them to operate with stability, and successfully fund a go-forward business plan that fully harnesses the benefits of the Plan.

### 3. Use of Proceeds.

Proceeds from the issuance of the New Preferred Stock, the New Common Stock, and the Exit Facilities, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

### 4. General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including controversies relating to the contractual and legal rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and holders of Claims and Interests. Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, this Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan, this Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto will not be binding or probative.

### 5. Releases.

The Plan contains certain releases (as described more fully in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" which begins on page 11), including mutual releases among the Debtors, Reorganized Debtors, and certain

19

of their key stakeholders, including the parties to the Plan Support Agreement and their advisors. Additionally, all holders of Claims or Interests that do not validly opt out of the releases contained in the Plan or file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.

### 6. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be nominated by the Exit RBL/Term Loan A Facility Agent in consultation with the Entities designated to receive the New Preferred Equity Class A Stock on the Effective Date. The members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

### A.    Vanguard's Corporate History.

#### 1.    Formation and Business.

The Debtors are an oil and natural gas company with a principal focus on acquisition, production, and development activities across eight states in nine geographic basins. Headquartered in Houston, Texas, the Debtors have approximately 295 employees. The Debtors' strategy involves acquiring properties with mature, long-lived production, relatively predictable decline curves, and lower-risk development opportunities. Over the past decade, the Debtors have grown into a material independent exploration and production ("E&P") company, fueled by largely by acquisition-based growth.

The Debtors' predecessor-in-interest, VNR LLC, was founded in October 2006. In October 2007, VNR LLC completed its initial public offering and began trading on the NASDAQ Global Select Market under the ticker symbol VNR. Following its initial public offering, VNR LLC's business focused on oil and natural gas reserve production primarily in the southern portion of the Appalachian Basin. Among other acquisitions, in October 2015, VNR LLC completed two significant unit-for-unit merger transactions: (a) a $413.3 million transaction with LRR Energy, L.P. and its general partner, LRE GP, LLC; and (b) a $415.2 million transaction with Eagle Rock Energy Partners, L.P. Like many of its industry peers, VNR LLC experienced a significant decline in its financial health as a result of the depressed oil and natural gas price environment that spanned from 2015 to 2017.

#### 2.    Vanguard I.

Over the past several years, as detailed further herein, market forces in the industry affected a number of oil and gas companies, pushing many to file chapter 11. On February 1, 2017, VNR LLC and its subsidiaries filed for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of Texas with approximately $1.8 billion in total funded debt outstanding.[7] Immediately prior to the commencement of Vanguard I, on February 1, 2017, VNR LLC entered into a restructuring support agreement with certain of its stakeholders to execute a comprehensive restructuring.

---

[7]    *In re Vanguard Nat. Res., LLC*, No. 17-30560 (MI) (Bankr. S.D. Tex. Feb. 1, 2017); *see also Declaration of Richard A. Robert, Chief Financial Officer of Vanguard Natural Resources, LLC in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 6].

On June 6, 2017, additional lenders under VNR LLC's funded debt obligations became parties to the restructuring support agreement.

On July 18, 2017, the Court entered the *Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 1109], approving and confirming the Vanguard I Plan.  The Vanguard I Plan provided for the reorganization of VNR LLC and its subsidiaries as a going concern and significantly reduced its long-term debt and annual interest payments.

On August 1, 2017, approximately six months after filing chapter 11, VNR LLC emerged from bankruptcy, at which time VNR LLC dissolved and VNR Finance Corp. reorganized as Vanguard Natural Resources, Inc. (*i.e.*, VNR), a Delaware corporation.[8]  Pursuant to the Vanguard I Plan, the Debtors delevered their balance sheet by approximately $850 million, and each of VNR LLC's equity securities outstanding immediately before emergence were cancelled and of no further force or effect.  Additionally, under the Vanguard I Plan, Vanguard's new organizational documents authorized Vanguard to issue new equity and warrants, certain of which was issued to holders of allowed claims pursuant to the Vanguard I Plan.  Vanguard's shares of common stock now trade and quote on the OTC Pink market (which is operated by OTC Markets Group, Inc.) under the symbol VNRR, and the outstanding warrants issued pursuant to the Vanguard I Plan also trade and quote on the OTC Pink market under the symbols "VNRRW" and "VNRWW."

Notwithstanding the Debtors' successful emergence from chapter 11, the feasibility of the chapter 11 plan confirmed in Vanguard I was predicated on various assumptions that ultimately did not materialize.  These include, as discussed further herein, assumptions about commodity prices, the impact of commodity price hedging on the business, and the expected returns on a number of capital investments pursued by Vanguard upon emergence.  Notwithstanding the consummation of its prior chapter 11 plan, Vanguard exited from chapter 11 over-levered and has endured significant liquidity challenges ever since.

**B.**      **Post-Vanguard I Organizational Structure**.

VNR is the lead Debtor in the Chapter 11 Cases and the ultimate parent of the Debtor entities.  A Corporate Organization chart summarizing the Debtors' organizational structure is attached hereto as **Exhibit C**.  A simplified version of the Debtors' current corporate structure is as follows:

---

[8]    *Notice of Occurrence of Effective Date of Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 1219], but the cases have not yet closed.



### C.    The Debtors' Assets and Operations.

#### 1.    The Debtors' Assets.

Following the 2007 initial public offering, the Debtors' business focused on oil and natural gas production primarily in the southern portion of the Appalachian Basin.  Subsequently, the Debtors expanded by acquiring oil and natural gas properties in a large number of U.S. onshore basins.  Following emergence from Vanguard I, the Debtors began a process of selling assets in order to reduce indebtedness and focus their portfolio toward five basins:  Arkoma-Woodford, Permian, Elk Basin, Piceance, and Pinedale.  Since August 2017, the Debtors have executed 16 asset divestitures in multiple basins, which divestments represent slightly more than half in aggregate purchase price of the divestments required to focus the Debtors' portfolio.  The Debtors presently operate in the following nine operating basins:

- *Green River Basin*.  Green River Basin properties are comprised of ownership interests in the Pinedale field in Sublette County in southwestern Wyoming.  Production in this field is dominated by natural gas and natural gas liquids ("NGLs") from tight sands formations.  These properties are not operated by the Debtors.

- *Piceance Basin*.  The Piceance Basin property is primarily comprised of ownership of the Mamm Creek Unit and is located in Garfield County, Colorado.  Production in this area is dominated by natural gas and NGLs from tight sand formations.  These properties are primarily operated by the Debtors.  In addition to the upstream assets, the Debtors have material midstream assets, including, among others, flow lines within the field and two material compression plants.

- *Permian Basin*.  The Permian Basin is one of the largest and most prolific oil and natural gas producing basins in the United States, extending over West Texas and southeast New Mexico.  The Permian Basin is characterized by oil and natural gas fields with long production histories and multiple producing formations.  The majority of the Debtors' producing wells in the Permian Basin are mature vertical oil wells that also produce high-Btu casinghead gas with significant NGLs content.

22

- **Arkoma Basin**.  Arkoma Basin properties primarily include horizontal wells in the Woodford Shale.  These properties are located in eastern Oklahoma.  The majority of the producing wells are not operated by the Debtor.  Additionally, the Debtors have substantial undeveloped acreage in the area, which is both operated and non-operated.

- **Gulf Coast Basin**.  Gulf Coast Basin properties include properties in the onshore Gulf Coast areas located in North Louisiana, Alabama, East Texas, and South Texas.  These properties are a mix of operated and non-operated, consisting of both oil and natural gas properties.  In Alabama, the Debtors additionally market elemental sulfur.  Lastly, the Debtors have ownership interests in certain material midstream assets, including the Fairway Plant in Texas, the Cotton Valley Plant in Louisiana, and the BEC Plant and Flomaton Plant in Alabama.

- **Big Horn Basin**.  The Big Horn Basin, located in Wyoming and Montana, is a prolific basin that is characterized by oil and natural gas fields with long production histories and multiple producing formations.  The Debtors operate most of their properties in the Elk Basin area but also have a small non-operated interest nearby.  Related to the Elk Basin field, the Debtors own material midstream assets, including a natural gas processing plant, in-field flowlines, and the Wildhorse pipeline system.

- **Anadarko Basin**.  The Anadarko Basin consists of mostly non-operated properties in western Oklahoma and the Texas Panhandle.  Within the Anadarko Basin, the Debtors' assets can generally be characterized by stratigraphic plays with multiple, stacked pay zones and more complex geology than many other operating areas.  Properties in the Anadarko Basin include mature fields with long production histories.

- **Wind River Basin**.  The Wind River Basin is located in central Wyoming, primarily concentrated in the eastern Wind River Basin, along the Waltman Arch.  Natural gas production in this basin is gathered through the Debtors' gathering systems and delivered to markets through pipelines owned by Tallgrass Interstate Gas Transmission and Colorado Interstate Gas.

- **Powder River Basin**.  The Powder River Basin primarily is located in northeastern Wyoming, and development operations are conducted in the Debtors' coalbed methane ("CBM") fields.  Most of the upstream assets are operated by the Debtors.  The Debtors' natural gas production in the Powder River Basin is gathered through gathering and pipeline systems owned by Powder River Midstream, Fort Union Gas Gathering, LLC and Thunder Creek Gas Services, LLC.

The geographical spread of the Debtors' operations in depicted in the following graphic:



As of December 31, 2018, the Debtors estimated that their total proved reserves were approximately 1,077.5 Bcfe, of which approximately 64 percent were natural gas reserves, 19 percent were oil reserves, and 17 percent were natural gas liquid reserves. Of these total estimated proved reserves, approximately 100 percent were classified as proved developed. Further, as of December 31, 2018, the Debtors owned working interests in 10,330 gross (3,620 net) productive wells. The Debtors' operated wells accounted for approximately 49 percent of their total estimated proved reserves as of December 31, 2018. The Debtors' average net daily production for the year ended December 31, 2018 was 346,128 Mcfe/day.[9]

### 2. The Debtors' Operations.

#### (a) Upstream Activities.

The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream." The upstream sector is comprised of E&P activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from under the ground. Common upstream assets include wells and simple well pad equipment. The midstream sector includes the activities involved in the gathering, transporting, processing, and storing of hydrocarbons. Common midstream assets include gathering pipelines, separation facilities, and tankage. The downstream sector is focused on the marketing and distribution of the products derived from the extracted hydrocarbons to the ultimate end users. Common downstream assets include refineries and retail sites. Many industry companies operate in two or more of these sectors. The majority of the Debtors' assets are considered to be in the upstream sector, but the Debtors also have ownership in midstream assets, many of which have been described in Article V.C.1 of this Disclosure Statement.

---

[9]    "Mcfe" means thousand cubic feet equivalent.

As noted, the Debtors primarily conduct their business operations in the "upstream" sector, meaning their E&P operations involve the capture and sale of oil and natural gas from domestic, onshore hydrocarbon basins.  Through oil and natural gas leases entered into with mineral rights owners throughout the regions in which the Debtors conduct business, the Debtors hold working interests in oil and gas properties that give them the right to drill and maintain wells in the applicable geographic areas.

As an "operator," the Debtors are the parties engaged in the production of oil or natural gas for a certain geographic unit, often established pursuant to state law, for the benefit of themselves and other parties with mineral interests or leasehold interests in the same unit.  Acting as operator, the Debtors conduct the day-to-day business of producing oil and natural gas at the well sites and initially cover their own expenses as well as the expenses incurred on behalf of the owners of working interests in a designated unit covered by a joint operating agreement, pooling order, or similar agreement.  The Debtors transport the majority of their hydrocarbon production by pipeline or tanker truck for sale to their customers.  After receipt of gross proceeds, the Debtors—when acting as operator—distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties with an interest in production.  The remaining proceeds are retained by the Debtors as operating revenues.

In areas where the Debtors maintain oil and natural gas leases, but do not act as operator, a third party typically will serve as the operator for the wells relating to the Debtors' oil and natural gas leases and will distribute an allocable share of any productive sale proceeds to the Debtors and will invoice to the Debtors the Debtors' share of operating expenses and capital investment.  These non-operating interests are significant to the Debtors' business, accounting for approximately 51 percent of the Debtors' total estimated proved reserves as of December 31, 2018.

(b)     **Midstream Activities**.

Primarily for the benefit of their production activities, the Debtors also provide "midstream" services, which involve the gathering, transportation, and processing of produced hydrocarbons.  The Debtors also own and maintain other midstream assets, including electrical infrastructure, pipelines, disposal systems, and a network of gathering systems in the Gulf Coast Basin, Piceance Basin, and Big Horn Basin.  These systems gather, transport, and process the Debtors' hydrocarbon production, and third-party hydrocarbon production, to larger gathering systems, as well as intrastate, interstate, and local distribution pipelines.  The Debtors' network of gathering systems permits them to transport production from their wells with fewer interruptions, and, additionally, minimizes any delays associated with a gathering company extending its lines to the Debtors' wells.  Moreover, the Debtors' ownership and control of these lines aids more efficient and effective operations by enabling the Debtors to realize faster connection of newly drilled wells to the existing system, control pipeline operating pressures and capacity to maximize production, control compression costs and fuel use, maintain system integrity, control the monthly nominations on the receiving pipelines to prevent imbalances and penalties, and track sales volumes and receipts closely to assure all production values are realized.

(c)     **Sales and Marketing Arrangements**.

The Debtors principally sell their oil and natural gas production to marketers, processors, refiners, and other purchasers who have access to nearby pipeline, processing and gathering facilities.  In areas where there is no practical access to pipelines, oil is trucked to central storage facilities where it is aggregated and sold to various markets and downstream purchasers.

The Debtors generally sell their oil and natural gas production from their operated properties on the spot market or under market-sensitive, short-term agreements with credit-worthy purchasers, including independent marketing companies, gas-processing companies, and other purchasers who have the ability to pay the highest price for the oil and natural gas production and move the oil and natural gas under the most

efficient and effective transportation agreements. Because all of the Debtors' oil and natural gas production from their operated properties is sold under market-priced agreements, the Debtors are positioned to take advantage of future increases in oil and natural gas prices, but is also subject to any future price declines. This potential volatility is partially offset through hedging arrangements, as discussed further herein. Additionally, the Debtors market their own natural gas on some of their non-operated properties.

The Debtors' natural gas is transported through their own and third-party gathering systems and pipelines. As such, the Debtors incur processing, gathering and transportation expenses to move their natural gas from the wellhead to a specified delivery point. These expenses vary based on the volume and distance shipped, and the fee charged by the third-party gatherer, processor or transporter. Capacity on these gathering systems and pipelines is occasionally limited and at times unavailable because of repairs or improvements, or as a result of priority transportation agreements with other gas shippers. While the Debtors' ability to market their natural gas has been only infrequently limited or delayed, if transportation space is restricted or is unavailable, the Debtors' cash flow from the affected properties could be adversely affected. In certain instances, the Debtors may enter into firm transportation agreements to provide for pipeline capacity to flow and sell a portion of their gas volumes. Currently, a majority of the Debtors' existing firm transportation agreements were assumed in connection with acquisitions of oil and natural gas properties. These agreements have term delivery commitments of fixed and determinable quantities of natural gas.

### (d)  Hedging Portfolio.

To provide protection against volatility in commodity prices, the Debtors historically have maintained a hedge portfolio for some level of oil, natural gas, and NGL volumes. The Debtors have also maintained a hedge portfolio for certain basin differentials. These commodity derivative instruments generally provide cash settlement payments to the Debtors when prevailing prices are below contract prices on the settlement date. By removing some measure of price volatility associated with production, the Debtors' hedge portfolio has helped mitigate the effects of a sustained decline in commodity prices, but conversely, has prohibited the Debtors from benefitting from recent rises in commodity prices. All of the counterparties to the Debtors' secured swap agreements are also lenders under the Debtors' Credit Agreement, and shortly following the Petition Date, the Debtors' secured swap agreements were terminated by the applicable counterparties. Amounts due and outstanding on account thereof were crystalized as claims, in the aggregate amount of approximately $47.7 million, to be paid in full pursuant to the Plan. The Debtors' sole unsecured swap agreement was monetized to provide additional liquidity to the Debtors. Accordingly, as of the date hereof, all of the Debtors' swap agreements have been terminated.

### 3.  Governance Matters.

On September 29, 2017, the Board announced the appointment of Richard Scott Sloan as Executive Vice President and Chief Financial Officer of Vanguard, and formally resigned his roles as chair of the Audit Committee and member of the Compensation Committee of the Board. The appointment followed Richard A. Robert, Vanguard's Executive Vice President and Chief Financial Officer's notification to the Board on September 26, 2017 of his decision to resign, effective immediately. Accordingly, the shareholders of Vanguard immediately elected Randall M. Albert to join the Board, filling the vacancy created by Robert's resignation, and on October 17, 2017, elected W. Greg Dunlevy to the Board.

On January 15, 2018, Scott W. Smith, Vanguard's President and Chief Executive Officer, stepped down, and was replaced by Richard Scott Sloan. In connection with Mr. Sloan's promotion to President and Chief Executive Officer, Ryan Midgett was promoted to serve as the Chief Financial Officer of Vanguard. Mr. Midgett previously served as Vice President, Finance and Treasurer of Vanguard. Additionally, Patty Avila-Eady was appointed to serve as the Chief Accounting Officer of Vanguard.

On February 21, 2018, the Debtors elected Joseph Hurliman, Jr. to the Board by written consent of a majority of their shareholders.

On December 18, 2018, Joseph Citarrella, the chairman of the Board, notified the Debtors of his decision to resign as chairman, effective December 19, 2018, as W. Greg Dunlevy succeeded Mr. Citarrella as chairman of the Board.

On February 1, 2019, Michael Alexander and Graham Morris resigned as directors. Additionally, the Debtors elected Patrick Bartels, Jr. and L. Spencer Wells to the Board by written consent of a majority of their shareholders.

On February 8, 2019, the Debtors elected Andrew E. Schultz to the Board by written consent of a majority of their shareholders.

### D. Prepetition Capital Structure.

As of the Petition Date, the Debtors have approximately $929.5 million in total funded debt obligations. The following table depicts the Debtors' prepetition capital structure as of the Petition Date:

| Debt | Approximate Amount Outstanding (in millions) |
|---|---|
| Revolving Credit Facility and Secured Swaps | $725.2 |
| Term Loan | $123.4 |
| Senior Notes | $80.7 |
| **Total Debt** | **$929.5** |

### 1. Credit Agreement.

On August 1, 2017, the Debtors entered into the Credit Agreement with VNG as the borrower. The Credit Agreement is guaranteed by Vanguard and all of VNG's subsidiaries and is secured on a first-priority basis by substantially all of VNG's and such guarantors' assets. The Credit Agreement provides a senior secured reserve-based revolving credit facility (the "Revolving Credit Facility") with an initial borrowing base of $850.0 million and a $125.0 million term loan (the "Term Loan").

The maturity dates of the Revolving Credit Facility and the Term Loan are February 1, 2021 and May 1, 2021, respectively. The Revolving Credit Facility accrues interest at a rate per annum equal to: (a) the alternative base rate plus an applicable margin of 1.75 percent to 2.75 percent, based on the borrowing base utilization percentage under the Revolving Credit Facility; or (b) adjusted LIBOR plus an applicable margin of 2.75 percent to 3.75 percent, based on the borrowing base utilization percentage under the Revolving Credit Facility. The Term Loan accrues interest at a rate equal to: (a) the alternative base rate plus an applicable margin of 6.50 percent for an Alternate Base Rate loan; or (b) adjusted LIBOR plus an applicable margin of 7.50 percent for a Eurodollar loan.

The borrowing base under the Revolving Credit Facility is subject to redeterminations from time to time, but not less than on a semi-annual basis. On March 12, 2019, the borrowing base was reduced to $677.9 million following the completion of an additional divestiture. As of the Petition Date, an aggregate principal amount of not less than approximately $677.7 million was outstanding under the Revolving Credit Facility.

The Credit Agreement delineates priority of payment as between lenders under both the Revolving Credit Facility and the Term Loan.  Pursuant to Section 4.03 of the Credit Agreement, "[a]fter acceleration or maturity of the Loans, all principal will be paid as provided in Section 10.02(b)."  In turn, Section 10.02(b) of the Credit Agreement provides for the following waterfall:

> All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:
>
> **First**, to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;
>
> **Second**, pro rata to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Issuing Bank and to the Lenders;
>
> **Third**, pro rata to payment of accrued interest on the Revolving Loans;
>
> **Fourth**, pro rata to payment of principal outstanding on the Revolving Loans, LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time, Debt referred to in clause (b) of the definition of Obligations owing to Secured Swap Providers, as cash collateral to be held by the Administrative Agent to secure the remaining LC Exposure and to payment of Obligations owed to any Treasury Management Bank under any Secured Treasury Management Agreement;
>
> **Fifth**, pro rata to payment of accrued interest on the Term Loans;
>
> **Sixth**, pro rata to payment of principal outstanding on the Term Loans;
>
> **Seventh**, pro rata to any other unpaid Obligations; and
>
> **Eighth**, any excess, after all of the Obligations shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Credit Agreement § 10.02(b).[10]

### 2.  Senior Notes.

On August 1, 2017, Vanguard issued the Senior Notes in an aggregate principal amount of approximately $80.7 million pursuant to that certain amended and restated indenture by and among Vanguard, as borrower, certain guarantors party thereto, and Delaware Trust Company, as trustee and as collateral trustee.  The obligations under the Senior Notes are guaranteed by all of Vanguard's subsidiaries and are secured on a second-priority basis by all of Vanguard and its subsidiaries' assets.  Interest is payable on the Senior Notes on February 15 and August 15 of each year, beginning on February 15, 2018. The Senior Notes mature on February 15, 2024.

### 3.  Intercreditor Agreement.

On August 1, 2017, Citi, as priority lien agent, and Delaware Trust Company, as collateral trustee, entered into that certain amended and restated intercreditor agreement, which was acknowledged and agreed to by Vanguard, VNG, and their subsidiaries (the "Intercreditor Agreement"), to govern the

---

[10]   All capitalized terms used in this excerpt shall have the meanings ascribed to them in the Credit Agreement.

relationship of holders of the Senior Notes, holders of debt under the Credit Agreement, and holders of other priority lien, second lien or junior lien obligations that the Debtors may issue in the future, with respect to the collateral.  Under the Intercreditor Agreement, the collateral trustee may enforce or exercise any rights or remedies with respect to any collateral, subject to a 180-day standstill period.  However, the collateral trustee may not commence, or join with another party in commencing, any enforcement action with respect to any second priority lien unless the first-priority liens have been discharged.

### 4.  Equity.

As of the Petition Date, Vanguard had approximately 20.1 million outstanding shares of common stock.  Prior to the Petition Date, Vanguard's shares of common stock were traded and quoted on the OTCQX market, which is operated by the OTC Markets Group, Inc., under the symbol VNRR.  On February 15, 2019, Vanguard received a notice from the OTC Markets Group, Inc. that Vanguard no longer met the standards for qualification for OTCQX.  On April 1, 2019, Vanguard was notified by the OTC Markets Group, Inc. that its common stock, ticker: "VNRR", and its outstanding warrants issued pursuant to the Vanguard I Plan, tickers: "VNRRW" and "VNRWW," were being removed from the OTCQX tier of the OTC Markets and downgraded to the OTC Pink, effective April 2, 2019.  The Debtors were informed that the foregoing decision was made by the OTC Markets Group, Inc. in light of the Debtors' filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which were disclosed by Vanguard in its Current Report on Form 8-K dated April 1, 2019.

## VI.  EVENTS LEADING TO THE CHAPTER 11 CASES.

### A.  Market Decline and Industry-Specific Challenges.

The market difficulties faced by the Debtors are consistent with those faced industry-wide.  Historically, the markets for oil, natural gas and NGLs have been volatile, and they likely will continue to be volatile in the future, especially given current geopolitical and economic conditions.  Among the factors causing such volatility are the domestic and foreign supply of oil and natural gas, the ability of members of the Organization of the Petroleum Exporting Countries to comply with agreed-upon production cuts and the cooperation of other producing countries to reduce production levels, social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, and the level and growth of consumer product demand.

These market conditions have affected oil and gas companies at every level of the industry around the world.  All companies in the oil and gas industry (not just E&P companies) have felt these effects.  However, independent oil and gas companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Over 100 oil and gas companies have filed for chapter 11 since the beginning of 2015, including most recently Jones Energy, Inc., Parker Drilling Corporation, Gastar Exploration, Inc., EXCO Resources, Inc., Bonanza Creek Energy, Inc., Memorial Production Partners LP, Seadrill Limited, and Cobalt International Energy, Inc.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

The Debtors were not immune to these macro-economic forces.  In 2017, the Debtors' revenues, earnings, and liquidity preserves were substantially and negatively affected by persistent, depressed commodity prices, which culminated in the Debtors' eventual chapter 11 filing in Vanguard I.  Specifically, the Debtors' revenue declined from approximately $788.1 million in the fiscal calendar year 2014 to approximately $566.6 million the fiscal calendar year 2015, and down to $264.4 million through

the third quarter of 2016. Further, the Debtors' operating cash flow saw significant decline through the third quarter of 2016, down to $179.6 million from $265.3 million over the same period of 2015.

Notwithstanding the Debtors' chapter 11 filing in 2017, which resulted in deleveraging of the Debtors' balance sheet, macroeconomic forces continued to weigh on the Debtors' operations and the overall health of its balance sheet. Additionally, the Debtors faced burdensome hedge book positions upon emergence from Vanguard I, further had their liquidity constrained through borrowing base redeterminations under the Credit Agreement, and invested in certain capital expenditures that delivered lower than expected production and returns. The confluence of these factors led to the Debtors losing over $100 million in liquidity in 2018.

### 1. Burdensome Hedge Book Positions and Regional Basis-Differentials.

Under the Credit Agreement, the Debtors are required to hedge a minimum of 60 percent of their production for 2019. Prior to the Petition Date, however, the Debtors were hedged at approximately 80−90 percent.[11]

Just prior to emergence from Vanguard I, rather than entering into a balanced combination of hedging transactions, such as swaps and collars, the Debtors entered primarily into swap agreements. As a result of those swap agreements, the Debtors were unable to participate in as much of the "upside" of the pricing environment upon emergence through September 2018 (*i.e.*, the Debtors were generally "locked in" at prices below market prices). Additionally, in certain basins, the Debtors saw significant reductions to their revenues due to widening of regional basis-differentials[12] from historical levels, and this risk was largely unhedged.

The Debtors' hedge position ultimately resulted in the Debtors seeing little benefit from higher oil and natural gas prices prior to the late 2018 downturn, and such hedges cost the Debtors approximately $80 million in potential revenues and thus potential incremental liquidity during 2018. Additionally, the deterioration of regional basis pricing for certain locations cost the Debtors additional potential liquidity versus the assumptions made at the time of Vanguard I's emergence.

### 2. Borrowing Base Redeterminations.

As discussed, the borrowing base under the Credit Agreement is subject to periodic redeterminations. In July 2018, December 2018, and again in March 2019, the Debtors' borrowing base under the Credit Agreement was redetermined lower. Combined with the other financial and operational challenges described herein, these borrowing base redeterminations further strained the Debtors' liquidity.

On December 28, 2018, following discussions and at the recommendation of their advisors, the Debtors borrowed the remaining approximately $17.1 million available outstanding under the Credit Agreement for general corporate purposes. Access to this additional liquidity, which, in the Debtors' view, was the least expensive funded source of liquidity available, has proven critical to the Debtors' ability to fund operations during negotiations with all major creditor constituencies regarding the terms of a consensual balance sheet restructuring.

---

[11]  As noted, shortly following the Petition Date, all of the Debtors' hedging arrangements were terminated.

[12]  A basis-differential represents the difference in prices between a marker price and the basin price. For example, a barrel of oil at Cushing might be quoted at $65, but the price in the Permian Basin for similar oil might be $60. The difference between the two is the basis-differential. Widening basis-differentials may occur due to a variety of factors, such as there not being sufficient infrastructure to transport the increasing supply of oil being produced by a specific basin.

### 3.   Capital Expenditures.

Lastly, the Debtors made various capital investments, specifically in the Haynesville, Piceance, Pinedale, and Arkoma regions that produced lower-than-expected returns in late 2017 and 2018.  In certain instances, the Debtors' wells provided a much lower rate of return than expected at the time of the original investment.  In other instances, delays in operations have prevented the Debtors from receiving any return from their investments.

### 4.   Anticipated Covenant Defaults

Under the Credit Agreement, the Debtors were required to:  (a) deliver their annual audited financials and compliance materials to the applicable lenders on or before March 31, 2019; (b) repay the principal and interest amounts on the Term Loan by mid-April 2019; and (c) maintain certain leverage ratios between first lien debt and EBITDA.  Absent a successful refinancing, an infusion of capital, and/or covenant relief, the Debtors would not be in compliance with the above covenants, and the failure to comply with any would trigger an automatic event of default under the Credit Agreement and the issuance of a "going concern" opinion (the "First Lien Covenant Defaults").

Additionally, under the indenture for the Senior Notes, the Debtors were required to:  (a) file certain financial disclosures with the SEC, as accelerated filer; and (b) repay the principal and interest amounts on the Senior Notes on or before March 31, 2019, and such failure to do either would likewise trigger an automatic event of default (the "Second Lien Covenant Defaults" and, together with the First Lien Covenant Defaults, collectively, the "Anticipated Covenant Defaults").  The financial Anticipated Covenant Defaults generally require majority consent to amend, waive, or forbear, while the payment default Anticipated Covenant Defaults generally require 100 percent consent to amend, waive, or forbear.[13]

To avoid the Anticipated Covenant Defaults, the Debtors, with the assistance of their advisors, commenced an out-of-court financing and bank facility amendment solicitation process (as described herein).  The Debtors engaged certain key stakeholders regarding a potential amendment to the Debtors' Credit Agreement, specifically with respect to covenant relief thereunder.  Unfortunately, these efforts did not result in an actionable out-of-court restructuring alternative that would provide the necessary covenant relief under the Debtors' Credit Agreement.  It then became clear that the necessary consensus for covenant relief among lenders under the Credit Agreement would not materialize.

### B.   Proactive Approach to Addressing Liquidity Constraints.

Following the Debtors' emergence from chapter 11 in 2017, the Debtors continued to face operational headwinds, as a result of market forces and industry specific challenges.  Beginning in September 2018, the Debtors began evaluating and subsequently implementing further liability management strategies that focused on, among other things, reducing financial leverage, expanding access to capital, asset portfolio repositioning, operational performance, capital deployment, and risk management. Since that time, the Debtors have implemented a number of initiatives designed to further these strategies.

---

[13]   Consent from at least 50.1 percent of holders of the aggregate principal amount outstanding under the Revolving Credit Facility is required to amend, waive, or forbear the financial First Lien Covenant Defaults.  Consent from 100 percent of holders of the aggregate principal amount outstanding under the Credit Agreement is required to amend, waive, or forbear payment default First Lien Covenant Defaults.  To amend, waive, or forbear the financial Second Lien Covenant Default or permit senior financing, consent from holders of at least 50.1 percent of the aggregate principal amount outstanding of Senior Notes is required.  Consent from 100 percent of the affected holders of the Senior Notes is required to amend, waive, or forbear the payment default Second Lien Covenant Default.

1.   **Exploration of Strategic Alternatives**.

In response to operating and financial challenges, the Debtors instituted measures to ensure frugality and preserve capital, including measures to increase operational efficiency and the reduction of employment-related expenses through headcount reduction.  However, it became clear to the Debtors that such measures alone would not be sufficient to meet future capital requirements and satisfy financial obligations.  In late 2018 and into early 2019, the Debtors began to consider addressing their liquidity and upcoming maturity issues through a more comprehensive restructuring.

(a)   **Asset Sales**.

As part of the Debtors' liability management strategy, the Debtors, with the help of their advisors, implemented programs to reposition the asset portfolio, including, but not limited to, asset divestitures. The Debtors significantly divested certain non-core assets in the latter half of 2017 and in 2018, resulting in a reduction of the Debtors' debt load under their Revolving Credit Facility.

Specifically, in November 2017, the Debtors completed the sale of their oil and natural gas properties in the Williston Basin in North Dakota and Montana.  During 2018, the Debtors completed the sale of certain oil and natural gas properties in the Permian Basin, the Green River Basin, the Arkoma Basin, DJ Basin, and Gulf Coast Basin.  In early 2019, the Debtors completed the sale of their oil and natural gas properties in the Jonah field in southwestern Wyoming.

In total, the Debtors sold approximately $145 million worth of assets following emergence from Vanguard I.  Most of the net cash proceeds from these divestments were used to pay down outstanding debt under the Revolving Credit Facility[14] and thus did not result in additional liquidity or improved metrics for the Debtors.  Some sales actually resulted in reduced liquidity and degraded the leverage metrics in the short term because of the credit agreements and leverage levels.

(b)   **Failed Refinancing Efforts**.

Beginning in August 2018, the Debtors engaged strategic advisors to assist in conducting a "roadshow" with dozens of large financial institutions to reintroduce the deleveraged Debtors to key potential investors, ultimately executing a number of non-disclosure agreements, opening and populating a dataroom, conducting various management presentations, and discussing potential deleveraging strategies, including, among other things, the provision of junior financing to limit exposure under the Revolving Credit Facility.  Unfortunately, interest was tepid, and these efforts ultimately did not materialize into in viable out-of-court restructuring alternative.

(c)   **Amendments to the Credit Agreement**.

On July 5, 2018, after proactive engagement of its lenders, Vanguard executed certain amendments to its Credit Agreement in an effort to continue its ongoing asset portfolio repositioning and divestment program.  The first amendment to the Credit Agreement reduced the borrowing base under the Revolving Credit Facility from $765.2 million to $729.7 million.  The second amendment to the Credit Agreement provided for an automatic mechanism to further reduce the borrowing base in connection with dispositions of oil and gas properties, subject to certain limitations.  Other amended terms including the following:

---

[14]   Pursuant to that certain second amendment to the Credit Agreement executed on July 5, 2018, the Credit Agreement requires a dollar-for-dollar reduction of the Revolving Credit Facility's borrowing base from all net cash proceeds received from each asset sale.

- increased first lien leverage covenant thresholds beginning in the third quarter of 2018 to the ration corresponding to the specified periods below:

| Period Ending | Consolidated First Lien Net Leverage Ratio |
|---|---|
| September 30, 2018 | 5.25:1.00 |
| December 31, 2018 | 5.50:1.00 |
| March 31, 2019 | 5.75:1.00 |
| June 30, 2019 | 5.25:1.00 |
| September 30, 2019 | 5.00:1.00 |
| December 31, 2019 March 31, 2020 | 4.75:1.00 |
| June 30, 2020 | 4.50:1.00 |
| September 30, 2020 | 4.25:1.00 |
| December 21, 2020 and thereafter | 4.00:1.00 |

- implementation of an asset sale basket enabling the Debtors to divest individual assets up to $25 million, and an aggregate amount up to $75 million, between redeterminations without requiring majority lender approval; and

- amendment of the adjusted EBITDA definition to, among other things, adjust for the termination of hedge contracts in conjunction with asset sales, exploration expenses, third-party fees and expenses, and one-time severance costs and expenses as a result of the Vanguard I Plan.

Following the execution of these amendments, the Debtors experienced operational and financial headwinds, which materially affected their ability to comply with certain debt covenants pursuant to the amended Credit Agreement. The Debtors prudently informed the public of their compliance *and* potential noncompliance with the covenants set forth therein. In the release of third quarter earnings in 2018, the Debtors stated that they were in compliance with all of their debt covenants, but given the then-current environment for commodity prices and basis differentials, the Debtors warned that they may not be in compliance with certain debt covenants in future periods beginning with the December 2018 reporting period. On December 6, 2018, the Debtors entered into a third amendment to the Credit Agreement. This amendment allowed the Debtors additional flexibility to pursue and consummate sales of certain of its oil and natural gas properties. On March 31, 2019, the Debtors entered into a fourth amendment to the Credit Agreement to correct a discrepancy in the lender assignment process (*i.e.*, to confirm that obligations under the Revolving Credit Facility and the Term Loan are independently assignable of each other and to ratify prior assignments).

### (d)    Retention of Restructuring Advisors.

In November 2018, the Debtors sought external strategic advice and assistance, engaging Evercore Group L.L.C. ("Evercore") as investment banker and financial advisor in December 2018. Later, in January 2019, the Debtors retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel and Opportune LLP ("Opportune") as restructuring advisor. The advisors were retained to assist the Debtors with exploring strategic alternatives.

Since Evercore, Kirkland, and Opportune's engagement, the Debtors and their advisors have engaged the major constituents in their capital structure as well as third parties regarding a value maximizing transaction effectuated either in- or out-of-court, including potential out-of-court financing and bank facility amendments. Additionally, Evercore also solicited the Debtors' stakeholders and third-parties for debtor in possession financing.

> **(e)** **Solicitation of Out-of-Court Financing and Credit Agreement Amendments**.

In light of tightening liquidity and the upcoming Anticipated Covenant Defaults, the Debtors looked to their largest, most senior group of debt holders—lenders under the Credit Agreement—to begin to find a viable path forward. Beginning in December 2018, the Debtors, in consultation with Evercore, commenced an out-of-court financing and bank facility amendment solicitation process to avoid the Anticipated Covenant Defaults. The Debtors also evaluated opportunistic asset sales to assist in the financing and bank facility amendment process. Simultaneously, the Debtors commenced contingency planning efforts in concert with the out-of-court financing process efforts as a backstop should such financing efforts not produce an actionable proposal.

Pursuant to the financing solicitation process, Evercore, on behalf of the Debtors, contacted approximately seven parties, including the Steering Committee, other of the Debtors' existing stakeholders, and third-parties, to gauge interest in the provision of an out-of-court financing. In parallel with the solicitation efforts, Evercore, on behalf of the Debtors, engaged certain stakeholders and exchanged term sheets regarding a potential amendment to the Debtors' Credit Agreement, specifically with respect to covenant relief to avoid the Anticipated Covenant Defaults. Unfortunately, these efforts did not result in an actionable out-of-court restructuring alternative. No party Evercore contacted was willing—or able— to provide financing of sufficient size due to, among other factors, the Debtors' financial position (particularly that substantially all of the Debtors' assets were encumbered under the existing debt instruments) and their highly leveraged capital structure. Moreover, the high consent threshold necessary among the more than 30 financial institutions acting as lenders under the Credit Agreement to permit additional senior financing or execute a meaningful waiver, forbearance, and/or amendment proved unattainable.

> **(f)** **Discussions with Creditors**.

Despite the Debtors' many initiatives in the months prior to the Petition Date, their efforts to consummate an out-of-court transaction did not result in the type of comprehensive deleveraging that can often only be achieved through a chapter 11 process. Ultimately, against the backdrop of macroeconomic challenges, rapidly declining liquidity, limited appetite from existing stakeholders for an out-of-court refinancing that would sufficiently delever the Debtors, and the looming Anticipated Covenant Defaults in 2019, the Debtors pivoted to chapter 11 contingency preparations, including soliciting proposals for potential debtor-in-possession financing and exploring the potential to deleverage.

Beginning in early March 2019, the Debtors, with the assistance of Evercore, contacted 17 parties, in addition to the Steering Committee, to solicit proposals for debtor-in-possession financing and indications of interest for an exit facility. Of the parties contacted, only three parties requested a non-disclosure agreement, only two of whom executed non-disclosure agreements and were granted access to due diligence through the Debtors' data room. Ultimately, the Debtors received only one proposal other than the Steering Committee's proposal, as discussed below.

Additionally, when it became clear that the necessary consensus among lenders under the Credit Agreement to avoid the Anticipated Covenant Defaults would not materialize, the Debtors reached out to the Noteholder Group, executing non-disclosure agreements and bringing their advisors under the tent as

quickly as possible.  In the week leading up to the Petition Date, the Noteholder Group expressed a desire to avoid an in-court proceeding.  The Debtors and their advisors, both with the Steering Committee and separately, engaged in meaningful discussions with the Noteholder Group in the hopes of ultimately reaching agreement on a value-maximizing path forward (whether that was through a chapter 11 process or a viable, actionable out-of-court restructuring).

Over the course of the week leading up to the Petition Date, and through countless telephonic conferences amongst the advisors and principals across the Debtors' management team, the Steering Committee, and the Noteholder Group, three things became crystal-clear.  *First*, any viable path forward had to solve for the Debtors' immediate cash needs.  *Second*, negotiating and implementing a mutually agreed-upon form of out-of-court "bridge" financing within the timeline dictated by the Debtors' liquidity needs and looming Anticipated Covenant Defaults was unlikely to be a viable path forward.  *Third*, ultimately the Debtors' key stakeholders all had the same goal:  to delever the Company as quickly as possible and provide the Debtors' valuable assets and operations an opportunity to move forward as a going concern.  A second debtor-in-possession financing proposal was received from affiliates of the Noteholder Group just before the filing, which the Debtors, in consultation with their advisors, determined was not in the best interests of the Debtors and their estates to pursue at that time.

These discussions ultimately led to the Debtors' securing of the DIP Facility.  The Debtors, in consultation with their advisors, determined that the financing proposal provided by a subset of the Steering Committee afforded the Debtors the greatest flexibility with the fewest restrictions and at the lowest cost, and was in the best interests of the Debtors and their estates.  Although the Debtors were unable to achieve a global consensus prior to filing, the DIP Facility provides the bedrock upon which the Debtors hope to build such accord.  As discussed, at the core, it was the Debtors' tightening liquidity and the looming Anticipated Covenant Defaults that dictated the timeline on which the Debtors could negotiate and ultimately necessitated a chapter 11 filing without a broader agreement in place—the Debtors needed to file for chapter 11 in order to access the additional liquidity provided by the DIP Facility to avoid halting operations entirely.  Nevertheless, the Debtors continued negotiations with the hope of entering into an agreement as soon as possible following the Petition Date.

As such, following the Petition Date, the Ad Hoc Term Loan Lender Group coalesced, and the Debtors and their advisors actively engaged in negotiations and traded a number of restructuring proposals with the Steering Committee, the Ad Hoc Term Loan Lender Group, and the Noteholder Group in an effort to reach consensus on a value-maximizing path forward.  [In the course of active negotiations, the Debtors and their advisors reviewed and evaluated these various restructuring proposals, and on April [●], 2019, the Board unanimously approved the Debtors' entry into the Plan Support Agreement.  On April [●], 2019, the Debtors and the Consenting Stakeholders executed the Plan Support Agreement.]

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A.    Corporate Structure upon Emergence.

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and

35

by-laws (or other formation documents) are amended under the Plan or otherwise, in each case to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

**B.     Expected Timetable of the Chapter 11 Cases**.

The DIP Facility and Plan Support Agreement contain a 110-day milestone to secure confirmation of a chapter 11 plan and a 120-day milestone to emerge from chapter 11. Thus, the Debtors intend to move as quickly as practicable during the Chapter 11 Cases. Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within four months after the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

**C.     First Day Relief**.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of R. Scott Sloan, President and Chief Executive Officer of Vanguard Natural Resources, Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed on the Petition Date [Docket No. 25]. Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the regular course business, including trade claimants who supply goods or services utilized by the Debtors on account of their working interests in oil and gas leases.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/VNR/.

**D.     Other Procedural and Administrative Motions**.

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Claims and Balloting Agent Retention. On April 1, 2019, the Debtors filed an application seeking to retain Prime Clerk LLC as their noticing, claims, and solicitation agent [Docket No. 9], which was approved by the Court that same day [Docket No. 63].

- Ordinary Course Professionals Motion. On April 9, 2019, the Debtors filed a motion seeking to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 141].

- Retention Applications. On April 23, 2019, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including:

  - Kirkland as legal counsel [Docket No. 196];

- Blank Rome LLP as legal co-counsel [Docket No. 195];

- Evercore as investment banker and financial advisor [Docket No. 197];

- Opportune as restructuring advisor [Docket No. 194];

- McCarn & Weir P.C. as special oil and gas counsel [Docket No. 192]; and

- Roger A. Soape, Inc. as independent contractual data consultants [Docket No. 193].

E.      **Schedules and Statements**.

The Debtors anticipate they will file their Schedules of Assets and Liabilities and Statement of Financial Affairs on or before May 6, 2019.

F.      **Litigation Matters**.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

In particular, one or more of the Debtors are parties to certain litigation stemming from Vanguard I, including the following:

- an adversary proceeding against the State of Wyoming, Department of Revenue, Mineral Tax Division seeking a tax refund (*i.e.*, *Vanguard Operating, LLC v.  Wyo. Dep't of Revenue*, Adv. Proc. No. 18-03046 (S.D. Tex.));

- seven adversary proceedings against certain Wyoming Counties seeking return of improper plan distributions and/or recovery of preferences (*i.e.*, Adv. Proc. Nos. 18-03244–18-03250 (S.D. Tex.));

- several claims objections as well as an appeal of an order allowing a late-filed claim from a certain Wyoming County (*i.e.*, No. 18-cv-00876 (S.D. Tex.));

- an adversary proceeding relating to the classification of a certain net profits interest and seeking a declaratory judgment that no royalty is owed (*i.e.*, *Vanguard Operating, LLC v. Michael L. Klein* et al., Adv. Proc. No. 18-03178 (S.D. Tex.));[15] and

- a number of preference actions in which one of the Debtors or VNR LLC is plaintiff.

In addition to the foregoing matters, the Debtors are also interested in an appeal currently pending before the Fifth Circuit, which may have implications on the Debtors' potential unclaimed property liabilities (*i.e.*, *Linn Operating, Inc. v. Okla. State Treasurer*, No. 18-40575 (5th Cir. filed June 18, 2018)).

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with

---

15   The Debtors are also parties to a multi-party civil action concerning the calculation of net profits interests under oil and gas leases (*i.e.*, No. 19-cv-00090 (S.D. Tex.)).

respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## VIII.   RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.  For additional risk factors that may affect the Debtors' restructuring, please refer to the Debtors' publicly available filings with the SEC, including but not limited to the Debtors' most recent Annual Report on Form 10-K filed on April 15, 2019.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.  DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A.   Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or waived in accordance with the Plan, the Effective Date will not take place.

#### 3.   The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan

and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Subject to the terms and conditions of the Plan and the Plan Support Agreement, any such modifications could result in less favorable treatment of any non-accepting Class of Claims, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each Impaired Class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class or Classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic

conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the commodities the Debtors provide), and increasing expenses.  See Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 44.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of:  (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.  The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.  Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed

Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 10. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity by backstopping Rights Offering, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan Support Agreement and the Plan and the significant deleveraging and financial benefits that they embody.

### B. Risks Related to Recoveries under the Plan.

#### 1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Preferred Stock and the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2. **Liquid Trading Markets for New Preferred Stock and New Common Stock May Not Develop**.

The Debtors and the Reorganized Debtors may consider applying to list the New Preferred Stock and the New Common Stock on a national securities exchange on or as soon as reasonably practicable after the Effective Date.  In such event, the Debtors make no assurance that they will be able to obtain these listings or, even if the Debtors do, that liquid trading markets for shares of New Preferred Stock and New Common Stock will develop.  The liquidity of any market for shares of New Preferred Stock and New Common Stock will depend upon, among other things, the number of holders of shares of New Preferred Stock and New Common Stock, Reorganized Vanguard's financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that active trading markets for New Preferred Stock and New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event active trading markets do not develop, the ability to transfer or sell New Preferred Stock or New Common Stock may be substantially limited.

3. **The Trading Price for the Shares of New Preferred Stock and New Common Stock May Be Depressed Following the Effective Date**.

Assuming that the Effective Date occurs, shares of New Preferred Stock and New Common Stock will be issued to holders of certain Classes of Claims.  Following the Effective Date of the Plan, shares of New Preferred Stock or New Common Stock may be sold to satisfy withholding tax requirements. In addition, holders of Claims that receive New Preferred Stock or New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Preferred Stock or New Common Stock available for trading could cause the trading price for the New Preferred Stock or the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Preferred Stock or the New Common Stock.

4. **Certain Holders of New Preferred Stock and New Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities**.

To the extent that the New Preferred Stock or the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by holders of Claims who receive New Preferred Stock or New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Preferred Stock and the New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Preferred Stock or New Common Stock to freely resell the New Preferred Stock or New Common Stock.  The Debtors may agree to take certain steps to register the New Preferred Stock and the New Common Stock after the Effective Date.  *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 54.

5. **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies**.

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. While the Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six (6) months.

Holders of New Preferred Stock or New Common Stock who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 54.

6. **Certain Tax Implications of the Plan**.

Holders of Allowed Claims and Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 55, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims and Interests.

7. **The Debtors May Not Be Able to Accurately Report Their Financial Results**.

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**C.**     **Risks Related to the Debtors' and the Reorganized Debtors' Businesses**.

**1.**     **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facilities upon emergence.

**2.**     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.**     **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases

44

continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4.   Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The financial projections contained in **Exhibit F** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 5.   The Debtors' Substantial Liquidity Needs May Impact Revenue.

The Debtors operate in a capital-intensive industry.  The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability

to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Oil, Natural Gas, and Natural Gas Liquids Prices Are Volatile, and Continued Low Oil, Natural Gas, or Natural Gas Liquids Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition.

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their operator customer base to make operating and capital expenditures to explore and drill for, develop, produce, and extract oil, natural gas, and NGLs.  Operators' willingness to conduct such activities are in turn dependent on prevailing oil, natural gas, and NGLs prices.  Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil, natural gas, and NGLs price expectations as actual pricing.  In short, the Debtors face a high level of exposure to oil, natural gas, and NGLs price swings. Oil, natural gas, and NGLs are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short-term and long-term cyclical trends. Oil, natural gas, and NGLs prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  The Debtors expect such volatility to continue in the future.  The prices for oil, natural gas, and NGLs are volatile due to a variety of factors, including, but not limited to:

- the domestic and foreign supply of oil and natural gas;

- the ability of members of the Organization of Petroleum Exporting Countries and other producing countries to agree upon production levels which has an impact on oil prices;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions;

- the level and growth of consumer product demand;

- labor unrest in oil and natural gas producing regions;

- weather conditions, including hurricanes and other natural occurrences that affect the supply and/or demand of oil and natural gas;

- the price and availability of alternative fuels and renewable energy sources;

- the impact of the U.S. dollar exchange rates on commodity prices;

- the price of foreign imports;

46

- technological advances affecting energy consumption;

- worldwide economic conditions; and

- the availability of liquid natural gas imports and exports.

Continued volatility or weakness in oil, natural gas, and NGLs prices (or the perception that oil, natural gas, and NGLs prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand to the Debtors' services. A sustained decline in oil, natural gas, or NGLs prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7. **The Reorganized Debtors May Be Subject to Risks in Connection with Certain Divestitures**.

In November 2017, the Debtors' engaged Jefferies to advise on strategic alternatives, including reducing financial leverage, expanding access to capital, divesting certain non-core assets, focusing the asset base, and funding growth opportunities. In 2017, the Debtors completed divestitures of a portion of the Debtors' non-core assets.

The Reorganized Debtors may be subject to certain risks in connection with any potential divestitures upon emergence. Various factors could materially affect the Reorganized Debtors' ability to execute on these strategic alternatives and any contemplated asset divestitures, including the approvals of governmental agencies or third parties and the availability of purchasers willing to acquire the assets with terms the Reorganized Debtors deem acceptable. Sellers often retain certain liabilities or agree to indemnify buyers for certain matters related to sold assets. The magnitude of any such retained liability or of the indemnification obligation is difficult to quantify at the time of the transaction and ultimately could be material. Also, as is typical in divestiture transactions, third parties may be unwilling to release the Reorganized Debtors from guarantees or other credit support provided prior to the sale of the divested assets. As a result, after a divestiture, the Reorganized Debtors may remain secondarily liable for the obligations guaranteed or supported to the extent that the buyer of the assets fails to perform these obligations.

8. **The Debtors' Business Is Subject to Complex Laws and Regulations that Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**.

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties. The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of oil, gas or other pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file claims for alternative water supplies, property damage or bodily injury. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable.

These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 9. The Debtors' Operations Are Subject to Hazards Inherent in the E&P Sector.

Risks inherent in the E&P sector, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment. These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations. The existence, frequency and severity of such incidents will affect operating costs, insurability and relationships with customers, employees and regulators.

### 10. The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity.

The E&P sector is highly competitive and fragmented and includes several large companies that compete in many of the markets in which the Debtors operate, as well as numerous small companies that compete with the Debtors on a local basis. The Reorganized Debtors' operations may be adversely affected if their current competitors or new market entrants expand into service areas where they operate. Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on the results of operations and the Reorganized Debtors' financial condition.

### 11. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 12. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 13. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization: (a) would be subject to compromise and/or treatment under the plan of reorganization; and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized Entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## IX.   SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.   Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of Claims against or Interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" which begins on page 5, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3, 4, 5, and [6] (collectively, the "Voting Classes"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from holders of Claims or Interests in Classes 1, 2, 7, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.   Voting Record Date.

**The Voting Record Date is [May 24], 2019**. The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

C. **Voting on the Plan**.

**The Voting Deadline is [June 21, 2019], at 5:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be:  (a) electronically submitted utilizing the online balloting portal maintained by the Notice and Claims Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**VANGUARD NATURAL RESOURCES, INC. (2019)**
**BALLOT PROCESSING CENTER**
**C/O PRIME CLERK LLC**
**830 3RD AVENUE, RD FLOOR**
**NEW YORK, NY 10022**

If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.

---

**PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:**

**EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**OR**

**VOTE ELECTRONICALLY THROUGH THE CUSTOMIZED,**
**ONLINE BALLOTING PORTAL ON THE DEBTORS' CASE WEBSITE**
**MAINTAINED BY PRIME CLERK LLC ("E-BALLOT")**

**Holders of Claims who cast a ballot via E-Ballot should NOT also submit a paper ballot.**

**E-BALLOT SHALL BE THE EXCLUSIVE MEANS OF VOTING ELECTRONICALLY. PRIME CLERK LLC SHALL NOT ACCEPT VOTES SUBMITTED VIA E-MAIL, FACSIMILE, OR ANY ELECTRONIC METHODS OTHER THAN E-BALLOT; *PROVIDED* THAT PRIME CLERK LLC SHALL ACCEPT MASTER BALLOTS FROM NOMINEES SUBMITTED VIA E-MAIL TO VNRBALLOTS@PRIMECLERK.COM.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (844) 216-9850. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

D. **Ballots Not Counted**.

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an Entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely

filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Debtors' credit facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (7) it lacks an original signature, with the understanding that the voting party's electronic signature through E-Ballot will be deemed an original signature; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

## X.      CONFIRMATION OF THE PLAN.

### A.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.      Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either:  (1) has accepted the plan; or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Preferred Stock and the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.      **Feasibility**.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 38, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference. Based upon the Financial Projections, the Debtors the Plan will meet the feasibility requirements of the Bankruptcy Code.

D.      **Acceptance by Impaired Classes**.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[16]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

E.      **Confirmation Without Acceptance by All Impaired Classes**.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

---

[16]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors were to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it would not "discriminate unfairly" and would satisfy the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.  Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit G** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going-concern value recoveries to creditors under the Plan are substantially higher than the recoveries such creditors would receive in a hypothetical liquidation of the Vanguard enterprise under chapter 7 of the Bankruptcy Code, as illustrated in the Liquidation Analysis. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

**XI.     CERTAIN SECURITIES LAW MATTERS**.

The Debtors believe the New Preferred Stock and the New Common Stock to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

**A.     Issuance of Securities under the Plan**.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.  In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  In reliance upon this exemption, the Debtors believe that the offer and sale under the Plan of New Preferred Stock and New Common Stock will be exempt from registration under the Securities Act and state securities laws with respect to any such holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code. Accordingly, no registration statement will be filed under the securities Act or any similar federal, state, or local law.

The shares of New Preferred Stock and New Common Stock will be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act.  Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering. The term "issuer," as used in section 4(a)(2) of the Securities Act and/or Regulation S, means, among other things, a person who issues or proposes to issue any security.  Any securities issued in reliance on section 4(a)(2) of the Securities Act will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.  Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to certain offerings and sales of securities outside of the United States.  Only Eligible Holders may receive New Preferred Stock and New Common Stock under the Plan.  "Eligible Holders" include "accredited investors," as defined in Rule 501(a) of Regulation D under the Securities Act and investors that are not U.S. persons in offerings made in compliance with applicable foreign securities laws and Regulation S.

**B.     Subsequent Transfers of Securities Issued under the Plan**.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who, except with respect to ordinary trading transactions of an entity that is not an issuer:

- purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under the plan of reorganization for the holders of such securities;

- offers to buy securities offered or sold under the plan of reorganization from the holders of such securities, if the offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Securities issued under the Plan that are "restricted securities" may only be sold pursuant to a registration statement or pursuant to exemption therefrom, such as the exemption provided by Rule 144 under the Securities Act.

Persons (i) who receive securities that are exempt under section 1145 of the Bankruptcy Code but who are deemed "underwriters" or (ii) who receive securities issued under the Plan that are "restricted securities" would, however, be permitted to sell such securities without registration if an available resale exemption exists, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.

**A.    Introduction**.

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service

(the "<u>IRS</u>"), all as in effect on the date hereof (collectively, "<u>Applicable Tax Law</u>").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the non-cash consideration received pursuant to the Plan (collectively, the "<u>Non-Cash Consideration</u>") as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy).  Further, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX**

ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

      **B.**      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**.

              **1.**   **Structure of the Plan**.

The Plan generally provides that the Plan and the Restructuring Transactions may be consummated in either a transaction that involves a taxable disposition of the Debtors' assets to the Reorganized Debtors (a "Taxable Transaction") or a transaction that does not involve a taxable disposition of the Debtors' assets to the Reorganized Debtors (a "Recapitalization Transaction"). In general, in a Taxable Transaction, certain of the Reorganized Debtors will be newly-created entities that acquire the Debtors' assets (potentially including equity interests in one or more of the Debtors) in connection with the Restructuring Transactions, and one of those newly-created entities will be the entity that is the issuer of the equity received by holders of Claims in satisfaction of such Claims. By contrast, in a Recapitalization Transaction, one or more of the existing Debtors will stay in place and issue equity interests to holders of Claims in satisfaction of such Claims.

As of December 31, 2018, the Debtors had approximately $74.51 million of NOLs and $2.95 million in general business credit carryforwards. Additional losses may be generated in 2019. In general, in a Taxable Transaction, the Debtors will recognize gain or loss upon the disposition of their assets in connection with the consummation of the Plan. There is a possibility that if gain is recognized, the Debtors could have insufficient tax attributes available to offset such gain. Furthermore, in a Taxable Transaction, the Reorganized Debtors will not succeed to any of the Debtors' existing tax attributes. By contrast, in a Recapitalization Transaction, the Debtors will not recognize gain or loss with respect to their assets as a result of the consummation of the Plan (although the Debtors may engage in certain Restructuring Transactions that do result in the recognition of gain or loss), but will be subject to the rules discussed below with respect to CODI and the application of Section 382 of the Tax Code.

              **2.**   **Cancellation of Debt and Reduction of Tax Attributes**.

In general, absent an exception, a debtor will realize and recognize CODI, for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.[17] Alternatively, a debtor with CODI may elect first to reduce the basis of its

---

[17] Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act (the "Tax Cut and Jobs Act"), interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions. It is unclear whether interest deductions

depreciable assets pursuant to section 108(b)(5) of the Tax Code.[18]  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding CODI is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded CODI exceeds its tax attributes, the excess CODI is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the Restructuring Transactions, the Debtors expect to realize CODI.  The exact amount of any CODI that will be realized by the Debtors will not be determinable until, at the earliest, the consummation of the Plan.  Because the Plan provides that certain holders of Claims will receive Non-Cash Consideration, the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value of the Non-Cash Consideration, which cannot be known with certainty at this time.

As noted above, in a Taxable Transaction, the section 108 rules are not expected to be applicable, because the Reorganized Debtors generally will not succeed to the Debtors' existing tax attributes, but the attribute reduction rules described above should not result in the reduction of any tax asset, including tax basis, of the Reorganized Debtors.  The potential exception to this general rule would be if the Reorganized Debtors acquire the stock of an entity that is taxable as a corporation and an election under section 338 of the Tax Code is not made with respect to such subsidiary, in which case such subsidiary's individual tax attributes, if any, may be subject to reductions as a result of the section 108 rules.

### 3.  Limitation of NOL Carryforwards and Other Tax Attributes.

Following the Effective Date, the Debtors anticipate that any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  The rules of sections 382 and 383 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the Non-Cash Consideration along with the cancellation of existing Interests in the Debtors pursuant to the Plan will result in an "ownership change" for these purposes, and that the Reorganized Debtors' use of the Debtors' Pre-Change Losses and tax credits will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

---

that are deferred under section 163(j) are subject to reduction under section 108 and whether interest that has not been able to be deductions as a result of section 163(j) gives rise to CODI or is excludable under one of several theories.

[18]    This extent to which this election can apply to the Debtors' assets that are subject to depletion, as opposed to depreciation, is subject to uncertainty.

Under section 382 of the Tax Code, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

As noted above, in a Taxable Transaction, the section 382 rules would not generally be expected to be relevant, because the Reorganized Debtors will not succeed to any of the Debtors' tax attributes. The potential exception to this general rule would be if the Reorganized Debtors acquire the stock of an entity that is taxable as a corporation and an election under section 338 of the Tax Code is not made with respect to such subsidiary, in which case such subsidiary's individual tax attributes, if any, may be subject to limitation under the section 382 rules.

(a)     **General Section 382 Annual Limitation**.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 2.20 percent for April 2019).  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent the Debtors have a net unrealized built-in gain at the time of the ownership change.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

(b)     **Special Bankruptcy Exceptions**.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

59

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its Pre-Change Losses.

If an ownership change is triggered on the Effective Date, the Debtors may not be eligible for the 382(l)(5) Exception.  Alternatively, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

## C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims.

### 1.    In General.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

In general, the U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on (i) whether the surrendered Claim constitutes a "security" of VNR for U.S. federal income tax purposes and (ii) whether any of the Non-Cash Consideration received by a U.S. Holder constitutes "stock" or "securities" of VNR, a successor to VNR under section 381 of the Tax Code, or a "party to a reorganization" under section 368 of the Tax Code.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Holders should consult their own tax advisors regarding the status of their claims as securities.

For purposes of these rules, "nonqualified preferred stock" generally will not constitute "stock" or "securities" (unless issued in exchange for other nonqualified preferred stock, which is not relevant here).  Although not free from doubt, the Debtors and Reorganized Debtors intend to take the position that the New Preferred Stock does not constitute "nonqualified preferred stock" for the purposes of these rules because the total enterprise value of the Reorganized Debtors is expected to be insufficient, as of the Effective Date, to satisfy the liquidation preference with respect to the New Preferred Stock, and

accordingly, the New Preferred Stock arguably participates in corporate growth to a significant extent. The following discussion assumes this treatment applies. However, this position is subject to significant uncertainty and the IRS or a court could take an opposing view, in which case the tax consequences of the Plan could be different than discussed below.

In general, in a Taxable Transaction, the Non-Cash Consideration will not constitute "stock" or a "security" under these rules, because the issuer of such Non-Cash Consideration will be a newly-formed entity that will not be a party that is eligible to issue consideration to which recapitalization treatment could apply.

## 2. U.S. Federal Income Tax Consequences to U.S. Holders of Revolving Credit Facility Claims and Secured Swap Claims.

Pursuant to the Plan, except to the extent that a holder of an Allowed Class 3 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, such holder shall receive its Pro Rata share of (A) the Exit Term Loan B Facility; (B) New Preferred Equity Class A; and (C) New Common Stock.

If a U.S. Holder's Allowed Claim qualifies as a "security" of VNR and the Plan is consummated as a Recapitalization Transaction, then the holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a holder of such Claim should recognize gain, if any, but not loss, to the extent of any "other property" (within the meaning of Section 356(a)(1)(B) of the Tax Code) received, with the amount of gain equal to the lesser of (x) the fair market value of any "other property" received and (y) the difference between (1) the fair market value of the Non-Cash Consideration and (2) such holder's adjusted basis, if any, in such Claim. Such holder's tax basis in the Non-Cash Consideration, apart from amounts allocable to accrued but untaxed interest, should generally equal the holder's tax basis in its Allowed Claim surrendered therefor increased by gain, if any, recognized by such holder in the transaction, decreased by the fair market value of any "other property" (if any) received, with such basis allocated between the Non-Cash Consideration treated as "stock" or a "security" based upon respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for Non-Cash Consideration treated as "stock" or a "security" should include the holding period for the exchanged Claim. With respect to consideration treated as "other property" (if any), the holder's tax basis in such property should be equal to its fair market value and the holder's holding period should begin on the day following the receipt of such property.

To the extent that a U.S. Holder's Allowed Claim does not qualify as a "security" of VNR, or if the Plan is consummated as a Taxable Transaction, such holder of such Claim will be treated as exchanging such Claim in a taxable exchange under section 1001 of the Tax Code. Accordingly, subject to the rules regarding accrued but untaxed interest, each holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the Non-Cash Consideration and (2) such holder's adjusted basis, if any, in such Claim. Subject to the rules regarding accrued but untaxed interest, a holder's tax basis in the Non-Cash Consideration should equal the fair market value of such property as of the date such property is distributed to the holder. A holder's holding period for the Non-Cash Consideration should begin on the day following the date it receives such property.

The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the holder, and whether and to what extent the holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.

### 3. U.S. Federal Income Tax Consequences to U.S. Holders of Term Loan Claims.

Pursuant to the Plan, except to the extent that a holder of an Allowed Class 4 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, such holder shall receive its Pro Rata share of (A) either New Preferred Equity Class A or New Preferred Equity Class B and (B) New Common Stock.

If a U.S. Holder's Allowed Claim qualifies as a "security" of VNR and the Plan is consummated as a Recapitalization Transaction, then the holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, and assuming the treatment of the New Preferred Equity described above applies, a holder of such Claim should not recognize gain or loss as a result of the exchange. Such holder's tax basis in the Non-Cash Consideration, apart from amounts allocable to accrued but untaxed interest, should generally equal the holder's tax basis in its Allowed Claim surrendered therefor, with such basis allocated between the Non-Cash Consideration based upon respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for Non-Cash Consideration should include the holding period for the exchanged Claim.

To the extent that a U.S. Holder's Allowed Claim does not qualify as a "security" of VNR, or if the Plan is consummated as a Taxable Transaction, such holder of such Claim will be treated as exchanging such Claim in a taxable exchange under section 1001 of the Tax Code. Accordingly, subject to the rules regarding accrued but untaxed interest, each holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the Non-Cash Consideration and (2) such holder's adjusted basis, if any, in such Claim. Subject to the rules regarding accrued but untaxed interest, a holder's tax basis in the Non-Cash Consideration should equal the fair market value of such property as of the date such property is distributed to the holder. A holder's holding period for the Non-Cash Consideration should begin on the day following the date it receives such property.

The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the holder, and whether and to what extent the holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.

### 4. U.S. Federal Income Tax Consequences to U.S. Holders of Senior Notes Claims.

Pursuant to the Plan, except to the extent that a holder of an Allowed Class 5 Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, such holder shall receive its Pro Rata share of New Common Stock.

If a U.S. Holder's Allowed Claim qualifies as a "security" of VNR and the Plan is consummated as a Recapitalization Transaction, then the holder of such Claim should be treated as receiving its distribution under the Plan in a recapitalization. Subject to the rules regarding accrued but untaxed interest, a holder of such Claim should not recognize gain or loss as a result of the exchange. Such holder's tax basis in the Non-Cash Consideration, apart from amounts allocable to accrued but untaxed interest, should generally equal the holder's tax basis in its Allowed Claim surrendered therefor, with such basis allocated between the Non-Cash Consideration based upon respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for Non-Cash Consideration should include the holding period for the exchanged Claim.

To the extent that a U.S. Holder's Allowed Claim does not qualify as a "security" of VNR, or if the Plan is consummated as a Taxable Transaction, such holder of such Claim will be treated as exchanging such Claim in a taxable exchange under section 1001 of the Tax Code. Accordingly, subject to the rules regarding accrued but untaxed interest, each holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the Non-Cash Consideration and (2) such holder's adjusted basis, if any, in such Claim. Subject to the rules regarding accrued but untaxed interest, a holder's tax basis in the Non-Cash Consideration should equal the fair market value of such property as of the date such property is distributed to the holder. A holder's holding period for the Non-Cash Consideration should begin on the day following the date it receives such property.

The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the holder, and whether and to what extent the holder had previously claimed a bad debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange.

### 5. Accrued Interest.

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 6. Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original

issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.

### 7. Limitation on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Shares of New Common Stock and New Preferred Stock.

#### (a) Dividends on New Common Stock and New Preferred Stock.

Any distributions made on account of the New Common Stock or New Preferred Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized VNR as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction, subject to applicable restrictions, so long as there are sufficient earnings and profits.

(b)     **Accruing Yield and "PIK OID" with Respect to the New Preferred Stock**.

Under section 305 of the Tax Code, certain accruals of yield with respect to stock that is treated as preferred stock for the purposes of section 305 may be treated as dividends to the extent of Reorganized VNR's "earnings and profits." Additionally, if stock that is treated as preferred stock for purposes of section 305 is treated as having been issued with "preferred OID," typically, where preferred stock's fair market value at issuance is less than its redemption amount, such "preferred OID" will be required to be taken into account as dividends (to the extent of Reorganized VNR's "earnings and profits") over the life of such preferred stock.

Although not free from doubt, for the same reason that the Debtors do not believe the New Preferred Stock should be treated as "nonqualified preferred stock," the Debtors do not believe the New Preferred Stock should be treated as "preferred stock" for purposes of section 305 of the Tax Code. Accordingly, the Debtors do not believe U.S. Holders of the New Preferred Stock will be required to include yield accruals on a current basis or recognize "PIK OID." However, this position is subject to substantial uncertainty, and the IRS or a court could take a different position.

(c)     **Sale, Redemption, or Repurchase of New Common Stock and New Preferred Stock**.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock and New Preferred Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held its shares for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

(d)     **Owning and Disposing of Interests in Exit Term Loan B Facility**.

(i)     **Ownership, Interest, and OID on Exit Term Loan B Facility**.

Stated interest paid to a U.S. Holder with respect to the Exit Term Loan B Facility will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the Exit Term Loan B Facility received by U.S. Holders exceeds the "issue price" of the Exit Term Loan B Facility by an amount equal to or greater than a statutorily defined de minimis amount, the Exit Term Loan B Facility will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the Exit Term Loan B Facility is the total of all payments due on the Exit Facilities other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the Exit Term Loan B Facility multiplied by the number of complete years to maturity from their original issue date, or if the Exit Term Loan B Facility provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the Exit Term Loan B Facility is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Exit Term

Loan B Facility, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the Exit Term Loan B Facility that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the Exit Term Loan B Facility is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the Exit Term Loan B Facility, and a Pro Rata amount of such de minimis OID must be included in income as principal payments are received on the Exit Term Loan B Facility.

The issue price of the Exit Term Loan B Facility generally will depend on whether the Exit Term Loan B Facility, as applicable, or the Claims exchanged therefor, is considered, for U.S. federal income tax purposes to be traded on an established securities market.  In general, a debt instrument will be treated as traded on an established securities market if, at any time during the 31-day period ending 15 days after the issue date:  (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property, and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.  Whether the New Debt (or Claims exchanged therefor) should be considered "publicly traded" may not be known until after the Effective Date.

Under section 451 of the Tax Code (as described above), accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) generally would be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement.  The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. U.S. Holders are urged to consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and any Non-Cash Consideration.

     **(ii)**  **Sale, Redemption, or Repurchase of Interests in Exit Term Loan B Facility**.

Upon the sale, exchange or other taxable disposition of an interest in the Exit Term Loan B Facility, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in its interest in the Exit Term Loan B Facility.  A U.S. Holder's initial tax basis in its interest in the Exit Term Loan B Facility will be increased by any previously accrued OID and decreased by any payments on the Exit Term Loan B Facility other than qualified stated interest.  Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the Exit Term Loan B Facility has been held for more than one year at the time of its sale, exchange or other taxable disposition.  Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains.  The deductibility of capital losses is subject to limitations as discussed above.

   **D.**  **Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims**.

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax

considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  Each non-U.S. Holders should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the consideration.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.  **Gain Recognition**.

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.  **Accrued and/or Imputed Interest**.

Recoveries under the Plan to a non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of the Debtors;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Debtors (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder

(unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.  U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning Shares of New Common Stock and New Preferred Stock.

Any distributions made with respect to New Common Stock or New Preferred Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized VNR's current or accumulated earnings and profits as determined under U.S. federal income tax principles.

To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the holder's basis in its shares.  Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, as discussed below.

Except as described below, dividends paid with respect to New Common Stock or New Preferred Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

The discussion above regarding the treatment of the New Preferred Stock also applies to non-U.S. Holders.

Dividends paid with respect to New Common Stock or New Preferred Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

To the extent the FIRPTA rules (discussed below) are applicable to any Non-U.S. Holder (and subject to the rules discussed below regarding less-than-5-percent holders if the New Common Stock or New Preferred Stock is regularly traded on an established securities market), distributions that are taxable

68

as dividends will be subject to withholding, as described above.  However, distributions that are not taxable as dividends but, instead, are treated as a return of capital or gain will be subject to withholding on an amount of 15 percent of the gross amount of any such distribution.

### 4. Sale, Redemption, or Repurchase of New Common Stock and New Preferred Stock.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Common Stock and New Preferred Stock received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States);

- Reorganized Debtors are or have been, during a specified testing period, a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock or New Preferred Stock under FIRPTA and be required to file U.S. federal income tax returns.  Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock or New Preferred Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market.  It is currently undetermined whether either the New Common Stock or either series of New Preferred Stock will be regularly traded on an established securities market as of the Effective Date.

The Debtors expect that the Reorganized Debtors will constitute a USRPHC as of the Effective Date.  Non-U.S. Holders who may receive or acquire New Common Stock or New Preferred Stock in

connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Stock or New Preferred Stock.

### 5.  Payments and OID Accruals on Exit Term Loan B Facility.

Subject to the discussion below regarding "FATCA," payments of interest and OID accruals to a Non-U.S. Holder with respect to Exit Facilities generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Reorganized Debtors, and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 6.  Sale, Exchange or Other Disposition of Interests in Exit Facilities.

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of an interest in Exit Facilities (other than an amount representing accrued but untaxed interest (or OID) on the Exit Facilities, which is subject to the rules discussed above under "Payments on Exit Facilities") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a

properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 7.  FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and New Preferred Stock and U.S.-source interest (including OID) with respect to Exit Facilities).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Although FATCA withholding rules could apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends (including interests in Exit Facilities, New Common Stock and New Preferred Stock), proposed regulations indefinitely suspend such withholding requirements.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### E.  Information Reporting and Back-Up Withholding.

The Debtors, Reorganized Debtors, and any applicable withholding agent will withhold all amounts required by law to be withheld from any distributions made under the Plan and with respect to the Non-Cash Consideration received under the Plan.  The Debtors, Reorganized Debtors, and any applicable reporting agent will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan or on account of Non-Cash Consideration received under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan or on account of Non-Cash Consideration received under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF**

**CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.]**

[*Remainder of page intentionally left blank.*]

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 30, 2019                              VANGUARD NATURAL RESOURCES, INC.
                                                    on behalf of itself and all other Debtors


                                                    _/s/ R. Scott Sloan_
                                                    R. Scott Sloan
                                                    President and Chief Executive Officer
                                                    Vanguard Natural Resources, Inc.

73

## Exhibit A

**Plan of Reorganization**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VANGUARD NATURAL | ) | Case No. 19-31786 (DRJ) |
| RESOURCES, INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT PLAN OF REORGANIZATION**
**OF VANGUARD NATURAL RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

**BLANK ROME LLP**
James T. Grogan (TX Bar No. 24027354)
Philip M. Guffy (SDTX ID No. 3380372)
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone:     (713) 228-6601
Facsimile:     (713) 228-6605
Email:          jgrogan@blankrome.com
                    pguffy@blankrome.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:     (713) 836-3600
Facsimile:     (713) 836-3601
Email:          brian.schartz@kirkland.com

-and-

Christopher Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          christopher.marcus@kirkland.com
                    aparna.yenamandra@kirkland.com

Dated: April 30, 2019

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, Inc. (1494); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); and VNR Holdings, LLC (6371). The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
        GOVERNING LAW ........................................................................................................1
    A.      Defined Terms. ......................................................................................................1
    B.      Rules of Interpretation. ........................................................................................13
    C.      Computation of Time. ..........................................................................................13
    D.      Governing Law. ...................................................................................................13
    E.      Reference to Monetary Figures. ..........................................................................14
    F.      Reference to the Debtors or the Reorganized Debtors. .......................................14
    G.      Controlling Document. .........................................................................................14

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS ..................14
    A.      Administrative Claims. .........................................................................................14
    B.      Professional Fee Claims. ......................................................................................14
    C.      Priority Tax Claims. .............................................................................................15
    D.      DIP Facility Claims. .............................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................16
    A.      Classification of Claims and Interests. ................................................................16
    B.      Treatment of Claims and Interests. ......................................................................16
    C.      Special Provision Governing Unimpaired Claims. ..............................................20
    D.      Elimination of Vacant Classes. ............................................................................20
    E.      Voting Classes, Presumed Acceptance by Non-Voting Classes. ........................20
    F.      Intercompany Interests. ........................................................................................20
    G.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................21
    H.      Controversy Concerning Impairment. .................................................................21
    I.      Subordinated Claims. ...........................................................................................21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ....................................................................21
    A.      General Settlement of Claims and Interests. ........................................................21
    B.      Restructuring Transactions. ..................................................................................21
    C.      Reorganized Debtors. ...........................................................................................22
    D.      Sources of Consideration for Plan Distributions. ................................................22
    E.      Corporate Existence. ............................................................................................23
    F.      Vesting of Assets in the Reorganized Debtors. ...................................................23
    G.      Cancellation of Existing Securities and Agreements. ..........................................24
    H.      Corporate Action. .................................................................................................24
    I.      New Organizational Documents. .........................................................................25
    J.      Directors and Officers of the Reorganized Debtors. ...........................................25
    K.      Effectuating Documents; Further Transactions. ..................................................25
    L.      Certain Securities Law Matters. ..........................................................................25
    M.      Section 1146 Exemption. .....................................................................................26
    N.      Management Incentive Plan. .................................................................................26
    O.      Employee Matters. ...............................................................................................26
    P.      Preservation of Causes of Action. .......................................................................27

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................28
    A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ......28
    B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .........28
    C.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. .....29
    D.      Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. ...........29
    E.      Indemnification Provisions. .................................................................................30
    F.      Insurance Policies. ...............................................................................................30
    G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ......................30

i

H.  Reservation of Rights. ........................................................................................30
I.  Nonoccurrence of Effective Date. ......................................................................30
J.  Contracts and Leases Entered Into After the Petition Date. ...............................31

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .......................................................31
A.  Distributions on Account of Claims and Interests Allowed as of the Effective Date. ...31
B.  Disbursing Agent. ..............................................................................................31
C.  Rights and Powers of Disbursing Agent. ...........................................................31
D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........32
E.  Manner of Payment. ...........................................................................................32
F.  Compliance with Tax Requirements. ..................................................................32
G.  Allocations. ........................................................................................................33
H.  No Postpetition Interest on Claims. ....................................................................33
I.  Foreign Currency Exchange Rate. ......................................................................33
J.  Setoffs and Recoupment. ....................................................................................33
K.  Claims Paid or Payable by Third Parties. ...........................................................33

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
            DISPUTED CLAIMS ....................................................................................34
A.  Allowance of Claims. .........................................................................................34
B.  Claims Administration Responsibilities. .............................................................34
C.  Estimation of Claims. .........................................................................................35
D.  Adjustment to Claims or Interests without Objection. .........................................35
E.  Time to File Objections to Claims. .....................................................................35
F.  Disallowance of Claims or Interests. ..................................................................35
G.  No Distributions Pending Allowance. .................................................................36
H.  Distributions After Allowance. ...........................................................................36
I.  No Interest. .........................................................................................................36

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..............36
A.  Discharge of Claims and Termination of Interests. .............................................36
**B.  Release of Liens.** ...............................................................................................36
**C.  Releases by the Debtors.** ...................................................................................37
**D.  Releases by Holders of Claims and Interests.** ...................................................38
**E.  Exculpation.** ......................................................................................................38
**F.  Injunction.** ........................................................................................................39
G.  Protections Against Discriminatory Treatment. ..................................................39
H.  Document Retention. ..........................................................................................40
I.  Reimbursement or Contribution. ........................................................................40

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ......................40
A.  Conditions Precedent to the Effective Date. .......................................................40
B.  Waiver of Conditions. ........................................................................................41
C.  Effect of Failure of Conditions. .........................................................................41

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................42
A.  Modification and Amendments. ..........................................................................42
B.  Effect of Confirmation on Modifications. ...........................................................42
C.  Revocation or Withdrawal of Plan. .....................................................................42

ARTICLE XI. RETENTION OF JURISDICTION ........................................................................42

ARTICLE XII. MISCELLANEOUS PROVISIONS .....................................................................44
A.  Immediate Binding Effect. ..................................................................................44
B.  Additional Documents. .......................................................................................44
C.  Payment of Statutory Fees. .................................................................................44

KE 59129293

D.      Statutory Committee and Cessation of Fee and Expense Payment. ........................................45
E.      Reservation of Rights. ...................................................................................................................45
F.      Successors and Assigns. .................................................................................................................45
G.      Notices. ............................................................................................................................................45
H.      Term of Injunctions or Stays. .......................................................................................................47
I.      Entire Agreement. ..........................................................................................................................47
J.      Exhibits. ..........................................................................................................................................48
K.      Nonseverability of Plan Provisions. ............................................................................................48
L.      Votes Solicited in Good Faith. ......................................................................................................48
M.      Closing of Chapter 11 Cases. ........................................................................................................48
N.      Waiver or Estoppel. .......................................................................................................................48
O.      Conflicts. .........................................................................................................................................48

iii

**INTRODUCTION**

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS OR INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Ad Hoc Term Loan Lender Group*" means the holders of Term Loan Claims represented by Brown Rudnick LLP, Quinn Emanuel Urquhart & Sullivan, LLP, and Perella Weinberg Partners LP.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.    "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

4.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Agent/Trustee*" means, each of, and in each case in its capacity as such: (a) the DIP Agent; (b) the Credit Agreement Agent; (c) the Senior Notes Trustee; (d) the Exit Collateral Agent; (e) the Exit RBL/Term Loan A Facility Agent; and (f) the Exit Term Loan B Facility Agent.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claim Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such

Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claim Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

7. "*Amended Management Employment Agreement*" means (a) the existing management compensation plans, and/or indemnification agreements of, or for the benefit of, the directors, officers, and management level employees of any of the Debtors in existence on the Agreement Effective Date; and (b) the Existing Employment Agreements, in each case, as amended to include the following terms, as shall be set forth in the form of amended employment agreement to be filed with the Plan Supplement: (y) each employment agreement shall provide that the occurrence of the Effective Date constitutes a Change of Control (as defined therein) and (z) the definition of "Good Reason" as set forth in each employment agreement shall be amended to include termination by the respective employee of the employment agreement within the 30-day period commencing on the three (3) month anniversary of the Effective Date (upon 30 days' written notice to the Reorganized Debtors).

8. "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases that will be assumed by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement, as may be amended, modified, or supplemented from time to time with the consent of the Required Consenting Revolver Lenders, the Required Consenting Term Loan Lenders, and the DIP Agent (such consent not to be unreasonably withheld or delayed); *provided* that, for the avoidance of doubt, the Amended Management Employment Agreements shall be on the Assumed Executory Contract and Unexpired Lease List.

9. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532.

10. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

11. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

12. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

13. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

15. "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, liabilities, judgments, remedies, causes of action, controversies, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, interests, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, choate or inchoate, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, or equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law preferential or fraudulent transfer or similar claim.

16. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18.     "*Claims and Noticing Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

19.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

20.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

21.     "*Class 3 Common Stock Pool*" means, (a) if Class 5 votes to accept the Plan, 75 percent of the New Common Stock, or (b) if Class 5 votes to reject the Plan, 89 percent of the New Common Stock, in each case subject to dilution on account of the Management Incentive Plan (if any).

22.     "*Class 3 New Preferred Equity Class A Stock Pool*" means the New Preferred Equity Class A available for distribution to holders of Allowed Class 3 Claims in accordance with the New Preferred Equity Documentation; *provided* that if any holder of an Allowed Class 4 Claim elects the Class 4 Preferred A Option, then the New Preferred Equity Class A available for distribution to holders of Allowed Class 3 Claims shall be reduced on a Pro Rata basis on account of such election, in accordance with the Class 4 Preferred A Option; *provided* that, for the avoidance of doubt, in no event shall the holders of Allowed Class 3 Claims receive in the aggregate less than 86.1 percent of the New Preferred Equity Class A to be distributed.

23.     "*Class 4 Preferred A Option*" means the election available to each holder of an Allowed Class 4 Claim to receive, on account of such Allowed Class 4 Claim, its Pro Rata share of New Preferred Equity Class A Stock available to holders of Allowed Class 4 Claims in accordance with the New Preferred Equity Documentation; *provided* that the maximum amount of New Preferred Equity Class A Stock available to all holders of Allowed Class 4 Claims who elect such option shall not exceed in the aggregate 13.9 percent of the New Preferred Equity Class A to be distributed.

24.     "*Class 4 Preferred B Option*" means the election available to each holder of an Allowed Class 4 Claim to receive, on account of such Allowed Class 4 Claim, its Pro Rata share of New Preferred Equity Class B Stock in accordance with the New Preferred Equity Documentation.

25.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

26.     "*Company*" means VNR and each of its direct and indirect subsidiaries.

27.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A of the Plan having been (a) satisfied or (b) waived pursuant to Article IX.B of the Plan.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.     "*Consenting Lenders*" means, collectively, the Consenting Revolver Lenders and the Consenting Term Loan Lenders.

32.     "*Consenting Revolver Lender*" means each Revolving Credit Facility Lender (or certain designated affiliates thereof) that is or becomes party to the Plan Support Agreement.

33.     "*Consenting Senior Noteholder*" means each Senior Noteholder (or certain designated affiliates thereof) that is or becomes party to the Plan Support Agreement.

34.     "*Consenting Stakeholders*" means, collectively, the Consenting Lenders and the Consenting Senior Noteholders.

35.     "*Consenting Term Loan Lender*" means each Term Loan Lender (or certain designated affiliates thereof) that is or becomes party to the Plan Support Agreement, including the Ad Hoc Term Loan Lender Group.

36.     "*Consummation*" means the occurrence of the Effective Date.

37.     "*Credit Agreement*" means the Amended and Restated Credit Agreement, dated as of August 1, 2017, by and among VNG as borrower, the guarantor parties thereto, the Credit Agreement Agent, and the lenders from time to time party thereto (as amended, restated or otherwise modified from time to time).

38.     "*Credit Agreement Agent*" means Citibank, N.A., in its capacity as administrative agent pursuant to the Credit Agreement Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Credit Agreement.

39.     "*Credit Agreement Documentation*" means, collectively, the Credit Agreement, the Loan Documents (as defined in the Credit Agreement), the Secured Swap Agreements (as defined in the Credit Agreement), and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents). For the avoidance of doubt, "Credit Agreement Documents" shall include all documentation related to the Revolving Credit Facility and the Term Loan.

40.     "*Credit Agreement Secured Parties*" means the Credit Agreement Agent, the Revolving Credit Facility Lenders, the Swap Parties, the Term Loan Lenders, and any other party to whom obligations are owed by any Debtor under the Credit Agreement.

41.     "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

42.     "*Cure Notice*" means a notice to non-Debtor counterparties to Executory Contracts and/or Unexpired Leases that includes proposed Cure amounts.

43.     "*Debtors*" means, collectively, each of the following: Vanguard Natural Resources, Inc.; Eagle Rock Acquisition Partnership, L.P.; Eagle Rock Acquisition Partnership II, L.P.; Eagle Rock Energy Acquisition Co., Inc.; Eagle Rock Energy Acquisition Co. II, Inc.; Eagle Rock Upstream Development Company, Inc.; Eagle Rock Upstream Development Company II, Inc.; Escambia Asset Co. LLC; Escambia Operating Co. LLC; Vanguard Natural Gas, LLC; Vanguard Operating, LLC; and VNR Holdings, LLC.

44.     "*DIP Agent*" means Citibank, N.A., in its capacity as administrative and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

45.     "*DIP Credit Agreement*" means the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of April 3, 2019, by and among VNR, VNG, and the domestic subsidiaries thereof, the DIP Agent, and the DIP Lenders.

46.   "*DIP Facility*" means the senior secured superpriority, priming secured debtor-in-possession credit facility in an aggregate principal amount of $130 million, on the terms set forth in the DIP Credit Agreement and the DIP Order, as applicable.

47.   "*DIP Facility Claim*" means a Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Credit Agreement or the DIP Order, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement and including, for the avoidance of doubt, any amount owed under the Revolving Credit Facility prior to the entry of the DIP Order that was "rolled up" into the DIP Facility under the DIP Order and the other DIP Loan Documents.

48.   "*DIP Lenders*" means the lenders under the DIP Credit Agreement.

49.   "*DIP Loan Documents*" means the DIP Credit Agreement and all other Loan Documents (as defined in the DIP Credit Agreement).

50.   "*DIP Order*" means, collectively, (a) the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [Docket No. 118] and (b) the Final Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and access the DIP Facility, which shall be in form and substance acceptable to the DIP Secured Parties.

51.   "*DIP Secured Parties*" means the DIP Lenders, the DIP Agent, the Issuing Banks (as defined in the DIP Credit Agreement), and the other Secured Parties (as defined in the DIP Credit Agreement).

52.   "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the DIP Agent, in consultation with the Debtors and the Required Consenting Revolver Lenders, to make or facilitate distributions pursuant to the Plan.

53.   "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

54.   "*Disclosure Statement* Order" means the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for solicitation of the Disclosure Statement.

55.   "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, or as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

56.   "*Distribution Date*" means the first date the Disbursing Agent will make distributions pursuant to the Plan, which shall be the Effective Date, or as soon thereafter as reasonably practicable.

57.   "*Distribution Record Date*" means, other than with respect to publicly held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing.

58.   "*DTC*" means the Depository Trust Company.

59.   "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective

Date set forth in Article IX.A. of the Plan have been satisfied or waived in accordance with Article IX.B. of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

60.    "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, (including the Amended Management Employment Agreements) in each case in accordance with Article IV.O of the Plan.

61.    "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

62.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

63.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors and the Reorganized Debtors; (b) the Exit RBL/Term Loan A Facility Secured Parties; (c) the Exit Term Loan B Facility Secured Parties; (d) the DIP Secured Parties; (e) each Agent/Trustee; (f) the Consenting Stakeholders; (g) any statutory committee appointed in the Chapter 11 Cases and each of its members; (h) each current and former Affiliate of each Entity in clause (a) through (g); and (i) each Related Party of each Entity in clause (a) through (g).

64.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

65.    "*Existing Employment Agreement*" means each of the agreements in place as between the Company and each of the Chief Executive Officer, Chief Financial Officer, and General Counsel and Corporate Secretary as of the Petition Date.

66.    "*Exit Collateral Agent*" means Citibank, N.A. (or its designee), in its capacity as a collateral agent under and pursuant to the terms of the Exit Facility Documentation.

67.    "*Exit Facilities*" means, collectively, the Exit RBL/Term Loan A Facility and the Exit Term Loan B Facility.

68.    "*Exit Facility Agent*" means, collectively, the Exit RBL/Term Loan A Facility Agent, the Exit Term Loan Facility B Agent, and the Exit Collateral Agent.

69.    "*Exit Facility Documentation*" means the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility Documentation, and the applicable collateral agency agreements, collateral documents, mortgages, deeds of trust, Uniform Commercial Code statements, and other loan documents governing the Exit Facilities, which documents shall be included in the Plan Supplement, and which shall be consistent in all material respects with the Exit Facility Term Sheet.

70.    "*Exit Facility Loan Agreements*" means those certain loan agreements memorializing the Exit Facilities, which shall be entered into among one or more of the Debtors or the Reorganized Debtors (as applicable), certain affiliates thereof that are obligors under the Exit Facilities, certain Exit Facility Agents, and the lenders thereunder.

71.    "*Exit Facility Term Sheet*" means the term sheet attached as <u>Exhibit B</u> to the Plan Support Agreement.

72.    "*Exit RBL/Term Loan A Facility*" means the first lien reserve-based revolving credit facility with an initial borrowing base of $65 million, and the term loan facility in the aggregate amount of $65 million, each of which shall be on such terms as set forth in the Exit RBL/Term Loan A Facility Documentation.

73.    "*Exit RBL/Term Loan A Facility Agent*" means Citibank, N.A. (or any successor thereto), as administrative agent under the Exit RBL/Term Loan A Facility, solely in its capacity as such.

74. "*Exit RBL/Term Loan A Facility Documentation*" means, in connection with the Exit RBL/Term Loan A Facility, the applicable credit agreements, collateral documents, mortgages, deeds of trust Uniform Commercial Code statements, and other loan documents governing the Exit RBL/Term Loan A Facility, which documents shall be included in the Plan Supplement, and which shall be consistent in all material respects with the Exit Facility Term Sheet.

75. "*Exit RBL/Term Loan A Facility Secured Parties*" means (i) the lenders under the Exit RBL/Term Loan A Facility (including banks, financial institutions, institutional lenders, or other entities serving as agents, arrangers, book-runners, and/or letter of credit issuers thereto, each solely in their capacity as such), (ii) certain lenders or affiliates of such lenders that are party to secured swap agreements with one or more of the Debtors or the Reorganized Debtors (as applicable), and (iii) certain lenders or affiliates of such lenders that are party to treasury management agreements with one or more of the Debtors or the Reorganized Debtors (as applicable).

76. "*Exit Term Loan B Facility*" means the new term loan lending facility in the aggregate amount of $285 million, which shall be on such terms as set forth in the Exit Term Loan B Facility Documentation.

77. "*Exit Term Loan B Facility Agent*" means Citibank, N.A. (or any successor thereto), as administrative agent under the Exit Term Loan B Facility, solely in its capacity as such.

78. "*Exit Term Loan B Facility Documentation*" means, in connection with the Exit Term Loan B Facility, the applicable credit agreements, collateral documents, mortgages, deeds of trust, Uniform Commercial Code statements, and other loan documents governing the Exit Term Loan B Facility, which documents shall be included in the Plan Supplement, and which shall be consistent in all material respects with the Exit Facility Term Sheet.

79. "*Exit Term Loan B Facility Secured Parties*" means the lenders under the Exit Term Loan B Facility, including banks, financial institutions, institutional lenders, or other entities serving as agents, arrangers, book-runners, and/or letter of credit issuers thereto, each solely in their capacity as such.

80. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

81. "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

82. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

83. "*General Unsecured Claim*" means any Claim, other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) a Priority Tax Claim, (c) an Other Priority Claim, or (d) an Intercompany Claim.

84. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

85. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

86. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

87. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

88. "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor.

89. "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

90. "*Interest*" means any Equity Security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

91. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

92. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

93. "*Management Incentive Plan*" means that certain post-Effective Date management incentive plan (if any), which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Required Consenting Revolver Lenders and the DIP Agent.

94. "*New Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Vanguard.

95. "*New Common Stoc*k" means common stock of Reorganized Vanguard.

96. "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, the Shareholders Agreement, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with the Plan Support Agreement (and subject to the consent, approval, and consultation rights set forth therein) and section 1123(a)(6) of the Bankruptcy Code (as applicable).

97. "*New Preferred Equity Class A Stock*" means the new series of class A convertible preferred stock to be issued by Reorganized Vanguard on the Effective Date on terms consistent in all material respects with the terms set forth in the New Preferred Equity Term Sheet and the New Preferred Equity Documentation.

98. "*New Preferred Equity Class B Stock*" means the new series of class B convertible preferred stock to be issued by Reorganized Vanguard on the Effective Date on terms consistent in all material respects with the terms set forth in the New Preferred Equity Term Sheet and the New Preferred Equity Documentation.

99. "*New Preferred Equity Documentation*" means, in connection with the New Preferred Equity Class A Stock and New Preferred Equity Class B Stock, the applicable documents, to be dated as of the Effective Date, governing such equity, which documents shall (a) be included in the Plan Supplement; (b) shall be in form and substance reasonably acceptable to the Required Consenting Term Loan Lender Group and the Required Ad Hoc Term Loan Lender Group; and (c) shall be otherwise consistent in all material respects with the New Preferred Equity Term Sheet; *provided* that, for the avoidance of doubt, all of the directors for the initial term of the New Board shall be nominated by the Exit RBL/Term Loan A Facility Agent in consultation with the Entities designated to receive the New Preferred Equity Class A Stock on the Effective Date.

100. "*New Preferred Equity Term Sheet*" means the term sheet attached as <u>Exhibit C</u> to the Plan Support Agreement.

101. "*New Preferred Stock*" means, collectively, the New Preferred Equity Class A Stock and the New Preferred Equity Class B Stock.

102.   "*Non-Executive Incentive Fund*" shall mean the fund, in an amount to be determined (which amount shall be reasonably acceptable to the Debtors, the Required Consenting Revolver Lenders, the Required Ad Hoc Term Loan Lender Group, and the Required Consenting Term Loan Lenders), to be established after the Effective Date by the Reorganized Debtors, the proceeds of which shall be distributed to non-executive employees after the Effective Date in furtherance of the Reorganized Debtors' business plan, and on such other terms and conditions to be set forth in the Plan Supplement.

103.   "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

104.   "*Other Secured Claim*" means any Secured Claim, other than a DIP Facility Claim, a Revolving Credit Facility Claim, a Secured Swap Claim, a Term Loan Claim, or a Senior Notes Claim, including any Secured Tax Claim or any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

105.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

106.   "*Petition Date*" means March 31, 2019, the date on which the Debtors commenced the Chapter 11 Cases.

107.   "*Plan*" means this *Joint Plan of Reorganization of Vanguard Natural Resources, Inc. and its Debtor Affiliates*, including the Plan Supplement, which is incorporated herein by reference.

108.   "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five (5) days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the New Organizational Documents; (b) the Exit Facility Documentation; (c) the New Preferred Equity Documentation; (d) the form of Amended Management Employment Agreements contemplated to be assumed pursuant to the Plan; (e) the identity and members of the New Board and any executive management for Reorganized Vanguard; (f) the Assumed Executory Contract and Unexpired Lease List; (g) the Rejected Executory Contract and Unexpired Lease List; (h) Schedule of Retained Causes of Action; (i) the form of Management Incentive Plan (if any); (j) the Restructuring Transactions Memorandum, if applicable, and (k) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan and the Plan Support Agreement.

109.   "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of [●], by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

110.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

111.   "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

112.   "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

113.   "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B of the Plan.

114.   "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

115.   "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

116.   "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date.

117.   "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

118.   "*Rejected Executory Contract and Unexpired Lease List*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, with the consent of the Required Consenting Revolver Lenders, the Required Consenting Term Loan Lenders, and the DIP Agent (such consent not to be unreasonably withheld or delayed); *provided* that, for the avoidance of doubt, the Amended Management Employment Agreements shall not be on the Rejected Executory Contract and Unexpired Lease List.

119.   "*Related Party*" means, collectively, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

120.   "*Released Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each DIP Secured Party; (e) each Exit RBL/Term Loan A Facility Secured Party; (f) each Exit Term Loan B Facility Secured Party; (g) each Agent/Trustee; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through (h); and (j) each Related Party of each Entity in clause (a) through (h); *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Released Party."

121.   "*Releasing Party*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each Credit Agreement Secured Party; (e) each DIP Secured Party; (f) each Senior Noteholder; (g) each Exit RBL/Term Loan A Facility Secured Party; (h) each Exit Term Loan B Facility Secured Party; (i) each Agent/Trustee; (j) all Holders of Claims; (k) all Holders of Interests; (l) each current and former Affiliate of each Entity in clause (a) through (j); and (m) each Related Party of each Entity in clause (a) through (j); *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan or (y) files an objection to the releases contained in the Plan shall not be a "Releasing Party."

122.   "*Reorganized Debtors*" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

123.   "*Reorganized Vanguard*" means, on or after the Effective Date, (a) VNR (which may change its name from "Vanguard Natural Resources, Inc." or jurisdiction of incorporation from Delaware to a name or jurisdiction of incorporation, respectively, that shall be set forth in the Plan Supplement) or, if applicable, (b) any (i) successor or assign, by merger, consolidation, or otherwise (including any newly established corporation, partnership, or limited

liability company) or (ii) other Reorganized Debtor designated to issue the New Common Stock or the New Preferred Stock, as applicable.

124.    "*Required Ad Hoc Term Loan Lender Group*" means, as of the relevant date, members of the Ad Hoc Term Loan Lender Group holding more than 45 percent of the aggregate outstanding principal amount of the Term Loan Claims that are held by the Ad Hoc Term Loan Lender Group.

125.    "*Required Consenting Revolver Lenders*" means, as of the relevant date, Consenting Revolver Lenders holding more than 50 percent of the aggregate outstanding principal amount of the Revolving Credit Facility that is held by Consenting Revolver Lenders.

126.    "*Required Consenting Term Loan Lenders*" means, as of the relevant date, Consenting Term Loan Lenders holding more than 50 percent of the aggregate outstanding principal amount of the Term Loan that is held by Consenting Term Loan Lenders.

127.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

128.    "*Restructuring Transactions Memorandum*" means a document, in form and substance reasonably acceptable to the Required Consenting Revolver Lenders and the Required Ad Hoc Term Loan Lender Group, that may be included in the Plan Supplement that will, if applicable, set forth certain components of the Restructuring Transactions, including the identity of Reorganized Vanguard.

129.    "*Revolving Credit Facility*" means the senior secured reserve-based revolving credit facility outstanding under the Credit Agreement.

130.    "*Revolving Credit Facility Claim*" means a Claim arising under, derived from, or based upon the Revolving Credit Facility; *provided* that, for the avoidance of doubt, any amount owed under the Revolving Credit Facility prior to the entry of the DIP Order that was "rolled up" into the DIP Facility under the DIP Order and the other DIP Loan Documents shall not constitute a Revolving Credit Facility Claim.

131.    "*Revolving Credit Facility Lender*" means each lender under the Revolving Credit Facility.

132.    "*Revolving Credit Facility Loan*" means the revolving loans issued under and on the terms set forth in the Credit Agreement.

133.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred by the Debtors, in consultation with the DIP Agent, pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

134.    "*Schedules*" means, collectively, the schedules of assets and liabilities and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as they may be amended, modified, or supplemented from time to time.

135.    "*Section 510(b) Claim*" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

136.    "*Secured Claim*" means a Claim secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

137.    "*Secured Swap Claim*" means, with respect to each Swap Party, individually, or all Swap Parties, collectively, as applicable, all Claims arising under or related to the Debtors' prepetition swap transactions entered

into between any Debtor and such Swap Party that are secured by the Credit Agreement Documentation, including all liabilities and obligations outstanding as of the Petition Date and all claims arising out of any termination of such transactions.

138.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

139.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law.

140.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

141.    "*Senior Noteholder*" means the holders or investment advisors or managers of discretionary accounts that hold Senior Note Claims.

142.    "*Senior Notes*" means the 9.0% senior secured second lien notes due 2024, issued pursuant to the Senior Notes Indenture.

143.    "*Senior Notes Claim*" means any Claim arising under the Senior Notes.

144.    "*Senior Notes Documentation*" means collectively, the Senior Notes Indenture and all other agreements, documents, and instruments delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

145.    "*Senior Notes Indenture*" means that certain Indenture dated August 1, 2017 (as amended, restated, modified or supplemented from time to time), by and among VNR as issuer, the guarantor parties thereto or in related transaction documentation, and the Senior Notes Trustee.

146.    "*Senior Notes Trustee*" means Delaware Trust Company, in its capacity as trustee and collateral trustee under the Senior Notes Indenture, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Senior Notes Indenture.

147.    "*Shareholders Agreement*" means the shareholders' agreement, partnership agreement, or limited liability company agreement, as applicable, of Reorganized Vanguard with respect to the New Common Stock issued on the Effective Date, which shall include reasonable protections for minority holders of New Common Stock and which shall be in form and substance reasonably acceptable to the Required Consenting Revolver Lenders and the Required Ad Hoc Term Loan Lender Group.

148.    "*Swap Party*" means each Secured Swap Provider (as defined in the Credit Agreement) that is a holder of an Allowed Secured Swap Claim.

149.    "*Term Loan*" means the term loans issued and on the terms set forth under the Credit Agreement.

150.    "*Term Loan Claim*" means a Claim arising under, derived from, or based upon the Term Loan.

151.    "*Term Loan Lender*" means each lender under the Term Loan.

152.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

153.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

154.    "*VNG*" means Vanguard Natural Gas, LLC.

155. "*VNR*" means Vanguard Natural Resources, Inc.

156. "*Voting Deadline*" means [June 21], 2019 at 5:00 p.m., prevailing Central Time.

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (9) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided that* corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document.*

In the event of an inconsistency between the Plan, and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *Professional Fee Claims.*

1.    <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice, an opportunity to object, and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows by Final Order, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.    <u>Professional Fee Escrow Account.</u>

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  No liens, claims, or Interests shall encumber the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors; *provided* that, prior to the Effective Date, the Estates and, upon the Effective Date, the Reorganized Debtors, shall have a reversionary interest in the excess amount, if any, remaining in the Professional Fee Escrow Account after all such Allowed amounts owing to the Professionals have been paid in full.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed *provided* that obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited to the balance of funds held in the Professional Fee Escrow Account.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court and shall be subject to the Liens securing the Exit Facilities, without any further action by the lenders thereunder or order of the Bankruptcy Court.

3.    <u>Professional Fee Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than fifteen (15) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.    <u>Post-Confirmation Fees and Expenses.</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Code.

C.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *DIP Facility Claims.*

As of the Effective Date, the DIP Facility Claims shall be Allowed Claims in the full amount outstanding under the DIP Loan Documents, including principal, interest, fees, and expenses.

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim (subject to the last sentence of this Article II.D), each holder of an Allowed DIP Facility Claim shall receive its Pro Rata share of participation in the Exit RBL/Term Loan A Facility and all commitments under the DIP Credit Agreement shall terminate.  Upon the indefeasible payment or satisfaction in full of the DIP Facility Claims in

accordance with the terms of this Article II.D, on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving Credit Facility Claims and Secured Swap Claims | Impaired | Entitled to Vote |
| Class 4 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 5 | Senior Notes Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | [TBD] | [TBD] |
| Class 7 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of

an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1. <u>Class 1 - Other Secured Claims</u>

   (a)   *Classification*:  Class 1 consists of any Other Secured Claims against any Debtor.

   (b)   *Treatment*:  Each holder of an Allowed Class 1 Claim shall receive, at the option of the applicable Debtor, with the consent of the Required Consenting Revolver Lenders and the DIP Agent:

      (i)     payment in full in Cash of its Allowed Class 1 Claim;

      (ii)    the collateral securing its Allowed Class 1 Claim;

      (iii)   Reinstatement of its Allowed Class 1 Claim; or

      (iv)   such other treatment rendering its Allowed Class 1 Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)   *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 - Other Priority Claims</u>

   (a)   *Classification*:  Class 2 consists of any Other Priority Claims against any Debtor.

   (b)   *Treatment*:  Each holder of an Allowed Class 2 Claim shall receive Cash in an amount equal to such Allowed Class 2 Claim on the later of (i) the Effective Date or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction, contract, or other agreement giving rise to such allowed Class 2 Claim.

   (c)   *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3. <u>Class 3 – Revolving Credit Facility Claims & Secured Swap Claims</u>

    (a)    *Classification*: Class 3 consists of all Revolving Credit Facility Claims and the Secured Swap Claims.

    (b)    *Allowance*: On the Effective Date, Class 3 Claims shall be Allowed in an aggregate amount equal to $[●].

    (c)    *Treatment*: Each holder of an Allowed Class 3 Claim shall receive a Pro Rata share of and interest in:

        (i)     the Exit Term Loan B Facility;

        (ii)    the Class 3 New Preferred Equity Class A Stock Pool; and

        (iii)    the Class 3 Common Stock Pool.

    (d)    *Voting*: Class 3 is Impaired under the Plan. Therefore, holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – Term Loan Claims</u>

    (a)    *Classification:* Class 4 consists of all Term Loan Claims against any Debtor.

    (b)    *Allowance*: On the Effective Date, Class 4 Claims shall be Allowed in an aggregate amount equal to $[126,000,000.00].

    (c)    *Treatment:* Each holder of an Allowed Class 4 Claim shall receive a Pro Rata share and interest in:

        (i)     at the option of each holder of an Allowed Class 4 Claim, either: (x) the Class 4 Preferred A Option or (y) the Class 4 Preferred B Option; and

        (ii)    10 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any).

    (d)    *Voting:* Class 4 is Impaired under the Plan. Therefore, holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Senior Notes Claims</u>

    (a)    *Classification:* Class 5 consists of all Senior Notes Claims against any Debtor.

    (b)    *Allowance*: On the Effective Date, Class 5 Claims shall be Allowed in an aggregate amount equal to $[82,000,000.00].

    (c)    *Treatment:* Each holder of an Allowed Class 4 Claim shall receive a Pro Rata share and interest in:

        (i)     if Class 5 votes to accept the Plan, 15 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any); or

        (ii)    if Class 5 votes to reject the Plan, 1 percent of the New Common Stock, subject to dilution on account of the Management Incentive Plan (if any).

(d)      *Voting:* Class 5 is Impaired under the Plan.  Therefore, holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.   <u>Class 6 – General Unsecured Claims</u>

(a)      *Classification:*  Class 6 consists of all General Unsecured Claims against any Debtor.

(b)      *Treatment:*  [To the extent such claim has not already been paid in full during the Chapter 11 Cases, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each allowed General Unsecured Claim, on the Effective Date each holder thereof will receive such treatment as is acceptable to the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent and in accordance with the Bankruptcy Code, to be determined prior to the hearing to consider approval of the Disclosure Statement].

(c)      *Voting:*  [TBD].

7.   <u>Class 7 – Intercompany Claims</u>

(a)      *Classification:*  Class 7 consists of all Intercompany Claims.

(b)      *Treatment:*  Class 7 Claim shall be, at the option of the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent, either reinstated, canceled and released without any distribution, or otherwise addressed at such parties' discretion.

(c)      *Voting:*  Class 7 is Impaired or Unimpaired under the Plan.  Holders of Class 7 Claims are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

8.   <u>Class 8 – Intercompany Interests</u>

(a)      *Classification:*  Class 8 consists of all Intercompany Interests.

(b)      *Treatment:*  Class 8 Interests shall be, at the option of the Debtors, the Required Consenting Revolver Lenders, and the DIP Agent, either reinstated, canceled and released without any distribution, or otherwise addressed at such parties' discretion.

(c)      *Voting:*  Class 8 is Impaired or Unimpaired under the Plan.  Holders of Class 8 Interests are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

9. Class 9 – Existing Equity Interests

    (a)    *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*:  Each Class 9 Interest will be canceled, released, and extinguished, and will be of no further force or effect.  Each holder of an Interest will not receive any distribution on account of such Interest.

    (c)    *Voting*:  Class 9 is Impaired.  Holders of Class 9 Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders Class 9 Claims are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

    (a)    *Classification:* Class 10 consists of all Section 510(b) Claims.

    (b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

    (c)    *Treatment:* Class 10 Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such claims.

    (d)    *Voting:* Class 10 is Impaired.  Holders (if any) of Allowed Class 10 Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders (if any) of Allowed Class 10 Claims are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be

owned by the applicable Reorganized Debtor, unless otherwise specified in the Restructuring Transactions Memorandum.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Facility Claims, the Revolving Credit Facility Claims, the Secured Swap Claims, the Term Loan Claims[, or the Senior Notes Claims], as applicable, and (2) any claim to avoid, subordinate, or disallow any DIP Facility Claim, Revolving Credit Facility Claim, Secured Swap Claim, Term Loan Claim[, or Senior Notes Claim], whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    *Restructuring Transactions.*

On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, to the extent set forth in the Restructuring Transactions Memorandum, if applicable, the applicable Debtors or the Reorganized Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to

effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan and the Restructuring Transactions Memorandum, if applicable, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

D.      *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations; (2) the Exit Facilities; and (3) the issuance and distribution of the New Preferred Stock and the New Common Stock.

1.      Issuance of New Preferred Stock and New Common Stock.

On the Effective Date, Reorganized Vanguard shall issue the New Preferred Stock and the New Common Stock pursuant to the Plan and the New Preferred Equity Documentation, as applicable. The issuance of the New Common Stock, including any options, or other equity awards, if any, reserved for the Management Incentive Plan (if any), by Reorganized Vanguard shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. Reorganized Vanguard shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New Preferred Stock and the New Common Stock is denominated) of the New Preferred Stock and the New Common Stock required to be issued under the Plan and pursuant to its New Organizational Documents. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares, units or equity interests (as the case may be based on how the New Preferred Stock and the New Common Stock is denominated) of the New Preferred Stock and the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.   Exit Facilities.

The Reorganized Debtors shall enter into the Exit Facilities on the Effective Date, on terms set forth in the Exit Facility Documentation.  The terms of the Exit Facilities shall be consistent with the Exit Facility Term Sheet and Exit Facility Documentation, as applicable.

Entry of the Confirmation Order shall be deemed approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facility Documentation, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Facility Claims in accordance with Article II.D of the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documentation (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documentation, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documentation, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood, however, that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.     Corporate Existence.

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, in each case to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

F.     Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring Transactions) or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan (including, for the avoidance of doubt, the Exit Facility Documentation) or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Securities and Agreements.*

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Facility Claims in accordance with **Error! Reference source not found.** of the Plan, except to the extent otherwise provided in the Plan Support Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, the Debtors' obligations under all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of, or parties to, such instruments, securities, and other documentation will have no rights against the Debtors arising from or relating to such instruments, securities, and other documentation, except the rights provided for pursuant to this Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI, the DIP Loan Documents, the Credit Agreement Documentation, and the Senior Notes Documentation shall continue in effect solely to the extent necessary to: (1) permit holders of Claims under DIP Loan Documents, the Credit Agreement Documentation, and the Senior Notes Documentation to receive distributions under the Plan, as applicable; (2) permit the Debtors, the Reorganized Debtors, the DIP Agent, the Credit Agreement Agent, and the Senior Notes Trustee to make distributions on account of the Allowed Claims under the DIP Loan Documents, the Credit Agreement Documentation, and the Senior Notes Documentation and on account of the Secured Swap Claims, as applicable; (3) preserve any rights of the DIP Agent, the Credit Agreement Agent, the Senior Notes Trustee (or any respective predecessor or successor thereof), or the Swap Parties as against any money or property distributable to holders of DIP Facility Claims, Revolving Credit Facility Claims, Secured Swap Claims, Term Loan Claims, or Senior Notes Claims, respectively, including any priority in respect of payment of fees, expenses, or indemnification and the right to exercise any charging lien. Except as provided in this Plan (including Article VI of this Plan), on the Effective Date, the DIP Agent, the Credit Agreement Agent, and the Senior Notes Trustee, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the Credit Agreement Documentation, and the Senior Notes Documentation, as applicable. The commitments and obligations (if any) of the DIP Secured Parties, the Credit Agreement Secured Parties, and/or the Senior Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Loan Documents, the Credit Agreement Documentation, and the Senior Notes Documentation, as applicable, shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision in a DIP Loan Document, the DIP Order, or the Credit Agreement Documentation is of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Facility Claims, the Revolving Credit Facility Claims, the Term Loan Claims, or the Secured Swap Claims.

H.      *Corporate Action.*

On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, to the extent set forth in the Restructuring Transactions Memorandum, if applicable, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors and officers for the Reorganized Debtors; (3) the distribution of the New Preferred Stock and the New Common Stock; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documentation; (6) adoption of the New Organizational Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (8) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Preferred Stock, the New Common Stock, the New Organizational Documents, the Exit Facility Documentation (as applicable), and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *New Organizational Documents.*

On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, to the extent set forth in the Restructuring Transactions Memorandum, if applicable, the organizational documents of each of the Debtors shall be amended, amended and restated, or replaced as may be necessary to effectuate the transactions contemplated or permitted by the Plan.  On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, to the extent set forth in the Restructuring Transactions Memorandum, if applicable, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of incorporation if and to the extent required in accordance with the corporate laws of the respective state or country of incorporation.  The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement.  After the Effective Date, the Reorganized Debtors may amend and restate New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

J.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be nominated by the Exit RBL/Term Loan A Facility Agent in consultation with the Entities designated to receive the New Preferred Equity Class A Stock on the Effective Date.  The New Board shall initially consist of [●] members.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents of the Reorganized Debtors.  The members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

K.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Certain Securities Law Matters.*

1.      The offering, issuance, and distribution of the New Preferred Stock, and the New Common Stock, as contemplated by Article IV.D of this Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code.  Such New Preferred Stock and New Common Stock will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

2.      If the ownership of the New Preferred Stock or the New Common Stock is reflected through the facilities of DTC, neither the Debtors, the Reorganized Debtors, nor any other Person shall be required to provide any

further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Preferred Stock and the New Common Stock under applicable securities laws.

       3.     DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Preferred Stock and the New Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

       4.     Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Preferred Stock and the New Common Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

*M.*     *Section 1146 Exemption.*

       Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities, as applicable; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.*     *Management Incentive Plan.*

       On the Effective Date, the Reorganized Debtors, in consultation with the Required Consenting Revolver Lenders and the Required Ad Hoc Term Loan Lender Group, may implement the Management Incentive Plan (if any), which shall be Filed with the Plan Supplement.

*O.*     *Employee Matters.*

       Except with respect to the Amended Management Employment Agreements, which shall be treated as set forth in Article IV.O1. herein, on the Effective Date, the Debtors shall have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees) that are set forth in the Assumed Executory Contract and Unexpired Lease List. Except to the extent provided by Article VIII of the Plan, nothing in the Plan shall limit,

diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such employment agreements.

1. <u>Amendment of Employment Agreements</u>.

On the Effective Date, the Reorganized Debtors shall assume the Amended Management Employment Agreements.

2. <u>Non-Executive Incentive Fund</u>.

On the Effective Date, Reorganized Vanguard shall fund the Non-Executive Incentive Fund, the proceeds of which shall be allocated by the New Board in its discretion to non-management employees of Reorganized Vanguard.

3. <u>Retiree Matters</u>.

Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.      *Preservation of Causes of Action.*

1.      In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, which, for the avoidance of doubt, shall become property of the Reorganized Debtors, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

2.      The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

3.      The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action

and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

The Debtors shall file the Assumed Executory Contract and Unexpired Lease List and the Rejected Executory Contract and Unexpired Lease List as part of the Plan Supplement.  On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (1) are identified on the Assumed Executory Contract and Unexpired Lease List; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (4)  are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (5) is a contract, instrument, release, or other agreement or document entered into in connection with the Plan or the Restructuring Transactions.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, or the Rejected Executory Contract and Unexpired Lease List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List and the Rejected Executory Contract and Unexpired Lease List, subject to, in each case, the consent of the Required Consenting Revolver Lenders, the Required Consenting Term Loan Lenders, and the DIP Agent (such consent not to be unreasonably withheld or delayed), at any time up to sixty (60) days after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 hereof.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide Cure Notices to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.

On the Effective Date, the Debtors or the Reorganized Debtors shall fund an escrow, in consultation with the DIP Agent, the Consenting Revolver Lenders, and the Ad Hoc Term Loan Lender Group, with the Cure amounts listed on the Cure Notices (or such amount otherwise agreed to by the Debtors or the Reorganized Debtors and the applicable counterparty to an Executory Contract or Unexpired Lease) for each Executory Contract and Unexpired Lease included on the Assumed Executory Contract and Unexpired Lease List.  Subject to the subsequent paragraph, the Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, within ninety (90) days of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before the later of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after the applicable Executory Contract or Unexpired Lease is added to the Assumed Executory Contract and Unexpired Lease List.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Indemnification Provisions.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date.

The Debtors shall maintain tail coverage under any directors' and officers' insurance policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the directors' and officers' existing insurance policies. In addition to such tail coverage, the directors' and officers' insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases.

The Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement such directors' and officers' insurance policies as the Debtors deem necessary, including purchasing any tail coverage.

F.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

H.    *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*J.*      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.*      *Distributions on Account of Claims and Interests Allowed as of the Effective Date.*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims and Interests; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in accordance with Article II.A, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.6 of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.  A Distribution Date shall occur no less frequently than once in every thirty (30) day period after the Effective Date, as necessary, in the Reorganized Debtors' sole discretion.

*B.*      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

*C.*      *Rights and Powers of Disbursing Agent.*

    1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.   Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided, further*, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder.

3.    Minimum Distributions.

[No fractional shares of New Preferred Stock or New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Preferred Stock or New Common Stock that is not a whole number, the actual distribution of shares of New Preferred Stock or New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Preferred Stock or New Common Stock to be distributed to holders of Allowed Claims and Allowed Interests (as applicable) shall be adjusted as necessary to account for the foregoing rounding.]

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

E.    *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other

mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

I.    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

J.    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.  In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties.</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

    2.   <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    3.   <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.*    *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

*B.*    *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.P of the Plan.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court.  All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

C.      *Estimation of Claims.*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the later of (a) one-hundred-eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by a Final Order of the Bankruptcy Court for objecting to such claims.

F.      *Disallowance of Claims or Interests.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  All Proofs of Claim Filed on account of an Indemnification Provision shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Provision is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of a Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not [accrue or] be paid on Claims[, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right].  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documentation, the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors (with the consent of the Required Consenting Revolver Lenders and the DIP Agent) elect to reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security**

interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such mortgage, deed of trust, Lien, pledge, or other security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, or other security interests.

### C.     *Releases by the Debtors.*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their Related Parties, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or Cause of Action against, or interest in, a Debtor or other Entity (or that any holder of any claim, interest, or Cause of Action could have asserted on behalf of the Debtors), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, or filing of the Plan Support Agreement, the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C by the Debtors, the Reorganized Debtors, and their Estates, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange

for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Causes of Action; (2) in the best interest of the Debtors, the Reorganized Debtors, and their Estates and all holders of Interests and Causes of Action; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) subject to the terms and provisions herein, a bar to the Debtors, the Reorganized Debtors, and their Estates asserting any Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their assets and property.

D.     *Releases by Holders of Claims and Interests.*

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly set forth in this Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby confirmed, each Released Party and its respective assets and property are, and are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Debtor, Reorganized Debtor, the Debtors' Estates and each Releasing Party, in each case on behalf of themselves and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, execution, or filing of the Plan Support Agreement, the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document relating to any of the foregoing, created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, the business or contractual arrangements between any Debtor and any Released Party, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation or any Claim or obligation arising under the Plan.  For the avoidance of doubt, nothing in this Plan shall be deemed to be, or construed as, a release, waiver, or discharge of any of the Indemnification Provisions.

E.     *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing or termination of the Plan Support Agreement and related transactions, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Exit RBL/Term Loan A Facility, the Exit RBL/Term Loan A Facility Documentation, the Exit Term Loan B Facility, the Exit Term Loan B Facility Documentation, the New Preferred Equity Documentation, the DIP Facility, the DIP Credit Agreement, the DIP Loan Documents, the Credit Agreement, the Credit Agreement Documentation, the Revolving Credit Facility, the Term Loan, the Senior Notes Indenture, the Senior Notes,

or any Restructuring Transaction, contract, instrument, release or other agreement or document relating to the foregoing created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Chapter 11 Cases (including the filing thereof), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan (including the New Preferred Stock and the New Common Stock), or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted bad faith, gross negligence, actual fraud, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not operate to waive or release the rights of any Entity to enforce this Plan, the Plan Support Agreement, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit RBL/Term Loan A Facility Documentation and the Exit Term Loan B Facility Documentation or any claim or obligation arising under the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

        Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Causes of Action, or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests; (4) asserting any right of setoff, subrogation, recoupment, or other similar legal or equitable right of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, Causes of Action, or interests unless such holder has Filed a motion requesting the right to perform such legal or equitable right on or before the Effective Date, and notwithstanding an indication of a claim, Cause of Action, or interest or otherwise that such holder asserts, has, or intends to preserve any such right pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action, or interests released or settled pursuant to the Plan.

        Upon entry of the Confirmation Order, all holders of Claims and Interests and their Related Parties shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

G.      *Protections Against Discriminatory Treatment.*

        Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the

Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Plan Support Agreement shall not have been terminated as to all the Consenting Stakeholders and remains in full force and effect as to the Consenting Stakeholders that remain party thereto;

2.      the Plan, the Confirmation Order, the Disclosure Statement, and the Disclosure Statement Order must be, in form and substance, reasonably acceptable to the Required Consenting Revolver Lenders, the Exit Facility Agent, and the Required Ad Hoc Term Loan Lender Group;

3.      the Plan, the Confirmation Order, the Disclosure Statement, and the Disclosure Statement Order must be, in form and substance, acceptable to the DIP Secured Parties;

4.      all documents necessary to consummate this Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

5.      the Disclosure Statement Order and the Confirmation Order shall have been entered, consistent in all material respects with the Plan Support Agreement, and such orders (a) shall not have been vacated or stayed, (b) shall not have been modified or amended in a manner inconsistent with the Plan Support Agreement, and (c) shall have become Final Orders;

6.      the Bankruptcy Court shall have entered the DIP Orders and the DIP Orders shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the DIP Agent and, to the extent set forth in the DIP Orders, the Credit Agreement Agent, and there shall be no default or event of default existing under the DIP Credit Agreement or the DIP Orders;

7.      the Amended Management Employment Agreements shall be assumed;

8.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

9.      the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

10.     the Exit Facilities, in form and substance materially consistent with the Plan Support Agreement and Exit Facility Term Sheet, shall have been consummated (with all conditions precedent thereto having been satisfied or waived);

11.     the New Preferred Stock and the New Common Stock, in form and substance materially consistent with the Plan Support Agreement, New Preferred Equity Documentation, and New Preferred Equity Term Sheet, shall have been issued;

12.     all accrued and unpaid reasonable and documented fees and expenses of the Consenting Stakeholders (including any advisors thereto) in connection with the Restructuring Transactions shall have been paid in accordance with the terms and conditions set forth in the Plan Support Agreement, the DIP Orders, the DIP Credit Agreement, and the Credit Agreement, as applicable;

13.     the final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Plan Support Agreement in all material respects and otherwise approved by the parties to the Plan Support Agreement consistent with their respective consent and approval rights as set forth therein;

14.     the Debtors shall have conducted a good faith analysis of, and produced a written report in form and substance reasonably acceptable to the Required Consenting Revolver Lenders and the DIP Agent regarding, the Executory Contracts or Unexpired Leases, including the Cure costs associated therewith, and such written report shall have been delivered to the Required Consenting Revolver Lenders and the DIP Agent;

15.     any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained; and

16.     the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects with the Plan Support Agreement, the Plan, and the Plan Supplement.

B.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX may be waived by the Debtors, with the written consent of the Required Consenting Revolver Lenders and the DIP Agent, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided* that, notwithstanding the foregoing or anything else contained in this Plan to the contrary and so long as the Plan Support Agreement has not been terminated as to the Ad Hoc Term Loan Lender Group, the Debtors shall not waive the conditions to Confirmation and Consummation set forth in Article IX.1, 2, 4, 5, 11, 12, 13, or 16 without the written consent of the Required Ad Hoc Term Loan Lender Group.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, that any modification or amendment that affects in any way (i) the Credit Agreement Secured Parties, the Credit Agreement Documentation, or the treatment of the Revolving Credit Facility Claims, the Secured Swap Claims, or the Term Loan Claims shall require the consent of the Credit Agreement Agent, (ii) the DIP Secured Parties, the DIP Loan Documents, or the treatment of the DIP Facility Claims shall require the consent of the DIP Agent, (iii) [the Senior Noteholders or the Senior Notes Documentation shall require the consent of the Senior Notes Trustee, or (iv)] the Exit RBL/Term Loan A Facility Secured Parties, the Exit Term Loan B Facility Secured Parties, or the Exit Facility Documentation shall require the consent of the applicable Exit Facility Agent; *provided, further,* that so long as the Plan Support Agreement has not been terminated as to the Ad Hoc Term Loan Lender Group any modification or amendment that directly affects the Ad Hoc Term Loan Lender Group, including any modification or amendment to Article III.B.4 (including the treatment described therein or any defined terms used therein or applicable thereto) or Article IX of the Plan (solely with respect to those conditions precedent that require the written consent of the Required Ad Hoc Term Loan Lender Group to waive), shall require the consent of the Required Ad Hoc Term Loan Lender Group.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

Subject to the terms of the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof;

22.     enforce all orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facilities and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until

the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      <u>if to the Debtors, to:</u>

> Vanguard Natural Resources, Inc.
> 5847 San Felipe, Suite 3000
> Houston, Texas 77057
> Attention:      Scott R. Sloan (President and CEO)
>                 Jonathan Curth (General Counsel)
> Email address:  ssloan@vnrenergy.com
>                 jcurth@vnrenergy.com

> with copies to:

> Kirkland & Ellis LLP
> 609 Main Street
> Houston, Texas 77008
> Facsimile: (713) 836-3601
> Attention:      Brian E. Schartz, P.C.
> Email:          brian.schartz@kirkland.com

> and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention:    Christopher Marcus, P.C.
           Aparna Yenamandra
Email:       christopher.marcus@kirkland.com
           aparna.yenamandra@kirkland.com

and

Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Facsimile:    (713) 228-6605
Attention:    James T. Grogan
           Philp M. Guffy
E-Mail:      jgrogan@blankrome.com
           pguffy@blankrome.com

2.   <u>if to a Consenting Lender, to:</u>

Citibank, N.A.
811 Main Street, Suite 4000
Houston, TX  77002
Attention:    Mr. Phil Ballard
E-mail:      phil.ballard@citi.com

with copies to:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attention:    Mitchell Seider
           Annemarie Reilly
E-mail:      mitchell.seider@lw.com
           annemarie.reilly@lw.com

and

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Attention:    Adam Malatesta
E-mail:      adam.malatesta@lw.com

and

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, Texas 77002
Attention:    Timothy A. "Tad" Davidson II
E-mail:      TadDavidson@huntonak.com

and, with respect to those certain Term Loan Lenders represented by Brown Rudnick, LLP, with copies to:

Brown Rudnick LLP
One Financial Center
Boston, Massachusetts 02111
Attention:      Robert Stark
                  Steven Pohl
E-mail:         rstark@brownrudnick.com
                  spohl@brownrudnick.com

3.    if to a Consenting Senior Noteholder, to:

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Attention:      John F. Higgins
                  Eric M. English
                  M. Shane Johnson
Email:          jhiggins@porterhedges.com
                  eenglish@porterhedges.com
                  sjohnson@porterhedges.com

and

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attention:      Brian M. Resnick
                  Benjamin M. Schak
E-mail:         brian.resnick@davispolk.com
                  benjamin.schak@davispolk.com

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities; *provided* that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.     *Entire Agreement.*

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/VNR or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

Dated:  April 30, 2019

VANGUARD NATURAL RESOURCES, INC.
on behalf of itself and all other Debtors

*/s/ R. Scott Sloan*

R. Scott Sloan
President and Chief Executive Officer
Vanguard Natural Resources, Inc.

**<u>Exhibit B</u>**

**Plan Support Agreement**

**<u>Exhibit C</u>**

**Corporate Organization Chart**





**<u>Exhibit D</u>**

**Disclosure Statement Order**

**<u>Exhibit E</u>**

**Liquidation Analysis**

**<u>Exhibit F</u>**

**Financial Projections**

**<u>Exhibit G</u>**

**Valuation Analysis**